## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
#### EASTERN DIVISION

**F I L E D**

MAY 18 2005 *rg*

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

|  |  |  |
|---|---|---|
| WACHOVIA SECURITIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 04 C 3082** |
| | ) | |
| DAVID NEUHAUSER; ANDREW A. | ) | |
| JAHELKA; RICHARD O. NICHOLS; | ) | |
| LEON A. GREENBLATT III; BANCO | ) | Judge William T. Hart |
| PANAMERICANO, INC., a South Dakota | ) | |
| Corporation; LOOP CORP., a South | ) | |
| Dakota corporation; LOOP PROPERTIES, | ) | Magistrate Judge Michael T. Mason |
| INC., an Illinois corporation; and | ) | |
| SCATTERED CORP., a South Dakota | ) | |
| corporation; | ) | |
| | ) | |
| Defendants. | ) | |

### NOTICE OF FILING

To:   James W. Naisbitt, Esq.
      James W. Naisbitt, Ltd.
      205 West Wacker Drive, Suite 1600
      Chicago, Illinois 60606

PLEASE TAKE NOTICE that on May 18, 2005, the undersigned counsel caused to be filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, Wachovia Securities, LLC's **First Amended Complaint**, a true and correct copy of which is attached hereto and herewith served upon you.

Respectfully submitted,

By: _____
       One of the Attorneys for Plaintiff,
       Wachovia Securities, LLC

Gary I. Blackman (ARDC# 6187914)
Christopher S. Griesmeyer (ARDC# 6269851)
LEVENFELD PEARLSTEIN, LLC
2 North LaSalle Street
Suite 1300
Chicago, Illinois 60602
(312) 346-8380
(312) 346-8434 (Facsimile)

## CERTIFICATE OF SERVICE

I, Christopher S. Griesmeyer, an attorney, state that I have served a copy of the foregoing

**Notice of Filing** and **First Amended Complaint** to all counsel of record listed below via First

Class U.S. Mail with proper postage prepaid from 2 North LaSalle Street, Chicago, Illinois

60602, before 5:00 p.m. on this 18th day of May, 2005:

To: James W. Naisbitt, Esq.
   James W. Naisbitt, Ltd.
   205 W. Wacker Drive, Suite 1600
   Chicago, IL  60606

Christopher S. Griesmeyer

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FILED

MAY 18 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| **WACHOVIA SECURITIES, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.  04  C  3082** |
| | ) | |
| **DAVID NEUHAUSER;  ANDREW A.** | ) | |
| **JAHELKA;  RICHARD O. NICHOLS;** | ) | |
| **LEON A. GREENBLATT III;  BANCO** | ) | Judge William T. Hart |
| **PANAMERICANO, INC.,** a South Dakota | ) | |
| Corporation; **LOOP CORP.,** a South | ) | |
| Dakota corporation; **LOOP PROPERTIES,** | ) | Magistrate Judge Michael T. Mason |
| **INC.,** an Illinois corporation; and | ) | |
| **SCATTERED CORP.,** a South Dakota | ) | |
| corporation; | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

The Plaintiff, Wachovia Securities, LLC ("Wachovia"), by its attorneys, Gary I.

Blackman and Christopher S. Griesmeyer of Levenfeld Pearlstein, LLC, and for its First

Amended Complaint against Defendants David Neuhauser ("Neuhauser") Andrew Jahelka

("Jahelka"), Richard O. Nichols ("Nichols"), Leon A. Greenblatt III ("Greenblatt") (Neuhauser,

Jahelka, Nichols and Greenblatt collectively referred to as the "Individual Defendants"), Banco

Panamericano, Inc., Loop Corp., Loop Properties, Inc., and Scattered Corp., states as follows:

### I. PRELIMINARY STATEMENT

1.      The Individual Defendants in this action have conspired to defraud Wachovia out

of more than $3.7 million.  Their fraud involved using two alter ego shell corporations – Loop

Corp. and NOLA, LLC – to open margin accounts with Wachovia (then Prudential Securities

Incorporated).[1]   The Individual Defendants then used those margin accounts as part of a fraudulent scheme to illegally and surreptitiously acquire a controlling interest in the publicly traded securities of Health Risk Management, Inc. ("HRMI").

2.     The Loop and NOLA accounts were just one small component of the Individual Defendants' global scheme to secretly takeover HRMI while violating SEC regulations and breaching their Standstill Agreement with HRMI.   Specifically, the Individual Defendants acquired more than 3,500,000 shares of HRMI stock during an 18-month period, and thwarted SEC regulatory and reporting requirements by acquiring the stock through 19 different trading accounts with 11 different brokerage firms, in the names of eight different shell corporations.

3.     As the price of HRMI stock rose – in no small measure due to the Individual Defendants' prolific acquisitions – they typically used the increased value of their holdings to fund the margin debt on additional purchases.   Thus, rather than using cash outlays to acquire more shares, the Individual Defendants traded off the artificially-inflated value of HRMI stock to fund their efforts to surreptitiously obtain control of the company.   Using this strategy in their Loop and NOLA accounts, the Individual Defendants were able to shift the majority of their investment risk to Wachovia.

4.     The Individual Defendants' illicit takeover scheme crumbled when the NASDAQ halted trading of HRMI stock and they were unable to satisfy the margin maintenance requirements on their accounts.

---

[1] The Individual Defendants, through their alter egos Loop Corp. and NOLA, LLC, established margin accounts with Prudential Securities Incorporated.  As explained below in Paragraph 8 (and footnote 2), certain assets of Prudential Securities Incorporated were assigned to Wachovia Securities, LLC as part of the July 2003 Prudential-Wachovia merger.  As this Court recognized and Ordered on June 2, 2004, the proper Plaintiff in this case is Wachovia Securities, LLC.  Accordingly, for ease of reference, the term "Wachovia" as used in this First Amended Complaint shall refer to *both* Prudential Securities Incorporated and Wachovia Securities, LLC.

2

5. *Importantly, this is not the only action involving the Individual Defendants' use of assetless shell corporations and unwitting broker-dealers to fraudulently acquire a controlling interest in HRMI.* Each of the following actions involve Defendants' use of alter egos – such as Loop, Corp., NOLA, LLC, Banco Panamericano, Inc., and Repurchase Corp. – to acquire large blocks of HRMI shares through unwitting broker-dealers:

- *James P. Stepehnson, Trustee for MJK Clearing, Inc., v. Leon A. Greenblatt, Banco Panamericano, Inc., Loop Corp., NOLA, LLC and Repurchase Corp.,* (BKY. No. 03-4053, U.S. Bankruptcy Ct., Dist. of MN);

- *John E. Feltl v. Leon A. Greenblatt, Banco Panamericano, Inc., Loop Corp., NOLA, LLC and Repurchase Corp.,* (Case No. 03-13751, MN State Court, Hennepin County);

- *Credit Suisse First Boston, LLC, v. Repurchase Corp., Leon A. Greenblatt, III, Andrew A. Jahelka and Richard O. Nichols,* (NYSE Arbitration No. 2003-014931);

- *Wachoiva Securities, LLC v. Loop Corp., and NOLA, LLC,* (NYSE Arbitration No. 2003-011927); and

- *Credit Suisse First Boston, LLC, v. Leon A. Greenblatt, III, Richard O. Nichols and Andrew A. Jahelka,* (Case No. 04 C 2142, N.D. Ill. (J. Grady).

6. During the course of discovery in this litigation, Wachovia has learned that the Individual Defendants have fraudulently transferred funds out of Loop Corp. and NOLA, LLC in an effort to ensure that those sham entities were truly empty corporate shells, and did so with an actual intent to hinder or delay Wachovia's ability to collect their margin debts.

7. By this action, Wachovia seeks monetary damages for common law fraud, securities fraud, conspiracy to commit fraud, and breach of contract arising out of the Individual Defendants' failure to meet their obligations under their margin agreements, as well as their attempts to circumvent the rules promulgated by the NYSE, the SEC, and the Federal Reserve governing the trading of securities on margin and the disclosure of controlling interests in the publicly traded securities of a corporation. Wachovia also seeks a declaratory judgment that the

3

Individual Defendants are jointly and severally liable for the obligations of their alter egos, Loop

Corp. and NOLA, LLC, under the margin account agreements at issue in this case. Finally,

Wachovia seeks all remedies available to it under the Illinois Uniform Fraudulent Transfer Act –

including, but not limited to, temporary, preliminary and permanent injunctive relief – for

Defendants' fraudulent transfers of Loop Corp. and NOLA, LLC assets.

## II. **PARTIES**

8.      Plaintiff Wachovia Securities, LLC ("Wachovia") is a Delaware limited liability

company with its principal place of business in Richmond, Virginia. Wachovia Securities, LLC

is wholly owned by Wachovia Securities Financial Holdings, LLC, also a Delaware limited

liability company with its principal place of business in Richmond, Virginia. In turn, Wachovia

Securities Financial Holdings, LLC is 62% owned by Wachovia Securities Holdings, LLC (a

Delaware limited liability company with its principal place of business in Richmond, Virginia)

and 38% owned by Prudential Securities Group, Inc. (a Delaware corporation with its principal

place of business in New York, New York). Finally, Wachovia Securities Holdings, LLC is

wholly owned by Wachovia Corporation, a North Carolina Corporation with its principal place

of business in Charlotte, North Carolina. A chart identifying the corporate relationships between

these entities is attached as Exhibit A.[2]

9.      Defendant David Neuhauser ("Neuhauser") is an individual resident and citizen

of Illinois.

---

[2] The Individual Defendants, through their alter egos Loop Corp. and NOLA, LLC, established margin accounts with Prudential Securities Incorporated, a Delaware corporation with its principal place of business in New York. Following the July 2003 merger between Prudential and Wachovia, Prudential Securities Incorporated's customer debits – including the Loop and NOLA accounts – became the assets of Wachovia Securities, LLC. Although the margin accounts at issue in this case initiated at Prudential Securities Incorporated, for ease of reference the term "Wachovia" in this First Amended Complaint shall refer to both the Plaintiff (Wachovia Securities, LLC) and its predecessor in interest (Prudential Securities Incorporated).

10. Defendant Andrew A. Jahelka ("Jahelka") is an individual resident and citizen of Illinois.

11. Defendant Richard O. Nichols ("Nichols") is an individual citizen of the United Kingdom and a permanent resident alien of the United States, who is domiciled in Illinois.

12. Defendant Leon A. Greenblatt III ("Greenblatt") is an individual resident and citizen of Illinois.

13. Defendant Banco Panamericano, Inc., ("Banco") is a South Dakota corporation with its principal place of business at **330 South Wells Street** in Chicago, Illinois.

14. Defendant Loop Corp. ("Loop") is a South Dakota corporation with its principal place of business at **330 South Wells Street** in Chicago, Illinois. Loop has been named a Defendant in this lawsuit solely for the purpose of enjoining its fraudulent transfer of assets. Wachovia is not asserting any claims against Loop that arise out of or relate to its margin account with Wachovia; rather, those claims were arbitrated by a NYSE Panel on April 28, 2005. *On May 10, 2005, Wachovia obtained an award against Loop Corp. in the amount of $2,349,000.00, plus $90,000.00 in attorneys' fees in the NYSE Arbitration matter.* Loop's Co-Respondent in that case, NOLA, LLC, filed for bankruptcy protection the day before the Arbitration was scheduled to begin.

15. Defendant Loop Properties, Inc. ("Loop Properties") is a South Dakota corporation with its principal place of business at **330 South Wells Street** in Chicago, Illinois.

16. Defendant Scattered Corp., ("Scattered") is a South Dakota corporation with its principal place of business at **330 South Wells Street** in Chicago, Illinois.

17. Based upon information and belief, at all relevant times the Individual Defendants were shareholders, officers, and controlling members of Defendants Loop, Banco, Loop

Properties and Scattered, as well as non-parties NOLA, LLC ("NOLA"), Chiplease, Inc. ("Chiplease") Repurchase Corp. ("Repurchase") and South Beach Securities, Inc. ("South Beach").[3] As such, each of the Individual Defendants was (and is) an "insider" and "affiliate" of Loop, Banco, Loop Properties, Scattered, NOLA, Chiplease, Repurchase and South Beach, as those terms are defined under 740 ILCS 160/2.

18. Similarly, Loop, Banco, Loop Properties, Scattered, NOLA, Chiplease, Repurchase and South Beach were at all relevant times "affiliates" of each other pursuant to 740 ILCS 160/2.

19. At all relevant times, Neuhauser, Jahelka, Nichols and Greenblatt were shareholders, officers, directors and controlling members of Loop and NOLA, and used these corporate shells to open margin accounts with Wachovia. The Individual Defendants then used these accounts as a vehicle to secretly and fraudulently acquire a controlling interest in HRMI. While they may have sought to limit their liability and conceal their activities from Wachovia through the use of the Loop and NOLA corporate shields, the Individual Defendants were the real parties behind this scheme to defraud and their corporate sham entities were merely assetless shells.

### III. JURISDICTION AND VENUE

20. This case was removed from the Circuit Court of Cook County, Illinois pursuant to 28 U.S.C. § 1441 on April 29, 2004. This Court has jurisdiction of the subject matter of the

---

[3] Repurchase, South Beach and NOLA were each recipients of fraudulent transfers from Loop and the Individual Defendants. However, because Repurchase, South Beach and NOLA have each filed for Chapter 11 bankruptcy protection, Wachovia is precluded by the Automatic Stay provision of 11 U.S.C. § 362 from naming them as Defendants in this litigation. It is also worth noting that NOLA (and its affiliate, South Beach) filed for bankruptcy protection on April 27, 2005 – *the day before Wachovia was scheduled to arbitrate its claims against NOLA* in the *Wachovia v. Loop Corp., et al.* NYSE Arbitration matter. Repurchase pulled a similar stunt by filing for bankruptcy protection the day before Credit Suisse was scheduled to arbitrate its claims in the *Credit Suisse v. Repurchase* NYSE Arbitration.

claims herein under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

21.     This Court also has "federal question" jurisdiction over Wachovia's federal securities fraud claims, pursuant to 28 U.S.C. § 1331.

22.     Venue is proper in this District under 28 U.S.C. § 1391(a)(2) and under 735 ILCS 5/19-104 because a substantial part of the events or omissions giving rise to the claims asserted herein arose in this District (specifically, in Deerfield, Illinois and Chicago, Illinois).

## IV. FACTUAL BACKGROUND

23.     As explained more fully below, the Individual Defendants are inter-related officers, directors, managers, shareholders and members of Loop Corp. and NOLA, LLC. Each of the Individual Defendants used Loop and NOLA to defraud Wachovia into allowing them to purchase shares of HRMI on margin. The Individual Defendants used their Loop and NOLA accounts as part of a global scheme to avoid the SEC's regulatory and reporting requirements. Had Wachovia been aware of Defendants' scheme, it never would have allowed them to open the Loop and NOLA margin accounts. Because the Individual Defendants concealed their takeover scheme and promised to conduct their trading "in accordance with all applicable laws or regulations," however, Wachovia did allow them to trade on margin – and ultimately lost more than $2.9 million ($3.7 million with interest) as a result. Defendants then embarked upon a fraudulent transfer campaign, looting Loop and NOLA in order to ensure that these sham corporate shells had not assets, thereby hindering and delaying Wachovia's collection efforts.

24.     Based upon documents produced by the Individual Defendants in this litigation on March 31, 2005, it is believed that the Individual Defendants first conceived of their scheme to

7

surreptitiously takeover HRMI in the fall of 1998. Specifically, on August 28, 1998, Greenblatt wrote to Dr. Gary T. McIlroy, the CEO of HRMI, and offered to acquire the company. Dr. McIlroy rejected this offer. Greenblatt responded by embarking upon a campaign to secretly takeover the company by acquiring a majority interest in its publicly-traded securities. In order to insulate himself and his associates from liability, and to hide his investment activities, Greenblatt and the other Individual Defendants opened 19 different trading accounts at 11 different brokerage firms in the names of eight different shell corporations. Thus, the Loop and NOLA accounts were just one component in the Defendants' much larger fraudulent scheme.

### A. THE LOOP ACCOUNT

25. On or about October 1, 2000, Neuhauser approached his broker at Wachovia, Kris Stelzner, to open an account on behalf of Loop Corp. He explained at that time that he worked for Greenblatt, who controlled Loop. Accordingly, on or about October 16, 2000, Neuhauser executed new account forms and margin agreements (true and correct copies of which are attached as Exhibit B) with Wachoiva.

26. In opening the Loop margin account, Neuhauser expressly represented that he, as well as Loop and its principals, would conduct trading in the account "in accordance with all applicable laws or requirements as well as the rules and practices of any market or clearing house through which my trades may be executed or processed." (See, Ex. B, p.1, ¶ 4). Neuhauser also orally represented to Kris Stelzner on or about October 1, 2000 that he and Greenblatt had a net worth of over $50 million, and would meet any margin calls that came due on the Loop account.

27. On or about October 31, 2000, Greenblatt, Jahelka and Nichols each signed a statement verifying that they were the owners of Loop. A true and correct copy of this statement is attached as Exhibit C.

28.    Furthermore, on or about November 16, 2000, a Limited Power of Attorney for Loop was executed in favor of Neuhauser.  A true and correct copy of the Limited Power of Attorney is attached as Exhibit D.

29.    Finally, in addition to listing Neuhauser as Loop's agent, Greenblatt and Jahelka also expressly signed as "joint account holders" for Loop – not in their capacity as corporate officers. (*See,* Ex. D).

### B. Trading Activity in Loop Account – HRMI

30.    The Individual Defendants used their Loop account in an effort to surreptitiously acquire a controlling interest in the shares of Health Risk Management, Inc. ("HRMI"), thereby avoiding the regulatory morass endemic to a legitimate merger or acquisition, and defrauding Wachovia, HRMI, the SEC and the public in the process.

31.    From the start, the Individual Defendants' trading in the Loop account consisted primarily of purchases of HRMI common stock.  HRMI was a NASDAQ listed stock which traded between a low of $6 per share and a high of $7.875 per share from the time that the Loop account was opened in October 2000 through the end of March 2001.  Throughout this period of time, the Individual Defendants met their margin calls and although they "bounced" two checks, they made good on both in the amount of $260,000.  As of March 31, 2001, the Loop account had accumulated in excess of 225,000 shares of HRMI.

32.    In April 2001, things changed dramatically.  The price of HRMI rose, closing as high as $10.65 per share.  It became clear at that time that the Individual Defendants were not using their Loop account to seek a quick profit or even as a long-term passive investment. Rather than lighten their holdings and take some profit on their HRMI position at the now higher prices, the Individual Defendants *accelerated* their purchases of HRMI.  In fact, by the end of

April, the Individual Defendants had increased the HRMI holdings in their Loop account more than 40% by purchasing an additional 96,000 shares – which brought their total HRMI position to more than 321,000 shares.

33.     The Individual Defendants did not fund their purchases of HRMI with additional cash outlays.   Instead, they primarily used the increased value of their existing holdings to provide the margin to purchase the additional shares.   The Individual Defendants purchased large blocks of HRMI stock with their Loop account, thereby causing the price of HRMI stock to rise. In turn, the increased value of their HRMI holdings enabled the Individual Defendants to acquire even *more* HRMI stock on margin.   In fact, the Individual Defendants added little more than $160,000 in cash to the Loop account to fund more than $650,000 worth of HRMI stock, which they purchased during that period.

## C. THE NOLA ACCOUNT

34.     In February 2001, Neuhauser opened another account at Wachovia in the name of NOLA, LLC.    Although NOLA is purportedly a limited liability company, Neuhauser established the trading account in NOLA's name as a *partnership* account, representing NOLA to be "a duly organized partnership," and identifying himself as the general partner.   A true and correct copy of the NOLA Partnership Account Agreement is attached as Exhibit E.

35.     By opening a partnership account with Prudential, Neuhauser accepted full responsibility for the obligations of NOLA pursuant to the account and margin agreements.   True and correct copies of NOLA's new account form and margin agreement are attached as Exhibits F and G, respectively.

10

36.     As with the Loop account, Neuhauser expressly represented at the time he opened the NOLA account that he, as well as NOLA and its principals, would conduct trading in accordance with all applicable laws and regulations.

37.     Contemporaneous with his opening of the NOLA account, Neuhauser again represented to his broker (Kris Stelzner) that he worked for Greenblatt, and that he and Greenblatt had a "substantial net worth" and would be able to meet any margin calls that came due on the NOLA account. The relationship between Greenblatt and Neuhauser was confirmed when Neuhauser purported to sever himself from the accounts around mid-March 2001, after which Mr. Stelzner began dealing directly with Greenblatt on *both* the Loop and NOLA accounts, and Greenblatt acknowledged that they were related accounts under his control.

### D. TRADING ACTIVITY IN NOLA ACCOUNT – HRMI

38.     From the outset, it was clear that NOLA's fundamental purpose was to provide yet another vehicle for the Individual Defendants to accumulate HRMI common stock. The Individual Defendants' initial HRMI investment in their NOLA account was a fairly modest 10,000 shares. This investment closed the month of March 2001 at a market value of $69,380 with an unexceptionable margin debt of approximately $36,000.

39.     However, during April 2001, the Individual Defendants purchased another 143,500 shares of HRMI through their NOLA account, for a total purchase price in excess of $1,150,000 – but entailing net cash deposits of less than $200,000. In doing so, the Individual Defendants used the same strategy that they employed with their Loop account -- they used the increased value of their already purchased HRMI shares to fund the margin debt on the new purchases.

### E. DEFENDANTS USE LOOP AND NOLA TO SHIFT RISK

40.     As noted above, the Individual Defendants in this case used the increased value of their HRMI shares to fund the margin debt on additional purchases. This is a highly profitable strategy. If the stock continues to rise, the investors can sell some HRMI shares for a profit while retaining the remainder without any actual cash outlay. On the other hand, if the stock drops, the investors only have a small percentage of the investment at risk. The overwhelming portion of the investment risk remains with Wachovia, the investors' margin creditor. Thus, the more HRMI stock Defendants purchased, the higher the price of that stock rose, thereby allowing them to purchase more and more shares of HRMI on margin  The Individual Defendants' investment strategy ultimately failed when NASDAQ halted trading in HRMI.

### F. DEFENDANTS USE LOOP AND NOLA IN A SCHEME TO DEFRAUD

41.     The Individual Defendants also used NOLA to shield their acquisitions of HRMI shares from the public, the SEC and HRMI itself. On April 5, 2001, Greenblatt disclosed on a Schedule 13D filing that he and his wife controlled almost 30% of the outstanding shares of HRMI, either through their direct ownership or through their control of certain entities (specifically, Chiplease, Banco and Loop). The Greenblatts updated their Schedule 13D filings on April 12 and 23, 2001, and disclosed that they had increased their holdings to almost 39% of the outstanding shares of HRMI.

42.     *Notably, NOLA is nowhere mentioned in these disclosures.* However, upon review of the Schedule 13D filings, the reason for that becomes readily apparent. On May 19, 2000, Greenblatt and his controlled entities had entered into a Standstill Agreement with HRMI

where they represented, among other things, that *they had no plans or intention of acquiring additional HRMI shares in excess of 40% of the outstanding shares of the company.*[4]

43.     The shares acquired by the Individual Defendants through their NOLA account thus breached the Standstill Agreement and violated the SEC rules pertaining to Schedule 13D disclosures. (*See* Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m, and Rules 13d-1, 13d-2, 13d-3 and 13d-5 promulgated thereunder).

44.     Thus, NOLA was established as a sham enterprise for the sole purpose of providing the Individual Defendants with a vehicle for avoiding detection while they defrauded HRMI and the public by breaching the Standstill Agreement with HRMI and violating the SEC regulatory scheme.

45.     In addition to hiding their NOLA holdings from the SEC, the Greenblatts also failed to disclose on their Schedule 13D filings the holdings of Repurchase Corp., South Beach Securities, Inc. and Teletech Systems, Inc. Far from the 1.8 million shares disclosed on the Schedule 13D report, Greenblatt and the Individual Defendants had actually acquired *more than 3.5 million shares of HRMI stock* during the 18-month time period from January 2000 and May 2001. Based upon documents produced by the Individual Defendants on March 31, 2005, they acquired this stock – and hoped to avoid SEC regulations and reporting requirements – by using *nineteen* different trading accounts at *eleven* different brokerage firms, under the names of *eight* different shell entities:

| SHELL ENTITY | BROKERAGE FIRM | STOCK | SHARES ACQUIRED | ACQUISITION DATES |
|---|---|---|---|---|
| Banco Panamericano, Inc. | Bear Stearns | HRMI | 243,225 | Jan. – Jun. 2000 |
| Banco Panamericano, Inc. | First Union Securities | HRMI | 124,000 | April 2001 |
| Banco Panamericano, Inc. | Miller, Johnson, Steichen & Kinnard ("MJSK") | HRMI | 413,100 | Sept. 2000 – May 2001 |

---

[4] A copy of this Standstill Agreement was produced by Defendants in this litigation on March 31, 2005.

| SHELL ENTITY | BROKERAGE FIRM | STOCK | SHARES ACQUIRED | ACQUISITION DATES |
|---|---|---|---|---|
| Banco Panamericano, Inc. | Northern Trust Securities | HRMI | 220,150 | Jan. 2000 – May 2001 |
| Banco Panamericano, Inc. | PaineWebber | HRMI | 56,000 | Feb. 2000 |
| Banco Panamericano, Inc. | South Beach Securities | HRMI | 10,300 | May 2000 |
| Banco Panamericano, Inc. | Stifel, Nicolaus & Co. | HRMI | 15,680 | Before May 2001 |
| Chiplease, Inc. | First Union Securities | HRMI | 25,700 | Feb. – April 2001 |
| Chiplease, Inc. | Quick & Reilly | HRMI | 36,500 | Before Aug. 2000 |
| Loop Corp. | MJSK | HRMI | 297,500 | Dec. 2000 – May 2001 |
| Loop Corp. | Prudential (Wachovia) | HRMI | 422,900 | Oct. 2000 – May 2001 |
| NOLA, LLC | MJSK | HRMI | 263,800 | April – May 2001 |
| NOLA, LLC | Prudential (Wachovia) | HRMI | 197,600 | March–May 2001 |
| Repurchase Corp. | Credit Suisse | HRMI | 447,000 | May 2001 |
| Repurchase Corp. | First Union Securities | HRMI | 174,200 | April 2001 |
| Repurchase Corp. | MJSK | HRMI | 320,200 | April – May 2001 |
| Scattered Corp. | H&R Block | HRMI | 27,200 | Before April 2001 |
| South Beach Securities, Inc.[5] | First Union Securities | HRMI | 169,400 | Before May 2001 |
| Teletech Systems, Inc.[6] | Northern Trust Securities | HRMI | 68,050 | Before Feb. 2000 |

46.     By concealing the true purpose behind their Loop and NOLA accounts, while simultaneously promising that their trading activity would comply with all applicable laws and regulations, the Individual Defendants duped Wachovia into acting as the unwitting bankroll for their scheme.     In doing so, the Individual Defendants perpetrated multiple violations of Regulations X and T of the Federal Reserve Board.  All of the Individual Defendants' activities with Wachovia were done with an eye toward defrauding the SEC, HRMI, Wachovia and the public at large.

47.     Had Wachovia known about the Individual Defendants' illegal plans to use their Loop and NOLA accounts to surreptitiously acquire a controlling interest in HRMI, Wachovia never would have allowed them to trade on margin.

---

[5] South Beach Securities, Inc. was a subsidiary of NOLA, LLC, and was controlled by the Individual Defendants.

[6] Teletech Systems, Inc. was a non-member manager of NOLA, LLC, and was controlled by the Individual Defendants.

### G. LOOP AND NOLA ARE DEFENDANTS' ALTER EGOS

48.     It is clear that Loop Corp. was simply a sham vehicle used by the Individual Defendants to embark upon a take-over of HRMI without incurring any financial risk themselves. It was (and is) nothing more than their alter ego.

49.     Similarly, NOLA, LLC was another alter ego of the Individual Defendants. This is evidenced by the *de facto* control exercised over the NOLA account by Greenblatt, as well as the linking of the NOLA and Loop accounts through Neuhauser's letter to PSI authorizing the transfer of funds between them. A true and correct copy of Neuhauser's authorization letter regarding the deposit of Loop checks in to the NOLA account is attached as Exhibit H.

### H. NASDAQ HALTS TRADING IN HRMI

50.     The Individual Defendants' scheme imploded on May 22, 2001, when the NASDAQ halted trading of the common stock of HRMI on the news that the company's independent auditors had resigned. At this time, the stock declined from a prior day's close of $7.5 per share to $4.75 per share.

51.     With the drop in HRMI stock, their Loop and NOLA accounts went from profitable to heavy losses and no longer had the funds – in either cash or marginable securities – to satisfy either the maintenance margin requirements imposed by Wachovia on prior holdings, or the Regulation T margin call issued on more recent purchases.

52.     Accordingly, Wachovia issued demands upon Loop and NOLA to deposit sufficient funds to meet margin. These demands went unheeded.

53.     Wachovia next issued demands to the Individual Defendants as principals of these entities, i.e. the "sole owners" of Loop and the "general partners" of NOLA. These demands also went unheeded.

15

54.     Consequently, Wachovia began to explore potential legal remedies. In the course of its investigations, it learned of the undisclosed relationships among the various Defendants and the purpose behind the formation of NOLA, LLC. Unfortunately, this knowledge came too late. As of June 19, 2001, Wachovia had extended margin credit to the Individual Defendants of almost $3 million, consisting of $1,098,459.90 to NOLA and $1,885,751.44 to Loop. At that time and today, that indebtedness was almost completely unsecured by the accounts' assets. With interest, these unpaid margin debts total more than $3.7 million as of April 28, 2005.

## I. DEFENDANTS EQUITABLY TOLL STATUTE OF LIMITATIONS

55.     On June 4, 2001, C. Philip Curley, Esq. (counsel for Loop, NOLA and the Individual Defendants) wrote to Wachovia and stated that he "represent[ed] Loop Corp. and NOLA, LLC in connection with their existing margin balances with your firm." Mr. Curley initiated settlement discussions with Wachovia, and proposed to satisfy the Loop and NOLA margin debts with proceeds from the sale of two office buildings located at 330 South Wells Street (the address of Loop, NOLA, Banco, Chiplease, Loop Properties, Scattered, and a host of other entities controlled by Greenblatt) and 407 South Dearborn Street. A true and correct copy of Mr. Curley's June 4, 2001 correspondence is attached as Exhibit I. Based upon these settlement overtures, Wachovia refrained from exercising its rights under the margin agreements and delayed filing its Statement of Claim against Loop and NOLA.

56.     On August 16, 2001, Mr. Curley wrote to Wachovia (through its counsel) and confirmed that his clients were unable to meet the Regulation T margin calls. Mr. Curley also stated that the proposed sale of 330 South Wells Street and 407 South Dearborn had fallen through. A true and correct copy of Mr. Curley's August 16, 2001 correspondence is attached as Exhibit J.

57.     Accordingly, on May 8, 2003, Wachovia filed its Statement of Claim against Loop and NOLA in the NYSE Arbitration, *Wachoiva Securities, LLC v. Loop Corp., et al.,* (NYSE Docket No. 2003-011927).

### J. DEFENDANTS ENGAGE IN FRAUDULENT TRANSFERS OF LOOP'S ASSETS

58.     Based upon documents first obtained during discovery in this litigation, Wachovia has learned that the Individual Defendants have effectively looted Loop and NOLA through a series of fraudulent transfers aimed at hindering or delaying Wachovia's efforts to collect its margin debts.

59.     For example, after the $1.8 million margin debt became due on the Loop account, the Individual Defendants looted the Loop corporate shell by making the following payments to Credit Suisse First Boston, for the benefit of Repurchase Corp. (an "affiliate" of Loop, with common ownership and control) *out of Loop Corp. funds:*

| DATE OF PAYMENT | AMOUNT OF PAYMENT | METHOD OF PAYMENT |
|---|---|---|
| September 27, 2001 | $10,000.00 | Check |
| November 28, 2001 | $10,000.00 | Wire Transfer |
| December 28, 2001 | $10,000.00 | Wire Transfer |
| February 26, 2002 | $10,000.00 | Wire Transfer |
| August 23, 2002 | $3,000.00 | Wire Transfer |

60.     These transfers are significant because Repurchase was another one of the sham corporations that the Individual Defendants used to surreptitiously acquire a controlling interest in HRMI. Moreover, these transfers in no way benefited Loop, and Loop did not receive any value whatsoever – let alone "reasonably equivalent" value – from Repurchase for these payments. Tellingly, Repurchase has since filed for bankruptcy protection, thereby preventing Wachovia from asserting any claims against it and mooting any suggestion that Loop's transfers to Repurchase would ever be repaid. Instead, the Individual Defendants shifted these assets from Loop to Repurchase with the actual intent to hinder and delay Wachovia's collection efforts.

17

61.     The Individual Defendants have engaged in a pattern and practice of applying one affiliate's assets to satisfy the obligations of another affiliate. For example, according to documents obtained during the course of this litigation, Loop obtained a $3.25 million loan from Marine Bank on January 26, 2001.[7] Loop was obligated to make monthly payments of approximately $35,000 to Marine Bank pursuant to a promissory note. In April of 2004, Loop tendered more than $105,000 in loan payments to Marine Bank *in the form of checks written on a __Chiplease__ account.* Based upon information and belief, the Individual Defendants treated this as a "gift" from Chiplease, and the $105,000 was not supported by any consideration from Loop.

62.     Loop also pledged certain of its assets – namely, its interests in 200 West Partners, LP, 200 West Properties, Inc., Old Colony Partners, LP and Old Colony Properties, Inc. – to Marine Bank as security for the January 26, 2001 loan. According to documents first obtained during discovery in this litigation, Loop transferred $2,198,326 of the Marine Bank loan proceeds to South Beach Securities, Inc., a subsidiary of NOLA and an affiliate of Loop. A true and correct copy of Loop's January 31, 2001 wire transfer request is attached as Exhibit K. Based upon information and belief, this transfer was designed to hide Loop's assets from Wachovia. Further complicating matters is the fact that South Beach has since filed for bankruptcy protection – with no indication of where the money went.

63.     Yet another example of an "affiliate-to-affiliate" fraudulent transfer by the Defendants involves EZLinks Golf, Inc., identified as a subsidiary of Loop Corp. in Loop's Marine Bank loan application materials (which were produced by Marine Bank pursuant to subpoena during the course of this litigation). On March 15, 2005, Nichols testified in a deposition (in the *Credit Suisse First Boston v. Greenblatt, et al.* litigation) that the shares of

---

[7] Wachovia does not know why Loop did not use the $3.25 million in Marine Bank loan proceeds to pay down its margin debt to Wachovia. Instead, it appears that Loop transferred most of those loan proceeds to yet another affiliate – South Beach Securities, Inc., a subsidiary of NOLA, LLC.

EZLinks had been transferred to Scattered Corp., another Greenblatt-controlled entity and an affiliate of Loop. Based upon information and belief, the transfer of Loop's interests in EZLinks to Scattered was not supported by consideration, and was not in exchange for "reasonably equivalent value." Rather, the transfer was another attempt at shifting and hiding Loop's assets from Wachovia.

64.     Still another example of an "affiliate-to-affiliate" fraudulent transfer orchestrated by the Individual Defendants is the April 1, 2002 transaction in which Loop granted Banco Panamericano, Inc. a security interest in all of its "deposit accounts maintained with any organization," as well as a security interest in all of Loop's "property, equipment, trademarks, licenses and any other asset." These assets specifically included all of Loop's interests in its operating subsidiaries: Telegraph Properties, Inc., Randolph Properties, Inc., 200 West Properties, Inc., Old Colony Properties, Inc., EZLinks Golf, LLC, EZLinks Golf, Inc., Telegraph Properties, LP, Randolph Properties, LP, 200 West Partners, LP, Old Colony Partners, LP, and H&M Partners, GP. Loop further pledged to Banco each operating subsidiary's respective "equipment, inventory, accounts, general intangibles, stock or partnership interests," include all proceeds from those assets.[8] These pledges to Banco served to further encumber Loop's assets, and constitute a "fraudulent transfer" under the Illinois Uniform Fraudulent Transfer Act.

65.     Finally, on September 24, 2002, Loop transferred its interests in Old Colony Partners, LP and 200 West Partners, LP to Loop Properties, Inc. (*See*, Affidavit of A. Jahelka, attached as Exhibit L, at ¶ 5). In addition to being an officer and director of Loop, Jahelka is also an officer and director of Loop Properties. (*Id.*). Once again, there is no indication that this

---

[8] It is unclear how (or if) Scattered reacted to the fact that Loop Corp's interests in EZLinks had already been pledged to Banco before they were transferred to Scattered.

"affiliate-to-affiliate" transfer was designed to accomplish anything other than hinder or delay Wachovia's efforts to collect Loop's margin debt.

66.     Loop's bank records indicate that the Individual Defendants' efforts to loot the company and hide its assets have been successful.  For example, Loop's May 2001 Marine Bank money market account statement (which was produced by Marine Bank pursuant to subpoena during the course of this litigation) reflects a balance of $254,090.77.  Similarly, Loop's May 2001 Marine Bank checking account statement (again, produced by Marine Bank during this litigation) reflects deposits in the amount of $2,617,576.08, and an ending balance of $49,167.16. Eight weeks after Wachovia had filed its Statement of Claim against Loop in the NYSE Arbitration, Loop's money market and checking account balances had dropped to *$0.00* and *$0.21,* respectively.  This is especially curious given the admissions by Banco and Chiplease in the *In re Resource Technology Corporation ("RTC")* bankruptcy, that RTC had paid $1,635,250 to Loop Corp. for "accounting and legal services" during the time period from February 29, 2000 through May 23, 2003.[9]

67.     This conduct by the "insiders" of Loop, i.e., the Individual Defendants, evidences a pattern and practice of hiding the company's assets with the actual intent to hinder and delay Wachovia's collection efforts.  Based upon information and belief – including the fact that NOLA filed for bankruptcy protection the day before it was to proceed to Arbitration against Wachovia – the Individual Defendants have similarly looted NOLA's assets.

---

[9] Resource Technology Corporation is yet another one of Greenblatt's entities.  In that bankruptcy proceeding, Banco and Chiplease are creditors of RTC.

<div align="center">

**COUNT I**
**COMMON LAW FRAUD**

</div>

68.     Wachovia re-states and incorporates by reference the allegations contained in
Paragraphs 1 through 67, inclusive, as Paragraph 68 of this Count I, which asserts common law
fraud claims against Greenblatt, Nichols, Jahelka and Neuhauser.

69.     When the Individual Defendants opened their Loop and NOLA margin accounts
with Wachovia, they expressly represented that they would conduct trading in those accounts "in
accordance with all applicable laws or requirements as well as the rules and practices of any
market or clearing house through which [their] trades may be executed or processed." (*See*, Ex.
B, p.1, ¶ 4). In truth, however, the Individual Defendants never intended to follow the SEC
regulations, but rather intended to actively flout those regulations by concealing their scheme to
acquire a controlling interest in HRMI.

70.     At the time he opened the Loop and NOLA margin accounts, Neuhauser
represented to his broker, Kris Stelzner, that the Individual Defendants had a net worth of more
than $50 million, and that they would meet any margin calls that came due. In truth, however,
the Individual Defendants never intended to satisfy any margin calls. Instead, they purposefully
opened their margin accounts through assetless sham corporations, mistakenly believing that
liability for those debts would stop with Loop Corp. and NOLA, LLC.

71.     At all relevant times, the Individual Defendants intended to use their Loop and
NOLA accounts to further their goal of acquiring full control of HRMI by leveraging margin
credit from Wachovia beyond the legally permitted and contractually approved levels. Their
plan presumed that significant purchases of the common stock of HRMI and disclosures of the
same would drive up the price of HRMI by: (a) reducing the float in the stock, and (b) fostering
rumors of a possible takeover.

<div align="center">

21

</div>

72.     The Individual Defendants intended to use the buying power generated by the price increase of the HRMI stock that they already owned to purchase substantial additional shares on margin. The 50% margin requirement contemplated by the regulatory bodies and set forth in the margin rules for the purchase of securities was ignored as the rising stock price served as a smoke screen for the Individual Defendants' purchases of HRMI without cash.

73.     Further, the Individual Defendants executed and publicly disclosed a Standstill Agreement with HRMI in which they represented that they had no intention to take full control of the company. Thus, on the one hand Defendants allowed natural speculation regarding their share acquisitions to fuel a rise in the stock price, while on the other hand they released information to the public that would forestall a buying panic, so that they could continue to accumulate shares at only modestly inflated prices.

74.     The Individual Defendants' scheme to surreptitiously take over HRMI through their alter egos – Loop and NOLA – not only constituted a fraud against the SEC, the public and HRMI, but against Wachovia as well. Their scheme involved funding an illicit takeover of HRMI on margin. Thus, the Individual Defendants induced Wachovia into allowing them to trade on margin, thereby shifting the financial risk of their illicit takeover scheme to Wachovia. This was a fraud on Wachovia, which would have never knowingly permitted the Individual Defendants to use the self-generated inflation of HRMI to fund their illegal effort to obtain control of the company.

75.     Rather, Wachovia (as any other broker-dealer) would have demanded additional cash margin. The risks inherent in extending credit to investors to purchase shares based on the shares already purchased in the same company is unacceptable because it multiplies the risk of a

22

price decline in those shares. However, Defendants' fraud on Wachovia, as well as on HRMI and the public, did not stop there.

76. The Individual Defendants next engaged in a scheme to conceal their true intentions – to acquire full control of HRMI – from Wachovia, HRMI, the SEC and the public at large. Disclosure would have embroiled them in a regulatory morass and might have created a buying panic in the stock that would have made their acquisition plan cost-prohibitive. Thus, the Individual Defendants came up with a rather artistic, yet fraudulent, solution. They established NOLA and, with the exception of Neuhauser and Greenblatt, failed to disclose their interest in that entity to anyone. Meanwhile, their NOLA account rapidly accumulated 3.3% of HRMI's outstanding shares. When added to the shares already controlled and disclosed by the Individual Defendants, the Standstill Agreement proved to be wholly without substance.

77. Meanwhile, Wachovia, unaware that NOLA was duplicating Loop's leveraging ruse, extended margin credit to NOLA on the value of its HRMI investments once the initial purchase had been cash margined. Thus, Wachovia was lured into a situation where it was unwittingly extending credit on the same collateral twice because the concentration of shares – an important factor in assessing margin risk – was concealed behind the artificial veil raised by Loop's and NOLA's bogus representation as separate corporate personae.

78. The Individual Defendants' (mis)representations to Wachovia regarding their ownership interests in Loop and NOLA, as well as their intentions to use their Loop and NOLA accounts to acquire a controlling interest in HRMI securities were both false, and known by them to be false at the time those representations were made. The Individual Defendants concealed their scheme because they knew Wachovia would never have agreed to open the margin accounts at issue in this case.

79.    The Individual Defendants' intention in asserting their false representations and omissions was to induce Wachovia to rely upon those (mis)representations and omissions and enter into margin account agreements with Loop and NOLA.

80.    In fact, Wachovia did rely upon the Individual Defendants' (mis)representations and omissions, to its substantial detriment. Wachovia entered into the Loop and NOLA margin account agreements with the Individual Defendants, and allowed them to trade HRMI stock on margin. As a result, the Individual Defendants were unable to meet the margin calls on their Loop and NOLA accounts, and Wachovia suffered damages the amount of $2,984,211.34 ($1,098,459.90 under the NOLA account, and $1,885,751.44 under the Loop account), plus interests and attorneys' fees. As of April 28, 2005, the total amount of the Loop and NOLA margin debt was $3,707,629.63.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order finding Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III, jointly and severally liable to Wachovia Securities, LLC in the amount of $3,707,629.63, plus interest, attorneys' fees and any such other and further relief as this Court deems just.

## COUNT II
### FEDERAL SECURITIES FRAUD

81.    Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 80, inclusive, as Paragraph 81 of this Count II, which asserts federal securities fraud claims against Greenblatt, Nichols, Jahelka and Neuhauser.

82.    The Individual Defendants' conduct in this case – specifically, their representations and omissions of material facts in connection with their intentions behind

24

opening the Loop and NOLA margin accounts, as well as their overall scheme to acquire a controlling interest in the securities of HRMI – constitutes fraud in the purchase or sale of securities in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

83.    In reliance upon the Individual Defendants' representations and omissions, Wachovia loaned them funds on margin, and suffered damages in an amount in excess of $3,707,629.63, plus interest and attorneys' fees as described above.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order finding Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III, jointly and severally liable to Wachovia Securities, LLC in the amount of $3,707,629.63, plus interest, attorneys' fees and any such other and further relief as this Court deems just.

## COUNT III
### CONSPIRACY TO COMMIT FRAUD

84.    Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 83, inclusive, as Paragraph 84 of this Count III, which asserts conspiracy claims against Greenblatt, Nichols, Jahelka and Neuhauser.

85.    Defendants Neuhauser, Jahelka, Nichols and Greenblatt, acted in concert for the purpose of illegally and secretly acquiring a controlling interest in the publicly traded securities of HRMI. As part of their scheme, the Individual Defendants induced Wachovia to enter into margin accounts with their alter egos – Loop Corp. and NOLA, LLC -- thereby allowing the Individual Defendants to acquire their controlling interest in HRMI on margin.

86.     In furtherance of their conspiracy, at least one of the Individual Defendants – co-conspirator Neuhauser – committed fraud against Wachovia. Specifically, Neuhauser induced Wachovia to enter into margin agreements with Loop and NOLA, while: (a) materially misrepresenting and omitting the Individual Defendants' intentions to use those entities as a vehicle to illicitly acquire a controlling interest in HRMI stock, and (b) materially misrepresenting his intention to conduct trading "in accordance with all applicable laws or requirements."

87.     Had Wachovia been aware of the Individual Defendants' true intentions, Wachovia never would have allowed them to acquire HRMI Stock on margin.

88.     Wachovia relied upon Neuhauser's fraudulent representations, and suffered over $3.7 million in losses as a result.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order finding Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III, jointly and severally liable to Wachovia Securities, LLC in the amount of $3,707,629.63, plus interest, attorneys' fees and any such other and further relief as this Court deems just.

## COUNT IV
### DECLARATORY JUDGMENT – ALTER EGO (LOOP CORP.)

89.     Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 88, inclusive, as Paragraph 89 of this Count IV, which seeks a declaration that Loop Corp. was the alter ego of Greenblatt, Nichols, Jahelka and/or Neuhauser.

90.     The Individual Defendants established Loop Corp. for the sole purpose of opening margin accounts (with Wachovia and various other brokers) to illegally acquire a controlling

interest in HRMI, thereby simultaneously: (a) defrauding the SEC, the public and HRMI itself, and (b) improperly shifting risk to margin creditors, such as Wachovia.

91.     Both Loop and NOLA are owned, managed, supervised and/or controlled by the same people – namely, Defendants Neuhauser, Jahelka, Nichols and Greenblatt. Loop and NOLA share the same office address (330 South Wells Street, Chicago Illinois), and were created and used for the same purpose: to insulate their principals from liability as they entered into margin agreements to illegally acquire a controlling interest in HRMI stock.

92.     The Individual Defendants' motives in establishing and utilizing Loop were unlawful – specifically, they intended to illicitly and secretly acquire a controlling interest in HRMI stock in violation of applicable securities rules and regulations.

93.     The Individual Defendants in this case used Loop and NOLA interchangeably as they acquired more and more HRMI stock on margin. Indeed, Defendant Neuhauser expressly authorized the co-mingling of funds between the two entities. (See Ex. H). When Neuhauser severed himself from the Loop and NOLA accounts, Defendant Greenblatt confirmed that both accounts – and corporate entities – were interrelated and under his control.

94.     Thus, Loop and NOLA were clearly the alter egos of each other in this case. Just as clear, Defendants Neuhauser, Jahelka, Nichols and Greenblatt shared and used the office, equipment, personnel and assets of Loop for their personal scheme to acquire control of HRMI. As such, Loop was merely the alter ego of Neuhauser, Jahelka, Nichols and Greenblatt.

95.     There exists an actual controversy between the parties regarding the liability of Defendants Neuhauser, Jahelka, Nichols and Greenblatt for the obligations of Loop under their agreements Wachovia with in this case.

96.     A Declaratory Judgment by this Court would terminate the controversy between the parties that has given rise to this proceeding.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order declaring:

(A)     Loop Corp. is the alter ego of Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III;

(B)     Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III are personally liable for the obligations of Loop Corp.; and

(C)     Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III are jointly and severally liable to Wachovia Securities, LLC in the amount of $1,885,751.44, plus accrued interest, for the debts of Loop Corp.

## COUNT V
### DECLARATORY JUDGMENT – ALTER EGO (NOLA, LLC)

97.     Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 96, inclusive, as Paragraph 97 of this Count V, which seeks a declaration that NOLA, LLC was the alter ego of Greenblatt, Nichols, Jahelka and/or Neuhauser.

98.     The Individual Defendants established NOLA, LLC for the sole purpose of opening margin accounts (with Wachovia and various other brokers) to illegally acquire a controlling interest in HRMI, thereby simultaneously: (a) defrauding the SEC, the public and HRMI itself, and (b) improperly shifting risk to margin creditors, such as Wachovia.

99.     Both NOLA and Loop are owned, managed, supervised and/or controlled by the same people – namely, Defendants Neuhauser, Jahelka, Nichols and Greenblatt. NOLA and Loop share the same office address (330 South Wells Street, Chicago Illinois), and were created and used for the same purpose: to insulate their principals from liability as they entered into margin agreements to illegally acquire a controlling interest in HRMI stock.

100.    The Individual Defendants' motives in establishing and utilizing NOLA were unlawful – specifically, they intended to illicitly and secretly acquire a controlling interest in HRMI stock in violation of applicable securities rules and regulations.

101.    The Individual Defendants in this case used NOLA and Loop interchangeably as they acquired more and more HRMI stock on margin. Indeed, Defendant Neuhauser expressly authorized the co-mingling of funds between the two entities. (*See* Ex. H). When Neuhauser severed himself from the Loop and NOLA accounts, Defendant Greenblatt confirmed that both accounts – and corporate entities – were interrelated and under his control.

102.    Thus, NOLA and Loop were clearly the alter egos of each other in this case. Just as clear, Defendants Neuhauser, Jahelka, Nichols and Greenblatt shared and used the office, equipment, personnel and assets of NOLA for their personal scheme to acquire control of HRMI. As such, NOLA was merely the alter ego of Neuhauser, Jahelka, Nichols and Greenblatt.

103.    There exists an actual controversy between the parties regarding the liability of Defendants Neuhauser, Jahelka, Nichols and Greenblatt for the obligations of NOLA under their agreements with Wachovia in this case.

104.    A Declaratory Judgment by this Court would terminate the controversy between the parties that has given rise to this proceeding.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order declaring:

(A)    NOLA, LLC is the alter ego of Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III;

(B)    Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III are personally liable for the obligations of NOLA, LLC; and

(C)    Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III are jointly and severally liable to Wachovia Securities, LLC in the amount of $1,098,459.90, plus accrued interest, for the debts of NOLA, LLC.

## COUNT VI
### PIERCING THE CORPORATE VEIL (LOOP CORP.)

105.    Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 104, inclusive, as Paragraph 105 of this Count VI, which seeks to pierce the corporate veil of Loop Corp. and hold Greenblatt, Nichols, Jahelka and/or Neuhauser personally responsible in their individual capacities for the Loop margin debt.

106.    Based upon information and belief, Defendants Neuhauser, Jahelka, Nichols and Greenblatt are officers, directors and/or shareholders of Loop.

107.    Both Loop and NOLA are owned, managed, supervised and/or controlled by the same people – namely, Defendants Neuhauser, Jahelka, Nichols and Greenblatt.  Loop and NOLA share the same office address (330 South Wells Street, Chicago Illinois), and were created and used for the same purpose: to insulate their principals from liability as they entered into margin agreements to illegally acquire a controlling interest in HRMI stock.

108.    The Individual Defendants in this case used Loop and NOLA interchangeably as they acquired more and more HRMI stock on margin.  Based upon information and belief, they co-mingled the assets of NOLA and Loop, and generally failed to observe corporate formalities.  Indeed, Defendant Neuhauser expressly authorized the co-mingling of funds between the two entities.  (*See* Ex. H).  When Neuhauser severed himself from the Loop and NOLA accounts, Defendant Greenblatt confirmed that both accounts – and corporate entities – were interrelated and under his control.

109.    Based upon information and belief, the Individual Defendants failed to adequately capitalize Loop.  Indeed, it is believed that Loop was (and through the numerous fraudulent transfers described above, currently is) an assetless shell corporation whose sole reason for

30

existence was to shield the Individual Defendants from liability in their fraudulent scheme to acquire a controlling interest in HRMI on margin.

110.    The Individual Defendants used Loop solely for their personal gain. There is such a unity of interest and ownership between the Individual Defendants and Loop (and between Loop and NOLA), that Loop's apparently "separate" corporate identity no longer exists. Adherence to the corporate fiction of "Loop Corp." in this case would sanction the Individual Defendants' scheme to defraud Wachovia, HRMI, the SEC and the public. Thus, the corporate identity of "Loop Corp." should be disregarded in this case because the Defendants' continued abuse of corporate fictions would merely promote injustice as to their creditor, Wachovia.

111.    This Court should therefore pierce the corporate veil of Loop Corp. and hold Defendants Neuhauser, Jahelka, Nichols and Greenblatt personally liable for the liabilities of Loop.

112.    There exists an actual controversy between the parties regarding the liability of Defendants Neuhauser, Jahelka, Nichols and Greenblatt for the obligations of Loop under their agreements with Wachovia in this case. A Declaratory Judgment by this Court would terminate the controversy between the parties that has given rise to this proceeding.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order declaring:

(A)    The corporate fiction of Loop Corp. shall be disregarded, and Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III are personally liable for the obligations of Loop Corp.; and

(B)    Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III are jointly and severally liable to Wachovia Securities, LLC in the amount of $1,885,751.44, plus accrued interest, for the debts of Loop Corp.

31

## COUNT VII
### PIERCING THE CORPORATE VEIL (NOLA, LLC)

113.     Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 112, inclusive, as Paragraph 113 of this Count VII, which seeks to pierce the corporate veil of NOLA, LLC and hold Greenblatt, Nichols, Jahelka and/or Neuhauser personally responsible in their individual capacities for the NOLA margin debt.

114.     Based upon information and belief, Defendants Neuhauser, Jahelka, Nichols and Greenblatt are managers and/or members of NOLA, LLC.

115.     Both NOLA and Loop are owned, managed, supervised and/or controlled by the same people – namely, Defendants Neuhauser, Jahelka, Nichols and Greenblatt. NOLA and Loop share the same office address (330 South Wells Street, Chicago Illinois), and were created and used for the same purpose: to insulate their principals from liability as they entered into margin agreements to illegally acquire a controlling interest in HRMI stock.

116.     The Individual Defendants in this case used NOLA and Loop interchangeably as they acquired more and more HRMI stock on margin. Based upon information and belief, Defendants co-mingled the assets of NOLA and Loop, and generally failed to observe corporate formalities. Indeed, Defendant Neuhauser expressly authorized the co-mingling of funds between the two entities. (*See* Ex. H). When Neuhauser severed himself from the Loop and NOLA accounts, Defendant Greenblatt confirmed that both accounts – and corporate entities – were interrelated and under his control.

117.     Based upon information and belief, the Individual Defendants failed to adequately capitalize NOLA. Indeed, it is believed that NOLA was (and through fraudulent transfers is still) an assetless shell whose sole reason for existence was to shield the Individual Defendants from liability in their fraudulent scheme to acquire a controlling interest in HRMI on margin. The

32

recent bankruptcy filing by NOLA lends significant credence to Wachovia's information and belief.

118.    The Individual Defendants used NOLA solely for their personal gain. There is such a unity of interest and ownership between the Individual Defendants and NOLA (and between NOLA and Loop), that NOLA's apparently "separate" corporate identity no longer exists. Adherence to the corporate fiction of "NOLA, LLC" in this case would sanction a fraud against Wachovia, HRMI, the SEC and the public. Thus, the corporate identity of "NOLA, LLC" should be disregarded in this case because the Individual Defendants' continued abuse of corporate fictions would merely promote injustice as to their creditor, Wachovia.

119.    This Court should therefore pierce the corporate veil of NOLA, LLC and hold Defendants Neuhauser, Jahelka, Nichols and Greenblatt personally liable for the liabilities of NOLA.

120.    There exists an actual controversy between the parties regarding the liability of Defendants Neuhauser, Jahelka, Nichols and Greenblatt for the obligations of NOLA under their agreements with Wachovia in this case. A Declaratory Judgment by this Court would terminate the controversy between the parties that has given rise to this proceeding.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order declaring:

(A)     The corporate fiction of NOLA, LLC shall be disregarded, and Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III are personally liable for the obligations of NOLA, LLC; and

(B)     Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III are jointly and severally liable to Wachovia Securities, LLC in the amount of $1,098,459.90, plus accrued interest, for the debts of NOLA, LLC.

## COUNT VIII
### BREACH OF CONTRACT

121.  Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 120, inclusive, as Paragraph 121 of this Count VIII, which asserts breach of contract claims against Greenblatt, Nichols, Jahelka and Neuhauser based upon the Loop and NOLA margin agreements and the Individual Defendants' status as alter egos of Loop and NOLA.

122.  The Individual Defendants in this case breached their margin and securities agreements with Wachovia by failing to meet margin calls, and by failing to conduct trading in their Loop and NOLA accounts in accordance with applicable securities laws and regulations.

123.  The agreements executed by the Individual Defendants establishing the Loop and NOLA accounts mandated the deposit of any required margin not later than 2 p.m. (E.T.) on the settlement date of any transaction and the payment, upon demand, of any debit balance that may be owing on the accounts.  (*See*, Exs. B, E, F, and G).

124.  In both the Loop and NOLA accounts, the Individual Defendants failed to meet the required margin deposit and to pay their debit balance upon Wachovia's demands.

125.  Defendant Neuhauser has expressly consented to be liable for the obligations under the NOLA account by his execution of the partnership account agreement.  (Ex. E). Similarly, Defendants Greenblatt, Jahelka and Nichols are liable for the obligations under the Loop and NOLA accounts as alter egos of those entities; and the entities themselves are liable for one another as alter egos of each other.

126.  Wachovia has, at all times, fulfilled all of its obligations pursuant to its various agreements with the Individual Defendants regarding the Loop and NOLA accounts.

127.    As a direct and proximate result of the Individual Defendants' breaches of the agreements establishing the Loop and NOLA accounts, Wachovia has suffered damages in the amount of $1,098,459.90 (under the NOLA account) and $1,885,751.44 (under the Loop account), plus interest, for a total of $3,707,629.63.

128.    Pursuant to the agreements at issue in this case, the Individual Defendants are further liable to Wachovia for its reasonable attorneys' fees incurred in its attempts to collect the outstanding indebtedness from them, together with interest on such amounts at the highest lawful rate. (Exs. B, E, F and G).

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order finding Defendants David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III, jointly and severally liable to Wachovia Securities, LLC in the amount of $3,707,629.63, plus interest, attorneys' fees and any such other and further relief as this Court deems just.

## COUNT IX
### FRAUDULENT TRANSFER – LOOP CORP.

129.    Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 128, inclusive, as Paragraph 129 of this Count IX, which asserts claims against Loop Corp. under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5, *et seq.* (the "UFTA"). ***This Count IX asserts no other claims against Loop, and specifically excludes any claims against Loop that arise out of or relate to the margin agreements at issue in this case.***

130.    The transactions described above in Paragraphs 59, 60, 62, 63, 64 and 65 each constitute a separate "transfer" of Loop's "assets" under the UFTA.

131. The transfer of assets described above in Paragraphs 59, 60, 62, 63, 64 and 65 were "fraudulent" under the UFTA because they were orchestrated with the actual intent to defraud Wachovia and hinder or delay its collection of Loop's margin debt. Specifically:

(a) The transfers to Repurchase Corp. described in Paragraphs 59 and 60 occurred after Wachovia had demanded repayment of Loop's margin debt and threatened suit if such repayment was not forthcoming. Moreover, Repurchase qualifies as an "insider" and "affiliate" under the UFTA, because it controlled Loop, or was jointly controlled by Greenblatt, Jahelka and Nichols. Because of this common ownership and control of Loop and Repurchase, Loop was able to maintain control over its property even after the transfer.

(b) The transfer of Loop's interests in its subsidiaries to Marine Bank, as described in Paragraph 62, allowed Loop to continue to maintain control of those subsidiaries. Moreover, the transfer of Loop's loan proceeds to South Beach Securities, Inc. concerned a transfer to an "insider" and "affiliate" under the UFTA, because South Beach and Loop are jointly controlled by Greenblatt, Jahelka and Nichols (and therefore Loop was still able to exercise control of the loan proceeds after they were transferred to South Beach).

(c) The transfer of Loop's interests in EZLinks Golf, Inc. to Scattered Corp., as described in Paragraph 63, constituted a transfer to an "insider" and "affiliate" under the UFTA, because Scattered and Loop are jointly controlled by Greenblatt, Jahelka and Nichols (and therefore Loop was still able to exercise control over EZLinks after the transfer).

(d) The transfer of Loop's interests in its subsidiaries to Banco Panamericano, Inc., as described in Paragraph 64, constituted a transfer to an "insider" and "affiliate" under the UFTA, because Banco and Loop are jointly controlled by Greenblatt, Jahelka and Nichols (and therefore Loop was still able to exercise control over its subsidiaries after the transfer). This transfer also occurred after Wachovia had demanded repayment of Loop's margin debt and threatened suit if such repayment was not forthcoming.

(e) The transfer of Loop's interests in its subsidiaries to Loop Properties, Inc., as described in Paragraph 65, constituted a transfer to an "insider" and "affiliate" under the UFTA, because Loop Properties and Loop are jointly controlled by Greenblatt, Jahelka and Nichols (and therefore Loop was still able to exercise control over its subsidiaries after the transfer). This transfer also occurred after Wachovia had demanded repayment of Loop's margin debt and threatened suit if such repayment was not forthcoming.

132. Furthermore, based upon information and belief (as informed by Loop's money market and checking account records at Marine Bank, which reflect balances of *$0.00* and *$0.21*,

respectively), Loop was insolvent or became insolvent shortly after the transfers described above in Paragraphs 59, 60, 62, 63, 64 and 65.

133.    The transfers described above in Paragraphs 59, 60, 62, 63, 64 and 65 were also "fraudulent" under the UFTA because Loop did not receive "reasonably equivalent value" from the transferees.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order:

(A)    Voiding and rescinding the transfer of Loop Corp.'s interests in EZLinks Golf, Inc. to Scattered Corp., and attaching those interests to the full extent of Wachovia Securities, LLC's damages;

(B)    Voiding and rescinding the April 1, 2002 transfer of Loop Corp.'s interests in its subsidiaries to Banco Panamericano, Inc. and attaching those interests to the full extent of Wachovia Securities, LLC's damages;

(C)    Voiding and rescinding the September 24, 2002 transfer of Loop Corp.'s interests in its subsidiaries to Loop Properties, Inc. and attaching those interests to the full extent of Wachovia Securities, LLC's damages;

(D)    Temporarily, preliminarily and permanently enjoining Defendants Loop Corp., David Neuhauser, Andrew Jahelka, Richard O. Nichols, and Leon A. Greenblatt III (and any other officers, directors, shareholders, employees or agents of Loop Corp.) from transferring or disposing of any asset of Loop Corp. until such time as Loop Corp.'s margin debt to Wachovia Securities, LLC has been fully satisfied; and

(E)    Appointing a receiver to freeze and control the assets of Loop Corp. until such time as Loop Corp.'s margin debt to Wachovia Securities, LLC has been fully satisfied.

### COUNT X
#### FRAUDULENT TRANSFER – SCATTERED CORP.

134.    Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 133, inclusive, as Paragraph 134 of this Count X, which asserts claims

against Scattered Corp. under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5, *et seq.* (the "UFTA").

135. The transaction described above in Paragraph 63 constitutes a "transfer" of Loop's "asset" under the UFTA.

136. The transfer of Loop's interests in EZLinks Golf, Inc., described above in Paragraph 63, was "fraudulent" under the UFTA because it was orchestrated with the actual intent to defraud Wachovia and hinder or delay its collection of Loop's margin debt. Specifically:

    (a)    The transaction constituted a transfer to an "insider" and "affiliate" under the UFTA, because Scattered Corp. and Loop are jointly controlled by Greenblatt, Jahelka and Nichols;

    (b)    Because Loop transferred its interests in EZLinks Golf to Scattered – an entity that is also controlled by Greenblatt, Jahelka and Nichols – Loop effectively retained control over the asset even after its transfer; and

    (c)    Based upon information and belief (as informed by Loop's money market and checking account records at Marine Bank, which reflect balances of *$0.00* and *$0.21,* respectively), Loop was insolvent or became insolvent shortly after the transfer of its interests in EZLinks Golf to Scattered.

137. The transfer of Loop's interests in EZLinks Golf, described above in Paragraph 63, was also "fraudulent" under the UFTA because Loop did not receive "reasonably equivalent value" from Scattered.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order:

    (A)    Voiding and rescinding the transfer of Loop Corp.'s interests in EZLinks Golf, Inc. to Scattered Corp., and attaching those interests to the full extent of Wachovia Securities, LLC's damages;

    (B)    Temporarily, preliminarily and permanently enjoining Scattered Corp. from transferring any interests in EZLinks Golf, Inc.; and

(C)     Appointing a receiver to freeze and control the assets of Scattered Corp. until such time as Loop Corp.'s margin debt to Wachovia Securities, LLC has been fully satisfied or the transfer of Loop Corp.'s interests in EZLinks Golf, Inc. to Scattered Corp. has been rescinded.

## COUNT XI
### FRAUDULENT TRANSFER – BANCO PANAMERICANO, INC.

138.    Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 137, inclusive, as Paragraph 138 of this Count XI, which asserts claims against Banco Panamericano, Inc. under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5, *et seq.* (the "UFTA").

139.    The transaction described above in Paragraph 64 constitutes a "transfer" of Loop's "assets" under the UFTA.

140.    The transfer of Loop's interests in its operating subsidiaries to Banco Panamericano, Inc., described above in Paragraph 64, was "fraudulent" under the UFTA because it was orchestrated with the actual intent to defraud Wachovia and hinder or delay its collection of Loop's margin debt.  Specifically:

(a)     The transaction constituted a transfer to an "insider" and "affiliate" under the UFTA, because Banco and Loop are jointly controlled by Greenblatt, Jahelka and Nichols;

(b)     Because Loop transferred its operating subsidiaries to Banco – an entity that is also controlled by Greenblatt, Jahelka and Nichols – Loop effectively retained control over those subsidiaries even after its transfer;

(c)     The transfer occurred after Wachovia had already demanded repayment of Loop's margin debt and threatened suit if such repayment was not forthcoming; and

(d)     Based upon information and belief (as informed by Loop's money market and checking account records at Marine Bank, which reflect balances of *$0.00* and *$0.21,* respectively), Loop was insolvent or became insolvent shortly after the transfer of its operating subsidiaries to Banco.

39

141. The transfer of Loop's operating subsidiaries to Banco described above in Paragraph 64, was also "fraudulent" under the UFTA because Loop did not receive "reasonably equivalent value" from Banco.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order:

(A)     Voiding and rescinding the April 1, 2002 transfer of Loop Corp.'s interests in its operating subsidiaries to Banco Panamericano, Inc., and attaching those interests to the full extent of Wachovia Securities, LLC's damages;

(B)     Temporarily, preliminarily and permanently enjoining Banco Panamericano, Inc. from transferring its interests Loop Corp.'s operating subsidiaries or other assets; and

(C)     Appointing a receiver to freeze and control the assets of Banco Panamericano, Inc. until such time as Loop Corp.'s margin debt to Wachovia Securities, LLC has been fully satisfied, or the April 1, 2002 transfer of Loop Corp.'s operating subsidiaries to Banco Panamericano, Inc. has been rescinded.

<div align="center">

**COUNT XII**
**FRAUDULENT TRANSFER – LOOP PROPERTIES, INC.**

</div>

142. Wachovia re-states and incorporates by reference the allegations contained in Paragraphs 1 through 141, inclusive, as Paragraph 142 of this Count XII, which asserts claims against Loop Properties, Inc. under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5, *et seq.* (the "UFTA").

143. The transaction described above in Paragraph 65 constitutes a "transfer" of Loop's "assets" under the UFTA.

144. The September 24, 2002 transfer of Loop Corp.'s interests in Old Colony Partners, LP, and 200 West Partners, LP, described above in Paragraph 65, was "fraudulent" under the UFTA because it was orchestrated with the actual intent to defraud Wachovia and hinder or delay its collection of Loop's margin debt. Specifically:

<div align="center">40</div>

(a)   The transaction constituted a transfer to an "insider" and "affiliate" under the UFTA, because Loop Properties, Inc. and Loop are jointly controlled by Greenblatt, Jahelka and Nichols;

(b)   Because Loop transferred its interests in Old Colony Partners, LP, and 200 West Partners, LP, to Loop Properties – an entity that is also controlled by Greenblatt, Jahelka and Nichols – Loop effectively retained control over those interests even after its transfer;

(c)   The transfer occurred after Wachovia had already demanded repayment of Loop's margin debt and threatened suit if such repayment was not forthcoming; and

(d)   Based upon information and belief (as informed by Loop's money market and checking account records at Marine Bank, which reflect balances of *$0.00* and *$0.21,* respectively), Loop was insolvent or became insolvent shortly after the transfer of its interests in Old Colony Partners, LP, and 200 West Partners, LP, to Loop Properties.

145.   The transfer of Loop's interests in Old Colony Partners, LP, and 200 West Partners, LP, to Loop Properties, described above in Paragraph 65, was also "fraudulent" under the UFTA because Loop did not receive "reasonably equivalent value" from Loop Properties.

**WHEREFORE,** Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter a Judgment Order:

(A)   Voiding and rescinding the September 24, 2002 transfer of Loop Corp.'s interests in Old Colony Partners, LP, and 200 West Partners, LP, to Loop Properties, Inc., and attaching those interests to the full extent of Wachovia Securities, LLC's damages;

(B)   Temporarily, preliminarily and permanently enjoining Loop Properties, Inc. from transferring its interests in Old Colony Partners, LP, 200 West Partners, LP, or any other asset of Loop Corp.; and

(C)   Appointing a receiver to freeze and control the assets of Loop Properties, Inc. until such time as Loop Corp.'s margin debt to Wachovia Securities, LLC has been fully satisfied, or the September 24, 2002 transfer of Loop Corp.'s interests in Old Colony Partners, LP, and 200 West Partners, LP, to Loop Properties, Inc., has been rescinded.

Respectfully submitted,

**WACHOVIA SECURITIES, LLC**

By: _____
    One of Its Attorneys

---

Gary I. Blackman (ARDC# 6187914)
Christopher S. Griesmeyer (ARDC# 6269851)
LEVENFELD PEARLSTEIN, LLC
2 North LaSalle Street
Suite 1300
Chicago, Illinois 60602
(312) 346-8380
(312) 346-8434 (Facsimile)

**EXHIBIT A**
**WACHOVIA / PRUDENTIAL CORPORATE STRUCTURE**



**WACHOVIA CORPORATION**

State of Incorporation:  **North Carolina**

Principal Place of Business:  **North Carolina**

**WACHOVIA SECURITIES HOLDINGS, LLC**

State of Organization:  **Delaware**

Principal Place of Business:  **Virginia**

62%

**PRUDENTIAL FINANCIAL, INC.**

State of Incorporation:  **New Jersey**

Principal Place of Business:  **New Jersey**

**PRUDENTIAL SECURITIES GROUP, INC.**

State of Incorporation:  **Delaware**

Principal Place of Business:  **New York**

38%

**WACHOVIA SECURITIES FINANCIAL HOLDINGS, LLC**

State of Organization:  **Delaware**

Principal Place of Business:  **Virginia**

**WACHOVIA SECURITIES, LLC**

State of Organization:  **Delaware**

Principal Place of Business:  **Virginia**

*(includes assets transferred from Prudential Securities Incorporated, including Loop Corp. and NOLA, LLC margin agreements)*

Document6

**EXHIBIT B**
**LOOP CORPORATION SECURITIES AGREEMENT**
**ACCOUNT NO. HLY 964831 85**

757016_1



# SECURITIES AGREEMENT
## Solely-Owned Corporations - Margin Account

LOOP CORPORATION
330 S WELLS ST STE 711
CHICAGO      IL 60606-7103

**Account Number**      HLY 964831 85
TIN # F36-4203965

Package Number:   00272 XXX 008136

This agreement describes the terms and conditions which govern my Prudential Securities Incorporated ("PSI") margin securities account. I agree to comply with these terms and conditions.

1. Unless I give you written notice to the contrary, I am not and will not be an employee of any exchange or a member firm of any exchange or the NASD. I am the only person who has an interest in this account.

2. This agreement will remain in effect for the life of the account and contains our entire understanding. I may instruct PSI to close my account at any time, and I understand I will be responsible for all fees, prior transactions, transactions outstanding as of the time PSI receives my instruction to close my account, as well as for all subsequent deliveries of my assets. In the event of my death, any order I gave PSI prior to my death is binding on my estate unless PSI receives actual notice of my death before the order is executed.

3. I agree to pay for all transactions or when necessary to deposit any required margin no later than 2:00 p.m. (E.T.) on the settlement date. PSI may require me to prepay for any order. PSI shall have a general lien on all money, securities or other property ("property") I may have on deposit with PSI or in which I have an interest, such as a joint account. PSI may, without notice to me and at its discretion, liquidate or transfer any such property in order to satisfy any indebtedness I may have to PSI or to relieve PSI of any risk of a deficit existing in my account. I shall be liable for any remaining deficiency in my account.

4. I agree to conduct my account in accordance with all applicable laws or regulations as well as the rules and practices of any market or clearing house through which my trades may be executed or processed. PSI may conduct all transactions for me in accordance with the customs and usages of securities firms and of the various exchanges. PSI's failure to comply with any rule or regulation which is not otherwise a breach of this agreement shall not relieve me of my obligations under this agreement.

5. PSI may, at its discretion, decline to accept any order from me including instructions to deliver out my account. PSI may require that I transfer my account from PSI. I understand that if I do not promptly transfer my account upon PSI's demand, PSI reserves the right to liquidate positions in my account at its discretion.

6. I agree to pay commissions, charges, interest and fees at PSI's prevailing rates, which may change without notice to me except as otherwise provided by law. I also agree to pay PSI's reasonable attorneys' fees and interest at the highest lawful rate in the event PSI takes legal action to collect any amount due from me to PSI.

7. PSI will send all written communications relating to my account to the mailing address I have given PSI. I acknowledge that if I have a new address I must advise PSI of that address. I understand that all communications sent to the address I have given PSI are deemed to be personally delivered to me. I agree that I will have no claim against PSI based on my failure to receive any communication.

8. All reports of the execution of orders (confirmations) and account statements are binding on me unless I object in writing ten days after mailing to me. I understand that I must advise the Branch Manager at the branch where my account is held, in writing, if I think there is an error or omission in any communication, even if an employee of PSI agrees to correct the error or omission. I understand that, notwithstanding the price at which the execution of an order was reported to me, the actual execution price is binding upon me.

9. If a court, regulatory agency or self-regulatory organization determines that a provision of this agreement is invalid or unenforceable, that decision will apply only to that provision; the rest of the agreement remains in effect. PSI does not waive any of its rights under this agreement, even if it does not insist at all times on strict compliance with all the terms of this agreement. No part of this agreement can be changed unless it is agreed to by me and an officer of PSI in writing.

10. Prudential Securities Incorporated client accounts are protected by SIPC and PSI's excess insurance coverage.

11. This agreement is to be governed by the laws of the State of New York and may be used for the benefit of PSI successors or assigns. I, as well as my representatives (which can include my heirs, executors, administrators, assigns or attorney-in-fact) am bound by the terms of this agreement.

**Agreement Continues on Page 2.**



Please remember to sign this agreement and confirm or provide your tax identification number, if applicable, on the signature page.

Prudential Securities Copy            This is page 1 of 6.

Prudential
Securities

LOOP CORPORATION
330 S WELLS ST STE 711
CHICAGO          IL 60606-7103

**Account Number     HLY 964831 85**
TIN # F36-4203965

Package Number:   00272 XXX 008136

12.   - Arbitration is final and binding on the parties.

- The parties are waiving their right to seek remedies in court, including the right to jury trial.

- Pre-arbitration discovery is generally more limited than and different from court proceedings.

- The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree that any controversy arising out of or relating to my account, to transactions with or for my account or any breach of this or any other agreement between us, whether executed or to be executed within or outside of the United States, and whether entered into prior, on or subsequent to the date indicated on the signature page, shall be determined by arbitration. The arbitration may be before either the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. or any other self-regulatory organization of which Prudential Securities Incorporated is a member, as I may elect and shall be governed by the laws of the State of New York. If I do not make such election by registered mail addressed to PSI at PSI's main office within five (5) days after demand by PSI that I make such election, then PSI may make the election. Any notice in connection with such arbitration proceeding, may be sent to me by mail, and I hereby waive personal service. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction, without notice to me. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

## Corporate Account Authorizing Resolution

This is a resolution duly adopted by the Board of Directors of the above named corporation at a meeting duly called and held on the _1st_ day of ___oct___, 1988, at which a quorum was present. This resolution has not been modified or rescinded and is still in full force and effect.

Resolved, that an account be opened by this corporation with Prudential Securities Incorporated (hereafter referred to as PSI), members of the New York Stock Exchange, and of the other stock exchanges, to purchase, sell (including short sales) and/or deal in any and all stocks, bonds, put and call options, other securities and property (including but not exclusively, debentures, notes, scrips, participation certificates, rights, subscriptions, option warrants, when issued securities, repurchase and reverse repurchase agreements, certificates of deposit, property, evidences of indebtedness, certificates of indebtedness, certificates of interest of any and every kind and nature whatsoever, secured or unsecured) and any and all commodities or contracts for the future delivery thereof, and that all orders and instructions, written or oral, for the account be given by either the President, Secretary, Treasurer, Vice-President or other designees of this corporation, and each of them is hereby authorized and directed to purchase or sell and deal through PSI, on behalf of this corporation, any and all stocks, bonds, and other securities, property and commodities or contracts for future delivery thereof, that either of them may deem necessary or advisable for this corporation, for cash or margin, and also to make payment and sign checks or drafts drawn upon the funds of the corporation, and to borrow and lend monies for or in connection with transactions for the account of the corporation, and also to pledge as collateral for loans to be made by or through PSI in connection with such purchases, sales or transactions, and otherwise, any stocks, bonds, other securities, property, commodities or contracts for the future delivery thereof, or any other assets belonging to this corporation, and also, to instruct PSI as to the transfer of funds, or of stock, bonds, options or other securities, to the name of this corporation, or to the name of any other person, including the officer, or designee giving such instructions, and also, for this corporation to withdraw from PSI from time to time, to deliver or accept delivery of, and to borrow, endorse or direct the transfer of record title of, any and all stocks, bonds, other securities, property, and commodities or contracts for the future delivery thereof, and/or assets or funds that may be carried by Prudential Securities Incorporated for the account of this corporation, and

Further Resolved, that each of the aforesaid officers of this corporation, be and hereby is authorized and directed to execute and deliver on behalf of this corporation any customer's agreement required by PSI, and to enter into, execute, and deliver, any and all other agreements, documents, releases, and writings that may be required by PSI for the opening and/or continuing of the account in connection with any transaction relating to the account or to any securities, moneys or other property of the corporation, whether or not in the account, and

Further Resolved, that until PSI shall receive due written notice of change or rescission of these resolutions, PSI may rely upon the authority contained in these resolutions as continuing fully effective, and PSI may rely upon any certified copy resolutions, specimen signatures or other writings, signed on behalf of this corporation by any officer thereof; the acceptance of any other form of notice shall not constitute a waiver of this provision, and the fact that any person hereby empowered ceases to be an officer or becomes an officer under some other title, shall not in any way affect the powers hereby conferred, until PSI shall receive due written notice of such change or rescission, and

Further Resolved, that in the event of any change in the office or powers of persons hereby empowered, the secretary shall certify those changes to PSI in writing, which notification, when received, shall be adequate both to terminate the powers of the person theretofore authorized, and to empower the persons thereby submitted, and

Please remember to sign this agreement and confirm or provide your tax identification number, if applicable, on the signature page.


Prudential
Securities

LOOP CORPORATION
330 S WELLS ST STE 711
CHICAGO          IL 60606-7103

**Account Number     HLY 964831 85**
TIN # F36-4203965

Package Number:   00272 XXX 008136

Further Resolved, that in the event all of the undersigned and other person(s) empowered in accordance with the terms above, die, become incapacitated or cease and/or refuse to serve in their designated capacity, we hereby appoint _____ to instruct PSI as to the disposition of the corporate assets.

Further Resolved, that any and all orders and instructions heretofore given PSI on behalf of this corporation by any officer of this corporation, are hereby in all respects ratified, confirmed and approved, and

Further Resolved, that the foregoing resolutions and the certificates actually furnished to PSI by any officer of the corporation, be and they hereby are made irrevocable, and shall be fully effective as to any transaction for the account of the corporation notwithstanding that the account may have been temporarily closed or inactive, until written notice of the revocation thereof shall have been received by PSI.

This is a solely-owned corporation.

## Dividend Reinvestment Program Agreement

I understand that Prudential Securities ("you") will be making a Dividend Reinvestment Program available to me. Under this Program, you will automatically reinvest cash dividends received on securities held in Street name in my account in additional shares of the same securities.

Eligible securities for the Dividend Reinvestment Program will include stocks quoted on the National Association of Securities Dealers Automated Quotations system for which you are a market maker, as well as common stocks and closed-end mutual funds for which there is an active market and which are listed on the New York Stock Exchange, the American Stock Exchange or regional stock exchanges. I understand that I am not required to participate in the Dividend Reinvestment Program, and by making a security eligible for the Dividend Reinvestment Program, you are not recommending that I or any other customer buy or sell that security.

I also understand that if I am an eligible client I may elect to participate in your Dividend Reinvestment Program by signing and returning this form. Thereafter, I may select or change the eligible securities participating in automatic reinvestment, or discontinue automatic reinvestment altogether by calling my Financial Advisor. I understand that this must be done at least one business day ahead of the next applicable dividend payment date for securities in the direct market purchase plan, and at least one business day ahead of the next applicable record date for selected securities and unit investment trusts where reinvestment shares are obtained through the issuing company plans.

You will credit my account with an amount equal to the cash dividend paid on each security selected by me for reinvestment, and debit my account for any fees or applicable withholding. The resulting net amount will be used for reinvestment in securities. There will be no fees charged to Retirement Plan accounts, COMMAND accounts and participants in the COMMAND Plus program. If I am a new participant, depending on the type of account I have with you, transaction fees will be deducted as follows:

| Dividend Amount | Transaction Fee Amount |
|---|---|
| up to $100 | 3.75% of the amount of the cash dividend |
| $100.01 - $500 | The greater of $3.75 or 2% of the amount of the cash dividend |
| over $500 | The greater of $10 or 1.5% of the amount of the cash dividend up to a maximum of $200 |

For example, on a dividend of $100, you will deduct a transaction fee of $3.75, leaving a balance of $96.25 to be reinvested.

These transaction fees may be changed, and the program may be changed or withdrawn altogether, by notice from you to me if I am affected.

In most cases, you will combine all net reinvestment amounts for a given security and purchase the shares in the open market on the payable date. The shares (including fractional shares computed to three decimal places) will be allocated to my account. The price, in most cases, will be the actual price paid by you. In the case of NASDAQ stocks purchased from your inventory or by going short, the price will not exceed the best prevailing offered quotations, in terms of both price and transaction size. If you purchase the shares in more than one transaction, the price of all shares will be the weighted average of the actual transaction prices. If you cannot complete the purchase on the payable date, you will allocate to my account either the full cash dividend, or a proration of the shares purchased and remaining net reinvestment amount.

Where individual issuer-sponsored reinvestment plans offer shares at a discount to market price, you will endeavor to obtain shares at the issuer-plan price, and if successful you will pass that discount along to me.

You will confirm my dividend reinvestment program transactions by way of my regular monthly or quarterly account statements rather than by immediate confirmations. I can obtain information regarding dividend reinvestment transactions up to the previous day by calling my Financial Advisor.

If my account participates in your Dividend Reinvestment Program and is transferred out of your firm, full shares will be transferred and fractional shares will be liquidated.

Please remember to sign this agreement and confirm or provide your tax identification number, if applicable, on the signature page.

00272 XXX 008136                    Prudential Securities Copy                    This is page 3 of 6.


rudential
Securities

LOOP CORPORATION
330 S WELLS ST STE 711
CHICAGO          IL 60606-7103

**Account Number    HLY 964831 85**
TIN # F36-4203965

Package Number:  00272 XXX 008136

I hereby enroll in your Dividend Reinvestment Program and agree to the deduction of any applicable transaction fees from my account as previously described in this agreement.

## General Information About Margin

A Prudential Securities margin account allows an investor to borrow against the value of the eligible securities in the account. A traditional use of margin is to purchase or sell securities.

Margin maintenance refers to the amount of market value that an investor is required to maintain in their account. If the value of the securities in an investor's account falls below the margin maintenance requirement an investor is subject to a "margin maintenance call," from Prudential Securities Incorporated. A maintenance call from Prudential Securities Incorporated asks that the investor repay all or part of the investor's debt in cash, or deposit or sell a sufficient amount of securities to cover the margin maintenance required, which sale could result in a substantial realized loss to the investor.

An investor entering into a margin agreement authorizes Prudential Securities Incorporated to lend securities that Prudential Securities Incorporated may be carrying on margin for the investor. In some instances, such loans may limit an investor's ability to exercise voting rights in the securities.

## Margin Agreement

1. I agree to keep whatever margins PSI, in its sole discretion, requires. I promise to pay on demand any debit balance which may be owing in my account.

2. I understand and agree that PSI may, at any time and in its sole discretion, without any margin call or prior demand or notice, sell any property which it is holding or carrying for me, or may buy any property which my account may be short, in order to close out entirely or in part, any commitment I may owe to PSI. PSI may place stop orders in regard to such property. Any sale or purchase may be made in PSI's sole discretion on any exchange or other market, or at public auction or private sale and may be done with or without advertising. PSI may buy for its own account such property and I waive any right to redeem that property.

3. I understand that any prior demand, call or notice that PSI will provide me will not amount to a waiver of its right to act without such demand, call or notice.

4. I agree that in giving an order to sell, a sell order for which I do not own or do not intend to deliver the security will be designated as "short" by me; all other sale orders will be designated as "long" by me. I understand that by designating a sell order as "long" I own the security, and that if the security is not in PSI's possession I represent that I will deliver it on or before the settlement date.

5. PSI and any firm succeeding to PSI are hereby authorized from time to time to lend separately, or together with the property of others, either to PSI or to others, any property, together with all attendant rights of ownership, which PSI may be carrying for me on margin. In connection with such loans, PSI may receive and retain certain benefits to which I will not be entitled. In certain circumstances, such loans may limit, in whole or in part, my ability to exercise voting rights of the securities lent. This authorization shall apply to all accounts carried by PSI for me and shall remain in full force until written notice of revocation is received by PSI at PSI's principal office in New York.

This account also requires that you submit the following signed documents:

Letter of Sole Ownership

If you need assistance with any of these documents, please consult with your Financial Advisor. Please disregard if these documents have already been provided.

Please remember to sign this agreement and confirm or provide your tax identification number, if applicable, on the signature page.

 Prudential
Securities

# SIGNATURE PAGE

LOOP CORPORATION
330 S WELLS ST STE 711
CHICAGO        IL 60606-7103

**Account Number    HLY 964831 85**
TIN # F36-4203965

Package Number:   00272 XXX 008136

By signing this agreement, I acknowledge that I have received and read a copy of this agreement, and further certify that I am authorized and empowered in my capacity as sole owner, to act on behalf of this corporation, pursuant to the preceding authorizing statement, and this agreement is in accordance with and does not conflict with the existing corporate charter, articles of incorporation and by-laws. I also confirm that I understand and agree to the following:

<div align="center">

Securities Agreement
Corporate Authorizing Resolution  (63)
Dividend Reinvestment Program Agreement  (3G)
Margin Agreement  (42)

</div>

By signing this agreement, I acknowledge that my securities may be loaned to PSI or loaned out to others.

This agreement also contains a pre-dispute arbitration clause on page 2 at paragraph 12.

In Witness Whereof, I have hereunto affixed my hand and the seal of the corporation, this _16_ day of _Oct_, in the year _2002_.

**Affix Seal Here**

Signature

Please keep one set for yourself and return the other entire set to PSI in the envelope provided.

Please review this package to make sure you have completed the preceding 'Corporate Account Authorizing Resolution' that it contains.

PRUDENTIAL SECURITIES INCORPORATED
ONE SEAPORT PLAZA, NEW YORK, NY 10292

Prudential Securities Copy                    This is page 5 of 6.



## *Service Fees*

Some or all of the service fees below may apply if your account meets the conditions described for each. Please bear in mind that there may be other fees applicable to specific PSI programs which are not listed here. Check with your Financial Advisor for any additional service fee information.

1. A quarterly Abandoned Account Safekeeping Fee of $25 will be charged if account statements and other correspondence mailed to you are returned by the Postal Service as undeliverable, and we are unable to locate you through reasonable efforts. These fees fairly reflect the costs incurred by Prudential Securities in safeguarding inactive and abandoned accounts and are not refundable.

2. A Basic Securities Account Fee of $50 is debited annually to most non-COMMAND Accounts. Accounts within a COMMAND Plus household, and packaged households exceeding $500,000 in long market value or $10,000 in commissions over the previous 12 months are not subject to this fee. (International, Retirement, and BusinessEdge Accounts are also exempt.)

3. Futures accounts will be charged a postage and handling fee of $4.50 per active day. An active day is defined as a day when any trade-related activity takes place in a futures account.

4. A $20 fee is charged for "optional exchanges." An optional exchange occurs when you choose to exercise an opportunity granted to you by a company whose securities you own. One example is a tender offer which invites the shareholder to present his/her shares at a set price. Exercising warrants and rights that entitle the shareholder to buy a proportionate amount of common stock at a specified price is also an example of an optional exchange. The optional exchange fee does not apply to mutual funds or to mandatory exchanges.

5. A Miscellaneous Fee of $5.25 will be charged on stock, option and bond purchases and sales. This fee does not apply to CDs, Unit Trusts or Mutual Funds. Certain Delivery versus Payment transactions may also be exempt.

6. There is a $50 fee for a certificate delivery of U.S. Treasury notes or bonds.

7. An Account Transfer Fee of $50 per account will be charged to cover the cost of transferring an account out of Prudential Securities. The Account Transfer Fee does not apply to IRA accounts.

8. Individual Retirement Accounts (IRA's) are subject to a Custodial Fee of $35 annually. There are various programs which may qualify you for a waiver of your IRA Custodial Fee. Please ask your Financial Advisor for details.

9. A Termination Fee of $50 will be charged when an IRA is closed.

These fees are provided for your information only and may not apply to all accounts. They do not constitute a part of this agreement.



**EXHIBIT C**
**LETTER DATED OCTOBER 30, 2000 TO**
**LOOP CORPORATION FROM**
**ROB TEMPLE, OPERATIONS MANAGER**

*To: Michelle*

October 30, 2000

Loop Corporation
330 S. Wells St. STE 711
Chicago, IL 60606-7103
Attn: David Neuhauser



Re: Account # HLY-964831-85

Dear David Neuhauser,

In order to accept company checks for deposit into the above referenced account, we must have a statement on file with signatures of the sole owners of the company. This statement will be applicable for any such checks in the future.

Please sign below and return this statement to us as soon as possible.

Thank you

Rob Temple
Operations Manager

The Sole Owners are:   LEON  GREENBLATT
                       ANDREW  JAHELKA
                       RICHARD  NICHOLS

**EXHIBIT D**
**LIMITED POWER OF ATTORNEY DATED 11/16/00**

Case: 1:04-cv-03082 Document #: 52 Filed: 05/18/05 Page 57 of 130 PageID #:610

 **Prudential Securities**

*To: Michelle Daley*

**Limited Power of Attorney**

Prudential Securities Incorporated
One Seaport Plaza
New York, NY 10292

| Branch | Account No. | FA | |
|---|---|---|---|
| H L Y | 9,6,4,8,3,1 | 8,5 | 52 |

Prudential Securities Incorporated is a subsidiary of The Prudential Insurance Company of America, Newark, New Jersey

This document authorizes the appointed agent to enter trading instructions on behalf of the client as well as to authorize the pay of monies and delivery of securities to be made only in the name of the client.

I, **Loop Corporation** of **330 S. Wells St. STE 711 Chicago, Ill**
(Client's Name) (Client's Address) do hereby name and app

**David Neuhauser** whose address is **Same as above** to be my true and lawful attorney
(Agent) (Agent's Address)

to conduct in my name, place and stead my **HLY- 964 831** with Prudential Securities Incorporate
(Account Number)

New York, NY, (hereinafter referred to as PSI), as PSI now is or at any time hereafter may be constituted and at any of PSI's offices give and place any and all orders including, but not exclusively, orders to purchase, sell (including short sales), exchange, trac assign, transfer or authorize the registration of stocks, bonds, open or closed end investment company shares and any o securities such as options, warrants, rights, privileges, puts and calls and/or commodities or contracts for the future delivery o such commodities or any options on such commodities or futures contracts on margin or otherwise. I authorize my attorney to to PSI any instructions that he may in his discretion deem appropriate for my account number with PSI.

I authorize my attorney to receive, accept and/or waive any notice and/or demand that PSI may give or issue with reference to o reason of the conduct of the account and I authorize my attorney to do and perform any act necessary in regards to the account t could do personally, including, but not limited to instructing transfer agents, and I hereby confirm any and all orders, instruction acts of my attorney whenever given or executed and complied with or relied upon by PSI.

I hereby instruct PSI that all payments of money instructed by my attorney to be paid shall be by check or transfer only to my order that all deliveries of securities, commodities, or other deliverable property instructed by my attorney to be delivered to my atto shall be registered in my name. I specifically provide that nothing in this clause is intended to, nor shall it, restrict the authority o attorney to give PSI orders for the payment of money against the delivery to PSI of securities or commodities or other property, o the delivery by PSI of securities, commodities or other property against the payment of money.

I instruct, authorize and acknowledge that all notices, confirmations, statements and/or demands made by PSI referrin account **HLY-(64 83)** may be mailed, delivered or served to or upon my attorney with the same force and effect as though it had b delivered personally to me, and confirmations and statements may be approved, or executed in writing or in any other manner my attorney with the same force and effect as if I had personally approved or executed it.

I hereby authorize PSI to act and rely upon the authority and power which I have given to my attorney. I acknowledge and conf that my attorney is solely my agent and that all acts and instructions given by him are solely on my behalf, for my account, and are responsibility.

I specifically acknowledge that nothing contained in this authorization is intended to or shall require PSI to act on any instruction my attorney in any instance in which PSI for any reason desires not to act on those instructions.

This power of attorney is durable and shall not be affected by subsequent disability or incapacity.

The authority I have granted in this power of attorney shall be fully effective even if the account is closed and opened from tim time, until PSI actually receives written notice of revocation of this power of attorney signed by me. All orders executed and any a done by PSI in good faith after my death or after an attempted revocation of this power of attorney without actual written receipt o notice of revocation or of actual notice of my death shall be and remain binding upon myself and my legal representative successors and assigns.

Client Signature *Leon Greenblatt*     Dated 11/16/00

Client Signature (If Joint Account) *Andrew Nelson*     Dated 11/16/00

Agent Signature *David Neuhauser*     Dated 11/16/00

We require two signed copies: Please return the White and Canary copies to the branch serving your account. Please retain the Pink copy for your records.

Form 6206 (Rev. 2-93)



NO. 3838 P. 2

OTPLD SEC PRU 2:02PM NOV 16. 2003

**EXHIBIT E**
**NOLA, LLC PARTNERSHIP ACCOUNT AGREEMENT**

 **Prudential**
Securities

**Partnership Account Agreement**

Prudential Securities Incorporated
One Seaport Plaza
New York, NY 10292

| BRNC | ACCOUNT NO. | FA | DEPL ID |
|------|-------------|-----|---------|
| 0.1.5 | 2.9.7.2.5.5 | 8.5 | 61 |

Prudential Securities Incorporated is a subsidiary of The Prudential Insurance Company of America, Newark, New Jersey

We, the undersigned, request you to open a partnership account in the name of _N.10 LLC_

a duly organized partnership, of which each of us is a general partner and of which the undersigned are the sole partners. We jointly and severally authorize and instruct you to accept from any one of us (each of us being fully authorized to act alone) any and all orders upon said account, and to act thereon, including (but, not exclusively) any and all orders for the purchase, for cash and/or on margin, of securities, options and commodities, for the sale of securities, options and commodities, for the payment of money, including payments to the person giving the order or any other action with respect thereto.

You are hereby further authorized to deliver, from time to time, to any one of us, securities and/or commodities held to the credit of said account and to pay, from time to time, to any one of us, monies held by you to the credit of said account, and each of us likewise consents that confirmations and notices with reference to said account may be sent or given by you to any one of us. Any one of us, acting alone, is fully authorized to make any commitments, agreements and/or modifications thereof, and enter into any transactions of any kind, with respect to this account.

This agreement shall be governed by the laws of the State of New York.

The authority hereby conferred shall remain in force until written notice of its revocation, addressed to you, is delivered to your office at One Seaport Plaza, New York City, and receipt thereof is acknowledged to us in writing signed by an officer of your corporation.

Each of us will sign all agreements as are required in connection with transactions for said account, all of the terms and provisions of which agreement, in addition to the provisions hereof shall be binding upon the partnership and upon each of us.

Each of us understands that, under the Rules of Fair Practice of the National Association of Securities Dealers, securities in certain public offerings may not be sold to any of the following:

(1) any officer, director, employee or agent of Prudential Securities Incorporated;

(2) any officer, general partner, director, employee or agent of any other broker/dealer;

(3) any senior officer of a bank, savings and loan company, insurance company, registered investment company, registered investment advisory company or any other institutional type domestic or foreign company engaged directly or indirectly in buying or selling securities;

(4) any employee of one of the institutions in # (3) above who works in the securities department of that institution or whose activities directly or indirectly involve or may influence the function of buying or selling securities for that institution;

(5) any person who may be in a position to act as a finder as to offerings or in a fiduciary capacity to entities who may be underwriters of offerings (such as, for example, attorneys, accountants, etc.); or

(6) a member of the immediate family of any person noted in #s (1) through (5) above. ("Immediate family" for these purposes includes parents, mother-in-law or father-in-law, husband or wife, brother or sister, brother-in-law or sister-in-law, children, or any relative to whose support the person contributes directly or indirectly).

We represent to you that there (check one): ☐ is    ☐ is not

any party to this account who is a person described above.

| Name (Please Print) David Neuhauser | Signature |
|---|---|
| Name (Please Print) | Signature |
| Name (Please Print) | Signature |
| Name (Please Print) | Signature |
| Name (Please Print) | Signature |

**THIS DOCUMENT MUST BE EXECUTED IN CONJUNCTION WITH CASH OR MARGIN AGREEMENT**

Part 1 White, New Accounts Copy
Part 2 Yellow, Branch Copy



**EXHIBIT F**
**NOLA, LLC OPENING MARGIN AGREEMENT**

 **Prudential**
Securities

**Client's Opening Margin Agreement**

*Prudential Securities Incorporated*
*One Seaport Plaza*
*New York, NY 10292*

Prudential Securities Incorporated is a subsidiary of the Prudential Insurance Company of America, Newark, New Jersey

---

### General Information about Margin

A Prudential Securities Incorporated margin account allows an investor to borrow against the value of the eligible securities in the account. A traditional use of margin is to purchase or sell securities.

Margin maintenance refers to the amount of market value that an investor is required to maintain in his account. If the value of the securities in an investor's account falls below the margin maintenance requirement an investor is subject to a "margin maintenance call" from Prudential Securities Incorporated. A maintenance call from Prudential Securities Incorporated asks that the investor repay all or part of the investor's debt in cash, or deposit or sell a sufficient amount of securities to cover the margin maintenance required. Inaction could result in a substantial realized loss to the investor.

An investor entering into a margin agreement authorizes Prudential Securities Incorporated to lend securities that Prudential Securities Incorporated may be carrying on margin for the investor. In some instances such loans may limit an investor's ability to exercise voting rights in the securities.

1. I agree as follows with respect to all of my accounts, in which I have an interest alone or with others, which I have opened or open in the future, with you for the purchase and sale of securities and commodities.

2. I am of full age and represent that I am not an employee of any Exchange or of a Member Firm of any Exchange or the NASD, and that I will promptly notify you in writing if I become so employed.

3. All transactions for my account shall be subject to the constitution, rules, regulations, customs and usages, as the same may be constituted from time to time, of the exchange or market (and its clearing house, if any) where executed.

4. Any and all credit balances, securities, commodities or contracts relating thereto, and all other property of whatsoever kind, including but not limited to property belonging to me, owed to me, or in which I may have an interest held by you or carried for my accounts, shall be subject to a general lien, for the discharge of my obligations (including unmatured and contingent obligations) to you. This general lien shall apply to all of my obligations to you, however arising and without regard to whether or not you have made advances with respect to such property. Such credit balances, securities, commodities or contracts relating thereto and all other property, as referenced above, may, without notice to me, be carried in your general loans and, consistent with the Lending Agreement below, all securities may be pledged, repledged, hypothecated or rehypothecated, separately or in common with other securities or any other property, for the sum due to you thereon or for a greater sum, without receiving in your possession and control, for delivery a like amount of similar securities or other property. At any time and from time to time you may, in your discretion, without notice to me, apply and/or transfer any securities, commodities, contracts relating thereto, cash or any other property guaranteed by me. You are specifically authorized to transfer to my cash account on the settlement day following a purchase made in that account, excess funds available in any of my other accounts, including but not limited to any free balance in any margin account or in any non-regulated commodities account, sufficient to make full payment of this cash purchase. I agree that any debt occurring in any of my accounts may be transferred by you at your option to my margin account.

5. I will maintain such margins as you may in your discretion require from time to time and will pay on demand any debit balance owing with respect to any of my accounts. Whenever in your discretion you deem it desirable for your protection, (and without the necessity of a margin call) including but not limited to an instance where a petition in bankruptcy or for the appointment of a receiver is filed by or against me, or an attachment is levied against my account, or in the event of notice of my death or incapacity, or in compliance with the orders of any Exchange, you may, without prior demand, tender, and without any notice of the time or place of sale, all of which are expressly waived, sell any or all securities, or commodities or contracts relating thereto which may be in your possession, or which you may be carrying for me, or buy any securities, or commodities or contracts relating thereto of which my account or accounts may be short, in order to close out in whole or in part any commitment in my behalf or you may place stop orders with respect to such securities or commodities and such sale or purchase may be made at your discretion on any Exchange or other market where such business is then transacted, or at public auction or private sale, with or without advertising and neither any demands, calls, tenders or notices which you may make or give in any one or more instances nor any prior course of conduct or dealings between us shall invalidate the aforesaid waivers on my part. You shall have the right to purchase for your own account any or all of the aforesaid property at any such sale, discharged of any right of redemption, which is hereby waived.

6. All orders for the purchase or sale of commodities for future delivery may be closed out by you as and when authorized or required by the Exchange where made. Against a "long" position in any commodity contract, prior to maturity thereof, and at least five business days before the first notice day of the delivery month, I will give instructions to liquidate, or place you in sufficient funds to take delivery; and in default thereof, or in the event such liquidating instructions cannot be executed under prevailing conditions, you may, without notice or demand, close out the contract or take delivery and dispose of the commodity upon any terms and by any method which may be feasible. Against a "short" position in any commodity contract, prior to maturity thereof, and at least five business days before the last trading day of the delivery month, I will give you instructions to cover, or furnish you with all necessary delivery documents; and in default thereof, you may without demand or notice, cover the contract, or if orders to buy in such contracts cannot be executed under prevailing conditions, you may procure the actual commodity and make delivery thereof upon any terms and by any method which may be feasible.

7. All transactions in any of my accounts are to be paid for or required margin deposited no later than 2:00 p.m. (ET) on the settlement date.

8. I agree to pay interest and service charges upon my accounts monthly at the prevailing rate as determined by you.

9. I agree that, in giving orders to sell, all "short" sale orders will be designated as "short" by me and all "long" sale orders will be designated as "long" by me and that the designation of a sell order as "long" is a representation on my part that I own the security and, if the security is not in your possession that it is not then possible to deliver the security to you forthwith and I will deliver it on or before the settlement date.

10. Reports of the execution of orders and statements of my account shall be conclusive if not objected to in writing addressed to the branch manager of the office servicing such account within five days ten days, respectively, after transmittal to me by mail or otherwise.

11. All communications including margin calls may be sent to me at my address given you, or at such other address as I may hereafter give you in writing, and all communications so sent, whether in writing or otherwise, shall be deemed given to me personally, whether actually received or not.

12. No waiver of any provision of this agreement shall be deemed a waiver of any other provision, nor a continuing waiver of the provision or provisions so waived.

13. I understand that no provision of this agreement can be amended or waived except in writing signed by an officer of your Company, and that this agreement shall continue in force until its termination by me is acknowledged in writing by an officer of your Company, or until written notice of termination by you shall have been mailed to me at my address last given you.

Form 1346 (Rev. 2-97)

**CLIENT: PLEASE SIGN ON THE BACK OF THE LAST PAGE**



| Branch | Account No. | FA | Doc. ID |
|--------|-------------|-----|---------|
| 0 1 5 | 2 9 7 2 5 5 | 8 5 | 42 |

14. • Arbitration is final and binding on the parties.
    • The parties are waiving their right to seek remedies in court, including the right to jury trial.
    • Pre-arbitration discovery is generally more limited than and different from court proceedings.
    • The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.
    • The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

The undersigned agrees, and by carrying an account for the undersigned you agree, all controversies which may arise between us concerning any transaction or the construction, performance or breach of this or any other agreement between us, whether entered into prior to or subsequent to the date hereof, shall be determined by arbitration.

This contract shall be governed by the laws of the State of New York, and shall inure to the benefit of your successors and assigns, and shall be binding on the undersigned, my heirs, executors, representatives, attorneys-in-fact, administrators and assigns. Any controversy arising out of or relating to my account or to transactions with or for me or to this Agreement or the breach thereof, and whether executed or to be executed within or outside of the United States, shall be settled by arbitration before either the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. or any other self-regulatory organization of which Prudential Securities Incorporated is a member, as I may elect and under the then existing arbitration procedures of the forum I have elected. If I do not make such election by registered mail addressed to you at your main office within five (5) days after demand by you that I make such election, then you may make such election. Notice preliminary to, in conjunction with, or incident to such arbitration proceeding, may be sent to me by mail and personal service is hereby waived. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Without notice to me. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

15. If any provision hereof is or at any time should become inconsistent with any present or future law, rule or regulation of any securities or commodities exchange or of any sovereign government or a regulatory body thereof and if any of these bodies have jurisdiction over the subject matter of this agreement, said provision shall be deemed to be superseded or modified to conform to such law, rule or regulation, but in all other respects this agreement shall continue and remain in full force and effect.

**Lending Agreement**

You and any firm succeeding to your firm are hereby authorized from time to time to lend separately or together with the property of others, either to yourselves or to others, any property, together with all attendant rights of ownership, which you may be carrying for me on margin. In connection with such loans, you may receive and retain certain benefits to which I will not be entitled. In certain circumstances, such loans may limit, in whole or in part, my ability to exercise voting rights of the securities lent. This authorization shall apply to all accounts carried by you for me and shall remain in full force until written notice of revocation is received by you at your principal office in New York.

By signing this agreement, I acknowledge that my securities may be loaned to you or loaned out to others.

By signing this agreement, I acknowledge that I have received a copy of this agreement.

This agreement contains a pre-dispute arbitration clause at page 2 at paragraph 14.

X _____                                    2/27/01
  Client's Signature (Please Sign and Print)                  Date

X _____
  Client's Signature (If Joint Account) (Please Sign and Print)    Date

[barcode]

**EXHIBIT G**
**NOLA, LLC COMMAND ACCOUNT MARGIN AGREEMENT**



# COMMAND℠ Account
### Margin Agreement



**Prudential Securities**

Prudential Securities Incorporated, a subsidiary of The Prudential Insurance Company of America, Newark, New Jersey

## GENERAL INFORMATION ABOUT MARGIN

A Prudential Securities Incorporated margin account allows an investor to borrow against the value of the eligible securities in the account. A traditional use of margin is to purchase or sell securities. Margin maintenance refers to the amount of market value that an investor is required to maintain in his account. If the value of the securities in an investor's account falls below the margin maintenance requirement an investor is subject to a "margin maintenance call" from Prudential Securities Incorporated. A maintenance call from Prudential Securities Incorporated asks that the investor repay all or part of the investor's debt in cash, or deposit or sell a sufficient amount of securities to cover the margin maintenance required, which sale could result in a substantial realized loss to the investor. An investor entering into a margin agreement authorizes Prudential Securities Incorporated to lend securities that Prudential Securities Incorporated may be carrying on margin for the investor. In some instances such loans may limit an investor's ability to exercise voting rights in the securities.

**1. COMMAND ACCOUNT.** I/we ("Client") hereby request that Prudential Securities Incorporated ("Prudential Securities") accept a Prudential Securities COMMAND Account ("COMMAND Account") application in Client's name as appears below. This Agreement sets forth the terms and conditions that govern the COMMAND Account to be provided to the Client, and in consideration of Prudential Securities accepting such COMMAND Account, Client hereby agrees to abide by all such terms and conditions, as of the date of execution.

**The Visa/Check Account** Client understands that, under the terms of this Agreement, a COMMAND Account consists of a Prudential Securities margin account (the "Securities Account") which is linked to a choice of either an investment fund ("COMMAND Fund") or to the COMMAND Insured Income Account℠ ("CMIIA") as described in the COMMAND Program Description (the COMMAND Fund and the CMIIA together shall be known as Primary Investment Vehicle), plus a Visa® Gold Card Account ("Visa Card Account") and COMMAND Checks ("Checks") provided by The Prudential Bank ("PB")*, with which Prudential Securities maintains an agreement. Under the terms of the Agreement between PB and Prudential Securities, the Visa Card Account may be opened, one or more Visa Gold Cards (the "Card") may be issued, and Checks may be provided for use in the COMMAND Account. The Visa Card Account and Checks shall be referred to as "Visa/Check Account."

**Tenancy by the Entirety Accounts** For Tenancy by the Entirety Accounts, Clients specifically authorize each other to use the COMMAND Account to buy and sell securities, write checks and use the Visa Gold Card or otherwise use the assets of the COMMAND Account without the prior approval of the other.

**Fees** Client understands that Prudential Securities will charge the Client an annual fee for services provided hereunder by debiting Client's COMMAND Account. Such fee is paid in advance and set forth in the COMMAND Program Description, the receipt of which Client hereby acknowledges. Client will be informed of any fee changes in advance. Should Client's COMMAND Account be terminated for any reason, Client will not receive a refund of any portion of that annual fee.

**Special Accounts** Prudential Securities, in its discretion, may modify the conditions of the COMMAND program for special accounts and limited categories of clients.

Prudential Securities investment advisory clients that participate in a Prudential Securities sponsored managed account program ("Advisory clients") and Employee Benefit Plan clients on whose behalf Prudential Securities files Form 1099-R with the Internal Revenue Service will not receive the features referenced in Section 3, below.

## 2. THE SECURITIES ACCOUNT

**Primary Fund and Automatic Daily Sweep** Client may use Client's Securities Account to purchase and sell securities, including options, on margin

or otherwise. Concurrent with the opening of Client's COMMAND Account, Client will choose one of the COMMAND Funds or CMIIA as Client's Primary Investment Vehicle. Free credit cash balances in Client's Securities Account of $1 or more will be automatically invested or deposited, on a daily basis, in the Primary Investment Vehicle by means of a purchase order submitted to the Primary Fund or a deposit into CMIIA by Prudential Securities, in accordance with the terms of the COMMAND Fund's prospectus or the Program Description. In addition, Client may make manual purchases of shares of another Money Fund ("Secondary Money Fund") or manual deposits into CMIIA as a Secondary Investment Vehicle. The purchase price for shares of the COMMAND Funds will be the net asset value per share next determined after receipt by a COMMAND Fund of a purchase order. Ordinarily, Prudential Securities may place a purchase order to the COMMAND Funds for shares or make a deposit to the CMIIA on Client's behalf to enable Client to purchase COMMAND Fund shares and earn COMMAND Fund dividends or earn CMIIA interest prior to final collection of deposits received to Client's Securities Account. However, in certain situations a purchase order or deposit entered until free credit cash balances or cash in the form of Federal Funds becomes available to Prudential Securities. Prudential Securities may reasonably withhold access to the funds so advanced until Prudential Securities is satisfied that any and all deposits to Client's Securities Account have been collected.

**Dividends/Interest** The COMMAND Funds expect to declare dividends daily, as earned, on shares of a COMMAND Fund and will reinvest daily any such dividends in COMMAND Fund shares. Dividends will be credited directly to Clients' COMMAND Account on a monthly basis. Client understands that an investment in shares of the COMMAND Funds is not equivalent to a bank deposit. As with any investment in securities, the value of Client's investment may fluctuate. The shares of beneficial interest of the COMMAND Funds are maintained on the register of the COMMAND Fund. Certificates are not physically issued.

**Securities Protection** Securities in Clients' Account are protected by the Securities Investor Protection Corporation and additional similar protection is provided through insurance purchased by Prudential Securities. CMIIA balances and interest are insured through the depository institution's Federal Deposit Insurance Corporation coverage.

**Redeeming Shares from Primary Investment Vehicle** Shares and cash comprising Client's Primary Investment Vehicle will be redeemed (at net asset value) or withdrawn, automatically, to satisfy debit balances in Client's Securities Account. Next shares and cash comprising Client's Secondary Investment Vehicle will be redeemed (at net asset value) or withdrawn, automatically, to satisfy debit balances in Client's Securities Account. Thereafter, Client's shares in other money market funds managed by Prudential Investment Fund Management LLC ("Prudential Money Funds") or balances in other insured income accounts will be redeemed at their net asset value or withdrawn, automatically, to satisfy debit balances in Client's Securities Account. If Client is eligible and elects the Monthly Automatic Payout feature, and/or the Cash Transfer Service feature, then the liquidation sequence set forth below in Section 3 will be applicable. No fee, commission or other charge will be made with respect to the purchase or redemption of COMMAND Fund or Prudential Money Fund shares or deposit to and withdrawal from CMIIA or other insured income accounts. Affiliates of Prudential Securities receive fees in connection with the operation of the COMMAND Funds. Administration, distribution and advisory fees will be paid by the COMMAND Funds as set forth in the COMMAND Fund prospectus. Client acknowledges receipt of the COMMAND Fund prospectus, which more fully describe the COMMAND Funds and the COMMAND Program Description, which describes the CMIIA.

**3. THE PB VISA/CHECK ACCOUNT** Client hereby applies to PB for a Visa/Check Account and may request that Checks be provided and, if applicable, that one or more Visa Gold Cards ("Card") be issued (or use

*The Prudential Bank means either the Prudential Bank & Trust Company or The Prudential Savings Bank F.S.B., each of which is a subsidiary of The Prudential Insurance Company of America.

03/28/2001    16:11      3123419555              RESOURCE TECHNOLOGY                    PAGE   82

TOTAL P.02

| Office | Account No. | IA | Doc. ID |
|--------|-------------|-----|---------|
| O,1,5 | 2,9,7,2,5,5 | P,S | CM |

given to Prudential Securities, or at such other address as Client may hereafter give Prudential Securities in writing, or to Prudential Securities, at its Branch Office servicing Client's Account. All notices and other communications shall be deemed given, if by personal delivery or facsimile transmission, on the date of such delivery or, if by mail, on the date of postmark when deposited, prepaid, in a US Post Office Box.

**12. REPRESENTATIONS.** Client is of full age and represents that Client is not an employee of any Exchange or of a Member Firm of any Exchange or the NASD other than Prudential Securities, and that Client will promptly notify Prudential Securities in writing if Client becomes so employed. Unless otherwise agreed in writing, Client agrees to pay commissions, charges, interest and fees at Prudential Securities' prevailing rates which may be changed from time to time without notice to the Client, and to pay Prudential Securities' reasonable attorneys' fees and interest at the highest lawful rate in Prudential Securities must take legal action to collect any amounts due from Client to Prudential Securities. Prudential Securities may require Client to prepay for any order. Client agrees to pay for all transactions no later then settlement date. Prudential Securities shall have a general lien on all properties Client may have on deposit with Prudential Securities either singly or jointly with another or otherwise and may, without notice to Client or Clients' successors, at its discretion, liquidate or transfers any such property in order to satisfy any indebtedness Client may have to Prudential Securities or to relieve Prudential Securities of any risk of a deficit existing in any of Clients' accounts. Client shall be liable for any remaining deficiency in any of Clients' accounts. Prudential Securities may conduct all transactions for Client in accordance with the customs and usages of securities firms and of the various exchanges.

**14. ACTS OF GOD.** Client understands that Prudential Securities will not be liable for loss caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, strikes, "Acts of God" or conditions beyond Prudential Securities' control.

**15. CAPTIONS.** Section captions have been inserted solely for the purpose of convenience in description and under no circumstances shall be deemed to qualify any of the rights set forth in the provisions.

**16. ARBITRATION/GOVERNING LAW**
- Arbitration is final and binding on the parties.
- The parties are waiving their right to seek remedies in court, including the right to jury trial.
- Pre-arbitration discovery is generally more limited than and different from court proceedings.
- The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.
- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree that all controversies which may arise between us concerning any transaction (whether executed or to be executed within or outside of the United States), my account or this or any other agreement between us, whether entered into prior, on or subsequent to the date indicated on the signature page, shall be determined by arbitration. The arbitration

may be before either the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. or any other self-regulatory organization of which Prudential Securities is a member, as I may elect and shall be governed by the laws of the State of New York. If I do not make such election by registered mail addressed to you at your main office within five (5) days after demand by you that I make such election, then you may make the election. Any action in connection with such arbitration proceedings, may be sent to me by mail, and I hereby waive personal service. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction, without notice to me. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein. This Agreement shall be governed by the laws of the State of New York, and shall inure to the benefit of Prudential Securities's successors and assigns, and shall be binding on the undersigned, Client's representatives, attorneys-in-fact, heirs, executors, administrators and assigns.

**17. Signature.** Client hereby consents and agrees to all of the terms and conditions of this Agreement appearing above and as continued on the reverse side.

For Corporate Accounts Only: A resolution of Client's Board of Directors authorizing the opening of this COMMAND Account must be attached. Client further warrants to PSI that the officers signing below are authorized and empowered, for and on behalf of the corporation, pursuant to the resolution of the Board of Directors of a margin COMMAND Account with PSI with complete and full authority to act on behalf of the corporation, to receive and distribute funds, write and sign Checks, and make charges on Client's Visa Card or against Client's Corporate COMMAND Account. This Agreement contains a pre-dispute arbitration clause on Page 2, in Section 16.

Account Name (Please Print)  _David _____ (Main)_

X _____
Signature

Account Name (If Joint Account)

X _____
Signature



CMO082PS

P.02

**EXHIBIT H**
**AUTHORIZATION LETTER FOR DAVID NEUHAUSER TO**
**DEPOSIT LOOP CHECKS INTO NOLA ACCOUNT**

757016_1

015-297255-85

TOTAL P.02

Dear Prudential Securities,

Please except checks from Loop Corp account HLY-964831 to be deposited into the Nola account 015-29725. Thank you

David Neuhauser



**EXHIBIT I**
**JUNE 4, 2001 CORRESPONDENCE FROM C. PHILIP CURLEY, ESQ.**

LAW OFFICES

ROBINSON CURLEY & CLAYTON, P.C.

SUITE 1700

300 SOUTH WACKER DRIVE

CHICAGO, ILLINOIS 60606

Telephone (312) 663-3100

Facsimile (312) 663-0303

E-Mail: RCCLAW@INIL.COM

ELLEN G. ROBINSON
C. PHILIP CURLEY
FAY CLAYTON
ALAN F. CURLEY
CYNTHIA H. HYNDMAN
JOHN H. WICKERT
SUSAN VALENTINE

JOHN D. CUMMINS, JR.
ELIZABETH J. HUBERTZ
CAROL A. JONES
ROBERT L. MARGOLIS
ROBERT S. MICHAELS
JOYCE A. POLLACK

June 4, 2001

<u>VIA FACSIMILE AND FIRST CLASS MAIL</u>

Patricia Roy, Esq.
Prudential Securities Incorporated
One New York Plaza
New York, NY 10292

    Re:   Nola, Inc. - 015-29725-5 and
             <u>Loop Corp - HLY-964830-1</u>

Dear Ms. Roy:

      As you know, I represent Loop Corp and NOLA, LLC in connection with their existing margin balances with your firm. As we have discussed over the telephone, my clients propose that your firm refrain from exercising its rights under the margin agreements and forebear any and all proceedings and actions of any kind against my clients, including but not limited to liquidating remaining positions in HRML stock in their accounts, in consideration for an assignment of proceeds from the sale of two downtown Chicago multi-story office buildings located at 330 South Wells Street and 407 South Dearborn Street. Copies of the listing agreements for the two properties are enclosed herewith.

      It is expected that sale of the properties will close within ninety days. Please indicate your agreement in principle to this proposal by return facsimile mail so that we may begin the necessary paperwork, and be sure to call me directly if you have any questions.

                Very truly yours,

                ROBINSON CURLEY & CLAYTON, P.C.

                C. Philip Curley

CPC/dsr



300152

## Representation Agreement
### (Exclusive Authorization to Sell or Exchange)

##### THIS IS INTENDED TO BE A LEGALLY BINDING AGREEMENT. READ IT CAREFULLY.

The undersigned ("Seller") hereby employs Marcus & Millichap of Chicago ("Agent") and grants to Agent, for a period of time (the "Term") commencing on <u>May 30</u>, <u>2001</u>, and ending at midnight on <u>September 30</u>, <u>2001</u>, and subject to extension as set forth in paragraph 3 below, the exclusive and irrevocable right and authority to sell that certain real property (the "Property") located in <u>Chicago</u>, County of <u>Cook</u>, State of <u>Illinois</u>, and more particularly described as follows:

### 330 South Wells Street – PIN:17-16-228-014

If the Property described above consists of two or more separate legal parcels Seller agrees to sell all or any combination of such parcels, and the term "Property" as used herein shall refer to any such combination. The term "Property" as used herein also shall include any interest therein or in its ownership.

1) TERMS AND CONDITIONS OF SALE: Seller agrees to accept an offer containing the following terms and conditions of sale.

   a. Purchase price: The purchase price for the Property is <u>SEVEN : EIGHT Million Hundred Thousand</u> dollars ($ <u>700,000</u>) payable at the closing pursuant to the terms stated in the Standard Addendum attached hereto.

   b. Deposit: There shall be a minimum deposit of <u>Two Hundred Thousand</u> dollars ($ <u>200,000</u>), which shall be credited to the purchase price at closing. Agent is authorized to accept such deposit on behalf of Seller, and Agent shall hold the deposit in a federally insured interest-bearing account at a banking institution designated by Agent. All interest shall be held with and become a part of the Deposit.

   c. Closing and Title Fees: Closing shall take place within <u>Sixty</u> (<u>60</u>) days after the effective date of an executed purchase agreement [ ] at the office of <u>T.B.D.</u>, located at <u>T.B.D.</u> ("Closing Agent"). Title shall be insured by a standard owner's title insurance policy issued by a title insurance company licensed to do business in the State of Illinois in the amount of the purchase price with premium paid by <u>Seller.</u> All other closing costs shall be paid in accordance with the custom in the county in which the Property is located.

   d. Prorations: Rents, interest on any debt being assumed or taken subject to by Buyer, and any other expenses of the Property shall be prorated as of closing. Security deposits, advance rentals, and the amount of any future lease credits shall be credited to Buyer. Real estate taxes for the year <u>2000/2001</u> shall be prorated on the basis of <u>105</u> % of the most recent ascertainable taxes [ x ] such prorations to be final / [ ] such taxes to be reprorated upon receipt of the actual bill. The amount of any bond or assessment which is a lien and not customarily paid with real property taxes shall be [x] paid / [ ] assumed by _____.

   e. Title Report: Within <u>Fifteen</u> (<u>15</u>) days after the effective date of an executed purchase agreement, Seller shall procure and cause to be delivered to Buyer a commitment for a standard owner's title insurance policy on the Property.

   f. Other terms and conditions:

2) COMMISSION: In consideration of the brokerage services to be rendered by Agent, Seller agrees to pay to Agent a commission equal to <u>Three & Three Quarter</u> percent (<u>3.75</u> %) of the purchase price of the Property upon the occurrence of any of the following events: ONE 3.25

   a. Agent procures a buyer during the Term, or any extension thereof, who is ready, willing and able to purchase the Property on the terms and conditions set forth herein or on any other terms and conditions acceptable to Seller, or

   b. The Property is sold, exchanged, leased with an option to purchase or otherwise conveyed during the Term, or any extension thereof, whether by Seller or by or through any other person or entity; or

   c. The Property is withdrawn from the market or made unmarketable by Seller during the Term, or any extension thereof, or this Representation Agreement is revoked by Seller, or Seller otherwise prevents or precludes Agent's performance hereunder; or

   d. A sale, exchange or other conveyance of the Property is made within nine (9) months after the expiration of the Term to a person or entity with whom Agent has negotiated, or to whose attention Agent has brought the Property, or who was

such person or entity has been submitted to Seller by delivery of a written offer to purchase the Property prior to expiration of the Term or a written notice within thirty (30) calendar days after such expiration. With respect to a sale, exchange or other conveyance to any such person or entity, Agent shall conclusively be deemed to be the procuring cause. The term "Prospective Purchaser" shall include that person or entity to whose attention Agent has brought the Property, as well as any partnership, joint venture, corporation, trust or other similar entity which that person or entity represents or in which it holds an ownership or beneficial interest.

In the case of any sale this commission shall be paid in cash at the closing, and Agent shall be entitled to make demand of any escrow holder or Closing Agent for payment from the proceeds of sale. Seller and Agent agree that if completion of a sale of the Property pursuant to a duly executed purchase agreement is prevented by default of the buyer, Seller shall be obligated to pay to Agent only an amount equal to one-half of any damages or other monetary compensation (including liquidated damages) collected from said buyer by suit or otherwise as a consequence of buyer's default, if and when such damages are collected; provided, however, that the amount due Agent shall not exceed the brokerage commission set forth above.

3)   EXTENSION OF TERM: If an agreement or letter of intent for the sale of the Property is executed by all necessary parties, and if said agreement or letter of intent is revoked, rescinded or otherwise terminated, and subsequently canceled, the Term shall be extended by the number of calendar days during which the sale agreement or letter of intent was in effect, whichever is longer. The maximum extension permitted hereunder shall be the number of days remaining in the Term from the date the sale agreement or letter of intent was executed, whichever event occurred earlier. Notwithstanding the foregoing, this Representation Agreement shall expire in all cases no later than nine (9) months after the original termination date stated above. The purpose of this extension provision is to allow Agent the opportunity to expose the Property to the marketplace for the full period of time contemplated by this Agreement.

4)   TITLE: Seller represents and warrants to Agent that fee title to the Property is now vested as follows: __In Trust__    that Seller and the individuals executing this Representation Agreement on behalf of Seller are duly authorized and empowered to execute this Representation Agreement and any subsequent Purchase Agreement; and that execution hereof shall not result in any breach of, or constitute a default under, any contract or other agreement to which Seller is a party.

5)   SELLER'S REPRESENTATIONS AND WARRANTIES: Seller and Agent acknowledge that any sale of Property shall be on an "as is" basis and, therefore, the following shall not inure to the benefit of any prospective purchaser.

a.   Material Defects: Seller represents and warrants that Seller knows of no material defects of the Property, including, but not limited to, energy conservation and/or safety retrofit(s) required by local ordinance as a condition of transfer. (Note any exceptions:_____

b.   Compliance with Laws: Seller represents and warrants that, to the best of Seller's knowledge, the Property and all improvements thereon are in compliance with all applicable laws, codes,       regulations and other similar governmental standards and requirements and that no material structural modifications or alterations of the improvements on the Property have been made without appropriate permits. (Note any exceptions:_____

c.   Flood Zone: Seller represents and warrants that the Property is not in a flood zone as set forth on H.U.D. "Special Flood Zone Area Maps."

d.   Hazardous Materials: Seller represents and warrants that, to the best of Seller's knowledge, the Property is not contaminated with any hazardous materials, including, but not limited to, asbestos, PCB transformers, other toxic, hazardous and contaminated substances, and underground storage tanks. (Note any exceptions:_____) Seller agrees to disclose to Agent and to prospective buyers any and all information which Seller has or may acquire regarding the presence and location of any hazardous materials on or about the Property. Seller agrees to comply with the Illinois Responsible Property Transfer Act (RPTA) and other local or state provisions concerning environmental information.

e.   Lead-Based Paint Hazards: Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 must be notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The Seller of any interest in residential real property is required to provide the Buyer with any information on lead-based paint hazards. (SELLER TO CHECK ONE OF THE FOLLOWING AND INITIAL.)
SELLER'S DISCLOSURE:

(_____) Seller has provided the Agent with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (List documents below):_____

(_____) Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

SELLER'S INITIALS _____

f.   Estoppel Certificates: Seller represents and warrants that Seller shall have the sole responsibility to investigate the accuracy of information set forth in any tenant's or lessee's estoppel certificate, and Seller further represents and warrants, to the best of Sellers knowledge, that the information contained in the estoppel certificates is complete and correct.

g.   Records, Financial Data and Marketing Assistance: Seller agrees to furnish, to certify as true and correct, and to make available to Agent and prospective buyers all financial data, rent statements, leases and other operating records of the Property, and to provide Agent with such assistance as Agent may reasonably request in marketing the Property. Seller agrees to refer promptly to Agent all inquiries of anyone interested in the Property.

h.   Indemnification: Seller agrees to indemnify and hold Agent harmless from and all liability, damages, losses, causes of action, or other claims (including attorneys' fees and other defense costs) arising from or asserted in connection with any incomplete or inaccurate information provided by Seller, or any material information concerning the Property which Seller has failed to disclose.

6)   SURVEY: Seller shall furnish at Seller's expense, a current survey acceptable to Buyer's lender by a licensed land surveyor, showing the present location of all improvements and encroachments, if any.

7)   INSPECTION OF PROPERTY: Seller agrees that Agent and its representatives shall have the right to enter upon and inspect the interior and exterior of the Property with prospective purchasers at all reasonable times.

8)   BEST EFFORTS: Agent agrees to use its best efforts in attempting to effect a sale of the Property.

9)   AFFILIATED BROKERS/DUAL AGENCY: Agent is affiliated with other brokerage companies in other states. Agent shall disseminate information about the Property to such affiliated brokers, inviting the submission of offers on the Property. Seller authorizes Agent and any affiliated broker to represent any prospective buyer in the acquisition of the Property, and to submit offers on behalf of such buyers. Seller understands that this authorization may result in Agent's representing both Seller and a prospective buyer, and Seller hereby authorizes and consents to such dual representation.

10)  OTHER BROKERS: In its efforts to best represent Seller, Agent reserves the right to cooperate or not cooperate with other licensed real estate brokers not affiliated with Agent. Agent reserves this right in an effort to minimize unauthorized showings and unnecessary disclosures of the Property. If Agent does elect to cooperate with unaffiliated brokers, it will be only with such brokers as Agent, in its sole discretion, believes to be properly qualified. Seller agrees that, in the event any broker other than Agent or a broker affiliated with Agent is involved in the disposition of the Property, Agent shall have no liability to Seller for the acts or omissions of such other broker, who shall not be deemed to be a subagent of Agent.

11)  ARBITRATION: If a controversy arises with respect to the subject matter of this Representation Agreement or any provision hereof, Seller and Agent agree that such controversy shall be settled by final, binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

12)  ATTORNEYS' FEES: In any litigation, arbitration or other legal proceeding which may arise between   the parties hereto, the prevailing party shall be entitled to recover its costs, including costs of arbitration, and reasonable attorneys' fees in addition to any other relief to which the party may be entitled.

13)  EXCHANGE/LEASE WITH OPTION: As used in this Agreement, the terms "sale," "sell" or "purchase" shall be understood to include an exchange of the Property or a lease with an option to purchase. In the event of an exchange, if no purchase price is identified, the commission described in Paragraph 2 above shall be calculated as a percentage of the exchange value of the Property. Agent is hereby authorized to represent all parties to any such exchange transaction and to collect compensation or commissions from them, provided there is full disclosure to all principals of such agency.

14)  TAX WITHHOLDING: Seller agrees to execute and deliver any instrument, affidavit or statement, or to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder.

15)  ADDENDA: Any addendum attached hereto and either signed or initialed by the parties shall be deemed a part hereof. This Representation Agreement expresses the entire agreement of the parties and supersedes any and all previous agreements between them with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge the terms hereof, and there no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. Any modification of this Representation agreement will be effective only if it is in writing and signed by the party

05/01/2001  15:54    3123419596             RESOURCE TECHNOLOGY              PAGE  05

to be charged.

(16) **NON-DISCRIMINATION:** Agent and Seller acknowledge that it is illegal for either Seller or Agent to refuse to lease or sell to any person on the basis of race, color, national origin, sex, marital status or physical disability.

(17) **COMPLIANCE WITH LAWS:** Agent and Seller acknowledge that the provisions of the Uniform Vender and Purchaser Risk Act of Illinois and the Real Estate Settlement Procedures Act of 1974, as amended, shall be applicable to this Representation Agreement. Seller agrees to comply with applicable local ordinances relating to the sale of the Property and Seller agrees to pay all transfer taxes allocable to Seller under both local ordinance and state law and shall otherwise comply with all local and state laws.

(18) **GOVERNING LAW:** This Representation Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. The undersigned Seller and Agent agree to the terms and conditions set forth in this Representation Agreement, and Seller acknowledges receipt of an executed copy hereof.

SELLER: _____

SELLER: _____

Address: _200 West Partners L.P_
_330 S. Wells #711_
_Chicago, IL   60606_

DATE: ___05/30/2001___

Telephone: _312-541-4048_

AGENT: MARCUS & MILLICHAP INCORPORATED OF CHICAGO

BY:    David Agosto, Howard Wiese & Erik Foster

Address: __8750 West Bryn Mawr, Suite #750__

_Chicago, Illinois 60631_

DATE ___05/30/2001___

REPRESENTATION IS MADE BY AGENT AS TO THE LEGAL OR TAX EFFECT OR VALIDITY OF ANY PROVISION OF THIS REPRESENTATION AGREEMENT. A REAL ESTATE BROKER IS QUALIFIED TO GIVE ADVICE ON REAL ESTATE MATTERS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT YOUR ATTORNEY OR TAX ADVISOR.

200156

  
to be charged.

16) NON-DISCRIMINATION: Agent and Seller acknowledge that it is illegal for either Seller or Agent to refuse to lease or sell to any person on the basis of race, color, national origin, sex, marital status or physical disability.

17) COMPLIANCE WITH LAWS: Agent and Seller acknowledge that the provisions of the Uniform Vendor and Purchaser Risk Act of Illinois and the Real Estate Settlement Procedures Act of 1974, as amended, shall be applicable to this Representation Agreement. Seller agrees to comply with applicable local ordinances relating to the sale of the Property and Seller agrees to pay all transfer taxes allocable to Seller under both local ordinance and state law and shall otherwise comply with all local and state laws.

18) GOVERNING LAW: This Representation Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. The undersigned Seller and Agent agree to the terms and conditions set forth in this Representation Agreement, and Seller acknowledges receipt of an executed copy hereof.

SELLER: _____

Address: _200 West Partners LP_

_370 S Wells #711_

_Chicago, IL 60606_

SELLER: _____

DATE: _05/30/2001_

Telephone: _312-371-4048_

AGENT: MARCUS & MILLICHAP INCORPORATED OF CHICAGO

BY: _David Agosto, Howard Wiese & Erik Foster_

Address: _8750 West Bryn Mawr, Suite #750_

_Chicago, Illinois 60631_

DATE _05/30/2001_

REPRESENTATION IS MADE BY AGENT AS TO THE LEGAL OR TAX EFFECT OR VALIDITY OF ANY PROVISION OF THIS REPRESENTATION AGREEMENT. A REAL ESTATE BROKER IS QUALIFIED TO GIVE ADVICE ON REAL ESTATE MATTERS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT YOUR ATTORNEY OR TAX ADVISOR.

## Representation Agreement
### (Exclusive Authorization to Sell or Exchange)

THIS IS INTENDED TO BE A LEGALLY BINDING AGREEMENT. READ IT CAREFULLY.

The undersigned ("Seller") hereby employs Marcus & Millichap of Chicago ("Agent") and grants to Agent, for a period of time (the "Term") commencing on May 30 , 2001 , and ending at midnight on September 30 , 2001 , and subject to extension as set forth in paragraph 3 below, the exclusive and irrevocable right and authority to sell that certain real property (the "Property") located in Chicago , County of Cook , State of Illinois , and more particularly described as follows:

### 407 South Dearborn Street – PIN:17-16-246-001 (Old Colony Building)

If the Property described above consists of two or more separate legal parcels Seller agrees to sell all or any combination of such parcels, and the term "Property" as used herein shall refer to any such combination. The term "Property" as used herein also shall include any interest therein or in its ownership.

1) TERMS AND CONDITIONS OF SALE: Seller agrees to accept an offer containing the following terms and conditions of sale: *AG*

   a. Purchase price: The purchase price for the Property is TEN MILLION SEVEN HUNDRED + FIFTY THOUSAND dollars ($10,750,000) payable at the closing pursuant to the terms stated in the Standard Addendum attached hereto.

   b. Deposit: There shall be a minimum deposit of Two Hundred Thousand dollars ($200,000 ), which shall be credited to the purchase price at closing. Agent is authorized to accept such deposit on behalf of Seller, and Agent shall hold the deposit in a federally insured interest-bearing account at a banking institution designated by Agent. All interest shall be held with and become a part of the Deposit.

   c. Closing and Title Fees: Closing shall take place within Sixty ( 60 ) days after the effective date of an executed purchase agreement [ ] at the office of T.B.D. , located at T.B.D. ("Closing Agent"). Title shall be insured by a standard owner's title insurance policy issued by a title insurance company licensed to do business in the State of Illinois in the amount of the purchase price with premium paid by Seller. All other closing costs shall be paid in accordance with the custom in the county in which the Property is located.

   d. Prorations: Rents, interest on any debt being assumed or taken subject to by Buyer, and any other expenses of the Property shall be prorated as of closing. Security deposits, advance rentals, and the amount of any future lease credits shall be credited to Buyer. Real estate taxes for the year 2000/2001 shall be prorated on the basis of 105 % of the most recent ascertainable taxes [ x ] such prorations to be final / [ ] such taxes to be reprorated upon receipt of the actual bill. The amount of any bond or assessment which is a lien and not customarily paid with real property taxes shall be [x] paid/ [ ] assumed by

   e. Title Report: Within Fifteen ( 15 ) days after the effective date of an executed purchase agreement, Seller shall procure and cause to be delivered to Buyer a commitment for a standard owner's title insurance policy on the Property.

   f. Other terms and conditions:

2) COMMISSION: In consideration of the brokerage services to be rendered by Agent, Seller agrees to pay to Agent a commission equal to ~~Three & Three Quarter~~ percent (~~3.75 %~~) of the purchase price of the Property upon the occurrence of any of the following events: Three and One Quarter  3.25 % *AG*

   a. Agent procures a buyer during the Term, or any extension thereof, who is ready, willing and able to purchase the Property on the terms and conditions set forth herein or on any other terms and conditions acceptable to Seller, or

   b. The Property is sold, exchanged, leased with an option to purchase or otherwise conveyed during the Term, or any extension thereof, whether by Seller or by or through any other person or entity; or

   c. The Property is withdrawn from the market or made unmarketable by Seller during the Term, or any extension thereof, or this Representation Agreement is revoked by Seller, or Seller otherwise prevents or precludes Agent's performance hereunder; or

   d. A sale, exchange or other conveyance of the Property is made within nine (9) months after the expiration of the Term to a person or entity with whom Agent has negotiated, or to whose attention Agent has brought the Property, or who was introduced to Seller by Agent as a prospective purchaser (herein, "Prospective Purchaser"), provided that the name of any such person or entity has been submitted to Seller by delivery of a written offer to purchase the Prop

the Term or a written notice within thirty (30) calendar days after such expiration. With respect to a sale, exchange or other conveyance to any such person or entity, Agent shall conclusively be deemed to be the procuring cause. The term "Prospective Purchaser" shall include that person or entity to whose attention Agent has brought the Property, as well as any partnership, joint venture, corporation, trust or other similar entity which that person or entity represents or in which it holds an ownership or beneficial interest.

In the case of any sale this commission shall be paid in cash at the closing, and Agent shall be entitled to make demand of any escrow holder or Closing Agent for payment from the proceeds of sale. Seller and Agent agree that if completion of a sale of the Property pursuant to a duly executed purchase agreement is prevented by default of the buyer, Seller shall be obligated to pay to Agent only an amount equal to one-half of any damages or other monetary compensation (including liquidated damages) collected from said buyer by suit or otherwise as a consequence of buyer's default, if and when such damages are collected; provided, however, that the amount due Agent shall not exceed the brokerage commission set forth above.

3)   EXTENSION OF TERM:  If an agreement or letter of intent for the sale of the Property is executed by all necessary parties, and if said agreement or letter of intent is revoked, rescinded or otherwise terminated, and subsequently canceled, the Term shall be extended by the number of calendar days during which the sale agreement or letter of intent was in effect, whichever is longer. The maximum extension permitted hereunder shall be the number of days remaining in the Term from the date the sale agreement or letter of intent was executed, whichever event occurred earlier. Notwithstanding the foregoing, this Representation Agreement shall expire in all cases no later than nine (9) months after the original termination date stated above.  The purpose of this extension provision is to allow Agent the opportunity to expose the Property to the marketplace for the full period of time contemplated by this Agreement.

4)   TITLE:  Seller represents and warrants to Agent that fee title to the Property is now vested as follows: __In Trust_____ that Seller and the individuals executing this Representation Agreement on behalf of Seller are duly authorized and empowered to execute this Representation Agreement and any subsequent Purchase Agreement; and that execution hereof shall not result in any breach of, or constitute a default under, any contract or other agreement to which Seller is a party.

5)   SELLER'S REPRESENTATIONS AND WARRANTIES:  Seller and Agent acknowledge that any sale of Property shall be on an "as is" basis and, therefore, the following shall not inure to the benefit of any prospective purchaser.

a.   Material Defects:  Seller represents and warrants that Seller knows of no material defects of the Property, including, but not limited to, energy conservation and/or safety retrofit(s) required by local ordinance as a condition of transfer.  (Note any exceptions:_____ )

b.   Compliance with Laws:  Seller represents and warrants that, to the best of Seller's knowledge, the Property and all improvements thereon are in compliance with all applicable laws, codes, _____ regulations and other similar governmental standards and requirements and that no material structural modifications or alterations of the improvements on the Property have been made without appropriate permits. (Note any exceptions:_____ )

c.   Flood Zone:  Seller represents and warrants that the Property is not in a flood zone as set forth on H.U.D. "Special Flood Zone Area Maps."

d.   Hazardous Materials:  Seller represents and warrants that, to the best of Seller's knowledge, the Property is not contaminated with any hazardous materials, including, but not limited to, asbestos, PCB transformers, other toxic, hazardous and contaminated substances, and underground storage tanks. (Note any exceptions: _____ ) Seller agrees to disclose to Agent and to prospective buyers any and all information which Seller has or may acquire regarding the presence and location of any hazardous materials on or about the Property.  Seller agrees to comply with the Illinois Responsible Property Transfer Act (RPTA) and other local or state provisions concerning environmental information.

e.   Lead-Based Paint Hazards:  Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 must be notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The Seller of any interest in residential real property is required to provide the Buyer with any information on lead-based paint hazards. (SELLER TO CHECK ONE OF THE FOLLOWING AND INITIAL.)
SELLER'S DISCLOSURE:

(_____)  Seller has provided the Agent with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (List documents below): _____

(_____)  Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing 00159

SELLER'S INITIALS _____

f. Estoppel Certificates: Seller represents and warrants that Seller shall have the sole responsibility to investigate the accuracy of information set forth in any tenant's or lessee's estoppel certificate, and Seller further represents and warrants, to the best of Sellers knowledge, that the information contained in the estoppel certificates is complete and correct.

g. Records, Financial Data and Marketing Assistance: Seller agrees to furnish, to certify as true and correct, and to make available to Agent and prospective buyers all financial data, rent statements, leases and other operating records of the Property, and to provide Agent with such assistance as Agent may reasonably request in marketing the Property. Seller agrees to refer promptly to Agent all inquiries of anyone interested in the Property.

h. Indemnification: Seller agrees to indemnify and hold Agent harmless from and all liability, damages, losses, causes of action, or other claims (including attorneys' fees and other defense costs) arising from or asserted in connection with any incomplete or inaccurate information provided by Seller, or any material information concerning the Property which Seller has failed to or disclose.

6) SURVEY: Seller shall furnish at Seller's expense, a current survey acceptable to Buyer's lender by a licensed land surveyor, showing the present location of all improvements and encroachments, if any.

7) INSPECTION OF PROPERTY: Seller agrees that Agent and its representatives shall have the right to enter upon and inspect the interior and exterior of the Property with prospective purchasers at all reasonable times.

8) BEST EFFORTS: Agent agrees to use its best efforts in attempting to effect a sale of the Property.

9) AFFILIATED BROKERS/DUAL AGENCY: Agent is affiliated with other brokerage companies in other states. Agent shall disseminate information about the Property to such affiliated brokers, inviting the submission of offers on the Property. Seller authorizes Agent and any affiliated broker to represent any prospective buyer in the acquisition of the Property, and to submit offers on behalf of such buyers. Seller understands that this authorization may result in Agent's representing both Seller and a prospective buyer, and Seller hereby authorizes and consents to such dual representation.

10) OTHER BROKERS: In its efforts to best represent Seller, Agent reserves the right to cooperate or not cooperate with other licensed real estate brokers not affiliated with Agent. Agent reserves this right in an effort to minimize unauthorized showings and unnecessary disclosures of the Property. If Agent does elect to cooperate with unaffiliated brokers, it will be only with such brokers as Agent, in its sole discretion, believes to be properly qualified. Seller agrees that, in the event any broker other than Agent or a broker affiliated with Agent is involved in the disposition of the Property, Agent shall have no liability to Seller for the acts or omissions of such other broker, who shall not be deemed to be a subagent of Agent.

11) ARBITRATION: If a controversy arises with respect to the subject matter of this Representation Agreement or any provision hereof, Seller and Agent agree that such controversy shall be settled by final, binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

12) ATTORNEYS' FEES: In any litigation, arbitration or other legal proceeding which may arise between   the parties hereto, the prevailing party shall be entitled to recover its costs, including costs of arbitration, and reasonable attorneys' fees in addition to any other relief to which the party may be entitled.

13) EXCHANGE/LEASE WITH OPTION: As used in this Agreement, the terms "sale," "sell" or "purchase" shall be understood to include an exchange of the Property or a lease with an option to purchase. In the event of an exchange, if no purchase price is identified, the commission described in Paragraph 2 above shall be calculated as a percentage of the exchange value of the Property. Agent is hereby authorized to represent all parties to any such exchange transaction and to collect compensation or commissions from them, provided there is full disclosure to all principals of such agency.

14) TAX WITHHOLDING: Seller agrees to execute and deliver any instrument, affidavit or statement, or to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder.

15) ADDENDA: Any addendum attached hereto and either signed or initialed by the parties shall be deemed a part hereof. This Representation Agreement expresses the entire agreement of the parties and supersedes any and all previous agreements between them with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge the terms hereof, and there no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. Any modification of this Representation agreement will be effective only if it is in writing and signed by the party to be charged.

16) NON-DISCRIMINATION: Agent and Seller acknowledge that it is illegal for either Seller or Agent to refuse to lease or sell to any person on the basis of race, color, national origin, sex, marital status or physical disability.

17) COMPLIANCE WITH LAWS: Agent and Seller acknowledge that the provisions of the Uniform Vender and Purchaser Risk Act of Illinois and the Real Estate Settlement Procedures Act of 1974, as amended, shall be applicable to this Representation Agreement. Seller agrees to comply with applicable local ordinances relating to the sale of the Property and Seller agrees to pay all transfer taxes allocable to Seller under both local ordinance and state law and shall otherwise comply with all local and state laws.

18) GOVERNING LAW: This Representation Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. The undersigned Seller and Agent agree to the terms and conditions set forth in this Representation Agreement, and Seller acknowledges receipt of an executed copy hereof.

SELLER: _____

SELLER: _____

Address: _Old Colony Partners LP_
_330 S. Wells # 711_
_Chicago, IL 60606_

Telephone: _312 841 4045_

DATE: _05/30/2001_

AGENT: MARCUS & MILLICHAP INCORPORATED OF CHICAGO

BY: _David Agosto, Howard Wiese & Erik Foster_

Address: _8750 West Bryn Mawr, Suite #750_
_Chicago, Illinois 60631_

DATE

REPRESENTATION IS MADE BY AGENT AS TO THE LEGAL OR TAX EFFECT OR VALIDITY OF ANY PROVISION OF THIS REPRESENTATION AGREEMENT. A REAL ESTATE BROKER IS QUALIFIED TO GIVE ADVICE ON REAL ESTATE MATTERS. IF YOU DESIRE LEGAL OR TAX ADVICE, ONSULT YOUR ATTORNEY OR TAX ADVISOR.

bcc:    Leon A. Greenblatt III

**EXHIBIT J**
**AUGUST 16, 2001 CORRESPONDENCE FROM C. PHILIP CURLEY, ESQ.**

757016_1

LAW OFFICES

# ROBINSON CURLEY & CLAYTON, P.C.

SUITE 1700

300 SOUTH WACKER DRIVE

CHICAGO, ILLINOIS 60606

___

TELEPHONE (312) 663-3100

FACSIMILE (312) 663-0303

E-MAIL: RCCLAW@INIL.COM

ELLEN G. ROBINSON
C. PHILIP CURLEY
FAY CLAYTON
ALAN F. CURLEY
CYNTHIA H. HYNDMAN
JOHN H. WICKERT
SUSAN VALENTINE

JOHN G. CUMMINS, JR.
ELIZABETH J. HUBERTZ
CAROL A. JONES
ROBERT L. MARGOLIS
ROBERT S. MICHAELS
DARLENE M. OLIVER
JOYCE A. POLLACK
ELYSSA BALINGIT WINSLOW

August 16, 2001

VIA FACSIMILE

Robert P. Bramnik
Wildman Harold Allen & Dixon
225 West Wacker Drive
Suite 3000
Chicago, IL 60606-1229

> Re: Nola, Inc. - 015-29725-5 and
> Loop Corp - HLY-964830-1

Dear Bob:

Unfortunately, my client is unable to raise the "Reg-T" margin call in the amount of $94,099. I have a draft Forbearance Agreement that I can forward to you for review if you would like. Also, please be advised that the Skyline Equities Realty, LLC/Gouletas letter of intent has been withdrawn as the purchaser insisted on seller financing that, among other things, would have made it difficult if not impossible for the sale to generate sufficient proceeds to pay Prudential. I am told, according to the real estate broker, that there are several other parties interested in the buildings and that a number of additional offers are expected within the next two weeks. I will continue to keep you advised.

Very truly yours,

ROBINSON CURLEY & CLAYTON, P.C.

C. Philip Curley

CPC/dsr



C00191

**EXHIBIT K**
**JANUARY 31, 2001 MARINE BANK WIRE TRANSFER REQUEST**

757016_1

DOMESTIC WIRE ✓

INTERNATIONAL _____

*WENDY*
*12:40 pm*
*12:55 pm*

| For Wire Dep't Use Only |
|---|
| Sc |
| Time: |

# CIB MARINE BANCSHARES, INC.
## OUTGOING WIRE TRANSFER REQUEST FORM

#2

**Originator Bank (circle one)**

| | | | | |
|---|---|---|---|---|
| Name: | Central Illinois Bank | CIB Bank-Chicago | (Marine Bank & Savings) | CIB Bank-indy | Mari |
| ABA: | 071122933 | 071901112 | 275970871 | 074014103 | |

DATE: ___1-31___

**SECTION I** (To be provided by customer)

**Customer Information (Sender)**

Account Name: LOOP CORP OF SOUTH DAKOTA     Account# 4000 5364

Address: 330 S. WELLS ST. SUITE 711     Source Of Funds (Circle One)

CHICAGO IL 60606

(Loan Disbursement)
Deposit Withdrawal
Other

Customer Initiating Wire MARINE BANK LOAN DOC CENTER

Amount $ 2,198,326.00

**Receiving Bank**

Bank Name PNC BANK NA     ABA# 031207607

DOMESTIC(9 digits required)

Bank Address →

City → | INTERNATIONAL ONLY |

Country →

Beneficiary SOUTH BEACH SECURITIES, INC     Account # 8103155917

Additional Instructions _____

To the extent allowed by law, the undersigned agrees that this wire transfer is irrevocable and that the sole obligation of CIB Marine Bancshares, inc. and its subsidiaries is to exercise ordinary care in processing this wire transfer. The Bank is not responsible for any losses or delays which occur as a result of any other parties involvement in processing this transfer.

X _____     X _____
                    Authorized Customer Signature(s)
If not signed by the customer , must be signed by an AVP or above on behalf of the customer.

**SECTION II** (All blanks need to be filled in by bank personnel)

Verification Method * BORROWING RESOLUTION     CALL BACK N/A

Available Balance $ 3,250,000     Fee charged $ N/A     Mandatory $20.00 fee for International wires

Memo post amount N/A

| Communicated to Wire Department |
|---|
| By Phone (217-892-9111) |
| Talked To: |
| By Fax (217-893-8251) |

Customer request taken by C HESS     JEFF HOLLENBECK V.P.

Account Debited 504654.     At Branch MAYFAIR

Account Credited 110590     Officer Authorization _____

TKTS MADE BY: C HESS     *Title is required for authorization verification GREGORY P. KOLTON PRESIDENT - CEO

* List method used to verify that customer is authorized to withdraw from the above noted account (ie., signature card (note if two signatures are required), drivers license)

**SECTION III** (For Wire Department Use Only)

| (For International Wires Only) |
|---|
| OFAC Procedures Completed by: |
| M&I Contact Person |
| Value Date |

Form rec'd/verified by _____     Time received _____

Transmitted by _____     Callback Contact _____

**MB-PROD 000362**

**EXHIBIT L**
**AFFIDAVIT OF ANDREW JAHELKA**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |  |
|---|---|---|
| MARINE BANK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 CH 12239 |
| | ) | Hon. Martin Agran |
| LOOP CORP OF SOUTH DAKOTA; LEON A. | ) | |
| GREENBLATT III; 200 WEST PARTNERS | ) | |
| LIMITED PARTNERSHIP; 200 WEST | ) | |
| PROPERTIES, INC.; OLD COLONY PARTNERS | ) | |
| LIMITED PARTNERSHIP; AND OLD COLONY | ) | |
| PROPERTIES, INC., | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF ANDREW A. JAHELKA

Andrew A. Jahelka, subject to penalty of perjury pursuant to § 1-109 of the Illinois Code of Civil Procedure, states as follows:

1.     I am the President of Loop Corp of South Dakota, a/k/a Loop Corp ("Loop Corp"), a defendant in this case. I am also the President of Old Colony Properties, Inc., which is the general partner of Old Colony Partners Limited Partnership, both of which are defendants in this case. I am also the President of 200 West Properties, Inc., which is the general partner of 200 West Partners Limited Partnership, both of which are defendants in this case.

2.     Attached hereto as Exhibit A is a true and correct copy of a Promissory Note given by Loop Corp in favor of BancoPanamericano, Inc., dated April 1, 2002, in the principal amount of $9,900,000, in connection with credit extended by BancoPanamericano, Inc. to Loop Corp.

MB-PROD 000105

3.    Attached hereto as Exhibit B is true and correct copy of a "Consolidated Amended and Restated Guaranty and Security Agreement ("the Agreement")," among, including but not limited to, Loop Corp, 200 West Properties, Inc., 200 West Partners Limited Partnership, Old Colony Properties, Inc., and Old Colony Partners Limited Partnership on one hand, and BancoPanamericano, Inc. on the other, by which, among other things, Loop Corp, Old Colony Properties, Inc. and 200 West Properties, Inc. granted certain liens in favor of BancoPanamericano, Inc. to secure the Promissory Note attached hereto as Exhibit A.

4.    The liens granted by virtue of the Agreement attached as Exhibit B extend to certain collateral that Marine Bank alleges was given by Loop Corp, Old Colony Properties, Inc., and 200 West Properties, Inc. to Marine Bank as collateral to secure the loan that is the subject of Marine Bank's Complaint in this case. That collateral includes, but is not necessarily limited to, Loop Corp's (former, as more fully described below) limited partnership interests in Old Colony Partners Limited Partnership and 200 West Partners Limited Partnership, as well as Old Colony Properties, Inc.'s general partnership interest in Old Colony Partners Limited Partnership and 200 West Properties, Inc.'s general partnership interest in 200 West Partners Limited Partnership. Thus, BancoPanamericano, Inc. has a security interest in the very same partnership interests that Marine Bank is attempting to foreclose upon in Marine Bank's Complaint.

5.    I am also the President of a corporation that is separate and distinct from Loop Corp called Loop Properties, Inc. On or about September 24, 2002, Loop Properties, Inc. acquired all of the limited partnership interests previously held and owned by Loop Corp in Old Colony Partners Limited Partnership and 200 West Partners Limited Partnership. These limited

2

MB-PROD 000106

partnerships interests were pledged as collateral to both Marine Bank and BancoPanamericano,

Inc. as set forth above.  Loop Properties, Inc. remains the owner of Loop Corp's former interests.

Andrew A. Jahelka

3

A

MB-PROD 000108

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call/Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $9,900,000 | 04-01-2002 | 12-31-2003 | | | | | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or document. Any item above containing "***" has been omitted due to text limitations.

Borrowers: Loop Corp., Inc, A South Dakota Corporation
401 South LaSalle Suite 1700
Chicago, IL 60605

Lender: Banco Panamericano, Inc
330 South Wells Street, Suite 718
Chicago, Illinois 60606

Principal Amount: $9,900,000
Initial Rate: 12.00%
Date of Note: April 1, 2002

PROMISE TO PAY. Loop Corp., Inc., A South Dakota Corporation ("Borrower") promises to pay to **BANCO PANAMERICANO, INC.** ("Lender"), or order, in lawful money of the United States of America, the principal amount or Nine Million Nine Hundred Thousand DOLLARS ($9,900,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued interest on December 31, 2003. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning May 31, 2002, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to accrued unpaid interest, then to principal, and any remaining amount to any unpaid collection costs and late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

PREPAYMENT. Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrowers of Borrower's obligation to continue to make payment s of accrued unpaid interest. Rather, early payments will reduce the principal balance due. borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: BANCO PANAMERICANO, INC., 330 South Wells Street Suite 718, Chicago, Illinois 60606

LATE CHARGE. If a payment is 10 days or more late, Borrowers will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

MB-PROD 000110

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, Lender, at its option, may if permitted under applicable law, increase the variable interest rate on this Note to 5.000 percentage points over the Index. The interest rate will not exceed the maximum rate permitted by applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrowers fails to make any payment when due under this Note.

**Other Defaults.** Borrowers fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrowers.

**Default in Favor of Third Parties.** Borrowers or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrowers's property or Borrowers's ability to repay this Note or perform Borrowers' obligations under this Note or any of the related documents other than one caused by any agreement of Borower with Lender.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrowers or on Borrowers's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.



**Death or Insolvency.** The death of Borrowers or the dissolution or termination of Borrowers's existence as a going business, the insolvency of Borrowers, the appointment of a receiver for any part of Borrowers's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrowers.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrowers or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrowers's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrowers as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrowers gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, of any of the indebtedness or any guarantor, endorser, surety, or dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, then upon notice Borrowers will pay that amount.

**ATTORNEY'S FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrowers does not pay. Borrowers will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrowers also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrowers hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrowers against the other.

**GOVERNING LAW.** This Note will be governed by, construed and enforced in accordance with federal law and the laws of the State of Illinois. This Note has been accepted by Lender in the State of Illinois.

**CHOICE OF VENUE.** If there is a lawsuit, Borrowers agrees upon Lender's request to submit to the jurisdiction of the courts of Cook County, State of Illinois.

**DISHONORED ITEM FEE.** Borrowers will pay a fee to Lender of $50.00 if Borrowers makes a payment on Borrowers's loan and the check of pre-authorized charge with which Borrowers pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrowers's accounts with Lender. This includes all accounts Borrowers holds jointly with someone else and all accounts Borrowers may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrowers authorizes Lender, to the e permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrowers acknowledges this Note is secured by a security interest in all Security Agreements

**LINE OF CREDIT.** This Note evidences a straight line of credit. Once the total amount of principal has been advanced, Borrowers is to entitled to further loan advances. Advances under this Note may be requested either orally or in writing by Borrowers or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person currently is authorized to request advances and authorize payments under the line of credit until Lender receives from Borrowers, at Lender's address shown above, written notice of revocation of his or her authority: **Loop Corporation** Borrowers agree to be jointly and severalbly liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrowers's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsement on this Note or by Lender's internal records, including but not limited to daily, weekly or monthly computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrowers or any guarantor is in default under the terms of this Note or any agreement that Borrowers or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrowers or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrowers have applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**LOAN PURPOSE.** The Undersigned hereby warrant and certify that the proceeds of this loan will be used solely for business purposes, as follows: repayment of prior indebtedness and purchase of uipment or other purpose approved by Lender.

**SECURITY INTEREST/DEPOSIT ACCOUNT.** The Undersigned further grants Lender a security interest in all of Undersigned's deposit accounts maintained with any organization. Should Undersigned maintain a deposit account, Bank is irrevocably appointed as Attorney-In-Fact to mail a notice to said organization with whom the deposit account is maintained perfecting Bank's security in said account. The undersigned further grants Lender a security interest in all property equipment trademarks licenses and any othe assset of Borrowers.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrowers, and upon Borrowers's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** This Note benefits Lender and its successors and assigns, and binds Borrowers and Borrowers's heirs, successors, assigns, and representatives. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this an without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWERS AND LENDER HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWERS AND LENDER AGREE TO THE TERMS OF THE NOTE.

BORROWERS ACKNOWLEDGES RECEIPT OF A COMPLETED COPYOF THIS PROMISSORY NOTE.

BORROWERS:

X_____
Loop Corp., Inc.
By Andrew Jahelka, Its authorized representative

MB-PROD 000112

B

MB-PROD 000113

CONSOLIDATED, AMENDED AND RESTATED GUARANTY AND SECURITY
AGREEMENT

among

Loop Corp. Inc., A South Dakota Corporation
AND EACH OPERATING
SUBSIDIARY AND EACH OPERATING
PARTNERSHIP DEFINED HEREIN
as BORROWERS and LOAN PARTIES

and

BANCO PANAMERICANO, INC., a South Dakota Corporation
AS LENDER

Dated as of April 1, 2002

## CONSOLIDATED
## LOAN, GUARANTY AND SECURITY AGREEMENT

This Consolidated Loan, Guaranty and Security Agreement, dated as of April 1, 2002 between Loop Corp., INC., A SOUTH DAKOTA CORP. and each Operating Subsidiary and each Operating Partnership (as defined in Section 1.1 below), as borrowers (collectively in such capacity, the "Borrowers" or "LOOP"), (as defined in Section 1.1 below), and the Lender, Banco Panamericano, Inc., a South Dakota Corporation.


MB-PROD 000114

PRELIMINARY STATEMENTS:

1.      In connection with the execution and delivery of the Existing Loan Agreement, certain Loan Parties executed certain other documents, agreements and instruments under which, among other things LOOP granted to the Lender Banco Panamericano, Inc., a South Dakota Corporation ("Banco" or "Lender") security interests in, and liens on lender or substantially all its assets as security for its obligations and liabilities under the Existing Loan Agreement.

2.      The Lender has made a demand loan to LOOP evidenced by (i) the Promissory Note dated April 1, 2002, made by LOOP to the Lender in the original principal amount of $9,900,000.

3.      In connection with the execution and delivery of the Existing LOOP Notes, certain Loan Parties executed certain other documents, agreements and instruments under which, among other things, LOOP granted security for LOOP's obligations and liabilities to the Lender.

4.      Under the Existing Loan Agreement, LOOP is indebted to the Lender, as of the date of this Agreement, in the outstanding principal amount of $9,900,000 under the Existing Note.

5.      LOOP has and may expand its business by, among other things, creating certain Operating Subsidiaries and Operating Partnerships and transferring certain assets to such Operating Subsidiaries and Operating Partnerships, and LOOP has requested the Lender extend additional credit to support LOOP's business expansion.

6.      The Lender is willing to provide the requested additional credit to LOOP on the terms and conditions contained in the Note as amended and this Agreement.  In this regard, the Loan Parties and the Lender desire to state the Existing Loan Agreement in its entirety to, among other things, (i) consolidate the various credit, collateral and guaranty agreements of the Loan Parties (including, without limitation, any existing LOOP Notes), (ii) provide for the additional credit facilities requested by the Loan Parties, (iii) modify certain terms and covenants set forth in any Existing Loan Agreement, (iv) reflect LOOP's present and contemplated business organizational structure and (v)continue security interests and liens in certain assets without any release or termination.

7.      The Loan Parties are affiliated with each other and certain Loan Parties are engaged in related businesses.  Each Loan Party acknowledges that the extension of credit by the Lender to the Borrowers benefits each Loan Party both directly and indirectly.

8.      Guarantors are defined to be in each Operating Subsidiary and each Operating Partnership.

MB-PROD 000115

<u>AGREEMENT</u>:

In consideration of the foregoing and the mutual agreements contained in this Agreement the parties to this Agreement agree as follows:

SECTION 1. <u>DEFINITIONS AND CONSTRUCTION</u>.

1.1     <u>General Terms</u>.  As used in this Agreement, unless the context otherwise requires, the following terms have the following meanings:

"Accounts" any and all accounts receivable or chattel paper arising from or in connection with the sale or lease of Inventory or other goods or out of the rendering of any services by a Loan Party and any and all of such Loan Party's rights to payments under leases or contracts of any nature whatsoever and, as to all of the foregoing, whether now or hereafter existing or acquired.

"Advance" means that portion of a Construction Loan that is disbursed to the applicable Borrowers after satisfaction of the requirements set forth in Section 9.2(B).

"Affiliate" means any Person that controls, is controlled by or is under common control with any other Person.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the directions of the management or policies of such Person.

"Agreement" has the meaning set forth in the Preamble.

"Bankruptcy Code" means 11 U.S.C. §~ 101-1330, as amended.

"Borrowers" has the meaning set forth in the Preamble.

"Business Day" means a day (other than a Saturday or Sunday) on which banks are open for business in Pierre, South Dakota.

"Cash and Cash Equivalents" means, at any time, any assets that are in the form of, or are readily convertible into, money, including, without limitation, cash, checks and other demand negotiable instruments, deposits with any bank or other financial institution (whether as demand deposits or time deposits and whether or not evidenced by certificates of deposit) and readily marketable short term (90 days or less) United States Government securities.

"Closing Date" means the date on which all of the conditions precedent to the effectiveness of this Agreement are satisfied or waived.

"Code" means the Uniform Commercial Code of the State of Illinois as in effect

MB-PROD 000116

on the Closing Date.

"Collateral" means all of the property in which a security interest is granted to the Lender by a Loan Party under Section 4 or under any Collateral document unless such security interest has been released under this Agreement or the other Loan Party Documents.

"Collateral documents" means all security agreements, mortgages, pledge agreements, assignments, hypothecations, assignments of custodial or brokerage accounts, guaranty agreements and any other agreements or documents given or required to be given by any Loan Party or any third party to the Lender under the terms of this Agreement to secure all indebtedness and obligations of the Loan Parties to the Lender under this Agreement and all other indebtedness and obligations now or hereafter owing by the Loan Parties to the Lender.

"Environmental Laws" means all federal, state and local laws, rules, regulations, ordinances, permits, orders and consent decrees relating to health, safety and environmental matters, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Toxic Substances Control Act, as amended, the Clean Water Act, the River and Harbor Act, Water Pollution Control Act, the Marine Protection Research and Sanctuaries Act, the Deep—Water Port Act, the Safe Drinking Water Act, the Super Fund Amendments and Reauthorization Act of 1986, the Federal Insecticide, Fungicide and Rodenticide Act, the Mineral Lands and Leasing Act, the Surface Mining Control and Reclamation Act, state and federal superlien and environmental clean up programs and laws and U.S. Department of Transportation regulations.

"Equipment" means any and all equipment, machinery, furniture and fixtures now owned or hereafter acquired by a Loan Party or in which such Loan Party has or may hereafter acquire an interest, wherever located.

"Event of Default" means the occurrence or existence of any one of more of the events described in Section 8.1.

"Expenses" has the meaning set forth in Section 3.2.

"ERISA" means the Employee Retirement Income Security Act of 1974, as now and hereafter amended, together with all regulations issued thereunder.

"GAAP" means generally accepted accounting principles, as in effect in the United States from time to time, applied in a manner consistent with that used by the Loan Parties on the Closing Date.

"General Intangibles" means any personal property (including things in action) now owned or hereafter acquired by a Loan Party other than goods, accounts, chattel paper, documents, instruments and money.


MB-PROD 000117

"Guarantors" has the meaning set forth in the Preamble.

"Indebtedness" means indebtedness for borrowed money, indebtedness representing the deferred purchase price of property (excluding indebtedness under normal trade credit for property purchased in the normal course of operations), obligations under notes payable or drafts accepted representing extensions of credit, indebtedness (whether or not assumed) secured by mortgages, security interests or other liens on property owned by a Loan Party and any Capitalized Lease Obligations.

"Inventory" means any and all of a Loan Party's inventory held (or being processed) for sale or lease, or furnished or to be furnished by a Loan Party under any contract of service, whether now owned or existing, or hereafter acquired or arising, including all raw materials, inventory in progress, finished inventory and supplies customarily classified as inventory, wherever located.

"Investments" means all or any of the assets contained in the Collateral Accounts.

"Investment Entity" means any corporation, partnership, joint venture or other person, whose stock, partnership interest, joint venture interest or evidence of indebtedness constitutes an Investment.

"Lender" has the meaning set forth in the Preamble.

"Letter of Credit" means any standby or commercial letter of credit issued by the Lender or any of its Affiliates for the account of LOOP, or any Operating Subsidiary.

"Lien" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any lease intended as security or any title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction)

"Loan Party Documents" means this Agreement, each Note, each Collateral document and any other agreements, documents or instruments required to be executed or delivered now or hereafter under the terms of this Agreement. The terms and provisions of the other Loan Party documents are incorporated by reference and made a part of this Loan Agreement.

"Loan Parties" has the meaning set forth in the Preamble.

"Loans" means the Promissory Note Dated April 1, 2002. together with any renewals, extensions or modifications thereof.

MB-PROD 000118

"Material Adverse Effect" means any material adverse effect whatsoever upon (i) the validity, performance or enforceability of any Loan Party Document, (ii) the properties, contracts, business operations, profits or financial condition of any Loan Party, (iii) the ability of any Loan Party to fulfill their respective obligations under the Loan Party documents or (iv) the Collateral.

"Notes" means any other form of promissory note executed and delivered by a Loan Party under the terms of this Agreement, together with any renewals, extensions or modifications thereof.

"Obligations" means all advances, debts, liabilities, obligations, covenants and duties owing, arising, due or payable from a Loan Party to the Lender of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument, arising under this Agreement or any of the other Loan Party documents or under any interest rate protection agreements or products with the Lender (including those acquired by assignment under the terms of this Agreement), whether absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising and however acquired. The term includes, without limitation, all interest, charges, expenses, fees, reasonable attorney's fees and any other sums chargeable to a Loan Party under any of the Loan Party documents.

"Operating Subsidiary" means each Subsidiary, either now existing or hereafter created, of LOOP including but not limited to Telegraph Properties, Inc., Randolph Properties, Inc., 200 West Properties, Inc., Old Colony Properties, Inc., EZLinks Golf LLC, a Delaware LLC, EZLinks Golf, Inc., a Delaware Corporation.

"Operating Partnership" means each Subsidiary, either now existing or hereafter created, of LOOP, including but not limited to, Telegraph Properties LP, an Illinois Limited Partnership, Randolph Properties LP, an Illinois Limited Partnership, 200 West Partners LP., an Illinois Limited Partnership, Old Colony Partners LP, an Illinois Limited Partnership, and H&M Partners, GP, a Texas General Partnership.

"Permitted Liens" means (i) Liens in favor of the Lender, (ii) existing Liens described on Schedule 7.1, or (iii) Liens for taxes not delinquent or, in a jurisdiction where payment of taxes is abated during the period of any contest, being contested in good faith by appropriate proceedings, with adequate reserves therefor being set aside on the books of the contesting party.

"Person" means any natural person, firm, enterprise, institution, corporation, association, partnership, trust, unincorporated organization, sole proprietorship, joint venture, limited liability company, any court, governmental authority or arbitration board or tribunal.

"Plan" means an employee pension benefit plan or other plan with respect to

MB-PROD 000119

"Plan" means an employee pension benefit plan or other plan with respect to which a Loan Party or any Affiliate is an "employer" or "party in interest", as those terms are defined in ERISA.

"Project" means the projects operated by LOOP and its Subsidiaries.

"Banco Panamericano" has the meaning set forth in the Preamble.

"LOOP" has the meaning set forth in the Preamble.

"Subsidiary" means any Person of which a Loan Party at any time owns, directly or indirectly, more than 50% of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time stock of any other class or classes of such corporation has or might have voting power by reason of the happening of any contingency) or, in the case of a Person that is not a corporation, 50% or more of the equity interest of such Person. "Subsidiary" includes all Operating Subsidiaries and Operating Partnerships.

"Termination Date" means the earlier of (i) December 31, 2003, or such later date to which the Loan Parties and the Lender agree to extend the term of this Agreement and (ii) the date of termination of the commitment to make further Loans under Section 8.2.

"Unmatured Event of Default" means any event that, with the passage of time, the giving of notice or both, would become an Event of Default, unless cured or waived as specifically provided for in this Agreement.

1.2    Accounting Terms. Any accounting terms used in this Agreement that are not specifically defined in this Agreement have the meanings customarily given them in accordance with GAAP.

1.3    Other Terms Defined in the Code. All other terms contained in this Agreement (and that are not otherwise specifically defined in the Agreement) have the meanings provided by the Code to the extent the same are used or defined in the Code.

1.4    References to Agreements  All references in this Agreement to other agreements refer to such agreements as amended, restated, supplemented or otherwise modified from time to time, unless such reference specifically states otherwise.

1.5    Other Definitional Conventions.

(A)    The words "hereof", "herein", "hereunder" and "hereto" and words of similar import when used in this Agreement refer to this Agreement as a whole and not any particular provision of this Agreement, and section, subsection, clause, exhibit and schedule references are to this Agreement, unless otherwise specified.

(B)    All terms defined in this Agreement in the singular have comparable

7

MB-PROD 000120

SECTION 2. INTENTIONALLY OMITTED

SECTION 3. GUARANTY.

3.1    Guaranty.  Subject to Section 3.3, each Guarantor listed below unconditionally and irrevocably guaranties the full and prompt payment when due (whether at maturity or earlier by reason of acceleration or otherwise) of, and the performance of, the following Obligations:

(A)    The Operating Partnerships, jointly and severally: all Obligations of the applicable Borrowers for the Project for which such Operating Partnership was created;

(B)    The Operating Subsidiaries, jointly and severally:  all obligations of the applicable borrowers for the project for which such Operating Subsidiary was created.
In each case, such Obligations, whether now or hereafter existing and whether for principal, interest, fees, expenses or otherwise, and interest accruing thereon following the filing of a bankruptcy petition by or against such Borrowers or Guarantors at the applicable rate specified in the Note, regardless whether such interest is allowed as a claim in bankruptcy.  Cross indemnities and contribution agreements among the LOOP with respect to their Obligations will be permitted.

3.2    Effect of Guaranty.  Subject to Sections 3.1 and 3.3, (i) each Guarantor will pay to the Lender, on demand by the Lender and in immediately available funds, the full amount of the Obligations guaranteed by such Guarantor under Section 3.1(A) and Section 3.1 (B) then due and payable and (ii) each Guarantor will pay to the Lender and reimburse the Lender for, on demand and in immediately available funds, (a) all losses, fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' and paralegals' fees, costs and expenses) paid or incurred by the Lender in (1) endeavoring to collect all or any part of the Obligations guaranteed by such Guarantor under Section 3.1 from, or in prosecuting any action against, any Borrower or Guarantor relating to this Agreement, the other Loan Party documents or the transactions contemplated by this Agreement or such documents, (2) taking any action with respect to any security or Collateral securing any Borrower's or Guarantor's Obligations and (3) preserving, protecting or defending the enforceability of, or enforcing, this Section 3 or its rights under this Section 3 (all such losses, fees, costs and expenses described in clauses (1) through (3) above are referred to as the "Expenses") and (b) interest on the Expenses, from the date of demand under this Section 3 until paid in full, at the per annum rate of interest described in the Note.  The undertakings of each Guarantor to the Lender as specified in this Section 3 constitute such Guarantor's Obligations. Each Guarantor further agrees that this Section 3 is an absolute guaranty of payment and is not a guaranty of collection.

3.3    Limitation on Guaranty.  The liability of each Guarantor under this Section 3 may in no event exceed the sum of (i) the greater of (a) the "Maximum Guaranteed Amount" as of the date of delivery of this Agreement and (b) the "Maximum Guaranteed Amount" determined as of the earlier of (1) the date of any demand under this Section 3 or (2)

MB-PROD 000121

Amount" determined as of the earlier of (1) the date of any demand under this Section 3 or (2) the date of the commencement of a case by or against such Guarantor under the Bankruptcy Code (ii) any and all Expenses. For purposes of this Section 3.2, "Maximum Guaranteed Amount" means, for each Guarantor, ninety-five percent (95%) of the lowest amount sufficient to (i) render such Guarantor "insolvent" as that term is defined in section 101(32) of the Bankruptcy Code, Section 3 of the Uniform Fraudulent Transfer Act ("UFTA") , or any other similar fraudulent conveyance or transfer law or statute applicable to the transactions contemplated by this Agreement, (ii) leave such Guarantor with "unreasonably small capital," as that term is used in section 548 (a) (2) (A) (ii) of the Bankruptcy Code, the equivalent term in Section 5 of the UFTA or any other similar fraudulent conveyance or transfer law or statute applicable to the transactions contemplated by this Agreement or (iii) to leave such Guarantor unable to pay its debts as they mature within the meaning of section 548 (a) (2) (A) (iii) of the Bankruptcy Code, Section 5 of the UFTA or any other similar fraudulent conveyance or transfer law or statute applicable to the transactions contemplated by this Agreement.

3.4    Liabilities Unconditional. Subject to Sections 3.1, 3.2 and 3.3, each Guarantor guarantees that such Guarantor's Obligations will be paid strictly in accordance with the terms of this Agreement and the Loan Party documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting such terms or the rights of the Lender with respect thereto. Each Guarantor agrees that its obligations under this Section 3 are unconditional, irrespective of:

(A)    the validity, enforceability, avoidance, assignment or subordination of any of the Obligations or any of this Agreement and the Loan Party documents;

(B)    the absence of any attempt by or on behalf of the Lender to collect, or to take any other action to enforce all or any part of the Obligations whether from or against any Loan Party or any other Person;

(C)    the election of any remedy by or on behalf of the Lender with respect to all or any part of the Obligations;

(D)    any change in the time, manner or place of payment of, or in any other term of, or any increase in the amount of, all or any of the Obligations, or the waiver, consent, extension, forbearance or granting of any indulgence by or on behalf of the Lender with respect to any provision in this Agreement or any of the other Loan Party documents;

(E)    the failure of the Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for all or any part of the Obligations;

(F)    the election by or on behalf of the Lender, in any proceeding instituted under the Bankruptcy Code of the application of section 1111(b) (2) of the Bankruptcy Code;

MB-PROD 000122

9

(G)     any borrowing or grant of a security interest by such Guarantor, as debtor in possession, under section 364 of the Bankruptcy Code;

(H)     the disallowance, under section 502 of the Bankruptcy Code, of all or any portion of the claims of the Lender for repayment of all or any part of the Obligations, including without limitation, any Expenses;

(I)     any other circumstance that might otherwise constitute a legal or equitable discharge or defense of such Guarantor; or

(J)     any change, restructuring or termination of or to the corporate or partnership structure or existence of such Guarantor, or any restructuring or refinancing of all or any portion of the Obligations.

3.5     Enforcement; Application of Payments.  The Lender may proceed directly and at once, without notice, against each Guarantor to obtain performance of and to collect and recover the full amount, or any portion, of such Guarantor's Obligations, without first proceeding against any Loan Party, any other Person or against any security or collateral for the Obligations.  The Lender has the exclusive right to determine the application of payments and credits, if any, from any Guarantor or from any other Person on account of such Guarantor's Obligations or any other liability of any of the Guarantors to the Lender.

3.6     Waivers.  (A) Each Guarantor waives promptness, diligence, presentment, demand of payment, filing of claims with a court in the event of receivership or bankruptcy of such Guarantor, protest or notice with respect to all or any part of such Guarantor's Obligations, all setoffs and counterclaims and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Section 3 or any other guaranty, the benefits of all statutes of limitation, the benefits of any statute the effect of which would require the Lender to first proceed against any other Loan Party or any other Person to enforce or collect all or any portion of the Obligations before proceeding against such Guarantor for the enforcement of such Guarantor's Obligations under this Section 3, and all other demands whatsoever (and will not require that such demands be made on any Loan Party as a condition precedent to the obligations of Guarantor under this Section 3) and covenants that this Section 3 will not be discharged, except by indefeasible payment in full in cash and performance of the Obligations and any other obligations contained in this Agreement.

(B)     Each Guarantor consents that from time to time, and without further consent of such Guarantor, the Lender may take any or all of the following actions without affecting the liability of such Guarantor: (i) extend, renew, modify, compromise, settle or release the Obligations (including any increase or decrease in the interest rate) ; (ii) release or compromise any liability of any party or parties with respect the Obligations; (iii) release its security interest in the Collateral or exchange, surrender or otherwise deal with the Collateral as the Lender may determine; or (iv) exercise or refrain from exercising any right or remedy of the Lender.



MB-PROD 000123

(C)    If, in the exercise of any of its rights and remedies, the Lender forfeits any of its rights or remedies, including, without limitation, its right to enter a deficiency judgment against any Loan Party or any other Person, whether because of any applicable law pertaining to "election of remedies" or the like, each Guarantor consents to such action by the Lender and waives any claim based upon such action. Any election of remedies that results in the denial or impairment of the right of the Lender to seek a deficiency judgment against any Loan Party will not impair the obligation of each Guarantor to pay the full amount of its Obligations.

(D)    In the event the Lender bids at any foreclosure or trustee's sale or at any private sale permitted by law or under any of the Loan Party documents, the Lender may bid all or less than the amount of the Obligations and the amount of such bid need not be paid by the Lender but will be credited against the Obligations. The amount of the successful bid at any such sale, whether the Lender or any other Person is the successful bidder, will be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations will be conclusively deemed to be the amount of the Obligations guaranteed under this Section 3, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which the Lender might otherwise be entitled by reason of such bidding at any such sale.

(E)    Each Guarantor agrees that, notwithstanding the foregoing and without limiting the generality of the foregoing, if the Lender is prevented by applicable law from exercising its rights to accelerate the maturity of the Obligations, to collect interest on the Obligations or to enforce or exercise any other right or remedy with respect to the Obligations, or the Lender is prevented from taking any action to realize on the Collateral, such Guarantor will pay to the Lender, upon demand therefor, the amount that otherwise would have been due and payable had such rights and remedies been permitted to be exercised by the Lender.

(F)    Each Guarantor and Loan Party assumes responsibility for keeping itself informed of the financial condition of any Loan Party and of all other circumstances bearing upon the risk of nonpayment of the Obligations or any part thereof, that diligent inquiry would reveal. Each Guarantor agrees that the Lender has no duty to advise it of information known to it regarding such condition or any such circumstance. If the Lender in its sole discretion undertakes at any time or from time to time to provide any such information to any Guarantor, the Lender is under no obligation to (i) undertake any investigation not a part of its regular business routine, (ii) disclose any information that it wishes to maintain confidential or (iii) make any other or future disclosures of such information or any other information to such Guarantor.

(G)    Each Guarantor and Loan Party consents and agrees that the Lender is under no obligation to marshal any assets or Collateral of such Guarantor or any Loan Party or other Person in favor of such Guarantor or otherwise in connection with obtaining payment of any or all of the Obligations from any Person or source.

3.7    <u>Subrogation</u>. No Guarantor or Loan Party will be entitled to be subrogated to any of the rights of the Lender against any Loan Party or any Collateral or right of

MB-PROD 000124

set-off held by the Lender for the payment of the Obligations and no Guarantor will seek any reimbursement from any Loan Party in respect of any such payment, set-off or application of funds until all of the Obligations have been indefeasibly paid in full. If any amount is paid to any Guarantor on account of such subrogation rights at any time when all the Obligations have not been paid in full, such amount will be held in trust for the benefit of the Lender and will forthwith be paid to the Lender to be credited and applied to the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement.

3.8     Taxes. All payments by each Guarantor under this Section 3 will be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and other taxes, fees, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority.

3.9     Subordination of Borrowers' Indebtedness. Any Indebtedness of a Borrower now or hereafter owed to or held by any Guarantor is subordinated to such Borrower's Obligations; provided, that notwithstanding the foregoing

3.10     Guaranty Releases. Upon receipt of a satisfactory (in the Lender's sole discretion) operating statement of the Operating Subsidiary and Operating Partnership covering the prior 12 months with respect to a particular Project (which operating statement is accompanied by unqualified opinion letter), the Lender will take such actions as are reasonably required by the LOOP to release the Guaranteed Obligations of such LOOP solely with respect to the Loan relating to such Project.

SECTION 4. COLLATERAL.

4.1     Security Interest and Pledge. To secure payment of their respective Obligations under this Agreement and all other Obligations now and hereafter owing to the Lender, each Loan Party (i) acknowledges and reaffirms its grant or pledge of any security interests granted or pledged by such Loan Party in connection with the Existing Loan Agreement, the Existing Notes or any document, agreement or instrument provided thereby and (ii) grants and pledges to the Lender, and to the Lender's successors and any assigns, a continuing security interest in, and does assign, transfer, pledge and hypothecate to the Lender, all of such Loan Party's right, title and interest in and to the following property:

(A)     with respect to the Obligations of LOOP, each Operating Subsidiary and Operating Partnership, all of LOOP's, and each Operating Subsidiary's and Operating Partnership's Equipment, Inventory, Accounts, General Intangibles, stock or partnership interest of any Operating Subsidiary, Operating Partnership or other Subsidiary, contract rights and royalties relating to the Projects.

(B)     all proceeds (including, without limitation, all insurance proceeds) and products of any of the items listed clause (A) above.

4.2     Further Assurances. Each Loan Party will execute and deliver to the Lender all Code financing statements, assignments, documents of title and other documents,



MB-PROD 000125

agreements and instruments, and take all further action, as the Lender may reasonably request in connection with the perfection and priority of any security provided for in this Section 4.

4.3    Collateral Release. The Lender will release, and release its Lien on, any Collateral upon receipt of Cash and Cash Equivalents or, in the Lender's reasonable discretion, replacement and similar Collateral in an amount and type equal to the collateral value of the Collateral being released.

## SECTION 5. REPRESENTATIONS AND WARRANTIES.

Each Loan Party represents and warrants to the Lender that with respect to such Loan Party as follows:

5.1    Organization: Good Standing. Each Loan Party that is not a natural person is a corporation or partnership duly organized, validly existing and in good standing under the laws of the State of its organization. Each Loan Party that is not a natural person is duly qualified and authorized to do business, and is in good standing as a foreign corporation or partnership, in all jurisdictions in which the failure to be so qualified or authorized to do business would have a Material Adverse Effect.

5.2    Authorization; Compliance with Laws Each Loan Party has all requisite power and authority and all necessary licenses and permits to own and operate its properties and to carry on its business as now conducted and as it contemplates that business to be conducted in the future. Each Loan Party is in compliance with all laws, rules and regulations that are applicable to such Loan Party, its operations or its properties.

5.3    Financial Information. The balance sheets of LOOP as of December 31, 1996, and the related statements of income, retained earnings and changes in financial position for the period then ended, copies of all of which have been delivered to the Lender, have been prepared in accordance with GAAP and present fairly the financial position of LOOP as of those dates, and the results of its operations for those periods. Except as set forth on Schedule 5.3, no changes having a Material Adverse Effect have occurred since the date of the most recent of those financial statements.

5.4    Disclosure. Neither this Agreement nor the financial statements referred to in Section 5.3 above nor any other written statement furnished by the Loan Parties to the Lender in connection with the negotiation of the Loans contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained therein or in this Agreement not misleading as of the date such statements were made, except as set forth on Schedule 5.4. There is no fact known to any Loan Party that a Loan Party has not disclosed to the Lender in writing that has, or to the best of the knowledge of the officers and directors of such Loan Parties in the future is likely to have, a Material Adverse Effect, except as set forth on Schedule 5.4.

5.5    Litigation. Except as previously disclosed to lender, there are no proceedings pending, or to the knowledge of the officers of any Loan Party threatened, before

13


MB-PROD 000126

any court, governmental authority or arbitration board or tribunal against or affecting any Loan Party, the outcome of which may reasonably be expected to have a Material Adverse Effect. No Loan Party is in default with respect to any order, judgement or decree of any court, governmental authority or arbitration board or tribunal.

5.6  Ownership Interests  The issued and outstanding capital stock or general partnership interested of each Loan Party and the ownership thereof as previously disclosed to Lender. There are no outstanding options, warrants or rights to purchase, nor any agreement for the subscription, purchase or acquisition of, any capital stock or partnership interests of any Loan Party except as previously disclosed to Lender.

5.7  Ownership of Assets. Each Loan Party has good and marketable title to all of the assets that it purports to own, including the assets described in the financial statements referred to in Section 5.3 in all cases free and clear from all liens, encumbrances, security interests, claims, charges and restrictions whatever, except for Permitted Liens. The Loan Parties' Equipment and Inventory is located at the locations previously disclosed to Lender or is in transit between such locations.

5.8  Authority; No Conflict; Due Execution; Enforceability. Each Loan Party has full entity or (in the case of natural persons) individual power and authority to execute, deliver and perform the Loan Party documents. The execution, delivery and performance of the Loan Party documents required to be effected by each Loan Party have been duly authorized by all appropriate action of such Loan Party and will not violate the provisions of the certificate or articles of incorporation, partnership agreement or bylaws (if any) of any such Loan Party or of any law, rule, judgement, order, agreement or instrument to which such Loan Party is a party or by which it is bound, nor do the same require any approval or consent of any public authority or other third party. The Loan Party documents have been duly executed and delivered by, and are the valid and binding obligations of, the Loan Parties, enforceable in accordance with their terms.

5.9  Taxes. Except as set forth on Schedule 5.9, all tax returns required to be filed by any Loan Party in any jurisdiction have been filed and all taxes, assessments, fees and other governmental charges upon any Loan Party or upon their respective assets, income or franchises have been paid before the time that those taxes could give rise to a Lien in such assets, income or franchises. No Loan Party knows of any proposed additional tax assessment against it.

5.10  Deleted

5.11  Employee Benefit Matters. Schedule 5.11 is a list of all Plans. No Plan has been terminated since the effective date of ERISA. No Plan is a "multiemployer plan" within the meaning of Section 3(37) (A) of ERISA. No "accumulated deficiency" (within the meaning of Section 412 of ERISA) or "reportable event" (as defined in Title IV or ERISA) has occurred with respect to any Plan. No Loan Party nor any Affiliate has incurred any material liability to the PBGC or otherwise under ERISA. The PBGC has not started or threatened to institute a proceeding against any Loan Party or any Affiliate under ERISA.

MB-PROD 000127



14

5.12  Intentionally Omitted.

5.13  Use of Proceeds. The proceeds of the Loans will be used by the Loan Parties solely for business purposes specified in Section 7.16 that are exempt from limitation on the rate of interest and related charges under any partnership agreement or bylaws (if any) of any such Loan Party or of any law, rule, judgement, order, agreement or instrument to which such Loan Party is a party or by which it is bound, nor do the same require any approval or consent of any public authority or other third party. The Loan Party Documents have been duly executed and delivered by, and are the valid and binding obligations of, the Loan Parties, enforceable in accordance with their terms.

5.14  Intentionally Omitted.

5.15  Solvency. Each Loan Party is, was at the time it pledged any Collateral to the Lender and at all times while any of the Obligations remain unpaid will be, solvent and generally able to pay its debts as such debts become due, with sufficient capital to carry on its business and transactions and all business and transactions in which it is about to engage. The fair market value of each Loan Party's property is, and at all times while any of the Obligations remain unpaid will be, greater than the sum of such Loan Party's debts.

5.16  Chief Executive Office. As of the Closing Date, the principal place of business and chief executive office of each Loan Party is listed on the signature pages of this Agreement. If any change in location occurs, the Loan Parties will notify the Lender of such change in accordance with Section 7.12. As of the Closing Date, the books and records of each Loan Party and all chattel paper and all records of account are located at the principal place of business and chief executive office of such Loan Party, and if any change in such location occurs, the Loan Parties will notify the Lender of such change in accordance with Section 7.12.

5.17  Other Corporate or Partnership Names  Except as listed on the signature pages of this Agreement, no Loan Party has used any other corporate, partnership or fictitious names in the past five years.

# SECTION 6. AFFIRMATIVE COVENANTS.

From the Closing Date and until all Loans are fully paid, the Lender has no further obligation to extend Loans under this Agreement and all Obligations have been satisfied, each Loan Party will:

6.1  Annual Financial Information. Furnish to the Lender, within 120 days after the end of each fiscal year of the applicable Loan Party, beginning with the fiscal year ending December 31, 2002, the following:

(A)  unqualified audited consolidated financial statements prepared in

MB-PROD 000128

accordance with GAAP by independent certified public accountants satisfactory to the Lender, containing the balance sheet of LOOP each Operating Subsidiary and each Operating Partnership as of the end of that year, their related profit and loss statements and reconciliation of surplus statements for that year, their statement of cash flows for that year, together with any management letter prepared by those certified public accountants and such comments and financial details as are customarily included in reports of like character;

(B)     unqualified reviewed consolidating financial statements prepared in accordance with GAAP by independent certified public accountants satisfactory to the Lender, containing the balance sheet of LOOP, each Operating Subsidiary and each Operating Partnership as of the end of that year, their related profit and loss statements and reconciliation of surplus statements for that year, their statement of cash flows for that year, together with any management letter prepared by those certified public accountants and such comments and financial details as are customarily included in reports of like character;

(C)     financial statements for each Guarantor.

6.2     Quarterly Financial Information.  Furnish to the Lender within 60 days after the end of the fiscal quarter ending March 31 2002, and 30 days after the end of each fiscal quarter thereafter, beginning with the fiscal quarter ending March 31, 2002, an internally prepared interim financial report, the accuracy of which is certified by the president or the chief financial officer of LOOP, prepared in accordance with GAAP, containing the balance sheet of LOOP, each Operating Subsidiary and each Operating Partnership, as of the end of such period, such parties' income statement showing the results of its operations for the portion of such parties' fiscal year then elapsed and such parties' statement of cash flows for the portion of such parties' fiscal year then elapsed.

6.3     Reporting Requirements  (A) Furnish to the Lender promptly after receipt thereof copies of financial statements, reports or similar items relating to any of the Investments. (B) Monthly reports on each Project containing a statement of cash flows for the immediate preceding month.

6.4     Notices.  (A) Promptly inform the Lender of any Event of Default, an Unmatured Event of Default and of any other occurrence that could reasonably be expected to have a Material Adverse Effect. Each Loan Party grants to the Lender or its representatives the right to examine its books and records at any reasonable time or times and will maintain complete and accurate books and records of its transactions in accordance with good accounting practices. Each Loan Party will furnish to the Lender any information that it may reasonably request concerning such Loan Party's financial affairs within 10 days after receipt of a request for that information.

(B)     Notify the Lender in writing within 10 days after receipt whenever any Loan Party receives notice of the commencement of any judicial or administrative proceeding or litigation commenced by or against any Loan Party.

MB-PROD 000129

6.5   Taxes. Pay and discharge, as often as the same may become due and payable, all taxes and assessments of whatever nature that may be levied or assessed against it or any of its properties, unless, and to the extent only that in a jurisdiction where payment of taxes and assessments is abated during the period of any contest, those taxes or assessments are being contested in good faith by appropriate proceedings and the applicable Loan Party has set aside on its books adequate reserves with respect to those taxes and assessments.

6.6   Maintenance of Existence. If applicable, maintain its corporate or partnership existence in good standing in the State of its organization and its qualification in good standing in every other jurisdiction in which the failure to be so qualified or authorized to do business would have a Material Adverse Effect. Each Loan Party will continue to conduct and operate its business substantially as presently conducted and operated and will comply with all governmental laws, rules, regulations and orders applicable to it, the failure to comply with which could reasonably be expected to have a Material Adverse Effect.

6.7   Maintenance of Business. Act prudently and in accordance with customary industry standards in managing or operating its assets, properties, business and investments and keep in good working order and condition, ordinary wear and tear excepted, all of its assets and properties that are necessary to the conduct of its business.

6.8   Deposit Accounts. As to LOOP, and any of their respective Subsidiaries, inform and maintain in good standing and valid security interest in each such account.

6.9   Employee Benefit Matters. Comply in all material respects with the requirements of ERISA, including, without limitation, all provisions regarding minimum funding requirements and requirements as to plan termination insurance. Within 30 days after it is filed, furnish to the Lender a copy of each annual report and annual return, as well as all schedules and attachments required to be filed with the Department of Labor or the Internal Revenue Service under ERISA in connection with each of its Plans, for each Plan year. Each Loan Party will notify the Lender immediately of any fact, including, without limitation, any "reportable event" (as defined in Title IV or ERISA) arising in connection with any of its Plans, or for the appointment by the appropriate United States District Court of a trustee to administer the Plan, together with a statement, if requested by the Lender, as to the reason therefore and the action, if any, proposed to be taken with respect thereto. Each Loan Party will furnish to the Lender, upon its request, any additional information concerning any of its Plans that the Lender may reasonably request.

6.10   Compliance with Laws. Comply, in all material respects, with all laws, ordinances, governmental rules and regulations (including, without limitation, Environmental Laws) to which it is subject and obtain and keep in force any and all licenses, permits, franchises or other governmental authorizations necessary to the ownership of its properties or to the conduct of its business, except where such violation or failure to obtain such could not reasonably be expected to have a Material Adverse Effect.

6.11   Deleted



MB-PROD 000130

6.12 _Insurance_. (A) The BORROWERS will maintain, at their expense, such public liability and third party property damage insurance in such amounts and with such deductibles as is customarily maintained by companies similarly situated.

(B) The Loan Parties will, at their expense, keep and maintain their assets and business insured against business interruption and any other loss or damage by fire, theft, burglary, pilferage, loss in transit, explosion, spoilage and all other hazards and risks ordinarily insured against by other owners or users of such properties in similar businesses, including flood, if the same is required under a designation of the area in which a Project is located as flood prone or a flood risk area, as defined by the Flood Disaster Protection Act of 1973, as amended, in an ~~amount at least equal to the lesser of (i) the outstanding principal balance of the Loans incurred~~ relating to such Projects or (ii) the full insurable value of all such property. The Loan Parties will deliver to the Lender the original (or a certified) copy of each policy of insurance within a reasonable time after receipt of such policy. The Loan Parties will direct all insurers under such policies of insurance to pay all proceeds of insurance policies directly to the Lender. The Lender will apply all such proceeds (less the amount of any expenses incurred by the Lender in litigating, arbitrating, compromising or settling any claim arising under such policies of insurance in its sole discretion) to the payment of the Obligations in accordance with Section 2.4.

(C) All such policies of insurance will be in form and substance reasonably satisfactory to the Lender. If the Borrower, at any time or times after the Closing Date, fails to obtain or maintain any of the policies of insurance required above or to pay any premium in whole or in part relating thereto, then the Lender, without waiving or releasing any obligation or Event of Default by the Loan Parties under this Agreement, may at any time or times thereafter (but is under no obligation to do so) obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that the Lender deems advisable and the Lender will give the Loan Parties written notice of any such action promptly after taking such action.

6.13 _Post-Closing Agreements_. The Loan Parties, as applicable, agree that:

(A) within 15 days of the Closing Date, each Loan Party will deliver to the Lender certificates of insurance for such Loan Party's casualty insurance policies together with loss payment endorsements on the Lender's standard form of Loss Payee Endorsement, naming the Lender as loss payee and certificates of insurance in respect to such Loan Party's liability insurance policies together with endorsements naming the Lender as a co-insured;

(B) within 15 days of the Closing Date, the Borrowers will pay in full to the Lender all accrued and unpaid out-of-pocket costs and expenses of the Lender (including, without limitation, all fees and expenses of Lender's counsel) incurred in connection with the structuring, preparations and negotiation of this Agreement;

(C) within 30 days of the Closing Date, the Loan Parties and the Lender will take such actions and execute such documents, agreements and instruments, including, without

18

MB-PROD 000131

limitation, leasehold deeds of trust if necessary to perfect the Lender's security interest in and to the landfill gas rights in the Projects.

## SECTION 7. NEGATIVE COVENANTS.

From the Closing Date and until all Loans are fully paid, the Lender has no further obligation to extend Loans under this Agreement and all Obligations have been satisfied, each Loan Party agrees that it will not, without the prior written consent of the Lender:

7.1 Encumbrances (i) As to LOOP and any Operating Subsidiary and Operating Partnership, create or permit to exist any Lien on any of its assets to any party, except Permitted Liens and (ii) as to any other Loan Party, create or permit to exist any Lien on any of the assets with respect to which such Loan Party granted a Lien to the Lender under Section 4.1.

7.2 Disposal of Assets. (i) As to LOOP and any Operating Subsidiary and Operating Partnership, sell, lease, transfer or otherwise dispose of any of its assets except for transactions in the ordinary course of business (provided, that under no circumstances will LOOP or any Operating Subsidiary or Operating Partnership transfer any assets to an Operating Subsidiary or Operating Partnership that has been released under Section 10.14) and (ii) as to any other Loan Party, sell, lease or otherwise dispose of any of the assets with respect to which such Loan Party granted a Lien to the Lender under Section 4.1.

7 3 Loans and Advances Make loans or advances to any Person other than (i) to another Loan Party and (ii) to other Persons in aggregate amounts not exceeding $5,000.

7.4 Deleted

7.5 Consolidations Mergers or Acquisitions Enter into any merger, consolidation, reorganization or recapitalization or purchase or otherwise acquire all, or substantially all, of the assets, obligations or capital stock of or any other interest in any other Person.

7.6 Distributions. As to any Borrower, (i) make any payment of any dividends or other distributions on capital stock of any corporation (except distributions in such stock), (ii) make any payment or other distribution on any partnership interest of any partnership and (iii) redeem or acquire securities unless made contemporaneously from net proceeds of the sale of securities or made by the exchange of capital stock or warrants or options for the securities.

7.7 Subordination of Indebtedness. Subordinate any indebtedness owing to such Loan Party by any Person to indebtedness of that Person owing to any other Person, except as contemplated by Section 9.1 (M)

MB-PROD 000132

7.8     Transactions with Affiliates.  Engage in any transaction with any Affiliate on terms less favorable to such Loan Party than would be obtainable at the time in comparable transactions of such Loan Party with arm's-length dealings with persons other than such Loan Party or such Affiliate.

7.9     Change of Business.  Eengage, directly or indirectly, in any line of business other than the lines of business presently engaged in by the Loan Parties or a line of business related thereto.

7.10   Indebtedness and Leases.  As to all Loan Parties, issue, incur, assume or permit to remain outstanding any Indebtedness, including indebtedness incurred in sale-leaseback or other leasing transactions, other than (i) Indebtedness owing to the Lender, (ii) Indebtedness incurred on terms and conditions (including, without limitation, interest and amortization rates) more favorable than Lender is then willing to provide; provided, that the Loan Parties give the Lender prior written notice of their intent to incur any such Indebtedness, such Indebtedness does not exceed $250,000 in the aggregate and such Loan Parties first offer the Lender a reasonable opportunity to provide such financing on substantially equivalent terms, (iii) Indebtedness contemplated by Section 9.2(A) (3)

7.11   Employee Benefit Matters.  Become a contributing employer with respect to a multi-employer employee benefit plan within the meaning of Section 3(37) (A) of ERISA (29 U.S.C. 1002), as amended, by Section 302 of the Multi-Employer Pension Plan Amendment Act of 1980 or establish for any of its employees any employee benefit plan that has, or may in the future incur, any unfunded past service liability.

7.12   Change of Name, Fiscal Year or Accounting Method.  Change its name, fiscal year or method of accounting except as required by GAAP and except that an Loan Party may change its name if such Loan Party has given the Lender 60 days' prior written notice of the name change and taken such action as the Lender deems necessary to continue the perfection of the security interests and liens granted to the Lender under this Agreement and the Collateral documents.

7.13   Compensation  After the occurrence and during the continuation of an Event of Default or an Unmatured Event of Default, pay any direct or indirect compensation (including salaries and fringe benefits) to any officer, director or stockholder of any Loan Party in excess of amounts paid to comparable executives of similarly situated companies or pay management or similar fees to Affiliates of the Loan Parties in excess of amounts previously disclosed to, and approved by, in each case in writing, the Lender.

7.14   Subsidiaries.  Without the prior written consent of the Lender, create any Subsidiary other than Operating Subsidiaries and Operating Partnerships in connection with the development and operation of Projects and conforming with the requirements of Section 6.11.

7.15   Use of Proceeds.  Use the proceeds of any Loan

(A)     to fund start-up and related costs for Projects and for working capital;



(B)    to finance construction and equipment costs relating to the development of Projects

Notwithstanding the foregoing, it is understood and agreed that such Loan proceeds may be used to pay (1) general overhead expenses, up to an amount not to exceed $100,000 per month, allocable to the operations of LOOP, the Operating Subsidiaries and the Operating Partnership and (2) costs, including reasonable professional fees, already incurred with respect to the matters described in clauses (A) and (B) above.

## SECTION 8.  EVENTS OF DEFAULT AND REMEDIES.

8.1    <u>Events of Default</u>.  The following are events of default under this Agreement ("Events of Default")

(A)    If any Borrower defaults in the payment of the principal or interest of any Loan or if any Loan Party defaults in the payment of principal or interest of any other Indebtedness now or hereafter owed to the Lender under this Agreement, when and as such payment is due and payable, whether by acceleration or otherwise; <u>provided</u>, that it will not be a default in the payment of interest if the Lender receives such payment within three days following the due date for such payment.

(B)    If any Loan Party fails to perform any of its other obligations or comply with any of the terms, conditions and covenants contained in this Agreement, any Loan Party Document or in any security agreement, mortgage, hypothecation assignment or other agreement, document or instrument required to be given under this Agreement or hereafter given to the Lender by any Loan Party or any third party to secure any Indebtedness now or hereafter owing by the Loan Parties to the Lender, or if there occurs any other event of default as defined in any such agreement, instrument or document; <u>provided</u>, that under this Section 8.11(B) it will not be a failure to perform the obligations under Section 6 if the Loan Parties comply with such obligations within 10 days after receiving notice from the Lender of failure timely to perform such obligations.

(C)    If any Loan Party defaults in the payment of any Indebtedness owing to any other firm, person or corporation and such default results in the acceleration or prepayment of such Indebtedness.

(D)    Any representation or warranty made in this Agreement or in any other Loan Party Document, or any statement or representation made in any certificate, report or other document delivered under this Agreement, is false or inaccurate in any material respect when made.

(E)    Any notice of lien, levy or assessment is filed of record with respect to all or any of a Loan Party's assets or any Investment or any Collateral Account by any federal, state or local governmental department or agency.

MB-PROD 000134

taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) becomes generally unable to pay its debts as such debts become due, (iii) makes a general assignment for the benefit of its creditors, (iv) commences a voluntary case under the Bankruptcy Code, (v) files a petition seeking to take advantage of any other law providing for the relief of debtors, (vi) fails to controvert in a timely or appropriate manner, or acquiesces in writing to, any petition filed against it in any involuntary case under the Bankruptcy Code or (vii) takes any corporate or partnership action for the purpose of effecting any of the foregoing.

(G)    If a proceeding or case is commenced in any court of competent jurisdiction and is not dismissed within 60 days thereafter, seeking (i) the liquidation, reorganization, dissolution, winding up or composition or readjustment of a trustee, receiver, custodian, liquidator or the like of any Loan Party or of all or any substantial part of the assets of any Loan Party, (ii) similar relief in respect of any Loan Party under any law providing for the relief of debtors or (iii) if an order for relief against any Loan Party is entered in an involuntary case under the Bankruptcy Code.

8.2 <u>Acceleration</u>. (A) Upon the occurrence of any Event of Default set forth in Sections 8.1(A) through 8.1(G), at the option of the Lender, the Lender's obligation to make or renew Loans terminates and all or any part of the unpaid principal balance of and accrued interest on all outstanding Loans under this Agreement, and all other indebtedness and obligations then owing to the Lender by any Loan Party, including, without limitation, all of the Loan Parties' contingent obligations, will become immediately due and payable, without presentment, demand, or notice of any kind, all of which are expressly waived by the Loan Parties.

(B)    Upon the occurrence of any Event of Default set forth in Sections 8.1(H) or 8.1(I), the Lender's obligation to make or renew Loans immediately terminates and all or any part of the unpaid principal balance of and accrued interest on all outstanding Loans under this Agreement, including, without limitation, all of the Loan Parties' contingent liabilities with respect to Letters of Credit or LC Guaranties, and all other Indebtedness then owing to the Lender by the Loan Parties, automatically becomes due and payable without presentment, demand or notice of any kind, all of which are expressly waived by the Loan Parties.

(C)    If an Event of Default occurs, the Lender may, regardless of whether the Lender is taking any of the other actions described in this Section 8.2 or otherwise, make demand upon the Loan Parties to, and immediately upon such demand the Loan Parties will, pay to the Lender in immediately available funds at the Lender's office, for deposit in the LC Cash Collateral Account, an amount equal to 105% of the aggregate undrawn amount of all outstanding Letters of Credit and LC Guaranties.

8.3    <u>Collection of Accounts; Attorney in Fact</u>. Upon the occurrence and during the continuation of an Event of Default or an Unmatured Event of Default, each Borrower authorizes and directs each account debtor under or in respect to any of the Collateral to pay all sums otherwise due or to become due to such Loan Party directly to the Lender, when, as and if the Lender so demands, and agrees that such payments to the Lender as provided in this Section

MB-PROD 000135

the Lender so demands, and agrees that such payments to the Lender as provided in this Section 8.3 will be a good receipt and acquittance to such Loan Party to the extent so made. Except as otherwise provided in this Agreement, unless and until the Lender has elected to collect directly the sums due or to become due in respect of the Collateral, each Borrower may collect and use the same for its general business purposes. Each Borrower constitutes and appoints the Lender its true and lawful attorney, in the place and stead of such Loan Party and with full power of substitution, either in the Lender's own name or in the name of such Loan Party, after any Unmatured Event of Default or Event of Default has occurred and so long as it remains continuing, to ask for, demand, sue for, collect, receive and give acquittance for, any and all monies due or to become due under and by virtue of the Collateral or any portion thereof, to endorse checks, drafts, orders and other instruments for the payment of money payable to such Loan Party on account thereof, to settle, compromise, prosecute or defend any action, claim or proceeding with respect thereto and to sell, assign, pledge, transfer and make any agreement respecting, or otherwise deal with, the same or take any action or execute any instrument that the Lender may deem necessary or desirable to accomplish the purposes of this Section 8.3; provided, however, that nothing in Section 8.3 contained will be construed as requiring or obligating the Lender to make any demand, or to make any inquiry as to the nature or sufficiency of any payment received by it or to present or file any claim or notice or take any action with respect to the Collateral or the monies due or to become due thereunder and no action taken by the Lender or omitted to be taken with respect to the Collateral will give rise to any defense, counterclaim or offset in favor of any Loan Party or to any claim or action against the Lender, all of which are waived by the Loan Parties to the extent permitted by law. The appointment under this Agreement by the Borrowers of the Lender as its attorney-in-fact is irrevocable and coupled with an interest.

      8.4   Remedies. (A) If an Event of Default has occurred and is continuing, the Lender may exercise, in addition to its other rights in this Section 8, as to all or any part of the Collateral, any one or more or all of the rights and remedies available to it under this Agreement, the Loan Party documents or at law, including, without limitation, the rights and remedies available to a secured party under the Code or otherwise given to a secured party by any other law or proceeding, at law or in equity, to assure that the Collateral is devoted to the satisfaction of the Obligations. The granting of specific rights and remedies to the Lender in this Agreement will not be deemed to limit or exclude any right or remedy granted to a secured party by the Code or such other law or proceeding.

      (B)    Without limiting the generality of the foregoing, if an Event of Default has occurred and is continuing, as to all or any portion of the Collateral, the Lender may from time to time, either before or after the exercise by the Lender of any other remedies, exercise any one or more of the following remedies, all of which are acknowledged by the Loan Parties to commercially reasonable:

      (1)    The Lender may sell, assign, contract to sell or otherwise dispose of all or any portion of the Collateral in any commercially reasonable manner, including by private or public sale, at such prices and on such terms as the Lender may in its absolute discretion deem reasonable in the circumstances, for cash or on credit or for future delivery and without the assumption of any credit risk. The Lender will give the Loan Parties at least ten days' prior

MB-PROD 000136

written notice of the time and place of any public sale of the Collateral, or any portion thereof, or of the time after which any private sale or other disposition thereof is to be made, it being expressly acknowledged that such ten days' notice constitutes reasonable notice. If the Lender purchases all or any portion of the Collateral at any sale, payment of the purchase price may be made by credit against the Obligations and such purchase will be made free of any right or equity of redemption of the Loan Parties, which right or equity, if any, is waived. The net proceeds of any disposition of Collateral by the Lender, after deduction or all expenses as provided in the Code and in this Section 8.4 or elsewhere in this Agreement, will be applied toward satisfaction of the Loan Parties' Obligations, first to reduce all unpaid fees, costs or expenses due to the Lender under this Agreement or under the Notes (or any of them) or under any of the other Loan Party uments, second to reduce earned but unpaid interest and then to reduce principal. The Lender will account for any surplus realized upon such disposition and the Loan Parties will remain liable for any deficiency.

       (2)    The Lender may take possession of all Collateral then in the possession or control of any Loan Party. Each of the Loan Parties agrees to assemble or cause to be assembled, at its expense, all Collateral at a convenient place acceptable to the Lender, and to make available the Loan Parties' facilities for the purpose of the Lender taking possession of, removing and putting the Collateral in such saleable form as the Lender may deem appropriate.

       (3)    To the extent permitted by the Code, the Lender may (but need not) retain the Collateral in full satisfaction of the Obligations.

       (C)    In addition to, and not in limitation of, its remedies set forth in Section 8.4(B), upon the occurrence and continuation of an Event of Default and after 30 days written notice from the Lender to the applicable Loan Party of such Event of Default, the Lender may liquidate and sell all assets held in the Collateral Accounts.

       (1)    In such event the Lender will, after deducting all costs or expenses of every kind (including reasonable attorneys' fees and disbursements) for care, safekeeping, collection, sale, delivery or otherwise, apply the residue of the proceeds of such sale(s) or liquidation(s) to the payment or reduction, either in whole or in part, of the Obligations in accordance with this Agreement and the Loan Party documents, returning the surplus, if any, to the applicable Loan Party.

       (2)    Any such sale may be effected after at least five days' notice of the time and place of any public sale or of the time after which a private sale is to take place (which notice the Loan Parties agree is commercially reasonable),but without any previous notice or advertisement. At any such sale the Lender may sell the whole or any part of the assets held in the Collateral Account and may otherwise act with respect to such assets as though the Lender was the outright owner thereof, the Loan Parties irrevocably constituting and appointing the Lender as the proxy and attorney-in-fact of the Loan Parties, with full power of substitution to do so; provided, however, the Lender will not have any duty to exercise any such right or to preserve the same and will not be liable for any failure to do so or for any delay in doing so. Any sale will be made at a public or private sale at the Lender's place of business, or at any public building in the

MB-PROD 000137

City of Chicago or elsewhere to be named in the notice of sale, either for cash or upon credit or for future delivery at such price as the Lender may deem fair and the Lender may be the purchaser of the whole or any part of the assets held in the Collateral Accounts so sold and hold the same thereafter in its own right free from any claim of the Loan Parties or any right of redemption. Each sale will be made to the bidder making the highest and best offer, but the Lender reserves the right to reject any and all bids at such sale that, in its discretion, it deems inadequate. Demands of performance, except as otherwise specifically provided for in this Agreement, notices of sale, advertisements and the presence of property at sale are waived and any sale under this Section 8.4 may be conducted by an auctioneer or any officer or agent of the Lender.

(3)   The applicable Loan Parties agree that following the occurrence and during the continuation of an Event of Default it will not at any time plead, claim or take the benefit of any appraisal, valuation, stay, extension, moratorium or redemption law now or hereafter in force to prevent or delay the enforcement of the Lender's rights under this Agreement or the absolute sale of the whole or any part of the assets held in the Collateral Accounts or the possession thereof by any purchaser at any sale under this Section 8.4 and such Loan Parties waive the benefit of all such laws to the extent they lawfully may do so. The applicable Loan Parties agree that they will not interfere with any right, power and remedy of the Lender provided for in this Section 8.4 or now or hereafter existing at law or in equity or by statute or otherwise or the exercise or beginning of the exercise by the Lender of any one or more of such rights, powers or remedies.

(D)     If an Event of Default has occurred and is continuing, the Lender, from time to time and without notice to the Loan Parties, may surrender, release or exchange all or any part of the Collateral, or compromise or extend or renew for any period (regardless whether longer than the original period) any indebtedness due in respect to the Collateral and take such action (including the making of any payments) as the Lender deems necessary, desirable or expedient to enforce any right or privilege in respect of any of the Collateral arising under this Agreement or any other agreement between the Lender and the Loan Parties or to protect, sell or enhance the value of any of the Collateral or to preserve, protect or enforce any of the Liens of the Lender thereon.

(E)     In connection with any disposition of the Collateral as provided in this Section 8.4, or in connection with and as a prerequisite to, any redemption of the Collateral by the Loan Parties as provided in Section 9-506 of the Code, the Loan Parties will pay and discharge all expenses, if any, of retaking, holding, preparing for sale, selling and the like, including, without limitation, accounting fees and expenses and reasonable attorneys' fees and legal expenses actually incurred by the Lender in connection with the enforcement of any of its rights under this Agreement. Any such expenses may be deducted and retained by the Lender from the proceeds of any disposition of the Collateral.

SECTION 9. CONDITIONS PRECEDENT.

MB-PROD 000138

The obligation of the Lender to make any advance is subject to the following conditions precedent:

9.1    Initial Loans  The obligation of the Lender to make the initial disbursement of any Loan is, subject to the following conditions precedent:

(A)    the Lender has received copies of appropriate corporate or partnership resolutions of the board of directors or general partners of each Loan Party, certified by the secretary of each Loan Party (or in the case of a limited partnership, of the general partner of such Loan Party) as being in full force and effect on the date of making the Loans, authorizing the execution, delivery and performance by such Loan Party of this Agreement and all other Loan Party documents to which it is a party.

(B)    the Lender has received all reports, certificates and opinions of attorneys and accountants that the Lender may have requested in connection therewith, and all legal matters incident thereto are satisfactory to the Lender's attorneys.

(C)    the Lender has received copies of the certificate or articles of incorporation, partnership agreement or bylaws of each Loan Party, including all amendments to them, certified by the secretary of such Loan Party (or in the case of a limited partnership, of the general partner of such Loan Party), as applicable as being in full force and effect on the date of making the Loans.

(D)    the Lender has received good standing certificates with respect to each Loan Party from each jurisdiction that a Loan Party is organized, dated not more than 30 days before the initial extension of Loans.

(E)    each Loan Party has executed and delivered to the Lender all Loan Party documents and such other documents or evidence as the Lender may reasonably request to consummate the transactions contemplated by this Agreement and the Loan Party documents, including the taking of all necessary actions in compliance with the conditions set forth in this Agreement and the Loan Party documents.

(F)    each Loan Party has delivered to the Lender fully executed UCC-1 financing statements to be filed against such Loan Party in accordance with the terms of this Agreement, including, without limitation, Section 4.2.

(G)    the Lender has received UCC lien search reports, satisfactory to it, of filings against each Loan Party and tax and judgments searches relating to each Loan Party for such jurisdictions as the Lender deems appropriate.

(H)    no material and adverse change in the business, operations or financial condition of any Loan Party or the Investments (taken as a whole) has occurred or is continuing.

(I)    LOOP has delivered to the Lender a properly executed and completed

MB-PROD 000139

(J)     Deleted.

(K)     the Lender is satisfied with the corporate and partnership structure of the Loan Parties.

9.2     <u>Provisions relating to Advances</u>. At Lender's option, advances may be made no more frequently than once in each calendar week with respect to any Project. At the Lender's option such Advance may be made directly to the applicable Borrowers or the Person or Persons entitled to such Advance. The Borrowers will make available to the Lender for inspection and copying at any time any documentation supporting the Borrowers' requests for Advances under this Agreement relating to the applicable Project and not delivered to the Lender under this Section 9.2.

## SECTION 10. <u>MISCELLANEOUS</u>.

10.1     <u>Expenses</u>. The Loan Parties will pay all reasonable out-of-pocket expenses actually incurred by the Lender, including, without limitation, appraisals and attorney fees, in connection with the preparation and execution of this Agreement, the Loan Party documents, any amendments to this Agreement or any Loan Party document and all related documents, the due diligence investigation of the Projects the enforcement of any of the provisions thereof, the collection of any Loans and the foreclosure of any security interests or other Liens given with respect thereto.

10.2     <u>Setoff</u>. Each Loan Party acknowledges that the Lender has the right to set off any indebtedness whether or not an Event of Default has occurred, including any indebtedness represented by any account maintained with the Lender by any Loan Party against any indebtedness that is at any time be due and payable by the Loan Parties to the Lender.

10.3     <u>Cumulative Remedies; Waiver; Amendment</u>. Each and every right granted to the Lender under this Agreement or under any other Loan Party document, or allowed it by law or equity, is cumulative and may be exercised from time to time. No failure on the part of the Lender to exercise, and no delay in exercising, any right operates as a waiver of such right or any other right. This Agreement and the other Loan Party documents may not be amended and no provision thereof may be waived except by a writing signed by all the parties thereto.

10.4     <u>Relationship</u>. The relationship between the Loan Parties and the Lender is solely that of borrower or guarantor and lender, the Lender has no fiduciary responsibilities to the Loan Parties, the Lender does not undertake any responsibility to the Loan Parties to review or inform the Loan Parties of any matter in connection with any phase of the Loan Parties' business or operations. The Loan Parties will rely entirely upon their own judgment with respect to their business and any review, inspection, supervision or information supplied to the Loan Parties by the Lender is for the protection of the Lender and neither the Loan Parties nor any third party is entitled to rely on such information.



MB-PROD 000140

10.5    Governing Law; Severability. This Agreement and the rights and obligations of the parties under this Agreement are governed and interpreted in accordance with the laws of the State of Illinois. Wherever possible, each provision of this Agreement must be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is prohibited by or be invalid under applicable law, such provision is ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

10.6    Notices. Any and all notices or other communications required or permitted under this Agreement or the other Loan Party documents must be in writing and be served either personally (in person or by courier or express mail service), by telecopier (with receipt confirmed) or by certified United States mail with postage fully prepaid addressed to such party at the address listed for such party on the signature pages of this Agreement, with a copies to:

> if to any Loan Party:
>
> Loop Corp.
> 401 South LaSalle Street
> Suite 1700
> Chicago, Illinois 60606
>
> and if to the Lender:
>
> Mr. C. Philip Curley
> Robinson, Curley & Clayton
> 300 South Wacker Drive
> Suite 1700
> Chicago, IL 60606

MB-PROD 000141

or such other place or places as any party designates by written notice served upon the other parties under the terms of this Section 10.6. Such notices become effective upon receipt if delivered personally or by telecopier and five days after dispatch if sent by certified mail.

10.7    Indemnification (A) Each Loan Party indemnifies the Lender and its directors, officers, employees, Affiliates and agents (collectively, "Indemnified Persons") against, and agrees to hold each such Indemnified Person harmless from, any and all losses, claims, damages and liabilities, including claims brought by any partner, trustee or beneficiary or former trustee or beneficiary of Loan Party or any partner of any Loan Party, and related expenses, including reasonable counsel fees and expenses, incurred by such Indemnified Person arising out of any claim, litigation, investigation or proceeding (whether or not such Indemnified Person is a party thereto) relating to any transactions, services or matters that are the subject of the Loan Party



28

thereto) relating to any transactions, services or matters that are the subject of the Loan Party documents; provided, however, that such indemnity does not apply to any such losses, claims, damages or liabilities or related expenses determined by a court of competent jurisdiction to have arisen from the gross negligence or willful misconduct of such Indemnified Person. If any litigation or proceeding is brought against any Indemnified Person in respect of which indemnity may be sought against a Loan Party under this Section 10.7, such Indemnified Person will promptly notify the Loan Parties in writing of the commencement of such litigation or proceeding, but the omission so to notify the Loan Parties does not relieve the Loan Parties from any other obligation or liability that it may have to any Indemnified Person otherwise than under this Section 10.7. Failure of the Indemnified Person to timely notify the Loan Parties of the commencement of such litigation or proceeding does not relieve Borrower of its obligations under this Section 10.7, except where such failure irrevocably prejudices the Loan Parties' ability to defend such litigation or proceeding.

(B) In case any such litigation or proceeding is brought against any Indemnified Person and such Indemnified Person notifies the Loan Parties of the commencement of such litigation or proceeding, the Loan Parties will be entitled to participate in such litigation or proceeding and, after written notice from the Loan Parties to such Indemnified Person, to assume the defense of such litigation or proceeding with counsel of its choice at its expense, provided that such counsel is satisfactory to the Indemnified Person in the exercise of its reasonable judgment. Notwithstanding the election of the Loan Parties to assume the defense of such litigation or proceeding, such Indemnified Person has the right to employ separate counsel and to participate in the defense of such litigation or proceeding, and the Loan Parties will bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the Loan Parties to represent such Indemnified Person would present such counsel with a conflict of interest, (ii) the defendants in, or targets of, any such litigation or proceeding include both an Indemnified Person and a Loan Party and such Indemnified Person has reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the Loan Parties (in which case the Loan Parties do not have the right to direct the defense of such action on behalf of the Indemnified Person), (iii) the Loan Parties have not employed counsel satisfactory to such Indemnified Person in the exercise of the Indemnified Person's reasonable judgment to represent such Indemnified Person within a reasonable time after notice of the institution of such litigation or proceeding or (iv) the Loan Parties authorize such Indemnified Person to employ separate counsel at the expense of the Loan Parties, provided that the Loan Parties will not be liable for the fees, costs and expenses of more than one separate counsel at the same time for all such Indemnified Persons in connection with the same action and any separate but substantially similar or related action in the same jurisdiction.

(C)    The Loan Parties will not consent to the entry of any judgment or enter into any settlement in any such litigation or proceeding unless such judgment or settlement includes as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Person of a release from all liability in respect to such claim or litigation, or unless such judgment or settlement involves matters unrelated to the Indemnified Person, or unless the Loan Parties provide such Indemnified Person with evidence, acceptable to such Indemnified Person in the reasonable exercise of its discretion, that the Loan Parties will be able to fulfill their indemnity obligations to such Indemnified Person. An Indemnified Person will not consent to the entry of

29

MB-PROD 000142

any judgment or enter into any settlement in any such litigation or proceeding without providing the Loan Parties with adequate notice of any such settlement or judgment, and without the Loan Parties' prior written consent, unless the Loan Parties cannot demonstrate to such Indemnified Person, in the reasonable exercise of such Indemnified Person's discretion, that the Loan Parties can fulfill their indemnity obligations. All Indemnified Persons will submit written evidence to the Loan Parties with respect to any cost or expense for which they are seeking indemnification.

(D)     The agreements of the Loan Parties in this Section 10.7 are in addition to any liability that the Loan Parties may otherwise have. All amounts due under this Section 10.7 are payable as incurred upon written demand for such amounts.

10.8    Marshalling; Payments Set Aside. The Lender is under no obligation to Marshall any assets in favor of any Loan Party or any other party or against or in payment of any or all of the Obligations. To the extent that the Loan Parties make a payment or payments to the Lender or the Lender enforces its security interests or exercises its rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied will be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

10.9    Section Titles. The section titles contained in this Agreement are without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties.

10.10   Counterparts. This Agreement and any amendment or supplement to this Agreement or any waiver granted in connection with this Agreement may be executed in any number of counterparts and by the different parties on separate counterparts and each such counterpart is deemed to be an original, but all such counterparts together constitute but one and the same Agreement.

10.11   Successors and Assigns. This Agreement is binding upon and inures to the benefit of each Loan Party and the Lender and their respective successors and assigns.

10.12   Assignments    The Lender has the right to assign all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of the Loans and the Notes) and the other Loan Party documents. Upon any such assignment, (i) the assignee becomes a party to this Agreement and, to the extent of such assignment, has all rights and obligations of the Lender under this Agreement and under the other Loan Party documents and (ii) the Lender, to the extent of such assignment, relinquishes its rights and is released from its obligations under this Agreement and under the other Loan Party documents. The Loan Parties will execute and deliver such documents and take such other actions as the Lender may request to accomplish the foregoing. The Loan Parties consent to the disclosure of any information obtained in connection with this Agreement by the Lender to any assignee or potential assignee.



MB-PROD 000143

10.13  <u>Releases</u>.  If the Loan Parties repay, either through replacement or substitute financing or otherwise, all of the Indebtedness incurred under this Agreement in connection with a particular Project, the Lender will release the Operating Subsidiary and Operating Partnership created in connection with such Project and such Subsidiaries will no longer be deemed Operating Subsidiaries or Operating Partnerships under this Agreement and the Obligations of such Subsidiaries as Operating Subsidiaries or Operating Partnerships under this Agreement will terminate.

10.14  <u>MUTUAL WAIVER OF JURY TRIAL</u>.  BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES TO THIS AGREEMENT WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER THIS AGREEMENT, ANY OF THE OTHER LOAN PARTY DOCUMENTS OR ANY OF THE OTHER AGREEMENTS.

MB-PROD 000144

Executed and delivered as of the day and year first above written.

<u>Borrowers:</u>

Loop Corp. Inc., a South Dakota Corporation
By:_____
Title:President

Telegraph Properties Inc., An Illinois Corporation
By:_____
Title:President

Randolph Properties Inc., An Illinois Corporation
By:_____
Title:President

200 West Properties Inc., An Illinois Corporation
By:_____
Title:President

Plymouth Properties Inc., An Illinois Corporation
By:_____
Title:President

Old Colony Properties Inc. , An Illinois Corporation
By:_____
Title:President

EZLINKS GOLF LLC, an Illinois Limited Liability Corporation,
By:_____
Title:President

Ezlinks Golf, Inc., a Delaware Corporation.
By:_____
Title:President

MB-PROD 000145

Telegraph Properties LP, an Illinois Limited Partnership,
By:_____
Title: President, Telegraph Properties Inc., its General Partner

Randolph Properties LP, an Illinois Limited Partnership,
By:_____
Title: President, Telegraph Properties Inc., its General Partner

200 West Partners LP., an Illinois Limited Partnership,
By:_____
Title: President, Telegraph Properties Inc., its General Partner

Old Colony Partners LP, an Illinois Limited Partnership,
By:_____
Title: President, Telegraph Properties Inc., its General Partner

H&M Partners, GP a Texas General Partnership
By:_____
Title:_____

Lender:

BANCO PANAMERICANO, INC.

By:_____
Title:_____

330 South Wells Street Suite 718
Chicago, Illinois  60606

MB-PROD 000146

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |  |
|---|---|---|
| MARINE BANK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 CH 12239 |
| | ) | Hon. Martin Agran |
| LOOP CORP OF SOUTH DAKOTA; LEON A. | ) | |
| GREENBLATT III; 200 WEST PARTNERS LIMITED | ) | |
| PARTNERSHIP; 200 WEST PROPERTIES, INC.; | ) | |
| OLD COLONY PARTNERS LIMITED | ) | |
| PARTNERSHIP; AND OLD COLONY | ) | |
| PROPERTIES INC., | ) | |
| Defendants. | ) | |

FILED-CH
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
CHANCERY DIVISION
2004 OCT 25 PM 3: 57

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on ___Nov 03___, 2004, at __9:30__ a.m., or as

soon thereafter as counsel may be heard, I shall appear before the Honorable Judge Martin Agran

or any judge sitting in his stead, in courtroom 2204 ~~2102~~, or such other courtroom as he may be using at

Richard J. Daley Center, Chicago, Illinois, and then and there present the attached **MOTION TO**

**DISMISS FOR FAILURE TO JOIN NECESSARY PARTIES,** a copy of which is attached

hereto.

By: _____

One of the Attorneys for Defendants

Alan R. Dolinko
Darlene M. Oliver
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100
(312) 663-0303 Facsimile
Firm No. 15479

MB-PROD 000147

## CERTIFICATE OF SERVICE

The undersigned, an non-attorney, certifies that she caused to be served a copy of

**MOTION TO DISMISS FOR FAILURE TO JOIN NECESSARY PARTIES** on the

following individuals, by depositing same in the United States First Class Mail, at 300 South

Wacker Drive, Chicago, Illinois; by Messenger Delivery; by Federal Express; or by Facsimile, as

indicated this 25th day of October 2004.

___ First Class Mail
_✓_ Messenger Delivery
___ Federal Express
___ Facsimile Delivery

Andrew R. Greene
Charles A. Duffield
Sonnenschein Nath & Rosenthal LLP
8000 Sears Tower
Chicago, Illinois 60606

_Nancy Ball_

Nancy Ball

Subscribed and sworn to before me
this 25th day of October, 2004.

_Dawn M. Shields_
Notary Public

"OFFICIAL SEAL"
Dawn M. Shields
Notary Public, State of Illinois
My Commission Expires 10/30/2006

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

MARINE BANK, )
)
Plaintiff, )
)
v. )
) No. 04 CH 12239
LOOP CORP OF SOUTH DAKOTA; LEON A. ) Hon. Martin Agran
GREENBLATT III; 200 WEST PARTNERS LIMITED )
PARTNERSHIP; 200 WEST PROPERTIES, INC.; )
OLD COLONY PARTNERS LIMITED )
PARTNERSHIP; AND OLD COLONY )
PROPERTIES INC., )
)
Defendants. )
)

## NOTICE OF FILING

PLEASE TAKE NOTICE that on Wednesday, November 17, 2004, the undersigned

caused to be filed with the Clerk of the Circuit Court of Cook County, Illinois, **DEFENDANTS'**

**ANSWER TO COUNTS I AND II AND COUNTERCOMPLAINT**, a copy of which is

herewith served upon you.

LOOP CORP OF SOUTH DAKOTA; LEON A.
GREENBLATT III; 200 WEST PARTNERS LIMITED
PARTNERSHIP; 200 WEST PROPERTIES, INC.; OLD
COLONY PARTNERS LIMITED PARTNERSHIP;
AND OLD COLONY PROPERTIES INC.,

By: _____

One of Their Attorneys

Alan R. Dolinko
Darlene M. Oliver
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100
(312) 663-0303 Facsimile
Firm No. 15479

MB-PROD 000149

## CERTIFICATE OF SERVICE

The undersigned, an non-attorney, certifies that she caused to be served a copy of

**DEFENDANTS' ANSWER TO COUNTS I AND II AND COUNTERCOMPLAINT** on the

following individuals, by depositing same in the United States First Class Mail, at 300 South

Wacker Drive, Chicago, Illinois; by Messenger Delivery; by Federal Express; or by Facsimile, as

indicated this 17th day of November 2004.

<div>

✓ First Class Mail
___ Messenger Delivery
___ Federal Express
___ Facsimile Delivery

</div>

<div>

Andrew R. Greene
Charles A. Duffield
Sonnenschein Nath & Rosenthal LLP
8000 Sears Tower
Chicago, Illinois 60606

Nancy Ball

</div>

Subscribed and sworn to before me
this 17th day of November, 2004.

Notary Public

**"OFFICIAL SEAL"**
**Dawn M. Shields**
Notary Public, State of Illinois
My Commission Expires 10/30/2006