IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **WACHOVIA SECURITIES, LLC,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) **Case No. 04 C 3082** ) |
| **DAVID NEUHAUSER; ANDREW A. JAHELKA; RICHARD O. NICHOLS; LEON A. GREENBLATT III; BANCO PANAMERICANO, INC.,** a South Dakota Corporation; **LOOP CORP.,** a South Dakota corporation; **LOOP PROPERTIES, INC.,** an Illinois corporation; and **SCATTERED CORP.,** a South Dakota corporation; | ) ) ) Judge William T. Hart ) ) ) Magistrate Judge Michael T. Mason ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
RULE 45 MOTION TO COMPEL MICHAEL MAY, CPA'S
PRODUCTION OF DOCUMENTS IN RESPONSE TO SUBPOENA DUCES TECUM**

The Plaintiff, Wachovia Securities, LLC ("Wachovia"), by and through its attorneys, Gary I. Blackman and Christopher S. Griesmeyer of Levenfeld Pearlstein, LLC, and pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, respectfully submits this Memorandum of Law in support of its Motion to Compel Michael May, CPA to produce all documents responsive to Wachovia's subpoena *duces tecum*.

### I. PRELIMINARY STATEMENT

This is Wachovia's second motion to compel, and the fourth discovery-related motion in this case. Michael May is the Defendants' accountant, and has documents that are directly relevant to Wachovia's UFTA claims, as well as its fraud, veil piercing and alter ego claims. However, the Defendants[1] are trying everything they can to prevent Wachovia from obtaining the documents necessary to prove its case.

---

[1] Although Mr. May is technically a third-party subpoena respondent, the individual Defendants have identified him as a witness with knowledge of the finances and operations of their various shell entities. Moreover, Mr. May's counsel,

Wachovia finds itself in a unique position: the majority of information and documents related to the Defendants' various (and fraudulent) asset transfers are in the sole possession of the Defendants, their accountant (Mr. May), their attorneys, or their various shell companies. For this reason, the Court has already determined that Wachovia is entitled to pursue a broad range of discovery in this case: "*in an alter ego situation like this, I think you're entitled to a broader discovery than would ordinarily be the case.*" (Dec. 22, 2004 H'rg. Tr., p. 9, lines 4-7).

Moreover, at least one federal court Judge has already found that Defendant Greenblatt has been running an illicit "corporate shell game." Specifically, the Honorable A. Benjamin Goldgar, adjudicating the *In re NOLA, LLC* and *In re South Beach Securities, Inc.* bankruptcy proceedings (Nos. 05 B 16682 and 05 B 16679, respectively) in the United States Bankruptcy Court for the Northern District of Illinois, recently dismissed those proceedings under § 1112(b) of the Bankruptcy Code on the ground that they were not good-faith filings. In reaching this result, Judge Goldgar concluded:

> The facts are laid out in the parties' papers and appear to be undisputed. To the extent there are disputes, the disputes are not material.
>
> Briefly, South Beach [Securities, Inc.] and NOLA are part of **an elaborate network of corporations and other business entities orbiting around Leon Greenblatt, a Chicago businessman.** According to Wachovia, these corporations are mostly shells through which Greenblatt and his associates have engaged in various activities of questionable legitimacy.
>
> One of these activities was the attempted acquisition in roughly 1999 of a controlling interest in the publicly-traded securities of Health Risk Management Incorporated, or HRM. Wachovia's papers both here and in connection with the earlier motion of debtor to retain counsel recite in detail the nature of Greenblatt's activities relating to HRM and the fallout from those activities. The accuracy of that description might be one the debtors here would dispute, although so far they have not seen fit to do so.
>
> **There is no dispute, however, that many of Greenblatt's corporations are indeed shells,** that HRM stock is currently worthless, and that Greenblatt's activities related to HRM precipitated an avalanche of litigation in assorted federal and state courts, including the District Court for the Northern District of Illinois.
>
> \* \* \*

---

Gregory J. Jordan, Esq. conceded that he was asked by C. Philip Curley, Esq. to represent Mr. May in this case. Mr. Curley, in turn, is counsel for the Corporate Defendants in this case, and at one time was counsel for the Individual Defendants in this case and the related NYSE arbitration proceeding before he withdrew for conflict-of-interest reasons. While Mr. Jordan has objected to the subpoena on behalf of Mr. May, it is a safe assumption that the real party calling the shots is Defendant Greenblatt or one of his co-conspirators.

> **South Beach and NOLA, the debtors in the cases here, are two more corporate shells, and their bankruptcy filings are just as questionable.** (Aug. 24, 2005 H'rg. Tr., *In re NOLA* and *In re South Beach* Bankruptcy proceedings, copy attached as Exhibit D, pp. 4-8) (emphasis added).

The conclusions reached by Judge Goldgar – if nothing else – demonstrate why Wachovia is entitled to broad discovery in this case, and why Mr. May should be compelled to produce all documents requested in Wachvoia's subpoena.[2]

## II. FACTUAL BACKGROUND[3]

The Defendants' shell game is impossibly complex. Unfortunately, in order to fully appreciate the relevance of Wachovia's Subpoena (and the frivolous nature of Mr. May's objections), a fairly detailed recitation of the factual background behind Defendants' fraudulent activities is required. The following documents will assist the Court in understanding the inter-relationships between the Defendants' myriad of shell corporations, their HRMI takeover scheme, and the fraudulent transfers between their various shells:

    Exhibit E:    Detail of known organization of Individual Defendants' empire;

    Exhibit F:    Detail of Defendants' acquisition of HRMI stock via shell companies; and

    Exhibit G:    Detail of Defendants' shell companies used to hide assets from creditors.

### A. AN OVERVIEW OF DEFENDANTS' SHELL GAME

Defendant Leon Greenblatt is a high-risk investor, specializing in bankruptcy arbitrage. He and his colleagues (the remaining Individual Defendants) funnel their investment activities through dozens of corporate shells. (*See, e.g.*, Exs. E-G). Many of these entities serve no purpose other than to provide multiple layers of limited liability protection for Greenblatt and his colleagues.[4] Each of the entities

---

[2] Copies of Wachovia's subpoena, Mr. Jordan's September 30, 2005 letter objecting to Wachovia's subpoena, and Wachovia's October 6, 2005 reply letter are attached as Exhibits A, B and C, respectively.

[3] Wachovia references the factual background set forth in this Memorandum of Law in its contemporaneously-filed motion to compel the Greenblatt-Controlled Entities to respond to their subpoenas.

[4] For example, according to their bankruptcy schedules, NOLA's only "asset" is the stock of South Beach Securities, Inc.; South Beach's only asset, in turn, is worthless shares of HRMI. Moreover, Defendants have identified NOLA's manager as Teletech Systems, Inc., which is owned or controlled by Greenblatt. (*See*, Ex. E. *See also*, bankruptcy schedules filed by NOLA and South Beach, attached as Exhibits H and I, respectively). Similarly, one of Loop's assets

3

identified on the spreadsheet attached as <u>Exhibit E</u> is ultimately owned or controlled by Mr. Greenblatt, his wife, Leslie Jabine, or one of the Individual Defendants. Moreover, each of these entities is a mere shell company, existing only on paper, operating out of one of Greenblatt's buildings – 330 South Wells Street in Chicago, Illinois. As explained below, Greenblatt and his colleagues used a number of these shell entities to surreptitiously acquire a controlling interest in HRMI. When their scheme fell apart, the Individual Defendants used these shells to transfer assets from one entity to the other as their creditors began closing in.

### B. DEFENDANTS' EFFORTS TO ACQUIRE HRMI

On August 28, 1998, Greenblatt wrote to Dr. Gary T. McIlroy, the CEO of HRMI, and offered to acquire the company. (A true and correct copy of Greenblatt's letter is attached as <u>Exhibit J</u>). Dr. McIlroy rejected this offer. Greenblatt responded by embarking upon a campaign to secretly take over the company by acquiring a majority interest in its publicly-traded securities. As Greenblatt used his corporate shells to acquire more and more HRMI stock, he realized that he would need to address the company's "poison pill," which was designed to prevent the very hostile takeover that Greenblatt was attempting. Accordingly, in February of 1999, Greenblatt, his wife Leslie Jabine, and two of his shell corporations (Chiplease, Inc. and Defendant Banco Panamericano, Inc.) petitioned the company for a special shareholders' meeting to repeal the poison pill. HRMI refused this request, and Greenblatt sued. On November 17, 1999, Banco Panamericano prepared proxy materials and asked that the company include a proposal to eliminate the poison pill at HRMI's annual meeting (which would then allow individual shareholders to acquire large blocks of HRMI stock). The company also refused this request, and Greenblatt sued again.

### C. THE HRMI STANDSTILL AGREEMENT

These lawsuits eventually culminated in the May 19, 2000 Standstill Agreement between Greenblatt, Jabine, Banco Panamericano and Chiplease on the one hand, and HRMI on the other hand.

---

is Loop Properties, Inc. In turn, Loop Properties, Inc. owns the shares of 200 West Properties, Inc., Old Colony Properties, and various other real estate concerns. (*See,* Ex. E).

4

(A true and correct copy of this Standstill Agreement is attached as <u>Exhibit K</u>). Under the Standstill Agreement, Greenblatt – including his associates and shell companies – was precluded from acquiring more than 40% of the publicly-traded shares of HRMI stock. The Standstill Agreement also provided Greenblatt's associate, Defendant Andrew Jahelka, with a seat on HRMI's board of directors. (Jahelka would eventually use his position as an HRMI board member to appoint Greenblatt as the company's chief restructuring officer). The company announced the terms of the Settlement Agreement, which fueled public interest in the stock.

### D. DEFENDANTS' LOOP AND NOLA ACCOUNTS

In October of 2000, the Individual Defendants opened a margin account with Wachovia under the name of "Loop Corp," and in February of 2001, they opened another account under the name of "NOLA, LLC." The Individual Defendants used these accounts for the sole purpose of acquiring large blocks of HRMI stock on margin. The more HRMI stock they purchased, the higher the stock price rose (thereby artificially inflating the value of their holdings). In turn, the increased value of their HRMI holdings enabled the Individual Defendants to acquire even *more* HRMI stock on margin. This enabled Greenblatt and his colleagues to shift the risk of their investment scheme to Wachovia, the margin creditor on the Loop and NOLA accounts.

### E. DEFENDANTS' SCHEME TO DEFRAUD

Defendants used their Loop and NOLA accounts – along with almost two dozen other accounts – to shield their acquisitions of HRMI stock from the public, the SEC and HRMI itself. Defendants' scheme involved two core components: (1) acquiring large blocks of HRMI stock, often on margin; and (2) acquiring that stock through multiple accounts in the names of numerous shell corporations, thereby allowing Defendants to conceal their activities from the SEC and HRMI.

On April 5, 2001, Greenblatt disclosed on a Schedule 13D filing with the SEC that he and his wife controlled almost 30% of the outstanding shares of HRMI, either through their direct ownership or through their control over certain shell companies – Chiplease, Banco Panamericano and Loop Corp.

(A true and correct copy of the April 5, 2001 filing is attached as Exhibit L). The Greenblatts updated their Schedule 13D filing on April 12, 2001, and disclosed that they had increased their holdings to almost 39% of the outstanding shares of HRMI. (A true and correct copy of the April 12, 2001 filing is attached as Exhibit M). *Notably, NOLA is nowhere mentioned in these disclosures.* The reason for this is clear: in the May 19, 2000 Standstill Agreement, Greenblatt represented that he had no intention of acquiring additional HRMI shares in excess of the outstanding shares of the Company. (*See*, Ex. K).

The shares of HRMI that Greenblatt acquired through his NOLA account thus breached the Standstill Agreement and violated the SEC rules pertaining to Schedule 13D disclosures. In addition to hiding *his* NOLA holdings from the SEC, Greenblatt also failed to disclose on his Schedule 13D filings the holdings of Repurchase Corp., South Beach Securities, Inc. and Teletech Systems, Inc. (each another one of his shell companies). Far from the 1.8 million shares disclosed on the Schedule 13D report, it appears that Greenblatt had actually acquired *more than 3.5 million shares of HRMI stock* during the 18-month time period from January 2000 and May 2001. Greenblatt acquired this stock – and hoped to avoid SEC regulations and reporting requirements – by using *nineteen* different trading accounts at *eleven* different brokerage firms, under the names of *eight* different shell entities:

| SHELL ENTITY | BROKERAGE FIRM | STOCK | SHARES ACQUIRED | ACQUISITION DATES |
|---|---|---|---|---|
| Banco Panamericano | Bear Stearns | HRMI | 243,225 | Jan. – Jun. 2000 |
| Banco Panamericano | First Union Securities | HRMI | 124,000 | April 2001 |
| Banco Panamericano | "MJSK" | HRMI | 413,100 | Sept. 2000 – May 2001 |
| Banco Panamericano | Northern Trust Securities | HRMI | 220,150 | Jan. 2000 – May 2001 |
| Banco Panamericano | PaineWebber | HRMI | 56,000 | Feb. 2000 |
| Banco Panamericano | South Beach Securities | HRMI | 10,300 | May 2000 |
| Banco Panamericano | Stifel, Nicolaus & Co. | HRMI | 15,680 | Before May 2001 |
| Chiplease, Inc. | First Union Securities | HRMI | 25,700 | Feb. – April 2001 |
| Chiplease, Inc. | Quick & Reilly | HRMI | 36,500 | Before Aug. 2000 |
| Loop Corp. | MJSK | HRMI | 297,500 | Dec. 2000 – May 2001 |
| Loop Corp. | Prudential (Wachovia) | HRMI | 422,900 | Oct. 2000 – May 2001 |
| NOLA, LLC | MJSK | HRMI | 263,800 | April – May 2001 |
| NOLA, LLC | Prudential (Wachovia) | HRMI | 197,600 | March-May 2001 |
| Repurchase Corp. | Credit Suisse | HRMI | 447,000 | May 2001 |
| Repurchase Corp. | First Union Securities | HRMI | 174,200 | April 2001 |
| Repurchase Corp. | MJSK | HRMI | 320,200 | April – May 2001 |
| Scattered Corp. | H&R Block | HRMI | 27,200 | Before April 2001 |
| South Beach Securities | First Union Securities | HRMI | 169,400 | Before May 2001 |
| Teletech Systems, Inc. | Northern Trust Securities | HRMI | 68,050 | Before Feb. 2000 |

These transactions are visually depicted on <u>Exhibit F</u>. By concealing the true purpose of his NOLA account, while simultaneously promising that his trading activity would comply with all applicable laws and regulations, Greenblatt duped Wachovia into acting as the unwitting bankroll for his fraudulent scheme. All of Greenblatt's activities were done with an eye toward defrauding the SEC, HRMI, Wachovia and the public at large.

### F. NASDAQ HALTS TRADING OF HRMI

Defendants' scheme began to unravel on May 22, 2001, when the NASDAQ halted trading of the common stock of HRMI on the news that the company's independent auditors had resigned. At this time, the stock declined from a prior day's close of $7.5 per share to $4.75 per share. With the drop in HRMI stock, Defendants' Loop and NOLA accounts (as well as their 17 other shell accounts) went from profitable to heavy losses. Greenblatt no longer had the funds – in either cash or marginable securities – to satisfy either the margin maintenance requirements imposed by Wachovia on prior holdings, or the Regulation T margin call issued on more recent purchases.

Consequently, Wachovia began to explore potential legal remedies. In the course of its investigations, it began to learn of the interrelationships among the various Defendants and the purpose behind the formation of Loop Corp. and NOLA, LLC. Unfortunately, this knowledge came too late. As of June 19, 2001, Wachovia had extended margin credit to Greenblatt of almost $3 million, consisting of $1,098,459.90 to NOLA, LLC and $1,885,751.44 to Loop Corp. At that time and today, that indebtedness was almost completely unsecured by the accounts' assets. With interest, these unpaid margin debts total <u>more than $4 million</u> as of October 2005.

Wachovia therefore filed an NYSE arbitration action against Loop and NOLA; these claims were arbitrated on April 28, 2005 – the day after NOLA had filed for bankruptcy protection. (Curiously, NOLA's counsel did not notify Wachovia of the bankruptcy filing, and instead actively participated in the arbitration hearing). On May 10, 2005, Wachovia obtained an arbitration award against Loop Corp. in the amount of $2,349,000, together with $90,000 in attorneys' fees. This Court reduced Wachovia's

7

arbitration award to a $2,478,418.80 judgment in a related proceeding on September 22, 2005. (A true and correct copy of this Court's Judgment Order is attached as Exhibit N).[5]

### G. DEFENDANTS TRANSFER AND HIDE ASSETS

Defendants, of course, knew that their investment scheme was risky. They therefore ensured that the corporate shells they used to accomplish their scheme were truly empty by the time their margin creditors came calling. They achieved this through a number of inter-related corporate transfers, which are visually depicted on Exhibit G.

For example, after the $1.8 million margin debt became due on the Loop account, Greenblatt looted the Loop corporate shell by making the following payments to Credit Suisse First Boston, for the benefit of Repurchase Corp. (an "affiliate" of Loop, with common ownership and control) *out of Loop Corp. funds:*

---

[5] Tellingly, this is not the only action involving Greenblatt's use of assetless shell corporations and unwitting broker-dealers to fraudulently acquire a controlling interest in HRMI. Each of the following lawsuits involve Greenblatt's use of alter ego shell corporations – such as NOLA, LLC, Loop Corp., and Banco Panamericano, Inc., – to acquire large blocks of HRMI shares through unwitting broker-dealers:
- *James P. Stepehnson, Trustee for MJK Clearing, Inc., v. Leon A. Greenblatt, Banco Panamericano, Inc., Loop Corp., NOLA, LLC and Repurchase Corp.*, (BKY. No. 03-4053, U.S. Bankruptcy Ct., Dist. of MN);
- *John E. Feltl v. Leon A. Greenblatt, Banco Panamericano, Inc., Loop Corp., NOLA, LLC and Repurchase Corp.*, (Case No. 03-13751, MN State Court, Hennepin County);
- *Wachovia Securities, LLC v. Loop Corp.*, (Case No. 05 C 3788, N.D. Ill. (J. Hart));
- *Wachovia Securities, LLC v. Loop Corp., and NOLA, LLC*, (NYSE Arbitration No. 2003-011927);
- *Credit Suisse First Boston, LLC, v. Repurchase Corp., Leon A. Greenblatt, III, Andrew A. Jahelka and Richard O. Nichols*, (NYSE Arbitration No. 2003-014931); and
- *Credit Suisse First Boston, LLC, v. Leon A. Greenblatt, III, Richard O. Nichols and Andrew A. Jahelka*, (Case No. 04 C 2142, N.D. Ill. (J. Grady)).

Nor is this the first time a creditor has found itself chasing one of Mr. Greenblatt's assetless shell corporations. To the contrary, this is part of Greenblatt's business strategy. For example, creditors in (at least) the following cases have asserted alter ego and/or veil piercing claims against Mr. Greenblatt and his colleagues:
- *Golf Venture, LLC v. Andrew H. Jahelka, Leon A. Greenblatt and Richard O. Nichols*, (Case No. 03 L 9503, IL Circuit Court of Cook County);
- *Golf Venture, LLC v. Loop Corp.*, (Case No. 02 L 3667, IL Circuit Court of Cook County);
- *City of Chicago v. Loop Corp.*, (Case No. 05 L 50191, IL Circuit Court of Cook County); and
- *Credit Suisse First Boston, LLC, v. Leon A. Greenblatt, III, Richard O. Nichols and Andrew A. Jahelka*, (Case No. 04 C 2142, N.D. Ill. (J. Grady)).

8

| DATE OF PAYMENT | AMOUNT OF PAYMENT | METHOD OF PAYMENT |
|---|---|---|
| September 27, 2001 | $10,000.00 | Check |
| November 28, 2001 | $10,000.00 | Wire Transfer |
| December 28, 2001 | $10,000.00 | Wire Transfer |
| February 26, 2002 | $10,000.00 | Wire Transfer |
| August 23, 2002 | $3,000.00 | Wire Transfer |

(*See,* Exhibit O, Exhibit G).

These transfers are significant because Repurchase Corp. was yet another one of Greenblatt's sham corporations that he used to surreptitiously acquire a controlling interest in HRMI. Moreover, these transfers in no way benefited Loop, and Loop did not receive any value whatsoever – let alone "reasonably equivalent" value – from Repurchase for these payments. Tellingly, Repurchase has since filed for bankruptcy protection, thereby preventing Wachovia from asserting any claims against it and mooting any suggestion that Loop's transfers to Repurchase would ever be repaid.

Thus, Defendants have engaged in a pattern and practice of applying one affiliate's assets to satisfy the obligations of another affiliate. For example, Loop obtained a $3.25 million loan from Marine Bank on January 26, 2001. (*See,* Exhibit P, Exhibit G). Loop was obligated to make monthly payments of approximately $35,000 to Marine Bank pursuant to a promissory note. (*Id.*). In April of 2004, Loop tendered more than $105,000 in loan payments to Marine Bank *in the form of checks written on a **Chiplease** account.* (*Id.*). For their part, Defendants treated this as a "gift" from Chiplease, and the $105,000 was not supported by any consideration from Loop. Furthermore, Loop pledged certain of its assets – namely, its interests in 200 West Partners, LP, 200 West Properties, Inc., Old Colony Partners, LP and Old Colony Properties, Inc. – to Marine Bank as security for the January 26, 2001 loan. (*Id.*). Specifically, Loop transferred $2,198,326 of the Marine Bank loan proceeds to South Beach, a subsidiary of NOLA and an affiliate of Loop. (A true and correct copy of Loop's January 31, 2001 wire transfer request is attached as Exhibit Q).[6]

---

[6] Curiously, South Beach makes no mention of this $2,198,326 in its bankruptcy schedules (*See,* Ex. I).

9

Yet another example of an "affiliate-to-affiliate" fraudulent transfer by Defendants involves EZLinks Golf, Inc., identified as a subsidiary of Loop Corp. in Loop's Marine Bank loan application materials. On March 15, 2005, Greenblatt's associate, Defendant Nichols testified that the shares of EZLinks had been transferred to Scattered Corp., another Greenblatt-controlled entity and an affiliate of Loop (not to mention a creditor of South Beach, *see* Ex. I). (A true and correct copy of relevant portions of Mr. Nichols' deposition testimony is attached as <u>Exhibit R</u>).

Still another example of an "affiliate-to-affiliate" fraudulent transfer orchestrated by the Defendants is the April 1, 2002 transaction in which Loop granted Defendant Banco Panamericano, Inc. a security interest in all of its "deposit accounts maintained with any organization," as well as a security interest in all of Loop's "property, equipment, trademarks, licenses and any other asset."(*See,* <u>Exhibit S</u>). These assets specifically included all of Loop's interests in its operating subsidiaries: Telegraph Properties, Inc., Randolph Properties, Inc., 200 West Properties, Inc., Old Colony Properties, Inc., EZLinks Golf, LLC, EZLinks Golf, Inc., Telegraph Properties, LP, Randolph Properties, LP, 200 West Partners, LP, Old Colony Partners, LP, and H&M Partners, GP. (*Id.*). Loop further pledged to Banco each operating subsidiary's respective "equipment, inventory, accounts, general intangibles, stock or partnership interests," including all proceeds from those assets.

Finally, on September 24, 2002, Loop transferred its interests in Old Colony Partners, LP and 200 West Partners, LP to Loop Properties, Inc. (*See,* Affidavit of A. Jahelka, attached as <u>Exhibit T</u>, at ¶ 5). In addition to being an officer and director of Loop, Defendant Jahelka is also an officer and director of Loop Properties. (*Id.*). Once again, there is no indication that this "affiliate-to-affiliate" transfer was designed to accomplish anything other than hinder or delay Greenblatt's creditors.

Loop's bank records show that Greenblatt's efforts to loot the company and hide its assets have been successful. For example, Loop's May 2001 Marine Bank money market account statement reflects a balance of $254,090.77. Similarly, Loop's May 2001 Marine Bank checking account statement reflects deposits in the amount of $2,617,576.08, and an ending balance of $49,167.16. Eight weeks

after Wachovia had filed its Statement of Claim against Loop in the NYSE Arbitration, Loop's money market and checking account balances had dropped to *$0.00* and *$0.21*, respectively. This is especially curious given the admissions by Banco and Chiplease in the *In re Resource Technology Corporation ("RTC")* bankruptcy, that RTC had paid $1,635,250 to Loop Corp. for "accounting and legal services" during the time period from February 29, 2000 through May 23, 2003.[7] (*See* Exhibit U).

### H. MICHAEL MAY IS DEFENDANTS' ACCOUNTANT

May is the Defendants' accountant. He performed accounting services for Loop Corp. from 1999 through 2002, at which point he began working for Loop Corp.'s subsidiary, Loop Properties, Inc. In his capacity as an accountant for Loop Corp. and Loop Properties, Inc., Mr. May also provided accounting services pertaining to a number of the shell companies that comprise Mr. Greenblatt's empire:

> Q: What line of business is or was Loop Corp. in?
> 
> A: **Loop Corp., what I did is did accounting services for other companies, worked with other companies' accounting departments and management.** At some points, I had an assistant. And Liz Sharp [currently acting as defense counsel for Loop Corp. and Loop Properties in this case] was also hired with Loop Corp., so it was like accounting/legal services that we provided different companies.
> 
> Q: Okay. And what did you understand the business of Loop Corp. to be?
> 
> A: I would say they were probably in the business of investments.
> 
> Q: Okay. Do you recall any specific investments that Loop Corp. may have had?
> 
> A: I believe that they had ownership in some real estate themselves. I think they did by some securities at various times.
> 
> Q: What did you understand the business of Loop Properties to be?
> 
> A: Similar to Loop Corp. We had investments in real estate. **We also provided – on that company, provided the accounting and legal services to other companies.**
> 
> \* \* \*
> 
> Q: Would you prepare tax returns on behalf of Loop Corp.?
> 
> A: Yes.
> 
> \* \* \*
> 
> Q: Have you ever acted as a CPA for Mr. Greenblatt in his individual capacity?
> 
> A: Yes.

---

[7] Resource Technology Corporation is yet another one of Greenblatt's entities. In that bankruptcy proceeding, Banco and Chiplease are creditors of RTC.

11

Q: Have you prepared Mr. Greenblatt's personal tax returns in the past?

A: Yes. (M. May Dep. Tr., pp. 5-8, attached as <u>Exhibit V</u>).

Thus, Mr. May admits that while employed at Loop Corp. and Loop Properties, Inc., his job was to provide accounting services to other companies, ***even though Loop and Loop Properties were in the "business of investments."*** Mr. May also admits that he was employed in a similar capacity at Scattered Corp. (Ex. V, p. 5). Mr. May therefore has documents that are directly relevant to the issues raised by Wachovia's allegations in this case.

### III. <u>LEGAL STANDARD</u>

Rule 45 of the Federal Rules of Civil Procedure allows Wachovia to issue subpoenas upon third parties in order to obtain documents relevant to this litigation. Rule 26(b) further provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). Rule 26(b) further provides that the Court may allow discovery "of any matter relevant to the subject matter involved in the action." *Id.* Moreover, it is clear that "relevant information" for discovery purposes need not be admissible at trial, but must merely appear "reasonably calculated to lead to the discovery of admissible evidence." *Id.* Thus:

> The test for relevancy under the Federal Rules is extremely broad and permissive. Relevant material may "encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."

*Minch v. City of Chicago*, 213 F.R.D. 526, 527 (N.D. Ill. 2003) (citing, *Oppenheimer Fund, Inc., v. Sanders*, 437 U.S. 340, 351 (1978)). *See also, In re Aircrash Disaster Near Roselawn, Ind.*, 172 F.R.D. 295, 303 (N.D. Ill. 1997) ("Discovery is designed to help define and clarify the issues, and is not limited to the merits of a case, since a variety of fact-oriented issues may arise during litigation that are not related to the merits.").

### IV. <u>ARGUMENT</u>

Wachovia's subpoena to Mr. May seeks documents that pertain to Defendants' corporate empire, including the financial affairs of their various shell companies and the various transfers of assets

12

among and between them. Such documents are directly relevant to Wachovia's UFTA claims, as well as its alter ego, veil piercing and fraud claims.

For his part, Mr. May does not object to the subpoena on relevancy grounds. Rather, Mr. May rests his refusal to produce a single document on only *two* objections: (1) the "accountant-client" privilege, and (2) that the subpoena is "overly broad." Mr. May further claims not to be able to respond to certain aspects of the subpoena because he does not know what simple words like "transaction," "principal," and "relationship" mean. As explained below, each of these objections is without merit.

### A. MR. MAY'S "ACCOUNTANT-CLIENT" OBJECTIONS ARE WITHOUT MERIT

Mr. May objects to every single request in Wachovia's subpoena on the ground that the request "would require that Mr. May violate the account/client privilege." (Ex. B). Mr. May's objection is misplaced, as federal courts do not recognize any "accountant-client" privilege. *See, e.g., In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) (**"There is no accountant-client privilege."**); *United States v. Frederick*, 182 F.3d 496 (7th Cir. 1999) (same); *Bland v. Fiatallis North America, Inc.*, 2002 WL 31655213 (N.D. Ill. 2003) (**"there is no such thing as an 'accountant-client privilege.'"**); *FDIC v. Mercantille National Bank*, 84 F.R.D. 345 (N.D. Ill. 1979) (same); *Baylor v. Mading-Dugan Drug Co.*, 57 F.R.D. 509 (N.D. Ill. 1972) (same); *In re Borden Co.*, 75 F. Supp. 857 (N.D. Ill. 1948) (same).[8]

Moreover, even if this Court were to recognize an "accountant's privilege" as a proper basis for withholding documents responsive to a subpoena, it is important to note that Mr. May has not produced a privilege log. It therefore appears that Mr. May anticipated his objection would not be sustained, but nonetheless lodged it for the mere purpose of delaying Wachovia's efforts to obtain key documents.

---

[8] Although Illinois is one of the few states that recognizes an "accountant's privilege" (*See* 225 ILCS 450/27), the protections afforded by the Illinois statute do not apply to documents and information transmitted to an accountant for the purpose of creating public financial documents, such as tax returns. *See, e.g., In re October 1985 Grand Jury No. 746*, 124 Ill.2d 466 (1988). In this case, Mr. May has testified in a related proceeding that his job was to prepare tax returns for Mr. Greenblatt and his related entities. (*See*, Ex. V). Therefore, even if the state law privilege applied in this federal court case – *and it does not* – the majority of documents in Mr. May's possession would not be protected in any event.

13

Mr. May's "accountant-client" objection should find no audience in this Federal Court, and instead the Court should compel Mr. May to produce all documents within his possession, custody or control that are requested in Wachovia's subpoena.

### B. MR. MAY'S OBJECTIONS TO THE SCOPE OF THE SUBPOENA ARE WITHOUT MERIT

As with his "account-client" objection, Mr. May objects to every single one of Wachovia's requests on the ground that they are "overly broad." Although Mr. May does not explain *why* he finds Wachovia's requests overly broad, it is clear from the allegations in Wachovia's First Amended Complaint that Mr. May's blanket objections are without merit.

Wachovia has alleged – with particularity – that the Defendants have engaged in a scheme to defraud, utilizing an impossibly complex web of interrelated shell companies to cover their tracks and hide their assets. Wachovia has presented numerous documents that suggest Defendants' scheme began in 2000, and continues today. For this reason, the Court has already determined that Wachovia is entitled to seek post-2001 discovery:

> To the extent necessary to calculate damages until the present date, **post-2001 discovery will be permitted**. Also, to the extent relevant to show that they were used as shell corporations, **plaintiff may seek post-2001 discovery** regarding Loop and NOLA financial transactions. (May 10, 2005 Memo. Op. Order, p. 4) (emphasis added).

Wachovia amended its Complaint to assert UFTA claims after the Court had already entered its May 10, 2005 Memorandum and Opinion Order on Wachovia's First Motion to Compel. For that reason, the Order does not address Wachovia's UFTA claims. However, the same rationale that the Court used to conclude that Wachovia is entitled to seek post-2001 discovery to (a) calculate damages, and (b) show that Loop and NOLA were shell companies, applies with equal force to Wachovia's UFTA claims. The gravamen of Wachovia's UFTA claims is that the Defendants have used their shell companies to transfer and hide assets from their creditors. The majority of Defendants' asset transfers necessarily occurred after May of 2001, when their HRMI scheme fell apart. (Indeed, Wachovia's First Amended Complaint details asset transfers that occurred as late as 2002 and 2004). In order for Wachovia to pursue its UFTA claims (and calculate its damages, and prove that the Defendants' various

14

corporate entities were – as Judge Goldgar concluded – assetless shells), Wachovia *__must__* be allowed to seek discovery pertaining to financial transactions of Loop Corp., NOLA, LLC and their "affiliates" (as that term is defined in the UFTA) from 2000 through the present.

In addition, to the extent that Mr. May objects to Wachovia's subpoena on the ground that it seeks documents pertaining to a number of Mr. Greenblatt's entities who are not parties to this case, it is important to remember that *__the Defendants__* are the ones responsible for setting up their impossibly complex web of interrelated companies. Any "burden" caused by Wachovia's discovery requests in this case – including its subpoena to Mr. May – is of the Defendants' own making and should not be entertained by this Court. Contrary to Mr. May's myopic view of the issues in this case, Wachovia's UFTA discovery should not be limited to the particular transactions (or Defendants) identified in the Complaint.

### C. MR. MAY'S OBJECTIONS TO WACHOVIA'S TERMINOLOGY ARE WITHOUT MERIT

Mr. May also objects to Wachovia's subpoena on the ground that it contains the following undefined terms: (a) "transactions," (b) "principals," and (c) "relationship." (Ex. B, pp 3-4). Although there is nothing unusual or confusing about these words, especially when viewed in the context of the subpoena, Wachovia nonetheless responded to Mr. May's objections by offering clear definitions in its October 6, 2005 letter. (*See,* Ex. C). Mr. May has made no effort to respond or produce documents, however, but is continuing to stand on his frivolous objections.

### V. CONCLUSION

**WHEREFORE,** for all of the reasons set forth above, the Plaintiff, Wachovia Securities, LLC, respectfully requests that this Court enter an Order pursuant to Rule 45 (c)(2)(B) of the Federal Rules of Civil Procedure:

- (A) Compelling Michael May, CPA to produce all documents requested by Plaintiff's August 26, 2005 Subpoena *Duces Tecum* within seven (7) days;
- (B) Finding Michael May, CPA in contempt for failing to obey Plaintiff's subpoena; and
- (C) Granting any such other and further relief as the Court deems just.

Dated: October 25, 2005                                                          Respectfully submitted,

                                                                                 **WACHOVIA SECURITIES, LLC**

                                                                                 By: /s/ Christopher S. Griesmeyer
                                                                                      One of its Attorneys

Gary I. Blackman (ARDC # 6187914)
Christopher S. Griesmeyer (ARDC # 6269851)
**LEVENFELD PEARLSTEIN, LLC**
2 North LaSalle Street - Suite 1300
Chicago, IL 60602
(312) 346-8380
(312) 346-8434 (Facsimile)