# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WACHOVIA SECURITIES, LLC )
)
       Plaintiff, )
           v. )
)
DAVID NEUHAUSER, )
ANDREW A. JAHELKA, )
RICHARD O. NICHOLS, and )
LEON A. GREENBLATT III, et al )
       Defendants. )

Case No. 04 C 3082

Judge William T. Hart

Magistrate Michael T. Mason

**FILED**

**NOV 9 2005**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## DEFENDANTS' NOTICE OF FILING

TO:    SEE ATTACHED SERVICE LIST

    PLEASE TAKE NOTICE that on the 9th day of November 2005, I shall cause to be filed with the Clerk of the District Court, Northern District of Illinois, the Individual Defendants' Memorandum in Opposition to Plaintiff's Motions to Compel: (1) Answers to Second Set of Interrogatories; (2) Documents pursuant to Second Request for Production; and (3) Plaintiff's Memoranda in Support of Motions to Compel, a copy of which is served upon you with this Notice of Filing.

                       James W. Naisbitt
                Counsel for the Individual Defendants

James W. Naisbitt (ARDC No. 6183543)
James W. Naisbitt, Ltd.
205 W. Wacker Drive
Suite 1600
Chicago, Illinois 60606-1213
(312) 345-1056
Fax: (312) 236-3820

a: neuhauser/dnof

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he caused to be served a copy of the foregoing document along with this Notice of Filing of same, on the individuals listed below by Federal Express, by telecopier, by messenger, or by depositing same in the United States Mail with proper postage pre-paid at 205 West Wacker Drive, Chicago, Illinois 60606-1441, as indicated below, on this 9th day of November, 2005.

|  |  |  |
|---|---|---|
| ___ | First Class United States Mail | Gary I. Blackman/Beau T. Grieman |
| ___ | Telecopier | Christopher S. Greismeyer |
| ___ | Federal Express | Levenfeld Pearlstein, LLC |
| _X_ | Messenger Delivery | 2 North LaSalle Street |
|  |  | Suite 1300 |
|  |  | Chicago, IL 60602 |

|  |  |  |
|---|---|---|
| _X_ | First Class United States Mail | Elizabeth D. Sharp |
| ___ | Telecopier | 330 South Wells St. |
| ___ | Federal Express | Suite 706 |
| ___ | Messenger Delivery | Chicago, IL 60606 |

|  |  |  |
|---|---|---|
| _X_ | First Class United States Mail | C. Philip Curley |
| ___ | Telecopier | John H. Wickert |
| ___ | Federal Express | Alan R. Dolinko |
| ___ | Messenger Delivery | Robinson Curley & Clayton, P.C. |
|  |  | 300 S. Wacker Drive |
|  |  | Suite 1700 |
|  |  | Chicago, IL 60606 |

By:  _____
James W. Naisbitt (ARDC No. 6183543)
James W. Naisbitt, Ltd.
205 W. Wacker Drive, Suite 1600
Chicago, IL 60606-1441
(312) 345-1056
(312) 236-3820 (Fascimile)

a:  neuhauser1/2certofserv

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WACHOVIA SECURITIES, LLC | ) | |
| | ) | Case No. 04 C 3082 |
| Plaintiff, | ) | |
| v. | ) | Judge William T. Hart |
| | ) | |
| DAVID NEUHAUSER, | ) | Magistrate Michael T. Mason |
| ANDREW A. JAHELKA, | ) | |
| RICHARD O. NICHOLS, and | ) | |
| LEON A. GREENBLATT III, et al, | ) | |
| Defendants. | ) | |

**INDIVIDUAL DEFENDANTS' MEMORANDUM IN OPPOSITION**
**TO PLAINTIFF'S MOTIONS TO COMPEL:**
**(1) ANSWERS TO SECOND SET OF INTERROGATORIES;**
**(2) DOCUMENTS PURSUANT TO SECOND REQUEST FOR PRODUCTION; AND**
**(3) PLAINTIFF'S MEMORANDA IN SUPPORT OF MOTIONS TO COMPEL**

Defendants David Neuhauser ("Neuhauser"), Andrew A. Jahelka ("Jahelka"), Richard O.

Nichols ("Nichols") and Leon A. Greenblatt III ("Greenblatt") (collectively, the "Individual

Defendants"), by their attorney, James W. Naisbitt of James W. Naisbitt, Ltd., for their Memorandum

in Opposition to Plaintiff's Motions to Compel (1) Answers to Second Set of Interrogatories; (2)

Documents pursuant to Second Request for Production; and (3) Plaintiff's Memoranda in Support of

its Motions to Compel, state as follows:

**1. Background and Preliminary Statement**

Wachovia continues to press its expansive, irrelevant and overbroad version of the scope of

discovery without compromise. Wachovia tries to persuade this Court by way of over-the-top, *uber-*

*rhetoric* which quite frankly misstates and misinforms the Court as to the limited issues in this case.

The Individual Defendants have already responded to and produced thousands of pages of

documents in response to both the first and second rounds of Plaintiff's discovery requests. In its

preliminary statement, ¶1 of the First Amended Complaint ("Amended Complaint") filed on May 18, 2005, Wachovia frames its version of the dispute by alleging that the Individual Defendants conspired to defraud Wachovia out of $3.7 million using two alter ego shell corporations, Loop Corp and NOLA, LLC, in order to open margin accounts with Wachovia (then Prudential Securities, Inc.). Wachovia claims the Individual Defendants then used the margin accounts as part of fraudulent scheme to acquire a controlling interest in the publicly traded shares of Health Risk Management, Inc. ("HRMI"). Wachovia alleges the claimed scheme "crumbled" when NASDAQ halted trading of HRMI shares and then the Individual Defendants were unable to satisfy margin maintenance accounts. Amended Complaint, ¶4. As set forth in Exhibits B and E to the Amended Complaint, these margin accounts were held in the names of Loop Corp. and NOLA, LLC, respectively. The claimed damages, therefore, derive from the alleged margin account losses from these two accounts.[1]

Wachovia claims that the Individual Defendants fraudulently transferred funds out of Loop Corp and NOLA, LLC in an effort to ensure that those "sham entities" were truly corporate shells and did so with the intent to hinder or delay Wachovia's ability to collect those margin debts. Wachovia further alleges that it is seeking remedies under the Illinois Uniform Fraudulent Transfer Act based upon the Defendants' fraudulent transfers of Loop Corp and NOLA, LLC assets. Amended Complaint, ¶8. Accordingly, the scope of discovery as presented in this second round must focus on any alleged transfers of assets from Loop Corp and NOLA, LLC.

In order of appearance, Corporate Defendants Banco Panamericano, Inc. ("Banco"), Loop

---

[1]Count VIII, alleging breach of contract against the Individual Defendants contains Plaintiff's calculation of the damages as $1,098,459.90 (under the NOLA, LLC account) and $1,885,751.44 (under the Loop Corp account), plus interest, for a total of $3,707,629.63.

2

Corp, Loop Properties, Inc. ("Loop Properties") and Scattered Corp.("Scattered") are named as

Defendants based upon the following allegations:

| | | |
|---|---|---|
| **Banco:** | ¶17 | Individual Defendants were and are insiders and affiliates of Banco; |
| | ¶64 | Loop Corp. granted Banco a security interest in deposits, property, equipment, trademarks, licenses and other assets on Apr. 1, 2002; |
| | Count IX, ¶131(b) | Loop Corp.'s transfers to Banco as alleged in ¶64 constituted a transfer to an "insider" and "affiliate;" |
| | Count XI, ¶139 | Loop Corp.'s transfers to Banco as alleged in ¶64 constituted a transfer to an "insider" and "affiliate." |
| **Loop Corp.** | ¶14 | Named solely for the purpose of enjoining fraudulent transfers of assets; |
| | ¶17 | Individual Defendants were and are insiders and affiliates of Loop Corp.; |
| | ¶58 | The Individual Defendants looted Loop Corp. through a series of fraudulent transfers; |
| | ¶59 | Loop Corp. paid $43,000 to Credit Suisse for the benefit of Repurchase Corp.; |
| | ¶62 | Loop Corp. pledged assets to Marine Bank as security for a Jan. 26, 2001 loan and transferred money to a subsidiary of NOLA, LLC;[2] |
| | ¶63 | Loop Corp. transferred shares of EZLinks, Golf, Inc. to Scattered; |
| | ¶64 | Loop Corp. granted Banco a security interest in deposits, property, equipment, trademarks, licenses and other assets on Apr. 1, 2002; |
| | ¶65 | On Sept. 24, 2002, Loop Corp. transferred assets to Loop Properties, Inc. |
| | Count IX, ¶64 | Loop Corp.'s transfers to Banco as alleged in ¶64 constituted a transfer to an "insider" and "affiliate;" |
| | Count XI, ¶139 | Loop Corp.'s transfers to Banco as alleged in ¶64 constituted a transfer to an "insider" and "affiliate." |
| **Loop Prop.** | ¶17 | Individual Defendants were and are insiders and affiliates of Loop Properties; |
| | ¶65 | On Sept. 24, 2002, Loop Corp. transferred assets to Loop Properties, Inc. |
| | Count IX, ¶131(e) | Loop Corp.'s transfers to Loop Properties as alleged in ¶65 constituted a transfer to an "insider" and "affiliate;" |
| | Count XII, ¶143 | Loop Corp.'s transfers to Loop Properties as alleged in ¶65 |

---

[2]This alleged transaction, of course, precedes the May 22, 2001 halt of trading of HRMI's shares by approximately four months. See Amended Complaint, ¶50.

3

constituted a transfer to an "insider" and "affiliate."

**Scattered**

| | |
|---|---|
| ¶17 | Individual Defendants were and are insiders and affiliates of Scattered; |
| ¶63 | Loop Corp. transferred shares of EZLinks, Golf, Inc. to Scattered; |
| Count IX, ¶131(c) | Loop Corp.'s transfers to Scattered as alleged in ¶63 constituted a transfer to an "insider" and "affiliate;" |
| Count X, ¶135 | Loop Corp.'s transfers to Scattered as alleged in ¶63 constituted a transfer to an "insider" and "affiliate." |

Finally, in citing Judge Goldgar's comments in In re NOLA, LLC and In re South Beach

Securities, Inc., Cases Nos. 05 B 16682 and 05 B 16679, respectively, Wachovia tries to create the

misleading impression that Defendants' acquisition of HRMI's stock defrauded HRMI, and led to

NASDAQ halting trading in HRMI's stock (see also, Amended Complaint, ¶50). Contrary to

Wachovia's spin on events, several events occurred. First, HRMI issued an April 23, 2001 Press

Release informing the public that HRMI had received a letter from NASDAQ that HRMI shares

would be delisted due to HRMI's failure to file its annual report and Form 10-K for the period

ending Dec. 31, 2000. A true, correct and accurate copy of the HRMI April 23, 2001 Press Release

is attached to this Opposition Memorandum as Exhibit 1. Second, on May 22, 2001, NASDAQ

issued its own Press Release announcing that trading of HRMI shares was halted at 9:13 a.m. and

would remain halted until such time as HRMI "has fully satisfied Nasdaq's request for additional

information." A true, correct and accurate copy of the NASDAQ May 22, 2001 Press Release is

attached to this Opposition Memorandum as Exhibit 2. Third, and contrary to Wachovia's

allegations that the Individual Defendants defrauded HRMI, Loop Corp obtained a January 13, 2005

judgment that it was entitled to a claim in the Bankruptcy Court for $3 million against HRMI based

upon HRMI's fraudulent misrepresentation to Loop Corp concerning HRMI's financial viability and

4

HRMI's use of Dec. 31, 2000 financial reports which HRMI knew were incorrect. A true, correct and accurate copy of the Memorandum Opinion and Order entered in <u>In re: Health Risk Management, Inc., et al; Adversary Proceeding: Moratza, Trustee for the Estate of HRMI v. Loop Corp. et al</u>, BKY 01-43354 through 01-43357, ADV 03-4113, is attached to this Opposition Memorandum and made a part hereof as Exhibit 3. <u>See</u> Exhibit 3 at 15-16.

## II. Local Rule 37.2 Discovery Conference

The Individual Defendants agree that counsel for the respective parties met and conferred on Oct. 18, 2005 with respect to outstanding discovery issues. At no time, however, did Plaintiff's counsel compromise in any way regarding the scope of the sought-after discovery. Plaintiff's counsel never sent any correspondence regarding its position or any correspondence offering to reduce the boundless scope of its requests. The Individual Defendants' counsel, however, did send an October 26, 2005 letter summarizing the results of that meeting and further attempted to narrow the scope of the few remaining issues subject to dispute. Although Plaintiff did *not* attach this letter to its Motions to Compel, a true, correct and accurate copy of this letter is attached to this Opposition Memorandum as Exhibit 4.

Of all the subject matter at issue in Wachovia's second round of discovery, there remain only five areas of dispute.

(1) Discovery concerning Teletech Systems, Inc., previously identified by the Individual Defendants as the Manager of NOLA, LLC in the Individual Defendants' responses to Wachovia's First Set of Interrogatories and the subject of Wachovia's Motion to Compel Answers to Interrogatories Nos. 8-13 and production to Doc. Req. Nos. 56-58, 62-65, 70-73;

(2) Discovery pertaining to all 33 of the Wachovia defined "Greenblatt-controlled entities" which are the subject of Wachovia's Motion to Compel Answers to Interrogatories Nos. 15-16 and production to Doc. Req. Nos. 9-17; 18-22;

5

(3)     Services performed by attorney Elizabeth D. Sharp and by accountant Michael May for all of these 33 so-called "Greenblatt-controlled entities' which are the subject of Wachovia's Motion to Compel production to Doc. Req. Nos. 35-41;

(4)     The identity of "sufficient capital" as referenced in the Individual Defendants' response to Int. No. 3;

(5)     The identity of documents which the Individual Defendants reference as being produced by Loop Corp., Loop Properties, Inc., Banco Panamericano, Inc. and Scattered Corp.[3]

## III. Argument

### A. The Legal Standard applicable to Discovery issues

In the first instance, the 2000 Amendments to the Federal Rules of Civil Procedure "shrunk" the Federal Rule 26(b)(1) scope of discovery from anything relevant to the "subject matter" of the controversy to things relevant to a "claim or defense" interposed by the parties. See, e.g., "Applying Amended Rule 26(B)(1) in Litigation: The New Scope of Discovery," Jeffrey W. Stempel and David F. Herr, 199 F.R.D. 396, 398 (2001); GFL Advantage Fund Ltd. v. Colkitt, 216 F.R.D. 189, 194 (D.D.C. 2003); Krieger v. Fadely, 199 F.R.D. 10, 13 (D.D.C. 2001) (under Fed. R. Civ. Pro. 26(b)(1), as amended, the substantive nature of the claims asserted defines relevancy); see also Ocean Atlantic Woodland v. DRH Cambridge Homes, 262 F.Supp.2d 923, 926-927 (N.D.Ill. 2003) (discovery under Fed. R. Civ. Pro. 26 is not without limits; the manner and scope of discovery must be tailored to some extent to avoid harassment or being oppressive). The authorities cited by Plaintiff in its Memo. at 5--in the "Legal Standard" section  and referencing Wachovia's Memo. of

---

[3]The Individual Defendants are surprised that Wachovia would even include this as a disputed issue. They agreed to supplement their identification of such documents once they were produced by the Corporate Defendants. Although Plaintiff's counsel represented to this Court during the Nov. 2, 2005 Court hearing that it had no interest in forcing parties to needlessly duplicate production, that is indeed what it is doing and demanding.

Law in Support of Motion to Compel Defendant Loop Corp.'s Answers to First Set of Interrogatories--clearly devolved from pre-amendment case law and therefore are not dispositive of the application of discovery case law to the discovery issues presented to the Court in this case.

Minch v. City of Chicago, 213 F.R.D. 526, 527 (N.D. Ill. 2001) (citing Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)), as quoted and relied upon by Wachovia, mistakenly relies on the pre-2000 Amendment Federal Rule 26(b)(1). The 1978 Oppenheimer case emphasized that in examining the scope of relevancy under Federal Rule 26(b)(1), the key phrase is "relevant to the *subject matter* involved in the pending action." (Emphasis added). Minch relied upon the pre-Amendment version of Fed. R. Civ. Pro.26(b)(1) and is not persuasive authority for the expansive discovery which Wachovia seeks.

Even the pre-Federal Rule 26(b)(1) Amendment Oppenheimer decision emphasized that discovery is not without appropriate limits: "[a]t the same time, 'discovery, like all matters of procedure, has ultimate and necessary boundaries." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). Oppenheimer reasoned that "...it is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken, or to events that occurred before an applicable limitations period, unless the information sought is otherwise relevant to the issues in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. at 352.

Wachovia's reliance on In re Aircrash Disaster Near Roselawn, Ind., 172 F.R.D. 295, 303 (N.D. Ill. 1997), is also misplaced. This case, again, focuses on the pre-Amendment Federal Rule 26(b)(1) standard "...which permits discovery regarding any matter not privileged, *which is relevant to the subject matter involved in the pending action.*" Id. (Emphasis added). It does not provide persuasive authority to this Court's effort to provide a common sense assessment as to the

7

appropriate scope of discovery under the amended Rule 26(b)(1). Wachovia's final citation is to the same misguided effect. Rubin v. Islamic Republic of Iran, 349 F. Supp.2d 1108, 1111 (N.D. Ill. 2004) (citing and relying on Meyer v. S. Pac. Lines, 199 F.R.D. 610, 611 (N.D. Ill. 2001)). Although Rubin and Meyer are chronologically post-amendment cases, Meyer quotes the old "relevancy to the subject matter" standard and not the post-amendment relevancy to the claim or defense standard. Meyer, 199 F.R.D. at 611. Notwithstanding, this defect of analysis, Rubin is instructive insofar as it reminds us that "[i]t is also true, however, that open-ended fishing expeditions will not be tolerated. Discovery has limits and these limits grow more formidable as the showing of need decreases."

## B. The Decreased Showing of Need in this case

Plaintiff has already been permitted to amend its Complaint in this case and filed same on May 18, 2005. The central thrust of the Amended Complaint is that the Individual Defendants allegedly transferred funds out of Loop and NOLA, LLC in order to ensure they were corporate shells and to defraud Wachovia. Amended Complaint, ¶¶1 and 6. Each of the specific allegations of fraudulent transfer are limited to alleged improper transfers from Loop Corp.

This Court also imposed a Joint Discovery Plan with written discovery closing on Dec. 31, 2005. Wachovia's discovery must be focussed and limited to its claims that with respect to the entities with which its alleged predecessor had a contractual margin agreement, it is the alleged fraudulent transfers out of those two entities--Loop Corp and NOLA, LLC--which frame the appropriate scope of discovery. As noted in Rubin, discovery has limits and it is entirely reasonable to limit discovery to the allegations related to Loop Corp and NOLA, LLC. There simply are no well-pled allegations in the Amended Complaint which support the incredibly broad based discovery

8

which Wachovia uncompromisingly demands.

## C. The Application of the Legal Standards to the Discovery at issue

### 1. Discovery regarding Teletech Systems, Inc.

Teletech was previously identified as the Manager of NOLA, LLC (and not as a member or owner) in the first round of discovery responses. Based on the allegations in the Amended Complaint which focus on the alleged fraudulent transfers *out of* Loop Corp and NOLA, LLC, counsel for the Individual Defendants suggested during the discovery conference, and confirmed in the letter attached hereto as Exhibit 4 at 2, that Wachovia agree to limit its requests to any alleged transfers from Loop Corp or NOLA, LLC (of which it was not aware of any) to Teletech. Wachovia refused in any way to limit its requests.

Wachovia claims entitlement to a vast array of discovery from Teletech based upon the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/2(a)(4), which defines an "affiliate" as "a person who operates the debtor's business under a lease or other agreement." That same section of the UFTA, however, defines "assets" as assets of the debtor, which in this case would be NOLA, LLC (or Loop Corp). 740 ILCS 160/2(b).

Wachovia demanded with respect to Teletech,[4] the Individual Defendants must identify and/or produce documents for a six-year period all assets (Int. No. 8; Doc. Req. No. 62); all liens and encumbrances (Int. No. 9; Doc. Req. No. 63); all checking accounts (Int. No. 10; Doc. Req. No. 56); all savings, money market, trusts or other bank accounts (Int. No. 11; Doc. Req. No. 57); all

---

[4]Wachovia admits in its Memo. in Support of its Motion to Compel Individual Defendants' Answer to Second Set of Interrogatories at 7, that with respect to NOLA, LLC and South Beach, "[t]he Individual Defendants *do* provide responsive answers...".

9

trading or brokerage accounts and not limited to HRMI for which any such accounts have been

produced (Int. No. 12; Doc. Req. No. 58); and any real estate held (Int. No. 13; Doc. Req. No. 64);

all loan applications (Doc. Req. No. 65); any transfer to any so-called "Greenblatt-Controlled entity"

(Doc. Req. Nos. 70-71); the identity of any transferee among any so-called "Greenblatt-Controlled

entity" (Doc. Req. No. 72); and the identity of the consideration for any transfer to any so-called

"Greenblatt-Controlled entity" (Doc. Req. No. 73). Wachovia absolutely refused to limit its requests

to any transfers or other information or documents relating to any alleged transfers from NOLA,

LLC or from Loop Corp.

This Court must deny Wachovia's Motions because the only assets at issue are those of the

alleged debtors, Loop Corp and NOLA, LLC. See e.g., Regan v. Ivanelli, 246 Ill.App.3d 798, 617

N.E.2d 808 (2d Dist. 1993) (The only property which can be conveyed to defraud creditors is that

in which the debtor has an interest). 740 ILCS 160(7)(d) provides that "a transfer is not made until

the debtor has acquired rights in the asset transferred." 740 ILCS 160(2)(b) defines an "asset" as

"property of a debtor." 740 ILCS 160/2(l) defines a "transfer" as "disposing of or parting with an

asset." Discovery must be denied as to these requests because they are not limited to Loop Corp or

NOLA, LLC acquisition of rights in an asset and then the alleged transfer of that asset by disposing

or parting with it. This result is fully consistent with the theme alleged in the Amended Complaint,

¶¶ 6 and 8, where Wachovia claims entitlement to recover damages under the UFTA based on alleged

fraudulent transfers of Loop Corp and NOLA, LLC assets.

## 2. Discovery regarding the so-called "Greenblatt-Controlled Entities"

With respect to the so-called "Greenblatt-controlled entities," Wachovia again refused in any

way to tailor its requests. Wachovia instead demanded responses for a six-year period (beginning

10

Jan. 1, 2000) for all of these entities which Wachovia unilaterally defines as including no fewer that 33 individuals or entities plus its (hh) definition which then seeks information regarding "[a]ny other entity in which Greenblatt, Nichols, Jahelka, Neuhauser or any of their relations are an 'insider' (as that term is defined by the Illinois Uniform Fraudulent Transfer Act, 'UFTA') or hold a controlling interest, including any subsidiary or 'affiliate' (as that term is defined by the UFTA) of any such entity."

The limitations regarding Teletech apply with equal force to necessarily deny Wachovia's incredibly broad and irrelevant requests and are incorporated in this section. Int. No. 15 seeks the identity of any person who has ever held an ownership interest in any one of the 33 entities (and any other entity in which any of the Individual Defendants or any of their relations have a defined interest) for a six-year period. This request is simply not tailored to the issues in this case. Similarly, Int. No. 16--seeking the purpose behind the formation of these entities and the identity of all persons with knowledge as to the purpose--is not conceivably relevant to the resolution of the claims and defenses in this case.

Doc. Req. Nos. 9-22 are similarly irrelevant. Doc. Req. No. 9 seeks all documents identifying or describing any person or entity with an ownership interest in the 33 entities. Doc. Req. Nos. 10-13 seeks all documents identifying corporate entities in which each of the respective Individual Defendants have an interest. Doc. Req. Nos. 14-17 even seek the identity of all documents identifying any corporate entities in which the parents of the four Individual Defendants have an interest. Doc. Req. Nos. 18-22 are equally misguided, seeking all accounts, assets, liens or encumbrances, asset transfers and non-privileged correspondence regarding these 33 entities for a six-year period. In a case where Wachovia's claims derive from contractual margin agreements of Loop Corp and NOLA, LLC, and allegations of fraudulent transfers from Loop Corp and NOLA,

11

LLC, this Court should reject Wachovia's position and deny its Motions.

### 3. Discovery concerning Attorney Sharp and Accountant May

Concerning services performed by attorney Sharp or accountant May, Wachovia has refused to limit its broad and irrelevant requests in any way. For the six-year period beginning Jan. 1, 2000, Wachovia seeks all documents pertaining to any compensation received by Sharp from any "Greenblatt-controlled entity." Doc. Req. No. 35, Ex. A to Wachovia's Memo. in Support of the Motion to Compel Document Responses. Wachovia further refused to elaborate on any conceivable relevance that any compensation to Sharp from any of some 33 entities (and the broad spin-off definition that Wachovia then ascribes to them) has on the resolution of the issues in this case, which must necessarily focus on alleged transfers out of Loop Corp and NOLA, LLC. Similarly, Doc. Req. No. 36 broadly asks for all documents concerning all work performed by Sharp for NOLA, LLC over this six-year period. Doc. No. 37 demands all documents pertaining to all work performed by Sharp for all of these 33 entities (and the expanded definition of other entities) and for the same six-year period. Doc. Req. No. 38 requires again all documents concerning or describing Michael May's relationship with Loop Corp. There simply is no reasoned attempt by Wachovia to appropriately tailor and limit its requests. Doc. Req. No. 39 is an unlimited demand for all documents--not limited to any source--regarding any form of compensation paid to Michael May. Doc. Req. 40 contains no limitation and simply demands all documents--unlimited by any specified subject matter--concerning any work performed by May for NOLA, LLC for a six-year period. Finally, Doc. Req. No. 41 demands all documents constituting, describing or concerning any work performed by May for any of the 33 entities (and the expanded definition of other entities).

Wachovia claims in its Memo. concerning its Motion to Compel the Production of

12

Documents at 5, that these requests are directly relevant to Wachovia's UFTA claims. For the reasons discussed concerning Teletech, these requests are irrelevant to claims of alleged improper transfers of Loop Corp and NOLA, LLC assets. It simply is not relevant, as Wachovia argues in its Memo. at 5, whether Sharp acted as in-house counsel for Loop Corp, Loop Properties, Inc., and Scattered; whether she represented herself as counsel for NOLA, LLC in relation to the arbitration proceeding, Wachovia Securites, LLC v. Loop Corp and NOLA, LLC; or whether she acted as counsel for Telegraph Properties, L.P. in its bankruptcy proceeding.

Wachovia seeks documents relating to all compensation to Sharp from any of the 33 entities (and the (hh) spin-off of other entities) (Doc. Req. No 35). Simply stated, any compensation, e.g, from Telegraph Properties, LP to Sharp is irrelevant to claims emanating from alleged fraudulent transfers from Loop Corp or NOLA, LLC. Similarly, all work performed by Sharp for any of these multiple entities--including invoices, billing records and time sheets for the six-year period--is an unfocussed inquiry and frankly, a harassing request. As with the other discovery requests at issue, Wachovia refused to modify its requests or tailor any one such request in any manner.

As to Accountant May, whether he provided accounting services for one or more of the 33 entities described as "Greenblatt-Controlled entities"--as Wachovia argues in its Memo. at 6--is not a relevant determinant as to the proper scope of discovery in this case as framed by the pleadings.

### 4. Discovery concerning Int. No. 3

Concerning Int. No. 3, Wachovia is apparently unsatisfied with the answer. In response to Wachovia's First Set of Interrogatories, the Individual Defendants' response stated that, "[Loop and NOLA, LLC] had sufficient capital at all referenced times to act as an investment company." In response to Wachovia's Int. No. 3 in the Second Set of Interrogatories, respondents explained that

13

"sufficient capital" meant "working capital which fluctuated during the relevant time" and then referenced a line of credit with Banco and also identified document RS2917-2921, which had previously been produced to Wachovia. This document was a subordinated loan agreement involving a loan in the amount of $2,198,326.00, which was to be repaid with interest at the rate of 12% per annum. The Individual Defendants believe they answered Int. No. 3 by explaining the response to the previous interrogatory and then by referencing the line of credit and loan.

### 5. **Discovery concerning the referenced production by Corporate Defendants**

This fifth issue is a non-starter and should not have been included in the Motion to Compel. As set forth in the Individual Defendants' counsel's letter of Oct. 26, 2005, the referenced production of documents (if any) was being made by the Corporate Defendants and as to any such responsive documents, once they were produced, the Individual Defendants agreed to identify any responsive documents by Bates-Stamp Numbers. The Corporate Defendants produced documents on Oct. 21, 2005 and the Individual Defendants will identify any responsive documents.

### IV. **Conclusion**

For the reasons expressed above, the Individual Defendants respectfully ask this Court (i) to deny the Motions to Compel; or in the alternative to grant only that portion of the Motions which is appropriate and just as under Fed. R. Civ. Pro. 26(b)(1); (ii) to deny Wachovia's request for reasonable expenses under Fed. R. Civ. Pro. 37(a)(4)(A) and find that the Individual Defendant's nondisclosures, responses and objections were substantially justified or find that other circumstances make an award to Wachovia unjust; and (iii) pursuant to Fed. R. Civ. Pro. 37(a)(4)(B), award the Individual Defendants all or a portion their reasonable expenses and costs incurred in Opposing the Motions based upon the extreme positions taken by Wachovia concerning these discovery issues.

14

Respectfully submitted,
David Neuhauser, Andrew A. Jahelka,
Richard O. Nichols and Leon A. Greenblatt,

By: *James W. Naisbitt*

Their counsel

James W. Naisbitt (ARDC No. 6183543)
James W. Naisbitt, Ltd.
205 W. Wacker Drive, Suite 1600
Chicago, Illinois 60606-1441
(312) 345-1056
Fax: (312) 236-3820

a: neuhauser/memoppmtc

15



→ Contact Us
→ HRMI Home

- Press Release Index

**Contact:** Judy St. John, Investor Relations
952-903-6023 or jstjohn@hrmi.com

## Health Risk Management Announces Receipt of NASDAQ Staff Determination, But Anticipates Corporate Rationalization Plan

MINNEAPOLIS, April 23, 2001...Health Risk Management, Inc. (the "Company") (NASDAQ: HRMIE) announced today that it has received a letter from the Nasdaq indicating that its shares would be delisted due to the Company's failure to file its annual report and Form 10-K for the period ended December 31, 2000, as required by Marketplace Rule 4310 (c)(14). The Company has requested a hearing before a Nasdaq Listing Qualifications Panel to review the Staff Determination, which will stay any delisting pending the issuance of a written determination following the hearing.

As the Company disclosed on April 19, it has not filed its annual report and 10-K based on the on-going negotiations regarding a corporate rationalization plan, new financings and a plan to increase the capital reserves of its HMO subsidiary. The Company intends to factor these matters into its annual report and 10-K, which it expects to file on or before May 15, 2001.

The Company, headquartered in Minneapolis, owns and operates two Medicaid HMOs in the Commonwealth of Pennsylvania. In addition, the Company provides managed care, administrative and indemnity services to self-funded employers, health plans, and other entities.

Forward looking statements in this news release reflected as expectations, plans, anticipations, prospects or future estimates are subject to the risks and the uncertainties present in the Company's business and the competitive health care marketplace including, but not limited to clients and vendors commonly experiencing mergers or acquisitions, use of estimates for incurred but not yet reported claims including medical services payable, use of estimates of bonus accruals

PR0017

**Exhibit 1**
**Page 1 of 2**

12/14/2004

including accounts receivable, reconciliations, volume fluctuations, provider relations and contracting, participant enrollment fluctuations, changes in member mix or utilization levels, fixed price contracts, contract disputes, contract modifications, contract renewals and non-renewals, regulatory issues and requirements, various business reasons for delaying contract closings, and the operational challenges of matching case volume with optimum staffing, having fully trained staff, having computer and telephonic supported operations, and managing turnover of key employees and outsourced services to performance standards. While occurrences of these risks, and others periodically detailed in the Company's SEC reports, cannot be predicted exactly, such occurrences can be expected to have an impact on HRM's anticipated level of revenue growth or profitability.

Previous HRM/IHQ news releases are available at the company web site, and through the News On-Call fax service at 1-800-758-5804, extension 399650.

Copyright © 2001 Health Risk Management, Inc. All rights reserved.

PR0018

Back to All 2001 Press Releases



# Press Release

The Nasdaq Stock Market, Inc.
One Liberty Plaza
New York, New York 10006

**For Release:** May 22, 2001
**Contact:** Scott Peterson
(202) 728-8955

## Nasdaq Halts Trading of Health Risk Management Inc. and Requests Additional Information from Company

**Washington, D.C.**—The Nasdaq Stock Market℠ announced that trading was halted in Health Risk Management Inc. (NASDAQ:HRMIE), today at 9:13 a.m., Eastern Time, for "additional information requested" from the company at a last price of $4.75. Trading will remain halted until Health Risk Management Inc. has fully satisfied Nasdaq's request for additional information.

For news and additional information about the company, please contact the company directly or check under the company's symbol using InfoQuotes℠ on the Nasdaq Web site.

For more information about The Nasdaq Stock Market, visit the Nasdaq Web site at http://www.nasdaq.com or the Nasdaq Newsroom℠ at http://www.nasdaq.com/newsroom.

Back to All 2001 Press Releases

**Exhibit 2**
**Page 1 of 1**

PR0066

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

Health Risk Management, Inc., et al.

                  Debtors.           BKY  01-43354 through 01-43357

---------------------------------

Timothy D. Moratzka, Trustee in Bankruptcy
for the Estate of Health Risk Management, Inc.      ADV 03-4113

                Plaintiff,

                                    MEMORANDUM OPINION
                                    AND ORDER

v.

Loop Corporation, a South Dakota corporation;
Andrew A. Jahelka; Chiplease, Inc.,
a South Dakota corporation; Banco Panamericano, Inc.,
a South Dakota corporation; Leon A. Greenblatt, III; and
Leslie Jabine,

                Defendants.

-----------------------------------------

At Minneapolis, Minnesota, January 13, 2005.

    This proceeding came on for trial on September 20, 2004. Stephen P. Kelley and Andrew

P. Moratzka appeared for the plaintiff and C. Philip Curley, Susan Valentine, and Mary Jo A. Jensen-

Carter appeared for the defendants.

    This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1)

and 1334, and Local Rule 1070-1. This is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2)(A) and (B).

NOTICE OF ELECTRONIC FILING ENTRY ORDER OR JUDGEMENT
and Docket Entry Made on _____ JAN 1 3 2005
Vaaajpka, Acting Clerk by: _____

RS 00795

Exhibit 3
Page 1 of 17

## PARTIES

Health Risk Management, Inc., provided health care management services and operated health care plans in Pennsylvania through its wholly owned subsidiary, HRM Health Plans (commonly referred to as HRMPA). Loop Corporation is a South Dakota corporation with its principle place of business in Chicago, Illinois. At the relevant time, Loop Corporation was a holding company that owned common stock in HRM. Loop is owned by Andrew Jehelka, Leon Greenblatt, III, and Richard Nichols. Chiplease, Inc. is a South Dakota corporation with its principle place of business in Chicago, Illinois. Banco Panamericano is a South Dakota corporation with its principle place of business in Chicago, Illinois. Leslie Jabine is a resident of Cook County, Illinois. Chiplease, Banco Panamericano, and Jabine all owned stock in HRM.

## FACTS

On May 1, 2003 the trustee filed a complaint with eight causes of action including: (1) breach of fiduciary duty, (2) conversion, (3) preferential transfer, (4) vicarious liability for Loop Corp., (5) vicarious liability for Chiplease, Banco Panamericano, Greenblatt and Jabine, (6) fraud, (7) breach of contract, and (8) unjust enrichment. I granted summary judgment on causes of action 1-6 and 8 on July 28, 2004 and the matter proceeded to trial on the breach of contract claim against Loop and Loop's counterclaim for rescission and return of $3 million.

The complaint is based on events surrounding a financing agreement between Loop and the debtors under which Loop was to provide $6 million in financing to HRMPA. The financing agreement consisted of two parts, one which Loop completed and one which it did not.

Health Risk Management, Inc. and three related entities filed Chapter 11 petitions on August 7, 2001. The cases were converted to Chapter 7 on March 13, 2002 and the plaintiff was appointed

2

trustee.

On February 28, 2001 HRMPA filed its Annual Statement with the company's government regulator, the Pennsylvania Department of Insurance. The annual statement indicated that the company had insufficient capital reserves, and the Department informed HRMPA that the company would come under its control unless it strengthened its financial condition. The Department requested HRMPA to create a Risk Based Capital Plan as required under Pennsylvania law to demonstrate how it would meet its capital reserve requirements and improve its overall financial condition.[1]

As the financial problems at HRM were coming to light in January 2001, Ernst & Young was doing an audit of the company's December 31, 2000 financial reports. This was not however, the only audit done on the December 31, 2000 numbers. On February 2, 2001, HRM's Chief Financial Officer Leland LeBlanc, hired the actuarial firm of Milliman & Robertson, Inc. to "prepare an independent estimate of the liability for Claims Payable as of December 31, 2000."[2] The stated purpose of this estimate was for HRM's internal use to compare against E&Y's estimates of claim liability. In its report to HRM dated February 12, 2001, Milliman determined that the numbers eventually certified by E&Y in the December 31, 2000 10-K were misstated by $7 million. Leblanc informed then CEO Gary McIlroy and E&Y that he had hired Milliman, but there is no evidence that anybody passed this information on to Loop or to Andrew Jehelka in his capacity as an investor or

---

[1]  This report was required under Pennsylvania law 40 PA. Code § 221.2-B(b)(2004).

[2]  Claims payable is a component of the Medical Loss Ratio. The MLR is a comparison of the amount of insurance premiums received by the company to the amount of claims payable to customers. It is a measure of the financial viability of the company. As the claims payable increases, the MLR increases thereby reducing the company's profitability.

3

RS 00797

executive committee member.

The Risk Based Capital Plan indicated that Loop would provide financing to HRMPA based on terms contained in a master agreement. On March 23, 2001, Loop sent HRM a letter of intent which contained the understandings of Loop and HRM regarding Loop's proposed investment. This would have been a good time for HRM to inform Loop about the Milliman audit, but it did not. The parties agreed to the terms contained in the letter on March 28, 2001.

The letter of intent conditioned the financing agreement on a number of things including changes in corporate governance and due diligence. As part of the changes in corporate governance, HRM's CEO resigned and Andrew Jahelka, the president of Loop, joined the audit committee and became one of five members of the executive committee serving in the role of CEO.[3] The Letter of intent stipulated that the parties would create a mutually acceptable, definitive agreement which would incorporate the terms of the letter of intent.

The parties created the Master Agreement which they intended to be the "definitive agreement" between the two parties.[4] The Master Agreement indicated two separate transactions that would result in an infusion of a total of $6 million into HRM and HRMPA to help HRMPA meet its regulatory requirements.

The first transaction discussed in the Master Agreement involved Loop purchasing a $3 million debenture from HRM. The parties arranged for this transaction to occur through an account

---

[3] A corporate resolution dated March 28, 2001 created the executive committee and announced Dr. McIlroy's retirement.

[4] The parties actually signed two different versions of the Master Agreement which differed as to the amounts and the parties involved in the transaction. Fortunately, the differences in the two versions of the "definitive agreement" are not germane to the outcome.

RS 00798

HRM established at Credit Suisse First Boston. HRM transferred the debenture to CSFB, but CSFB never notified Loop it was prepared to execute the transaction. According to LeBlanc, the transaction scheduled to occur on May 15, 2001 did not occur because of internal issues at CSFB. The trustee's breach of contract claim is based on the failed debenture transaction.

The Master Agreement contemplated a second transaction, which did occur but not exactly as described in the Master Agreement. The Master Agreement called for Loop to contribute its limited partnership interest in an Illinois LLP to HRM. Soon before the scheduled execution of the Master Agreement on May 15, 2001, the Pennsylvania Department of Insurance determined that HRM needed an infusion of $6 million in cash. The parties abandoned the plan to transfer partnership interests and negotiated a cash transaction to satisfy the Department's requirements. Loop secured $3 million in cash by refinancing a commercial office building in Chicago late on May 15, 2001. Jahelka accepted and held the check for HRM and deposited that amount in HRMPA's US Bancorp account on May 16, 2001.

HRM was late in filing its year-end financial report for 2000.[5] Although under the Master Agreement, Loop had a right to do its own audit, it decided to forgo doing one. For this reason, Loop wanted to wait to sign the Master Agreement until E&Y released its report. E&Y did not release its report until May 4, 2001. After the release of the audit report, discussion ensued among HRM management, the audit committee, and E&Y regarding the medical claims payable liability.

In an Audit Committee meeting held at 9:00am on May 10, 2001, the members, including Jehelka, discussed the possibility of a misstatement on the medical claims payable liability. On May

---

[5]   HRM informed the Securities and Exchange Commission of its late filing in a Form 12b-25 filing on 04/03/01. HRM indicated it needed more time to gather information and complete the audit.

RS 00799

15, 2001 the audit committee learned that the disagreement on the numbers in the medical claims payable liability between LeBlanc and E&Y had been resolved. This too would have been an excellent opportunity to inform Loop that Milliman had done an audit indicating that the medical claims payable liability had been underestimated by $7 million, but again nothing was said.

Loop and HRM signed the Master Agreement on May 15, 2001. On May 18, 2001 E&Y resigned as HRM's auditor and withdrew its opinion on the year end 2000 financials because it disclosed that the medical claims liability in the financials had been understated by $2.8 million. The second transaction never took place. HRM and E&Y blamed each other for the misstatement in a Form 8-K filed with the SEC. HRM hired Milliman to do a new actuarial analysis on the medical claims liability and received its second report on June 18, 2001 indicating again that the misstatement amounted to $7 million.

## DISCUSSION

### Breach of Contract

The elements of a breach of contract action are (a) formation of a contract, (b) performance by the plaintiff of any conditions precedent to the right to demand performance by the defendant (c) breach of the contract by the defendant, and (d) damages. *Indust. Rubber Applicators, Inc. v. Eaton Metal Prods., Co.*, 171 N.W.2d 728, 731 (1969); *Nguyen v. Control Data Corp.*, 4011 N.W.2d 101, 105 (Minn. App. 1987).

Defenses to a breach of contract claim include mutual mistake and misrepresentation. A court may rescind an agreement if both parties were mutually mistaken about material facts. *Gartner v. Eikill*, 319 N.W.2d 397, 398 (Minn. 1982); Restatement (Second) of Contracts § 152(1)(1981). Additionally, an agreement is voidable if it is entered into based on fraud or misrepresentation.

6

RS 00800

*Carpenter v. Vreeman*, 409 N.W.2d 258, 260-261 (Minn. App. 1987); Restatement (Second) of Contracts § 162(2)(1981).

The Master Agreement constituted a valid contract between the parties. The trustee argues that Loop breached the contract by not performing the first transaction in the Master Agreement. Loop argues that it did not breach the contract, but even if it did, it is entitled to rescission based on mutual mistake or misrepresentation.

### *Mutual Mistake*

Mutual mistake consists of a clear showing that both contracting parties misunderstood the fundamental subject matter or term of the contract. *Dubbe v. Lanno Equip., Inc.*, 362 N.W.2d 353, 356 (Minn. App. 1985). If there is a mutual mistake concerning a material fact, parties to a contract may avoid the contract. *Winter v. Skogland*, 404 N.W.2d 789 (Minn. 1987). A contract may be avoided on the grounds of mutual mistake if the party seeking to avoid the contract did not assume the risk of the mistake. *Gartner v. Eikill*, 319 N.W.2d 397, 398-399 (Minn. 1982). A material fact is one that is so substantial and fundamental that a mistake defeats the object of the parties who made the contract. The mistake must be more than just the monetary value of the item, but must go to the very nature of the deal. *Gartner*, 319 N.W.2d at 399.

If the mistake of a material fact was mutual, then the contract is voidable unless a party assumed the risk of the contract. *Id.* A party can assume the risk of a contract under three different scenarios. Firstly, risk is allocated to a party by the contract. Secondly, a court can assign the risk to a party because it is reasonable to do so. Thirdly, a party is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates, but treats that lack of knowledge as sufficient. Restatement (Second) of Contracts § 154 (1981).

7

RS 00801

To assist in determining the materiality of a misstatement, the Restatement instructs a court to consider "the purposes of the parties" and "its own general knowledge of human behavior in bargain transactions." Restatement (Second) of Contracts § 154 cmt. d (1981). The purpose of the contract between the two parties was to make HRMPA's Risk Based Capital Plan viable to meet the capital requirements of the Commonwealth of Pennsylvania Insurance Department. It later became evident that even with Loop's financing, HRMPA would not be viable because of miscalculations in the medical claims payable liability and in reality the company was insolvent by December 31, 2000. The misstatement created a fundamental mistake that went to the purpose of the contract's formation.

However, Loop assumed the risk of the contract because it knew at the time it executed the contract that it had only limited knowledge about the facts relating to the contract, and treated its limited knowledge as sufficient. As part of the letter of intent dated March 23, 2001, Loop made execution of the final agreement contingent on due diligence, but Loop waived its contingent rights which include the right to do due diligence. Had Loop chosen to do its own due diligence, it would likely have determined, on its own, the misstatements and not entered into the contract. T h e contract is not void based on mutual mistake because Loop assumed the risk of the mistake by not performing due diligence which it had a right to do.[6]

### Misrepresentation

#### A.

If a contract is entered into based on a misrepresentation that is either material or fraudulent,

---

[6]    It is also open to question whether this was a mutual mistake. HRM had the February 12, 2001 report from Milliman, and it knew there was a serious question about the medical claims payable.

RS 00802

it is voidable. *Carpenter*, 409 N.W.2d at 260-261 *citing* Restatement (Second) of Contracts § 164(1)(1981). A misrepresentation is defined as "an assertion that is not in accord with the facts." Restatement (Second) of Contracts § 159(1981). An assertion can be a non-disclosure of a fact where the person making the assertion knows that disclosure of the fact is necessary to prevent a previous assertion from being a misrepresentation. Restatement (Second) of Contracts § 161(1981).

**Material Misrepresentation**

A contract is voidable if a party's manifestation of assent is induced by a material representation. Restatement (Second) of Contracts § 164(1)(1981). A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or the maker knows it will likely induce the recipient to assent. *Carpenter*, 409 N.W.2d at 261; Restatement (Second) of Contracts § 162(2)(1981). A misrepresentation induces a party's assent if it substantially contributes to his decision to assent. Restatement (Second) of Contracts § 167(1981).

There are two elements to material misrepresentation. Firstly, the individual has to have made a misrepresentation and secondly, the misrepresentation must be material. *Gully v. Gully,* 599 N.W.2d 814, 821 (Minn.1999). A misrepresentation may be made by either (1) an affirmative statement that is false or (2) concealing or not disclosing certain facts that render the facts that are disclosed as misleading. *M.H. and J.H.L. v. Caritas Family Services*, 488 N.W.2d 282, 289 (Minn. 1992).

This does not mean however, that there is an obligation to disclose information. The general rule is that "one party to a transaction has no duty to disclose material facts to the other." *Klein v. First Edina Nat'l Bank,* 196 N.W.2d 619, 622 (1972). In certain circumstances however, a duty to disclose does arise. One of those situations is when disclosure would be necessary to clarify

9

RS 00803

information already disclosed, which would otherwise be misleading. *Id.* A material fact is one that is so substantial and fundamental that a mistake defeats the object of the parties who are making the contract. *Gartner,* 319 N.W.2d at 399.

**Fraudulent Misrepresentation**

A contract is also voidable if a party's manifestation of assent is induced by a fraudulent misrepresentation. *Carpenter,* 409 N.W.2d at 260; Restatement (Second) of Contracts § 164(1)(1981). A misrepresentation is fraudulent if the "maker knows or believes the assertion is not in accord with the facts" Restatement (Second) of Contracts § 162(1)(1981). According to the Restatement, a fraudulent misrepresentation need not be material in order to entitle the recipient to relief, but a non-fraudulent misrepresentation will not entitle him to relief unless it is material. Restatement (Second) of Contracts § 162 cmt. c (1981).

**Minnesota's Version**

In Minnesota, the courts do not really distinguish very well between fraudulent and material misrepresentation.[7] To prove a fraudulent misrepresentation in Minnesota, a party must show (1) there was a misrepresentation, (2) the misrepresentation was false, (3) the representation must concern past or present facts, (4) the fact must be material, (5) the fact must be susceptible to knowledge, (6) the representor must have known the fact to be false or asserted such knowledge without knowing if it were true of false, (7) the representor must have intended that the other person

---

[7]    In Minnesota, materiality is an element of fraudulent misrepresentation. *Davis v. Re-Trac Mfg. Corp.,* 149 N.W.2d 37 (Minn. 1967) includes in the elements of fraud a materiality element. *Weise v. Red Owl Stores, Inc.,* 175 N.W.2d 184 (1970) includes as an element of "fraudulent misrepresentation" a materiality element. *Florenzano v. Olson,* 387 N.W.2d 168, 174 n. 4. Citing *Hanson v. Ford Motor Co.,* 278 F.2d 586, 591 (8th Cir. 1960) following Minnesota law.

10

RS 00804

be induced to act, (8) the other person must have been so induced to act or so justified in acting, (9) the person's actions must have been in reliance on the representation, (10) the person must have suffered damage, (11) the damage must be attributable to the representation. *Weise v. Red Owl Stores, Inc.*, 175 N.W.2d 184 (1970); *Johnson Bldg. Co. v. River Bluff Dev. Co.*, 374 N.W.2d 187, 193-194 (Minn. App. 1985). In the present case the misrepresentation made was both material and fraudulent.

## B.

When HRM hired Milliman on February 2, 2001 to prepare an estimate of the medical claims liability, it learned the amounts were misstated by $7 million. If this information were true, that would mean that HRMPA was insolvent as of December 31, 2000. HRM chose not to share this information with Loop. Because HRM had issued financial statements with significantly different information, this resulted in a misrepresentation to Loop about HRM's financial viability. The misrepresentation in this case was HRM's silence about hiring Milliman and Milliman's subsequent report. Leblanc hired Milliman because he wanted it to "prepare an independent estimate of the liability for Claims Payable as of December 31, 2000." Loop relied on HRM's silence and assumed the financials reported in the December 31, 2000 10-K to be correct when HRM knew they were not. HRM's silence rendered the facts disclosed misleading and Loop entered into the contract based on the silence.

The information is material because an investor like Loop would clearly want to know if the numbers upon which it is relying are so incorrect as to render the investment insolvent.[8] A material

---

[8]    In a securities context, the United States Supreme Court indicated that "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449

11

fact is one that is so substantial and fundamental that a mistake defeats the object of the parties who are making the contract. *Gartner,* 319 N.W.2d at 399. If HRM had a sense that the numbers reported were incorrect and hired an auditor who reported the numbers were incorrect then that information is clearly material. Without that knowledge, an investor like Loop would rely on the reported numbers.

HRM needed a cash investment to satisfy the Commonwealth of Pennsylvania Department of Insurance. It wanted Loop to make the investment and knew Loop would likely not invest if it knew about the financial misstatements in the December 31, 2000 10-K. HRM therefore intended for Loop to rely on its silence about the accuracy of the 10-K.

Reasonable and justifiable reliance are two different standards, but Minnesota courts have at times used the terms synonymously.[9] While the element stated often contains the term "justified", the language in the opinion often refers to reasonable action. Based on the analysis done by the United States Supreme Court, it becomes clear that Minnesota has adopted a justifiable reliance standard.

The Supreme Court analyzed the difference between justifiable and reasonable reliance under 11 U.S.C. § 523(a)(2)(A) as it relates to common law fraud in *Field v. Mans,* 516 U.S. 59 (1995). The Court looked first to the Restatement (Second) of Torts § 537 (1976). In this section the Restatement indicates that both actual and justifiable reliance are required for the tort of fraudulent

---

(1976).

[9] Cases that refer to reliance as justified include: *Davis v. Re-Trac Mfg. Corp.* 149 N.W.2d 37 (1967); *Weise v. Red Owl Stores, Inc.* 175 N.W.2d 184 (1970); *Swanson v. Domning,* 86 N.W.2d 716 (1957); *Spiess v. Brandt,* 41 N.W.2d 561 (1950). Cases referring to reasonable reliance include: In *re Strid,* 487 N.W.2d 891 (Minn. 1992); *Petition of Anderson,* 565 N.W.2d 461 (Minn. App. 1997).

12

RS 00806

misrepresentation. It is generally recognized in contract law that if a misrepresentation is material, the recipient probably relied on it. *Kungys v. U.S.*, 485 U.S. 759, 788 (1988).

Importantly, the Restatement indicates that a person is justified in relying on a representation of fact "although he may have ascertained the falsity of the representation if he had made an investigation. *Field,* 516 U.S. at 70. "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than a community standard of conduct to all cases." Restatement (Second) of Torts § 545A (1976). The Court recognized the difference between justifiable and reasonable reliance by indicating that conduct must be justifiable but does not necessarily need to conform to the conduct of the reasonable man as required under the reasonable reliance standard. *Field,* 516 U.S. at 71.

Using the justifiable reliance standard requires that the individual must "use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Restatement (Second) of Torts § 541 Cmt. a. (1976). Prosser Law of Torts agrees that justifiable reliance is the proper standard in a fraudulent misrepresentation case. "The matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may be fairly charged against him from the facts within his observation in the light of his individual case." W. Keeton et. al., Prosser and Keeton on the Law of Torts § 108 at 751 (5th ed. 1984).

To find fraud in Minnesota, a court must determine the specific intelligence and experience of the party rather than using a reasonable man standard. *Murphy v. Country House, Inc.*, 240 N.W.2d 507, 512 (1976). In Minnesota the reliance of an individual can be inferred by the conduct of the party. *Davis v. Re-Trac Mfg., Co.* 149 N.W.2d 37, 39 (1967). The question of reasonableness

13

RS 00807

is also one of fact. For example, if a party to whom a representation has been made does not make an independent inquiry into the falsity of the information, the party whose misrepresentations induced the act cannot escape liability by claiming the other party ought not to have trusted him. *Id.*

It is reasonable for an investor to rely on year-end, audited financial statements filed with the SEC in a 10-K. It is also reasonable, even for a sophisticated investor, to rely on a party's silence regarding possible errors in audited financial statements especially under the fairly exigent circumstances that existed here. While HRM is normally under no obligation to disclose information, it should have in this situation because its silence made disclosed information misleading.[10]

Loop is a sophisticated investor. It is reasonable however, for it to rely on HRM's audited financial statement and on HRM's silence to any contrary audit which indicated a computational error in the medical claims payable liability of $7 million.[11] If HRM had not remained silent and informed Loop it knew of the error, Loop would have known that HRMPA was insolvent as of December 31, 2000 and would not have made the investment.

Loop suffered damages as a result of its reliance on HRM's misrepresentation. The amount of damages in a misrepresentation action is to be determined by the trier of fact. *Strouth v. Wilkinson*, 224 N.W.2d 511, 514 (1971). Damages are limited to the actual-out-of-pocket loss sustained by the plaintiff as a proximate result of the other party's fraud. Normally this amount is

---

[10]     See *M.H. and J.H.L. v. Caritas Family Services*, 488 N.W.2d 282, 289 (Minn. 1992).

[11]     The Minnesota Supreme Court indicated that the proper standard for determining reasonable reliance is whether the misrepresentation was calculated to deceive a person of the capacity and experience of that individual who received the misrepresentation. *Berg v. Xerxes-Southdale Office Building, Co.* 290 N.W.2d 612, 616 (Minn. 1980).

14

RS 00808

the difference between the actual value of the property received and the amount paid for it in addition to other damages. *Id.*

### *Rescission*

In its counterclaim, Loop requested rescission of the Master Agreement and a return of its initial $3 million investment. In the second transaction, Loop paid to HRM $3 million in cash which represented proceeds from a refinance of real estate. Both the first and second transactions are part of the Master Agreement whose purpose was to provide financing for HRM and HRMPA. Jehelka deposited the $3 million check into HRM's USBancorp account on May 16, 2004 as a partial satisfaction of the contract. The first transaction did not take place and forms the basis of the trustee's breach of contract claim. Loop received nothing in return for its $3 million contribution and seeks a return of that money because it was induced into the contract by fraudulent or material misrepresentation.

### CONCLUSION

The contract between Loop Corp. and HRM was procured by HRM's material and fraudulent misrepresentation, entitling Loop to rescind the contract. Loop suffered $3 million in damages from the second transaction. Loop suffered these damages because it relied on HRM's silence thereby indicating the numbers upon which Loop relied were accurate. While Loop is not entitled to a money judgment against the trustee, it is entitled to a claim in the case for the return of its $3 million.

15

RS 00809

## ORDER

THEREFORE, IT IS ORDERED:

    1. The plaintiff shall recover nothing from defendant Loop Corporation.

    2. Defendant Loop Corporation is entitled to a claim of $3 million.

LET JUDGMENT BE ENTERED ACCORDINGLY.


ROBERT J. KRESSEL
UNITED STATES BANKRUPTCY JUDGE

16

RS 00810

STATE OF MINNESOTA

                   SS.

COUNTY OF HENNEPIN

I, Lynn M. Hennen, hereby certify: I am Deputy Clerk of the United States Bankruptcy Court for the District of Minnesota; on January 13, 2005; I place copies of the attached:

# MEMORANDUM OPINION AND ORDER
# and JUDGMENT

in individual postage metered official envelopes addressed to each of the persons, corporations, and the firms at their last known addresses:

Habbo G. Fokkena, U.S. Trustee
1015 U.S. Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

C. Philip Curley, Esquire
300 South Wacker Drive
Suite 1700
Chicago, Illinois 60606

Mary Jo A. Jensen-Carter, Esquire
1339 East County Road D
Vadnais Heights, Minnesota 55109

Stephen P. Kelley, Esquire
901 Marquette Avenue
Suite 1400
Minneapolis, Minnesota 55402-2859

I sealed and place the envelopes in the United States mail at Minneapolis, Minnesota.

_____

LYNN M. HENNEN

RS 00811

# James W. Naisbitt, Ltd.

205 W. Wacker Drive
Suite 1600
Chicago, Illinois 60606-1441
Writer's Direct Dial: (312) 345-1056
Fax: (312) 236-3820
E-Mail: jnaisbitt@aol.com

October 26, 2005

**By Fax Transmission: (312) 346-8434**
Christopher S. Griesmeyer
Levenfeld Pearlstein, LLC
2 North LaSalle Street
Suite 1300
Chicago, IL 60602

> Re: **Wachovia Securities, LLC v. Neuhauser, et al; Case No. 04 C 3082**
> **Local Rule 37.2 Discovery Conference**

Dear Christopher:

During our Oct. 18, 2005 Local Rule 37.2 Discovery Conference I advised you and Gary I. Blackman that I would send you a letter by today's date regarding the following discovery issues. I have not addressed those Requests which are not subject to any outstanding dispute.

> I. **The Individual Defendants' Responses to Wachovia's**
> **Second Set of Interrogatories.**

**Interrogatory No. 1:** You asked that I check or confirm whether there was a transfer of approximately $200,000.00 from NOLA, LLC to Loop Corp., and if so, to Supplement the answer. You indicated that you believe that the transfer is reflected on a document previously produced in this case (but you were not able to identify the document either by name or by Bates number). Kindly advise as to what document you were referring to and I will follow-up on this.

**Interrogatory No. 3:** There was some misunderstanding (and we believe on your part) as to this Interrogatory which inquired as to "sufficient capital" referenced in the Individual Defendants' Answer to Interrogatory No. 4. As we answered, this referred to working capital which fluctuated during the relevant time.

**Interrogatory No. 4:** You have asked whether the answer would change if the objections were waived. In this regard, and with respect to other discovery requests discussed below, you and I were looking to determine whether there was information which you would seek in the context of a Motion to Compel or whether there was no further information to be sought. With respect to this Int. No. 4, the answer would not change if the objections were waived (and obviously, we are not waiving the objections, including those regarding the relevant time frame; we do not believe that you have properly or appropriately interpreted Judge Hart's May 10, 2005 Opinion and Order in this regard).

**Exhibit 4**
**Page 1 of 3**

Christopher S. Griesmeyer
Page 2
Oct. 26, 2005

**Interrogatory No. 5:** I agreed to Supplement this Int. No. 5 as to the time if known regarding South Beach's office space in New Jersey.

**Interrogatory No. 7:** As with Int. No. 4, the answer does not change if the objections are waived (and they are not waived).

**Interrogatory Nos. 8-13:** The Individual Defendants indicated in their answers that Teletech was not a subsidiary of NOLA, LLC. Nonetheless, you are insisting that the Individual Defendants provide information regarding Teletech. To the extent that there were any transfers from NOLA, LLC or Loop Corp. to Teletech (and I am not aware of any but will check), the interrogatory will be supplemented. In addition and with respect to Int. No. 12, you have asked that I double check and determine whether there were other brokerage accounts for NOLA, LLC, Teletech and South Beach, over and beyond any brokerage accounts which held HRMI shares (which have already been produced in this case). To the extent there are, this interrogatory response will be supplemented.

**Interrogatory No. 15:** The Individual Defendants do not waive their objections and note that Wachovia has refused to try to narrow the scope of its requests either on a temporal basis (you are demanding from Jan. 1, 2000 to the present notwithstanding Judge Hart's May 10, 2005 Court Order) or by narrowing the field for what it calls the "Greenblatt-Controlled Entities" which you then define as including no fewer that 33 individuals or entities plus your (hh) definition which you describe as "[a]ny other entity in which Greenblatt, Nichols, Jahelka, Neuhauser or any of their relations are an 'insider' (as that term is defined by the Illinois Uniform Fraudulent Transfer Act, 'UFTA') or hold a controlling interest, including any subsidiary or 'affiliate' (as that term is defined by the UFTA) of any such entity." Obviously, the Individual Defendants believe Wachovia is seeking information not relevant to any claim or defense and which goes well beyond the scope of discovery as framed by the Amended pleadings in this case.

**Interrogatory No. 16:** Regarding the request as to the "Greenblatt-Controlled Entities," I have the same comments as those for Int. No. 15 above. In addition, you asked whether we would supplement with respect to the identity of "outside counsel" who had knowledge with respect to the facts and circumstances surrounding the purpose behind the formation of all of these entities. I do not believe that any outside counsel has knowledge of the facts and circumstances detailing the purpose behind the formation of the five entities for which an answer was given, but as to those five entities the Individual Defendants will provide the name of outside counsel(s), if any, who assisted in the incorporation of such entities.

## II.    The Individual Defendants' Responses to Wachovia's
Second Request for the Production of Documents.

You asked generally whether the Individual Defendants would Supplement their Responses to identify documents by Bates numbers and I said we would and will do so once production is complete.

**Document Request No. 8:** The Individual Defendants had identified RS2917-2921 as responsive to this Request. During our discovery conference you advised me that you did not believe these documents were responsive. Please see Section 1.1 of that document, RS2917, in which the consideration is clearly identifiable.

Christopher S. Griesmeyer
Page 3
Oct. 26, 2005

**Document Request Nos. 9-21:** We agreed we are at issue on these Requests. I again point out that Wachovia refuses to attempt to more narrowly tailor any of these Requests. I asked and you declined to limit these Requests to NOLA, LLC and Loop Corp. or even to NOLA, LLC, South Beach, Loop Corp. and Loop Properties, Inc. You declined to further limit any of these Requests in any manner. With respect to Doc. Req. Nos. 18-21, I agreed to identify by Bates numbers those documents previously produced.

**Document Request No. 22:** During our discovery conference, I advised you that my understanding was that the referenced documents (if any) were being produced by Loop Corp., Loop Properties, Banco and Scattered and would be so produced by Oct. 21, 2005. To the extent that any of the documents which were produced on Oct. 21, 2005 are responsive to this Request, I will supplement the Response to reference by Bates-Stamped number the Corporate Defendants' document production.

**Document Request Nos. 35-41:** We are at issue on these. Again, I did not hear adequate explanation of relevance or any compromise proposed by Wachovia in order to limit in any manner any of these Requests.

**Document Request Nos. 43:** You had asked whether the answer of the Individual Defendants changes if the objections were waived (and the objections are not waived). The answer would not change.

**Document Request Nos. 44-55:** I indicated to you that although the Individual Defendants were not waiving their objections, the answers did not change.

**Document Request Nos. 56-58, 62-65, 70-73:** With respect to each of these Requests, you have asked that the Individual Defendants provide responsive documents, if any, with respect to Teletech. As with the Teletech issue referenced above in connection with Int. Nos. 8-13, and to the extent that there were any transfers from NOLA, LLC or Loop Corp. to Teletech (and I am not aware of any but will check), the Document Responses will be supplemented.

**Document Request No. 74:** Regarding the Exhibits, please see RS1236-1578, 1599-2812.

The Individual Defendants will supplement their discovery responses consistent with this letter on or before Nov. 3, 2005.

If you believe that I have (i) mischaracterized any portion of our discussions during the Oct. 18 Discovery Conference; or (ii) omitted any reference to a material issue, please advise. Otherwise, I will operate under the assumption that I have accurately characterized outstanding issues and our efforts to resolve same.

Very truly yours,

James W. Naisbitt

cc:    C. Philip Curley (By Fax Transmission: 312-663-0303)
       Elizabeth D. Sharp (By Fax Transmission: 312-341-4054)