IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WACHOVIA SECURITIES, LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DAVID NEUHAUSER; ANDREW A. )<br>JAHELKA; RICHARD O. NICHOLS; )<br>LEON A. GREENBLATT III; BANCO )<br>PANAMERICANO, INC., a South Dakota )<br>Corporation; LOOP CORP., a South )<br>Dakota corporation; LOOP PROPERTIES, )<br>INC., an Illinois corporation; and SCATTERED )<br>CORP., a South Dakota corporation; )<br>)<br>)<br>Defendants. ) | Case No. 04 C 3082<br><br>Judge Virginia M. Kendall<br><br>Magistrate Judge Maria Valdez |

PLAINTIFF'S LOCAL RULE 56.1 AMENDED SEPARATE
STATEMENT OF UNDISPUTED FACTS

Plaintiff, Wachovia Securities, LLC ("Wachovia"), by its attorneys, Gary I. Blackman, Christopher S. Griesmeyer and Adam B. Rome of Levenfeld Pearlstein, LLC, and pursuant to Local Rule 56.1(b)(3) for the Northern District of Illinois, hereby submits this Amended Separate Statement of Undisputed Facts ("SSUF").

| | |
|---|---|
| Exhibit 1: | Deposition Transcript, Leon Greenblatt III |
| Exhibit 2: | RS 2953-57 (Loop Corp.'s Application) |
| Exhibit 3: | Deposition Transcript, Andrew Jahelka |
| Exhibit 4: | RS 2867-2869 (NOLA, LLC's Articles of Organization) and (Certificate of Dissolution) |
| Exhibit 5: | RS 2816-2824 (NOLA, LLC's Application) |
| Exhibit 6: | Aug. 24, 2005 H'rg. Tr., *In re NOLA* and *In re South Beach* Bankruptcy proceedings |
| Exhibit 7: | Deposition Transcript, Kris Stelzner |
| Exhibit 8: | Deposition Transcript, David Neuhauser |
| Exhibit 9: | Defendants' Deposition Ex. 12 |
| Exhibit 10: | Deposition Transcript, Douglas Damrow |
| Exhibit 11: | Deposition Transcript, Elizabeth Niemann |

| | |
|---|---|
| Exhibit 12: | Group Exhibit Defendants' Dep. Exhibits 15, 50, 51 |
| Exhibit 13: | Prudential Financial Statements - C0001-87; RS 857-878; RS 947-949 |
| Exhibit 14: | Plaintiff's Deposition Exs., 7, 9, 10, 11 |
| Exhibit 15: | Individual Defendants' Supplemental Answers and Objections to Plaintiff's First Set of Interrogatories |
| Exhibit 16: | September 22, 2005 Judgment Order |
| Exhibit 17: | February 16, 2006 Judgment Order |

## I LOOP CORP.

1. Loop Corp. is a small, closely-held company owned by Defendants, Leon A. Greenblatt, III (50%), Andrew Jahelka (30%), and Richard Nichols (20%). (Ex. 1, Greenblatt, Dep. Tr., pp. 5, 6, 104, 105).

2. Messrs. Greenblatt, Jahelka and Nichols are the sole officers and directors of Loop Corp. *(Id)*.

3. Mr. Greenblatt is Loop's Secretary. *(Id)*.

4. Mr. Jahelka is its President. *(Id)*.

5. Mr. Nichols is its Treasurer. *(Id)*.

6. Loop Corp. was incorporated in South Dakota on September 12, 1997. (Ex. 2, RS 2955-57).

7. Loop Corp. maintains its registered office at 330 South Wells Street, Suite 711 in Chicago, Illinois. *(Id)*.

8. Loop Corp. is a "holding company," and until September of 2002, Loop Corp. did hold ownership interests in limited partnerships which, in turn, owned various parcels of commercial real estate in Chicago. (Ex. 3, Jahelka Dep. Tr., pp. 15, 85).[1]

---

[1] After the margin debt came due, and for no consideration, Loop Corp. transferred all of its real estate interests to Loop Properties, Inc., a wholly-owned subsidiary of Loop Corp. that also operated out of Suite 711 in the 330 South Wells building. *(Id.,* at p. 38).

9. In 2000, Loop Corp. obtained a loan from Banco Panamericano ("Banco"). (Ex. 1, Greenblatt Dep. Tr., pp. 55-56). Mr. Greenblatt testified as follows:

> Q: Okay, thank you. Now Banco's loan to Loop Corp., is that a performing loan?
>
> A: No.
>
> Q: And how much is the loan to Loop Corp. for?
>
> A: I believe the balance is now approximately 16 or $17 million.
>
> Q: And what collateral if any did Loop Corp. give to Banco in exchange for this loan?
>
> A: All the assets of the corporation.
>
> Q: Has Banco's loan to Loop Corp. always been 16 to 17 million?
>
> A: No.
>
> Q: When did the loan first start?
>
> A: 2000. (*Id*).

10. The Banco loan was secured by a blanket lien against all of Loop's assets. (*Id*).

11. Banco allowed Loop to increase its line of credit under the Banco loan to $16 - $17 million. (*Id.*).

12. Banco is wholly owned by one of Greenblatt's family trusts, and like Loop and NOLA, Banco is another one of Greenblatt's shell companies. (*Id.*, pp. 51-52, 60).

13. Banco operates out of Suite 718 of the 330 South Wells building, and its only "employee" is Mr. Greenblatt. (*Id.*, pp. 51-52, 60). Mr. Greenblatt testified as follows:

> Q: Banco Panamericano. Are you familiar with that company?
>
> A: Yes.
>
> Q: Who owns Banco?
>
> A: A family trust.
>
> Q: Is it the same family trust that owns 50 percent of Scattered Corp. and 100 percent of Chiplease?

3

A: It's the same family trust that owns Chiplease but I don't know if it's the same family trust that owns 50 percent of Scattered.

Q: And the family trust that owns Banco, does it own 100 percent of Banco?

A: Yes.

Q: And what is Banco's address?

A: 330 South Wells, suite 718.

Q: Did Banco operate out of suite 718 in 2000 and 2001?

A: I believe so.

Q: What does Banco do?

A: Banco is a lender.

***

Q: Who at Banco reviewed the loan documents?

A: I would.

Q: Who prepared the loan documents?

A: I don't recall.

Q: Does Banco have a loan committee?

A: Banco has just me.

Q: Just you?

A: Yes. *(Id.)*

## II. NOLA, LLC

14. NOLA, LLC is a small, closely-held company that was organized on July 27, 1994. (Ex. 4, RS 2867-2869).

15. Its current members are the fathers of Greenblatt, Jahelka and Nichols. (Ex. 3, Jahelka Dep. Tr., p. 164).

Q: Well, your father is a member of NOLA?

A: That's correct.

4

> Q: And who else is?
>
> A: Greenblatt's father and Nichols' father.
>
> Q: Do you know whether the parents of the three of you set out independently from the three of you to decide to purchase HRMI stock through NOLA?
>
> A: I don't believe that happened.
>
> Q: How was it that those three individuals, your parent, Mr. Greenblatt's parents, and Mr. Nichols' parents decided to purchase stock in HRMI?
>
> A: I don't know.
>
> Q: Do you know whether they – strike that. Did you ever speak with either your father or Mr. Greenblatt's father or Mr. Nichols' father about purchasing stock at HRMI?
>
> A: No. (*Id.*).

16. Teletech Systems, Inc., had the absolute authority to manage all of NOLA's assets. (Ex. 1, Greenblatt, Dep. Tr., p. 194). Teletech Systems, Inc., through Mr. Greenblatt specifically provided David Neuhauser the power to enter into trades on NOLA's behalf. (Ex. 1, Greenblatt, Dep. Tr. pp. 192-194).

17. According to NOLA's Secretary of State filings, its manager is "Teletech Systems, Inc.," which also operates out of Suite 711 in the 330 South Wells building. (Ex. 5, RS 2816-2824). NOLA was administratively dissolved on December 28, 1998. (Ex. 4, Certificate of Dissolution).

18. Since 2001, Leon Greenblatt has been the sole officer and employee of Teletech, and as such was solely responsible for making the day-to-day decisions of NOLA, LLC. (Ex. 1, Greenblatt Dep. Tr., pp. 86-93).

> Q: Are you an employee of Teletech Systems, Inc?
>
> A: Yes.
>
> Q: Do you have an employment agreement with Teletech?
>
> A: No.
>
> Q: Where does Teletech have its office?

5

A: I don't know.

Q: Where do you report to work?

A: Teletech has not had a business in six years.

Q: But you are still an employee of Teletech?

A: I'm the officer of Teletech, yes.

Q: What is your position at Teletech exactly?

A: I'm the president and secretary.

Q: Who are the other officers of Teletech?

A: Now?

Q: Yes.

A: There are no other officers. (*Id*).

19. On April 27, 2005, NOLA filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois. (Ex. 6, *In re NOLA, LLC*, 05 B 16682).

20. According to NOLA's bankruptcy filings, its only asset was 100% of the stock in its wholly-owned subsidiary, South Beach Securities, Inc. (*Id*.).[2]

21. On August 24, 2005, Judge Goldgar dismissed the NOLA bankruptcy proceeding under § 1112(b) of the Bankruptcy Code on the ground that it was not a good-faith filing. (Ex. 6, Aug. 24, 2005 H'rg. Tr., *In re NOLA* and *In re South Beach* Bankruptcy proceedings, pp. 4-8).

22. In reaching this result, Judge Goldgar concluded that: (a) NOLA and South Beach Securities are part of an "elaborate network of corporations" orbiting around Mr. Greenblatt, (b) many of Greenblatt's companies are mere corporate shells, and (c) NOLA and South Beach were two such shells:

> The facts are laid out in the parties' papers and appear to be undisputed. To the extent there are disputes, the disputes are not material.
>
> **Briefly, South Beach [Securities, Inc.] and NOLA are part of an elaborate network of corporations and other business entities**

---

[2] South Beach Securities, in turn, filed for bankruptcy the same day, and identified its only asset as shares of Heath Risk Management Inc. ("HRMI") – the same stock that Defendants acquired on margin through their Loop and NOLA accounts at Wachovia. (*In re South Beach Securities, Inc.*, 05 B 16679).

6

>orbiting around Leon Greenblatt, a Chicago businessman. According to Wachovia, these corporations are mostly shells through which Greenblatt and his associates have engaged in various activities of questionable legitimacy.
>
>One of these activities was the attempted acquisition in roughly 1999 of a controlling interest in the publicly-traded securities of Health Risk Management Incorporated, or HRM. Wachovia's papers both here and in connection with the earlier motion of debtor to retain counsel recite in detail the nature of Greenblatt's activities relating to HRM and the fallout from those activities. The accuracy of that description might be one the debtors here would dispute, although so far they have not seen fit to do so.
>
>**There is no dispute, however, that many of Greenblatt's corporations are indeed shells,** that HRM stock is currently worthless, and that Greenblatt's activities related to HRM precipitated an avalanche of litigation in assorted federal and state courts, including the District Court for the Northern District of Illinois. (*Id.* pp. 4-5) (emphasis added).

23. Judge Goldgar therefore dismissed NOLA's bankruptcy petition, finding that "South Beach and NOLA, the debtors in the cases here, are two more corporate shells, and their bankruptcy filings are just as questionable." (*Id.*). In fact, the only asset of South Beach was worthless shares of HRMI stock – the very same stock that individual defendants were using their Loop and NOLA accounts to acquire on margin. (*In re: South Beach Securities, Inc.*, 05 B 16679).

### III. DAVID NEUHAUSER

24. David Neuhauser was a day trader who held an individual trading account at Wachovia, as well as a business account in the name of his company, Loren Holdings, Inc. (Ex. 7, K. Stelzner Dep. Tr., pp. 30, 39-42).

25. Kris Stelzner, the Wachovia broker who inherited Mr. Neuhauser as a client when his regular broker left the firm, described him as "a very sophisticated trader" who was "knowledgeable about equities, bonds, commodities." (*Id.*, pp. 41-42).

>Q: Okay. As I understand it, you met with David Neuhauser, he came into the office?
>
>A: Yes.
>
>Q: Tell me what you can remember about the meeting.

7

  A:  David Neuhauser was a very knowledgeable about equities, bonds, commodities. He was very self-confident. He did not need investment advice.

  Q:  He told me, solicit exactly what the buyer to sell. He would call every morning. Typically, he wanted a short stock, around $4,000 shares of stock, and cover his position the same day.

  A:  I would have to make calls to the short desk to make sure that we had stock available for him to short, so I would call him a very sophisticated trader. (*Id.*).

  26. In 1996, Mr. Neuhauser started clerking for Mr. Greenblatt. (Ex. 8, D. Neuhauser Dep. Tr., pp. 17, 20).

  Q:  And after you stopped going to school in 1996, your next – your first employer, I believe, was the Chicago Stock Exchange; is that correct?

  A:  Correct.

        \*\*\*

  Q:  Did you ever work for Leon Greenblatt?

  A:  Yes.

  Q:  Did you ever work for him as a clerk?

  A:  Yes. That was my initial job, by the way. My initial job was – you know, I met Mr. Greenblatt through the floor of the exchange, and eventually received a job with South Beach Securities. (*Id*).

  27. In 1997, Mr. Neuhauser became an employee of South Beach Securities, Inc. (*Id.* at pp. 17, 20).

  28. Despite the fact that Mr. Neuhauser was employed by South Beach, and he never worked for Loop or NOLA, nonetheless he opened two margin accounts at Wachovia under the "Loop Corp." and "NOLA, LLC" names. (*Id.* at pp. 17, 20, 138-142).

  Q:  Going back to Ex. 10. Can you explain to me how it is that you came to sign these documents?

  A:  I don't know.

  Q:  Were you asked to sign these documents – let me ask that question. Did someone ask you to sign the documents that are attached as Ex. 10.

  A:  Yes.

8

Q: Who?

A: I have no idea.

Q: You have no idea who asked you to sign them?

A: No. Could have been the brokerage firm. I have no idea.

Q: But you're not employed by Nola, correct?

A: No.

Q: And you were never employed by Nola.

A: No.

Ms. Sharp: Objection, asked and answered.

Q: I'm sorry the answer was a little unclear. Were you ever employed by Nola?

A: No.

Q: So you're basically saying that someone from Prudential asked you to open up this account on behalf of Nola.

Q: Why would they do that if you weren't employed with Nola?

Mr. Wickert: Objection to the form of the question.

A: I'm suggesting that obviously someone from Prudential supplied me with this agreement and I signed it.

Q Why are you signing it if your are not employed by Nola?

Mr. Wicket: Objection to the form of the question.

Ms. Sharp: Objection to the form, asked and answered, argumentative.

Mr. Naisbitt: I join in that objection.

A: They supplied me with a document. I had obviously accounts open at Prudential. If they asked for something, I usually complied with them.

Q: So if Prudential sends you an account form on behalf of a company that you are not associated with at all, you're going to sign it?

Mr. Naisbitt: Objection, argumentative.

Ms. Sharp: Objection, asked and answered.

A: Not necessarily.

Q: So then this Nola account, is it your personal account?

A: No.

Q: Well, who account is it?

A: I have no idea. (*Id.* at p. 138-142).

9

## IV. THE "LOOP CORP." AND "NOLA, LLC" ACCOUNTS

29. On or about September 28, 2000, Mr. Neuhauser opened a margin account at Wachovia in the name of "Loop Corp." (Ex. 9, Def.'s Dep. Ex. 12; Ex. 8, D. Neuhauser Dep. Tr., p. 97).

30. Neuhauser opened the account at the direction of Mr. Greenblatt. (Ex. 8, D. Neuhauser Dep. Tr., pp. 97, 129).

> Q: So I don't understand why you then decided to open the account in the name of Loop Corp.
>
> A: Oh, I believe Mr. Greenblatt wanted an account opened. And like I said, the broker specifically at the time who was my broker, you know, mentioned it me that, you know, do you know anyone. You know, would ask me at different points did I know anyone who wanted to open an account. When Mr. Greenblatt suggested at some point he wanted to open an account, I think it came up that, hey, maybe we should open an account here. (*Id.* at p. 97-8).
>
> Q: So when you did open the account at Prudential in the name of Loop Corp., that was with Mr. Greenblatt's prior authorization, correct?
>
> A: Yes. (*Id.* at 98-9).

31. When Mr. Neuhauser opened the account, he was required to provide certain information regarding the investment experience and financial status of Loop Corp. (Ex. 9, Def.'s Dep. Ex. 12; Ex. 10, D. Damrow Dep. Tr., pp. 169-174; Ex. 11, E. Niemann Dep. Tr., pp. 140-141; Ex. 7, K. Stelzner Dep. Tr., pp. 170-174).

32. Doug Damrow, Wachovia's branch manager from January of 1999 until April of 2001, provided the following testimony.

> Q: When an account is set up a Prudential, does Prudential rely in the information that is provided to it by its customers in deciding whether to allow that customer to trade?
>
> A: Yes.
>
> Q: And does Prudential rely on that information that is provided by the customers in deciding whether to allow that customer to trade on margin?
>
> A: Yes.
>
> Q: And would it be fair to say that Prudential when it is allowing a customer to trade, it's assuming that the information that is provided to it by the customer is true and correct?
>
> A: Absolutely.

10

Q: And Prudential would not be in a position to always determine or guess what a client's or customer's motivations or conduct is?

Mr. Curley: Objection to form.

Mr. Naisbitt: I join in the objection.

Ms. Sharp: I do too.

A   True.

Q: And if a customer withholds information, was there any mechanism in place at the time at Prudential to know whether or not everything the customer is saying is true?

Mr. Curley: Objection. Form of the question and foundation.

Mr. Naisbitt: I join in the objection.

Ms. Sharp: I do as well.

A:   Not that I was aware of.

Q.   Now, you looked at Exhibits 12 and 15 which are the new account statements for Loop and NOLA. Do you recall looking at those?

A.   I do.

Q.   Do you recall there is various categories of information, I'm not going to go through them all, where the customer is providing that information to Prudential?

A.   Yes.

Q.   And that's not information that Prudential is ascertaining or determining on its own?

Mr. Curley: Objection. No foundation.

Ms. Sharp: Objection. No foundation. Calls for speculation.

Mr. Naisbitt: I join in those objections.

A.   That is accurate.

Q.   So if, for example, there is a reference under client's investment experience and it says "equity ten years, bonds ten years, options ten years, futures ten years, mutual funds ten years," and I'm referring to Exhibit 12 for loop, that's information that would have had to come from the customer?

Mr. Naisbitt: Objection. Lack of foundation.

A:   Yes.

Mr. Curley: Same objection.

Q.   And would the same hold true for the customer's net worth?

Mr. Naisbitt: Same objection.

Mr. Curley: Same objection.

A.   Yes.

> Q. Now, if Loop had come into Prudential and said that it was just a real estate holding company whose assets were encumbered and it did not have ten years of trading experience, can you say whether Prudential would have allowed Loop to trade as it did on margin?
>
> Mr. Naisbitt: Objection. Speculative.
>
> Mr. Curley: Incomplete hypothetical and no foundation. Requires speculation.
>
> A. They probably would not have allowed it.
>
> Q. Okay. Now you were the branch manager. We've already established that.
>
> A. Yes.
>
> Q. And is it fair to say that you sitting here today had knowledge as to what Prudential would or would not have done in the year 2000-2001 with respect to customers looking to open new accounts.
>
> Let me rephrase it. I'm asking you these questions with respect to customers that might be opening accounts at Prudential, correct?
>
> A. Yes.
>
> Q. And you were the branch manager in 2001 for part of the year?
>
> A. Yes.
>
> Q. And would it be fair to say that as you sit here today you have an understanding of what Prudential would or would not have done in 2000 and 2001 if presented with the various scenarios I've presented?
>
> Mr. Curley: Object to the form of the question.
>
> A. Yes, I have an understanding.
>
> Q. Now, if you knew that a customer had a number of brokerage accounts at other firms and was using those accounts to trade high concentrations of one stock, is that something that would be of concern to Prudential?
>
> A. Yes.
>
> Q. Why?
>
> A. Prudential violations of various regulations by the SRO's. Also our concern for the possibility of the customer driving the stock – price of the stock up and then wishing to get out and having no buyers to buy the stock. (Ex., 10, Damrow Dep. Tr., pp. 169-174).

33. Elizabeth Niemann, an employee at Wachovia for 19 years, including its administrative manager for the last 12 years, testified to the following:

> Q: Okay. And I want to show you what we previously marked as Exhibit 15, which is the account opening statement for Nola. I'd ask you to look to the client profile section on the left-hand side.
>
> A: Uh-huh.
>
> Q: And does that reflect under net earnings a 13?

12

A: To tell you the truth, it's very fuzzy. It looks like a 12.

Q: Okay. And if it's a 12, what would be the corresponding code or representation with respect to net worth from the code sheet?

A: Are you stating the liquid net worth or are you talking about the earnings?

Q: Starting out with – well, let's start out with the net earnings.

A: Okay.

Q: And the net earnings reflect a 12?

A: Correct. That's what I see.

Q: And on the code sheet, what would a 12 relate to?

A: That would be numbers between 10 million and $24,999,999.

Q: Okay. And then what's the next code that you recognize?

A: Right under there?

Q: Correct,

A: It says stockholders equity. That's also listed as a 12, which would be the same information.

Q: Okay. And then what does it say under "Stated net worth"?

A: It says 13.

Q: And what would that relate to on the code sheet?

A: Greater than 25 million.

Q: Okay. And then is there a number nest to stated liquid net worth?

A: Yes.

Q: And what was – what would that be?

A: It says 13, which is also greater than 25 million.

Q: Okay. So based on this sheet, was it represented to Prudential when the Nola account was opened that the stated net worth and stated liquid net worth of Nola was in excess of $25 - $24 million.

Mr. Wickert: Objection, lack of foundation.

Mr. Naisbitt: I join in the objection.

A: Yes, it would be over – for 13, it would be over 25 million.

Q: Okay. Now, the information that appears on these intake open sheets, whether it's for the Nola account or the Loop account, is all that information obtained from the customer?

A: Yes.

Q: And is it relied upon by Prudential in the opening of the accounts?

A: Yes.

Q: And is there an expectation by Prudential that is the customer says, for

13

Case: 1:04-cv-03082 Document #: 235 Filed: 06/14/07 Page 14 of 20 PageID #:4127

example, that its net worth or its liquid net worth is in excess of $10 million or in excess of $25 million that that is, in fact, true?

A: Yes.

Q: And does Prudential expect that its customers provide truthful and accurate information?

A: Yes.

Q: Now, if a customer such as Loop...provide information that they have been trading equities for 10 years and bonds for 10 years and options for 10 years and futures for 10 years and mutual funds for 10 years as reflected on Exhibit 50, is that something that Prudential relies on in opening the accounts?

A: Yes.

Q: And is that something that Prudential expects to be true?

A: Yes. (Ex. 11, E. Niemann Dep. Tr., pp. 140-141).

34. Kris Stelzner, a financial consultant for Wachovia from 1999 to 2001, also testified to the information provided to Wachovia by Mr. Neuhauser:

Q: Do you recall that Miss Sharp asked you to look at the new business account records for Loop and Nola. Loop is No. 12. I think Nola is No. 15.

A: Which form?

Q: (indicating).

A: Yes.

Q: This is No. 12, and that's the information on the form with respect to the customer?

A: That's correct.

Q: Okay. Now, is it your understanding that all of the information on the form—this is Exhibit 12 and I'll show that to you, and Exhibit 15, which is a similar document for Nola, is provided by the customer to Prudential?

A: Absolutely.

Mr. Wickert: Objection, foundation.

Mr. Naisbitt: I join in the objection.

Q: To the best of your knowledge, the information on Exhibits 12 and Exhibit 15, which we've referred to as the intake forms, that's not information that is created independently by Prudential, is it.

14

A: No.

Q: And does Prudential assume that when that information is provided that it's truthful and accurate?

Mr. Naisbitt: I object to the form of the question and its lack of foundation.

A: Absolutely.

Q: Now, I ask you to take a look at Exhibit 12 in the second section there it says "Client Profile." And you may want to grab the magnifying glass. Do you see where it says "client's investment experience"?

A: Yes.

Q: And do you recall that Miss Sharp asked you whether those 10s that are thereafter, equities, bonds, options, futures, mutual funds, is a code or the years that the customers was experienced in those fields?

A: It would relate to the number of years verses a code.

Q: Okay, And that – and your prior testimony was you didn't know and it could be a code. Do you see where it says "number of years in" and then it says colon and then it's got each of those categories?

A: Yeah. I didn't see – I see that. I didn't see the client's investment experience above it. So that would naturally pertain to years, 10 years in equities, 10 years in bonds, 10 years in options, futures, and 10 years in mutual funds. I thought it referenced a code before so. (Ex. 7, K. Stelzner Dep. Tr., pp. 171-174).

35. This information was memorialized on Wachovia's new account intake form. (Ex., 9, Def.'s Dep. Ex. 12; Ex., 10, D. Damrow Dep. Tr., pp. 169-172; Ex. 11, E. Niemann Dep. Tr., pp. 140-141; Ex. 7, K. Stelzner Dep. Tr., pp. 170-174).

36. Neuhauser made the following representations:

- Loop Corp. had at least 10 years of investment experience in equities, bonds, options, futures, and mutual funds;

- Loop Corp. had net earnings of between $10,000,000 and $24,999,999;

- Loop Corp.'s net worth was between $10,000,000 and $24,999,999; and

- Loop Corp.'s liquid net worth was between $10,000,000 and $24,999,999. (Ex. 12, Def.'s Dep. Exs. 15, 50, 51; E. Niemann Dep. Tr. at pp. 140-141).

37. In reality, Loop Corp. was not incorporated until September 12, 1997, approximately three years before Mr. Neuhauser opened the trading accounts at Wachovia. (Ex. 2, RS 2955-57).

15

38. Five months later, Mr. Neuhauser opened a margin account at Wachovia in the name of "NOLA, LLC." (Ex. 14, Pl.'s Dep. Ex. 10). Neuhauser executed a Security Agreement on behalf of Loop that allowed Loop to open a trading account at Wachovia. (Ex. 14, Pl.'s Dep. Ex. 7). Neuhauser signed as "agent for Loop" the Limited Power of Attorney document. (Ex. 14, Pl.'s Dep. Ex. 9). Neuhauser executed the "Partnership Account Agreement" on behalf of NOLA. (Ex. 14, Pl.'s Dep. Ex. 10). Neuhauser drafted letters to Wachovia requested it to "except checks from Loop Corp. account...to be deposited into the Nola account...." (Ex. 14, Pl.'s Dep. Ex. 11).

39. Once again, this was at the direction of Mr. Greenblatt, in his capacity as the sole employee and officer of NOLA's manager. (Ex. 15, Individual Defendants' Supplemental Answers and Objections to Plaintiff's First Set of Interrogatories, p. 9; Ex. 8, D. Neuhauser Dep. Tr., pp. 155-156; Ex. 1, Greenblatt Dep. Tr., pp. 86-89).

40. As was the case with the Loop account, Mr. Neuhauser was required to provide certain information regarding the investment experience and financial status of NOLA, LLC. (Ex. 9, Def.'s Dep. Ex. 12; Ex. 10, D. Damrow Dep. Tr., pp. 169-172; Ex. 11, E. Niemann Dep. Tr., pp. 140-141; Ex. 7, K. Stelzner Dep. Tr., pp. 170-174).

41. This information was memorialized on a new account intake form. (Ex. 9, Def.'s Dep. Ex. 12; Ex. 10, D. Damrow Dep. Tr., pp. 169-172; Ex. 11, E. Niemann Dep. Tr., pp. 140-141; Ex. 7, K. Stelzner Dep. Tr., pp. 170-174).

42. Neuhauser made the following representations:

- NOLA, LLC. had at least 15 years of investment experience in equities, bonds, options, futures, and mutual funds;

- NOLA, LLC had net earnings of between $10,000,000 and $24,999,999;

- NOLA, LLC's net worth was in excess of $25,000,000; and

- NOLA, LLC's liquid net worth was in excess of $25,000,000. (Ex. 12, *Cf.* Def.'s Dep. Exs. 15, 50, 51; Ex. 11, E. Niemann Dep. Tr. at pp. 140-141).

16

43. Based upon the information that Mr. Neuhauser provided regarding the investment experience and financial status of Loop Corp. and NOLA, LLC, Wachovia allowed the accounts to be opened, and further allowed the accounts to trade on margin. (Exs. 9, 12 – Loop and NOLA's Intake Forms).

44. Moreover, NOLA, LLC had been administratively dissolved, and was a legal non-entity when Mr. Neuhauser opened the account in February 2001. (Ex. 4, Certificate of Dissolution).

## V. WACHOVIA'S DAMAGES

45. Once the Loop and NOLA accounts were opened, the Individual Defendants used them to acquire substantial numbers of shares of stock in Health Risk Management, Inc. ("HRMI") on margin. (Ex. 13, C0001-87; RS 947-949).[3]

46. The Loop and NOLA accounts were used almost exclusively for that purpose. (*Id.*).

47. On May 22, 2001, the NASDAQ halted trading in HRMI, and the value of the Loop and NOLA accounts fell into debit balances. (*Id.*).

48. When Greenblatt spoke with Wachovia's representatives he treated the Loop and NOLA accounts as the information contained therein belong to him – not the entities. After the accounts had been opened, Greenblatt told Wachovia his net worth, not Loop or NOLA's, and when the NASDAQ halted trading of HRMI stock and the Loop and NOLA accounts fell into substantial debit position, Greenblatt told Wachovia that he would make good on Loop and NOLA's debt. (Ex. 7, K. Stelzner Dep. Tr., p. 51); (Ex. 10, D. Damrow Dep. Tr., P. 145-146).

49. Defendants incurred margin debt in the Loop account totaling $1,885,751.44. (Ex. 13, C0001-87; RS 947-949).

50. Defendants incurred margin debt totaling $1,098,459.90 in the NOLA account. (Ex. 13, C0001-87; RS 947-949).

---

[3] Wachovia attached to its SSUF documents bates numbered C0001-C0002 as a representative sample of the documents bates numbered C0001-00087; RS 947-949.

17

51. Defendants were unable to repay Wachovia out of "Loop" or "NOLA" funds. (Ex. 13, C0001-87; RS 947-949).

52. Consequently, Wachovia obtained NYSE Arbitration Awards against Loop and NOLA, which have been reduced to judgments in the amount of $2,478,418.80 and $1,358,847.73, respectively. (Ex. 16, Sept. 22, 2005 Judgment Order; Ex. 17, Feb. 16, 2006 Judgment Order).

53. Wachovia has suffered more than $3.8 million in damages as a result of the false representations provided by Neuhauser and Greenblatt. *Id.*

## VI PARTIES

54. Plaintiff Wachovia Securities, LLC ("Wachovia") is a Delaware limited liability company with its principal place of business in Richmond, Virginia. Wachovia Securities, LLC is wholly owned by Wachovia Securities Financial Holdings, LLC, also a Delaware limited liability company with its principal place of business in Richmond, Virginia. In turn, Wachovia Securities Financial Holdings, LLC is 62% owned by Wachovia Securities Holdings, LLC (a Delaware limited liability company with its principal place of business in Richmond, Virginia) and 38% owned by Prudential Securities Group, Inc. (a Delaware corporation with its principal place of business in New York, New York). Finally, Wachovia Securities Holdings, LLC is wholly owned by Wachovia Corporation, a North Carolina Corporation with its principal place of business in Charlotte, North Carolina. (Pl.'s Revised Second Am. Compl. ¶ 8 – *DK 209*); (Defs.' Answer to Revised Second Am. Compl. at ¶ 8 – *DK 227*); (Corp. Defs.' SSUF ¶ 1 – *DK 223*); (Individual Defs.' SSUF ¶ 1 – *DK 226*).

55. Defendant David Neuhauser is an individual resident and citizen of Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 9 - *DK 227*).

56. Defendant Andrew A. Jahelka is an individual resident and citizen of Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 10 - *DK 227*).

57. Defendant Richard O. Nichols is an individual citizen of the United Kingdom and a permanent resident alien of the United States, who is domiciled in Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 11 - *DK 227*).

58. Defendant Leon A. Greenblatt III is an individual resident and citizen of Illinois, and resides at 2350 North Lincoln Park West, Units 1S, 2S and 3S, Chicago, Illinois 60614. (Defs.' Answer to Revised Second Am. Compl. at ¶ 12 - *DK 227*).

59. Defendant Banco Panamericano, Inc. is a South Dakota corporation with its principal place of business at 330 South Wells Street in Chicago, Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 13 - *DK 227*).

60. Defendant Loop Corp. is a South Dakota corporation with its principal place of business at 330 South Wells Street in Chicago, Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 14 - *DK 227*).

61. Defendant Loop Properties, Inc. is a South Dakota corporation with its principal place of business at 330 South Wells Street in Chicago, Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 15 - *DK 227*).

62. Defendant Scattered Corp. is a South Dakota corporation with its principal place of business at 330 South Wells Street in Chicago, Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 16 - *DK 227*).

## VII. JURISDICTION AND VENUE

63. This court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1331. (Defs.' Answer to Revised Second Am. Compl. at ¶ 20, 21 - *DK 227*); (Corp. Defs.' SSUF ¶ 10 – *DK 223*); (Individual Defs.' SSUF ¶ 10 – *DK 226*).

64. Venue is proper in this District under 28 U.S.C. § 1391(a)(2) and under 735 ILCS 5/19-104 because a substantial part of the events or omissions giving rise to the claims asserted herein arose in the Northern District of Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 22 - *DK 227*).

**WHEREFORE,** Wachovia Securities, LLC requests that Partial Summary Judgment be entered in its favor and against David Neuhauser and Leon Greenblatt, III on Count I of its Revised Second Amended Complaint.

Respectfully submitted,

**WACHOVIA SECURITIES, LLC**

By: /s/ Adam B. Rome
One of Its Attorneys

Gary I. Blackman (ARDC #6187914)
Christopher S. Griesmeyer (ARDC#6269851)
Adam B. Rome (ARDC #6278341)
LEVENFELD PEARLSTEIN, LLC
2 North LaSalle Street, Suite 1300
Chicago, Illinois 60602
(312) 346-8380 (Telephone)
(312) 346-8434 (Facsimile)