**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WACHOVIA SECURITIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 3082 |
| v. | ) | |
| | ) | |
| DAVID NEUHAUSER; ANDREW A. JAHELKA; | ) | Judge Virginia M. Kendall |
| RICHARD O. NICHOLS; | ) | |
| LEON A. GREENBLATT III; BANCO | ) | |
| PANAMERICANO, INC., a South Dakota | ) | Magistrate Judge |
| Corporation; LOOP CORP., a South Dakota | ) | Maria G. Valdez |
| corporation; LOOP PROPERTIES, INC., | ) | |
| an Illinois corporation; and SCATTERED CORP., | ) | |
| a South Dakota corporation; | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS NEUHAUSER AND GREENBLATT'S
LOCAL RULE 56.1(B)(3) RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants David Neuhauser ("Neuhauser") and Leon A. Greenblatt III ("Greenblatt")

provide this Local Rule 56.1(b)(3) response in opposition to Plaintiff Wachovia Securities, LLC's

("Wachovia") Amended Statement of Facts submitted by Wachovia in support of its motion for

partial summary judgment directed to Count I of the Revised Second Amended Complaint.

Additionally, Neuhauser and Greenblatt include their statement of additional facts that require denial

of Plaintiff's motion.

**DEFENDANTS' RESPONSE**

1.     Loop Corp. is a small, closely-held company owned by Defendants, Leon A.
Greenblatt, III (50%), Andrew Jahelka (30%), and Richard Nichols (20%). (Ex. 1, Greenblatt, Dep.
Tr., pp. 5, 6, 104, 105).

**ANSWER:**     Admitted.

2.      Messrs. Greenblatt, Jahelka and Nichols are the sole officers and directors of Loop Corp. *(Id)*.

**ANSWER:**     Admitted in part and disputed in part.  It is disputed that Greenblatt remained an

officer of Loop Corp after 2001.  (Wachovia Ex. 1; Greenblatt dep. at pp 98-99).

The references to "Wachovia Ex. ___" refer to the Exhibits submitted by Wachovia

in conjunction with its Amended Statement of Facts.

3.      Mr. Greenblatt is Loop's Secretary. *(Id)* .

**ANSWER:**     Disputed.  (Wachovia Ex. 1;   Greenblatt dep. at pp 98-99).

4.      Mr. Jahelka is its President. *(Id)*

**ANSWER:**     Admitted.

5.      Mr. Nichols is its Treasurer. *(Id)*.

**ANSWER:**     Admitted.

6.      Loop Corp. was incorporated in South Dakota on September 12, 1997. (Ex. 2, RS 2955- 57).

**ANSWER:**     Admitted.

7.      Loop Corp. maintains its registered office at 330 South Wells Street, Suite 711 in Chicago, Illinois. *(Id)*.

**ANSWER:**     Admitted.

8.      Loop Corp. is a "holding company," and until September of 2002, Loop Corp. did hold ownership interests in limited partnerships which, in turn, owned various parcels of commercial real estate in Chicago. (Ex. 3, Jahelka Dep. Tr., pp. 15, 85).[1]

**ANSWER:**     Admitted in part and disputed in part.  Wachovia's footnote 1 is disputed because

there was consideration for the transfer of real estate.  (D. Ex. 3, Supplemental Loop

---

[1] (Wachovia's footnote)  After the margin debt came due, and for no consideration, Loop Corp. transferred all of its real estate interests to Loop Properties, Inc., a wholly-owned subsidiary of Loop Corp. that also operated out of Suite 711 in the 330 South Wells building. (Id., at p. 38).

2

Properties Interrogatory Answer at 3 hereto).[2]   Loop Corp. owned other assets in addition to the limited partnership interests.  (Wachovia Ex. 3, Jahelka Dep. at 95-98).

9.      In 2000, Loop Corp. obtained a loan from Banco Panamericano ("Banco"). (Ex. 1, Greenblatt Dep. Tr., pp. 55-56).  Mr. Greenblatt testified as follows:

> Q:      Okay, thank you. Now Banco's loan to Loop Corp., is that a performing loan?
> A:      No.
> Q:      And how much is the loan to Loop Corp. for?
> A:      I believe the balance is now approximately 16 or $17 million.
> Q:      And what collateral if any did Loop Corp. give to Banco in exchange for this loan?
> A:      All the assets of the corporation.
> Q:      Has Banco's loan to Loop Corp. always been 16 to 17 million?
> A:      No.
> Q:      When did the loan first start?
> A:      2000. *(Id)*.

**ANSWER:**   Admitted.

10.      The Banco loan was secured by a blanket lien against all of Loop's assets. *(Id)*.

**ANSWER:**   Admitted.

11.      Banco allowed Loop to increase its line of credit under the Banco Loan to $16 - $17 million. *(Id.)*.

**ANSWER:**   Admitted.

12.      Banco is wholly owned by one of Greenblatt's family trusts, and like Loop and NOLA, Banco is another one of Greenblatt's shell companies. *(Id*., pp. 51-52, 60).

**ANSWER:**   Admitted in part and disputed in part.  It is disputed that Banco, Loop and NOLA are shell companies owned by Greenblatt.  Wachovia's citations to the record do not establish that Greenblatt exclusively owns Banco, and in fact, as Wachovia alleges,

---

[2]  "D. Ex." refers to the Defendants' Exhibits appended to this Response.

3

it is owned by a family trust.  (Wachovia Ex. 1, Greenblatt Dep. at 51-52, 60).
Greenblatt also does not exclusively own Loop (see Wachovia's Amended
Statement of Fact No.1 and Defendants' Response to ¶1 at p. 1 above) and he has no
ownership interest in NOLA.  (See Response to Wachovia's Amended Statement of
facts ¶15.)  Wachovia's citation to the record does not establish anything that
remotely indicates that Loop, NOLA or Banco are "shell[s]."  (Wachovia Ex. 1,
Greenblatt Dep. at 51-52, 60). Greenblatt and Neuhauser also assert that the term
"shell" is vague, ambiguous and lacks any meaningful specificity.

13.     Banco operates out of Suite 718 of the 330 South Wells building, and its only
"employee" is Mr. Greenblatt. (*Id.*, pp. 51-52, 60). Mr. Greenblatt testified as follows:

| | |
|---|---|
| Q: | Banco Panamericano. Are you familiar with that company? |
| A: | Yes. |
| Q: | Who owns Banco? |
| A: . | A family trust. |
| Q: | Is it the same family trust that owns 50 percent of Scattered Corp. and |

100 percent of Chiplease?

| | |
|---|---|
| A: | It's the same family trust that owns Chiplease but I don't know if it's |

the same family trust that owns 50 percent of Scattered.

| | |
|---|---|
| Q: | And the family trust that owns Banco, does it own 100 percent of |

Banco?

| | |
|---|---|
| A: | Yes. |
| Q: | And what is Banco's address? |
| A: | 330 South Wells, suite 718. |
| Q: | Did Banco operate out of suite 718 in 2000 and 2001? |
| A: | I believe so. |
| Q: | What does Banco do? |
| A: | Banco is a lender. |

***

| | |
|---|---|
| Q: | Who at Banco reviewed the loan documents? |
| A: | I would. |
| Q: | Who prepared the loan documents? |
| A: | I don't recall. |
| Q: | Does Banco have a loan committee? |
| A: | Banco has just me. |
| Q: | Just you? |
| A: | Yes. (*Id.*) |

4

**ANSWER:**    Admitted.

14.    NOLA, LLC is a small, closely-held company that was organized on July 27, 1994. (Ex. 4, RS 2867-2869).

**ANSWER:**    Admitted.

15.    Its current members are the fathers of Greenblatt, Jahelka and Nichols. (Ex. 3, Jahelka Dep. Tr., p. 164).

> Q:    Well, your father is a member of NOLA?
> A:    That's correct.
> Q:    And who else is?
> A:    Greenblatt's father and Nichols' father.
> Q:    Do you know whether the parents of the three of you set out independently from the three of you to decide to purchase HRMI stock through NOLA?
> A:    I don't believe that happened.
> Q:    How was it that those three individuals, your parent, Mr. Greenblatt's parents [sic], and Mr. Nichols' parents [sic] decided to purchase stock in HRMI?
> A:    I don't know.
> Q:    Do you know whether they - strike that. Did you ever speak with either your father or Mr. Greenblatt's father or Mr. Nichols' father about purchasing stock at HRMI?
> A:    No. (*Id.*).

**ANSWER:**    Admitted.

16.    Teletech Systems, Inc., had the absolute authority to manage all of NOLA's assets. (Ex. I, Greenblatt, Dep. Tr., p. 194). Teletech Systems, Inc., through Mr. Greenblatt specifically provided David Neuhauser the power to enter into trades on NOLA's behalf. (Ex. 1, Greenblatt, Dep. Tr. pp. 192-194).

**ANSWER:**    Admitted in part and disputed in part.  It is disputed that Teletech Systems, Inc.

("Teletech") had the "absolute authority" to manage all of NOLA's assets.  It is

admitted that Teletech had authority to manage those assets but that authority was

limited by applicable limited liability company act provisions.  It is also disputed as

to the exact date in 2001 that Mr. Greenblatt replaced Mr. Gary Metzger at Teletech

as Teletech's president.  (Wachovia Ex. 1, Greenblatt Dep. at 87-89).

5

17.     According to NOLA's Secretary of State filings, its manager is "Teletech Systems, Inc.," which also operates out of Suite 711 in the 330 South Wells building. (Ex. 5, RS 2816-2824). NOLA was administratively dissolved on December 28, 1998. (Ex. 4, Certificate of Dissolution).

**ANSWER:**     Admitted in part and disputed in part.  It is disputed to the extent that the paragraph

implies that NOLA is still dissolved.  An application to reinstate NOLA was filed

and it was returned to good standing on or about June 6, 2001.  (Wachovia Ex. 5)

18.     Since 2001, Leon Greenblatt has been the sole officer and employee of Teletech, and as such was solely responsible for making the day-to-day decisions of NOLA, LLC. (Ex. 1, Greenblatt Dep. Tr., pp. 86-93).

Q:      Are you an employee of Teletech Systems, Inc?
A:      Yes.
Q:      Do you have an employment agreement with Teletech?
A:      No.
Q:      Where does Teletech have its office?
A:      I don't know.
Q:      Where do you report to work?
A:      Teletech has not had a business in six years.
Q:      But you are still an employee of Teletech?
A:      I'm the officer of Teletech, yes.
Q:      What is your position at Teletech exactly?
A:      I'm the president and secretary.
Q:      Who are the other officers of Teletech?
A:      Now?
Q:      Yes.
A:      There are no other officers. *(Id.)*.

**ANSWER:**     Admitted in part and disputed in part.  It is disputed as to the exact date in 2001 that

Mr. Greenblatt replaced  Mr. Gary Metzger at Teletech  as Teletech's president.

(Wachovia Ex. 1, Greenblatt Dep. at 87-89).

19.     On April 27, 2005, NOLA filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois. (Ex. 6, *In re NOLA, LLC*, 05 B 16682).

**ANSWER:**     Admitted.

6

20.     According to NOLA's bankruptcy filings, its only asset was 100% of the stock in its wholly-owned subsidiary, South Beach Securities, Inc. (*Id.*)[3]

**ANSWER:**     Admitted in part and disputed in part.   The relevancy is disputed as neither

Greenblatt or Neuhauser was a party to the bankruptcy, and the events described

concern a bankruptcy filed some four years after the events of this case.

21.     On August 24, 2005, Judge Goldgar dismissed the NOLA bankruptcy proceeding under §1112(b) of the Bankruptcy Code on the ground that it was not a good-faith filing. (Ex. 6, Aug. 24, 2005 H'rg. Tr., *In re NOLA* and *In re South Beach Bankruptcy* proceedings, pp. 4-8).

**ANSWER:**     Admitted in part and disputed in part.   The relevancy is disputed as neither

Greenblatt or Neuhauser was a party to the bankruptcy, and the events described

concern a bankruptcy proceeding filed some four years after the events of this case,

and relate mainly to the financial condition of NOLA in 2005.  Further, the entirety

of Judge Goldgar's ruling is set forth as Exhibit 6 to Wachovia's Amended

Statement of Facts.  The lack of "good faith" finding which was made, (despite no

evidentiary hearing being held (Wachovia Ex. 6 at 4)), had nothing to do with the

facts of the instant case, but arose out of the fact that in 2005 NOLA had no "going

concern value."  (Wachovia Ex. 6 at 9).

22.     In reaching this result, Judge Goldgar concluded that: (a) NOLA and South Beach Securities are part of an "elaborate network of corporations'orbiting around Mr. Greenblatt, (b) many of Greenblatt's companies are mere corporate shells, and (c) NOLA and South Beach were two such shells:

The facts are laid out in the parties' papers and appear to be undisputed. To the extent there are disputes, the disputes are not material.

---

[3] (Wachovia's footnote)  South Beach Securities, in turn, filed for bankruptcy the same day, and identified its only asset as shares of Heath Risk Management Inc. ("HRMI") - the same stock that Defendants acquired on margin through their Loop and NOLA accounts at Wachovia. (*In re South Beach Securities, Inc.*, 05 B 16679).

> **Briefly, South Beach [Securities, Inc.] and NOLA are part of an elaborate network of corporations and other business entities orbiting around Leon Greenblatt, a Chicago businessman**. According to Wachovia, these corporations are mostly shells through which Greenblatt and his associates have engaged in various activities of questionable legitimacy.
>
> One of these activities was the attempted acquisition in roughly 1999 of a controlling interest in the publicly-traded securities of Health Risk Management Incorporated, or HRM. Wachovia's papers both here and in connection with the earlier motion of debtor to retain counsel recite in detail the nature of Greenblatt's activities relating to HRM and the fallout from those activities. The accuracy of that description might be one the debtors here would dispute, although so far they have not seen fit to do so.
>
> **There is no dispute, however, that many of Greenblatt's corporations are indeed shells**, that HRM stock is currently worthless, and that Greenblatt's activities related to HRM precipitated an avalanche of litigation in assorted federal and state courts, including the District Court for the Northern District of Illinois. (*Id*. pp. 4-5) (emphasis added).

**ANSWER:**     Admitted in part and disputed in part. It is admitted that Judge Goldgar made some of the comments quoted above, but the remainder is disputed as Wachovia has edited out the fact that Bankruptcy Judge Goldgar made these statements without holding an evidentiary hearing. (Wachovia Ex. 6 at 4). Additionally, a review of the transcript in its entirety reveals that these comments are Bankruptcy Judge Goldgar's characterization of certain facts relating to the NOLA bankruptcy and are not properly characterized as "conclusions," and, as quoted above, he himself noted that the debtors might dispute his characterization of the facts. The relevancy of Bankruptcy Judge Goldgar's ruling is also disputed as neither Greenblatt or Neuhauser was a party to the bankruptcy, and the events described concern a bankruptcy proceeding filed some four years after the events of this case, and relate mainly to the financial condition of NOLA in 2005.

8

23. Judge Goldgar therefore dismissed NOLA's bankruptcy petition, finding that "South Beach and NOLA, the debtors in the cases here, are two more corporate shells, and their bankruptcy filings are just as questionable." (*Id*). In fact, the only asset of South Beach was worthless shares of HRMI stock - the very same stock that individual defendants were using their Loop and NOLA accounts to acquire on margin. (*In re: South Beach Securities, Inc.*, 05 B 16679).

**ANSWER:**      Admitted in part and disputed in part. Defendants dispute that the portion of

Bankruptcy Judge Goldgar's transcript quoted is a "finding," but it instead appears

in a portion of the transcript where Bankruptcy Judge Goldgar is characterizing

Wachovia's position. (Wachovia Ex. 6 at 5-6). Further, the relevancy is disputed

as neither Greenblatt or Neuhauser was a party to the bankruptcy, and the events

described concern a bankruptcy proceeding filed some four years after the events of

this case, and relate mainly to the financial condition of NOLA in 2005.

24. David Neuhauser was a day trader who held an individual trading account at Wachovia, as well as a business account in the name of his company, Loren Holdings, Inc. (Ex. 7, K. Stelzner Dep. Tr., pp. 30, 39-42).

**ANSWER:**      Admitted in part and disputed in part. The term "day trader" is vague, ambiguous

and lacking in specificity. Defendants admit that at times Neuhauser made "day

trades" and admit the remaining allegations of this paragraph except the

characterization of Neuhauser as a "day trader." (D. Ex. 1 at ¶ 13, Neuhauser

Affidavit.)

25. Kris Stelzner, the Wachovia broker who inherited Mr. Neuhauser as a client when his regular broker left the firm, described him as "a very sophisticated trader" who was "knowledgeable about equities, bonds, commodities." (*Id*., pp. 41-42).

Q:      Okay. As I understand it, you met with David Neuhauser, he came into the office?
A:      Yes.
Q:      Tell me what you can remember about the meeting.
A:      David Neuhauser was a very knowledgeable about equities, bonds, commodities. He was very self-confident. He did not need investment advice.
Q:      He told me, solicit exactly what the buyer to sell. He would call every

morning. Typically; he wanted a short stock, around $4,000 shares of stock, and cover his position the same day.

      A:     I would have to make calls to the short desk to make sure that we had stock available for him to short, so I would call him a very sophisticated trader. (*Id.*).

**ANSWER:**     Defendants admit only that this was Stelzner's testimony, but they dispute that his testimony, by itself establishes any undisputed facts. Defendants also dispute that Wachovia's practice of quoting at length from depositions complies with L.R. 56.1(a), and the requirement that the statement of facts consist of "short numbered paragraphs."

26.     In 1996, Mr. Neuhauser started clerking for Mr. Greenblatt. (Ex. 8, D. Neuhauser Dep. Tr., pp. 17, 20).

      Q:     And after you stopped going to school in 1996, your next - your first employer, I believe, was the Chicago Stock Exchange; is that correct?
      A:     Correct.

***

      Q:     Did you ever work for Leon Greenblatt?
      A:     Yes.
      Q:     Did you ever work for him as a clerk?
      A:     Yes. That was my initial job, by the way. My initial job was - you know, I met Mr. Greenblatt through the floor of the exchange, and eventually received a job with South Beach Securities. (*Id*)

**ANSWER:**     Admitted.

27.     In 1997, Mr. Neuhauser became an employee of South Beach Securities, Inc. (*Id*. at pp. l7, 20).

**ANSWER:**     Admitted.

28.     Despite the fact that Mr. Neuhauser was employed by South Beach, and he never worked for Loop or NOLA, nonetheless he opened two margin accounts at Wachovia under the "Loop Corp." and "NOLA, LLC" names. (*Id*. at pp. 17,20, 138-142).

      Q:     Going back to Ex. 10. Can you explain to me how it is that you came to sign these documents?
      A:     I don't know.

10

Q:      Were you asked to sign these documents -let me ask that question. Did someone ask you to sign the documents that are attached as Ex. 10.

A:      Yes.

Q:      Who?

A:      I have no idea.

Q:      You have no idea who asked you to sign them?

A:      No. Could have been the brokerage firm. I have no idea.

Q:      But you're not employed by Nola, correct?

A:      No.

Q:      And you were never employed by Nola.

A:      No.

Ms. Sharp: Objection, asked and answered.

Q:      I'm sorry the answer was a little unclear. Were you ever employed by Nola?

A:      No.

Q:      So you're basically saying that someone from Prudential asked you to open up this account on behalf of Nola.

Q:      Why would they do that if you weren't employed with Nola?

Mr. Wickert: Objection to the form of the question.

A:      I'm suggesting that obviously someone from Prudential supplied me with this agreement and I signed it.

Q       Why are you signing it if your are not employed by Nola?

Mr. Wicket: [sic]  Objection to the form of the question.

Ms. Sharp: Objection to the form, asked and answered, argumentative.

Mr. Naisbitt: I join in that objection.

A:      They supplied me with a document. I had obviously accounts open at Prudential. If they asked for something, I usually complied with them.

Q:      So if Prudential sends you an account form on behalf of a company that you are not associated with at all, you're going to sign it?

Mr. Naisbitt: Objection, argumentative.

Ms. Sharp: Objection, asked and answered.

A:      Not necessarily.

Q:      So then this Nola account, is it your personal account?

A:      No.

Q:      Well, who [sic] account is it?

A:      I have no idea. (*Id*. at p. 138-142).

**ANSWER:**      Admitted in part and disputed in part.  Defendants dispute the argumentative nature

of the first two clauses in this paragraph.  Defendants admit that Neuhauser, as an

agent for Loop and NOLA, opened the two margin accounts.  Defendants dispute

that Wachovia has accurately set forth the testimony and objections at pp. 138-142

11

of the  Neuhauser Dep. Tr., Wachovia Ex. 8, but admit that pp. 138-142 of the

Transcript  accurately sets forth the testimony and objections.  Defendants also

dispute that Wachovia's practice of quoting at length from depositions complies with

L.R.  56.1(a),  and  the  requirement  that  the  statement  of  facts  consist  of  "short

numbered paragraphs."

29.    On or about September 28, 2000, Mr. Neuhauser opened a margin account at Wachovia in the name of "Loop Corp." (Ex. 9, Def.'s Dep. Ex. 12; Ex. 8, D. Neuhauser Dep. Tr., p. 97).

**ANSWER:**    Admitted.

30.    Neuhauser opened the account at the direction of Mr. Greenblatt. (Ex. 8, D. Neuhauser Dep. Tr., pp. 97, 129).

> Q:    So I don't understand why you then decided to open the account in the name of Loop Corp.
> A:    Oh, I believe Mr. Greenblatt wanted an account opened. And like I said, the broker specifically at the time who was my broker, you know, mentioned it [sic] me that, you know, do you know anyone. You know, would ask me at different points did I know anyone who wanted to open an account. When Mr. Greenblatt suggested at some point he wanted to open an account, I think it came up that, hey, maybe we should open an account here. (*Id*. at p. 97-8).
> Q:    So when you did open the account at Prudential in the name of Loop Corp., that was with Mr. Greenblatt's prior authorization, correct?
> A:    Yes. (*Id*. at 98-9).

**ANSWER:**    Admitted.

31.    When Mr. Neuhauser opened the account, he was required to provide certain information regarding the investment experience and financial status of Loop Corp. (Ex. 9, Def.'s Dep. Ex. 12; Ex. 10, D. Damrow Dep. Tr., pp. 169-174; Ex. 11, E. Niemann Dep. Tr., pp. 140-141; Ex. 7, K. Stelzner Dep. Tr., pp. 170-174).

**ANSWER:**    Disputed.   Neuhauser denies making the alleged representations.  (D. Ex. 1,

Neuhauser Affidavit at ¶¶ 4-6).  Damrow and Niemann have no personal knowledge

concerning the opening of the Loop account, and thus have no knowledge as to what

representations were made or who made them.  (Wachovia Ex. 10, Damrow Dep. 35-

12

36.  Wachovia Ex.11, Niemann Dep. at 15-17).  Damrow has never had a conversation with Neuhauser.  (Wachovia Ex.10, Damrow Dep. at 23 ).  Niemann's only conversations with Neuhauser did not concern the opening of the Loop or NOLA accounts.  (Wachovia Ex. 11, Niemann Dep at 16-19).  Except for his signature, Stelzner's handwriting does not appear on the Wachovia Exhibit 9, the Loop account intake form. (Wachovia Ex. 7, Stelzner Dep. at 48-49).  Stelzner does not remember any conversations with Neuhauser concerning the net worth or annual revenues of Loop.  (Wachovia Ex. 7, Stelzner Dep. at 122-123).  Stelzner can only remember a conversation he had with Greenblatt concerning Loop after the opening of the Loop account.  (Wachovia Ex. 7, Stelzner Dep. at 50-52, 122).

32.  Doug Damrow, Wachovia's branch manager from January of 1999 until April of 2001, provided the following testimony.

> Q:    When an account is set up at Prudential, does Prudential rely in the information that is provided to it by its customers in deciding whether to allow that customer to trade?
> A:    Yes.
> Q:    And does Prudential rely on that information that is provided by the customers in deciding whether to allow that customer to trade on margin?
> A:    Yes.
> Q:    And would it be fair to say that Prudential when it is allowing a customer to trade, it's assuming that the information that is provided to it by the customer is true and correct?
> A:    Absolutely.
> Q:    And Prudential would not be in a position to always determine or guess what a client's or customer's motivations or conduct is?
> Mr. Curley: Objection to form.
> Mr. Naisbitt: I join in the objection.
> Ms. Sharp: I do too.
> A.    True.
> Q.    And if a customer withholds information, was there any mechanism in place at the time at Prudential to know whether or not everything the customer is saying is true?
> Mr. Curley: Objection. Form of the question and foundation.
> Mr. Naisbitt: I join in the objection.

<u>Ms. Sharp</u>: I do as well.

     A.     Not that I was aware of.

     Q.     Now, you looked at Exhibits 12 and 15 which are the new account statements for Loop and NOLA. Do you recall looking at those?

     A.     I do.

     Q.     Do you recall there is various categories of information, I'm not going to go through them all, where the customer is providing that information to Prudential?

     A.     Yes.

     Q.     And that's not information that Prudential is ascertaining or determining on its own?

<u>Mr. Curley</u>: Objection. No foundation.

<u>Ms. Sharp</u>: Objection. No foundation. Calls for speculation.

<u>Mr. Naisbitt</u>: I join in those objections.

     A.     That is accurate.

     Q.     So if, for example, there is a reference under client's investment experience and it says "equity ten years, bonds ten years, options ten years, futures ten years, mutual funds ten years," and I'm referring to Exhibit 12 for loop [sic], that's information that would have had to come from the customer?

<u>My. Naisbitt</u>: Objection. Lack of foundation.

     A.     Yes.

<u>My. Curley</u>: Same objection.

     Q.     And would be same hold true for the customer's net worth?

<u>Mr. Naisbitt</u>: Same objection.

<u>Mr. Curley</u>: Same objection.

     A.     Yes.

     Q.     Now, if Loop had come into Prudential and said that it was just a real estate holding company whose assets were encumbered and it did not have ten years of trading experience, can you say whether Prudential would have allowed Loop to trade as it did on margin?

<u>Mr. Naisbitt</u>: Objection. Speculative.

<u>Mr. Curley</u>: Incomplete hypothetical and no foundation. Requires speculation.

     A.     They probably would not have allowed it.

     Q.     Okay. Now you were the branch manager. We've already established that.

     A.     Yes.

     Q.     And is it fair to say that you sitting here today had knowledge as to what Prudential would or would not have done in the year 2000-2001 with respect to customers looking to open new accounts.

          Let me rephrase it. I'm asking you these questions with respect to customers that might be opening accounts at Prudential, correct?

     A.     Yes.

     Q.     And you were the branch manager in 2001 for part of the year?

     A.     Yes.

       Q.     And would it be fair to say that as you sit here today you have an understanding of what Prudential would or would not have done in 2000 and 2001 if presented with the various scenarios I've presented?

Mr. Curley: Object to the form of the question.

       A.     Yes, I have an understanding.

       Q.     Now, if you knew that a customer had a number of brokerage accounts at other firms and was using those accounts to trade high concentrations of one stock, is that something that would be of concern to Prudential?

       A.     Yes.

       Q.     Why?

       A.     Potential violations of various regulations by the SRO's. Also our concern for the possibility of the customer driving the stock - price of the stock up and then wishing to get out and having no buyers to buy the stock. (Wachovia Ex. 10, Damrow Dep. Tr., pp. 169-174).

**ANSWER:**      Admitted in part and disputed in part. Defendants admit only that this was

Damrow's testimony, but they dispute that his testimony, by itself, establishes any

undisputed facts. Defendants also dispute that Wachovia's practice of quoting at

length from depositions complies with L.R. 56.1(a), and the requirement that the

statement of facts consist of "short numbered paragraphs." It is disputed that

Damrow was the branch manager of the Deerfield branch beginning in January 1999.

Damrow was not the branch manager of Deerfield until April, 2001, after the Loop

and NOLA accounts were opened. (Wachovia Ex. 10, Damrow Dep. at 11-12).

There is no factual basis for Damrow's testimony as he had no personal knowledge

concerning the opening of the Loop or NOLA accounts. (Wachovia Ex. 10, Damrow

Dep. at 35-37). Damrow has also denied having any knowledge of any fraud

concerning the Loop or NOLA accounts. (Wachovia Ex. 10, Damrow Dep. at 41-

43). Damrow's handwriting does not appear on the Loop account intake form, and

he does not know whether he had ever seen the form. (Wachovia Ex. 10, Damrow

Dep. at 47-48).

33. Elizabeth Niemann, an employee at Wachovia for 19 years, including its administrative manager for the last 12 years, testified to the following:

Q:  Okay. And I want to show you what we previously marked as Exhibit 15, which is the account opening statement for Nola. I'd ask you to look to the client profile section on the left-hand side.

A:  Uh-huh.

Q:  And does that reflect under net earnings a 13?

A:  To tell you the truth, it's very fuzzy. It looks like a 12.

Q:  Okay. And if it's a 12, what would be the corresponding code or representation with respect to net worth from the code sheet?

A:  Are you stating the liquid net worth or are you talking about the earnings?

Q:  Starting out with - well, let's start out with the net earnings.

A:  Okay.

Q:  And the net earnings reflect a 12?

A:  Correct. That's what I see.

Q:  And on the code sheet, what would a 12 relate to?

A:  That would be numbers between 10 million and $24,999,999.

Q:  Okay. And then what's the next code that you recognize?

A:  Right under there?

Q:  Correct,

A:  It says stockholders equity. That's also listed as a 12, which would be the same information.

Q:  Okay. And then what does it say under "Stated net worth"?

A:  It says 13.

Q:  And what would that relate to on the code sheet?

A:  Greater than 25 million.

Q:  Okay. And then is there a number nest [sic] to stated liquid net worth?

A:  Yes.

Q:  And what was - what would that be?

A:  It says 13, which is also greater than 25 million.

Q:  Okay. So based on this sheet, was it represented to Prudential when the Nola account was opened that the stated net worth and stated liquid net worth of Nola was in excess of $25 - $24 million.

Mr. Wickert: Objection, lack of foundation.

Mr. Naisbitt: I join in the objection.

A:  Yes, it would be over - for 13, it would be over 25 million.

Q:  Okay. Now, the information that appears on these intake open sheets, whether it's for the Nola account or the Loop account, is all that information obtained from the customer?

A:  Yes.

Q:  And is it relied upon by Prudential in the opening of the accounts?

A:  Yes.

16

Q:     And is there an expectation by Prudential that is the customer says, for example, that its net worth or its liquid net worth is in excess of $10 million or in excess of $25 million that that is, in fact, true?

A:     Yes.

Q:     And does Prudential expect that its customers provide truthful and accurate information?

A:     Yes.

Q:     Now, if a customer such as Loop ... provide information that they have been trading equities for 10 years and bonds for 10 years and options for 10 years and futures for 10 years and mutual funds for 10 years as reflected on Exhibit 50, is that something that Prudential relies on in opening the accounts?

A:     Yes.

Q:     And is that something that Prudential expects to be true?

A:     Yes. (Ex. 11, E. Niemann Dep. Tr., pp. 140-141).

**ANSWER:**     Admitted in part and disputed in part. It is admitted that Niemann was the administrative manager of the Deerfield branch office. Defendants further admit only that this was Niemann's testimony, but they dispute that her testimony, by itself, establishes any undisputed facts. Defendants also dispute that Wachovia's practice of quoting at length from depositions complies with L.R. 56.1(a), and the requirement that the statement of facts consist of "short numbered paragraphs." There is no foundation or factual basis for Niemann's testimony as she has no personal knowledge concerning the opening of the Loop or NOLA accounts. (Wachovia Ex. 11, Niemann Dep. at 15-17). She admits she did not personally have any role in the opening of the Loop or NOLA accounts. (Wachovia Ex. 11, Niemann Dep. at 15). Niemann also testified that Wachovia had no written guidelines for the opening of a customer's account. (Wachovia Ex. 11, Niemann Dep. at 46).

34.     Kris Stelzner, a financial consultant for Wachovia from 1999 to 2001, also testified to the information provided to Wachovia by Mr. Neuhauser:

Q:     Do you recall that Miss Sharp asked you to look at the new business account records for Loop and Nola. Loop is No. 12. I think Nola is No. 15.

A:     Which form?

17

Q:      (indicating).

A:      Yes.

Q:      This is No. 12, and that's the information on the form with respect to the customer?

A:      That's correct.

Q:      Okay. Now, is it your understanding that all of the information on the form–this is Exhibit 12 and I'll show that to you, and Exhibit 15, which is a similar document for Nola, is provided by the customer to Prudential?

A:      Absolutely.

Mr. Wickert: Objection, foundation.

Mr. Naisbitt: I join in the objection.

Q:      To the best of your knowledge, the information on Exhibits 12 and Exhibit 15, which we've referred to as the intake forms, that's not information that is created independently by Prudential, is it.

A:      No.

Q:      And does Prudential assume that when that information is provided that it's truthful and accurate?

Mr. Naisbitt: I object to the form of the question and its lack of foundation.

A:      Absolutely.

Q:      Now, I ask you to take a look at Exhibit 12 in the second section there it says "Client Profile." And you may want to grab the magnifying glass. Do you see where it says "client's investment experience"?

A:      Yes.

Q:      And do you recall that Miss Sharp asked you whether those 10s that are thereafter, equities, bonds, options, futures, mutual funds, is a code or the years that the customers was experienced in those fields?

A:      It would relate to the number of years verses [sic] a code.

Q:      Okay, And that - and your prior testimony was you didn't know and it could be a code. Do you see where it says "number of years in" and then it says colon and then it's got each of those categories?

A:      Yeah. I didn't see - I see that. I didn't see the client's investment experience above it. So that would naturally pertain to years, 10 years in equities, 10 years in bonds, 10 years in options, futures, and 10 years in mutual funds. I thought it referenced a code before so. (Ex. 7, K. Stelzner Dep. Tr., pp. 171-174).

**ANSWER:**     Admitted in part and disputed in part. Defendants admit only that this was Stelzner's

testimony, but they dispute that his testimony, by itself, establishes any undisputed

facts. Defendants also dispute that Wachovia's practice of quoting at length from

depositions complies with L.R. 56.1(a), and the requirement that the statement of

facts consist of "short numbered paragraphs." Mr. Stelzner did not testify that the

18

information on the forms was provided by Neuhauser. (Wachovia Ex. 7, Stelzner Dep. at 171-174). Stelzner does not remember any conversations with Neuhauser concerning the net worth or annual revenues of Loop. (Wachovia Ex. 7, Stelzner Dep. at 122-123). Stelzner also testified that he did not personally decide to extend credit to Loop or NOLA, and thus his testimony has no foundation. (Wachovia Ex. 7, Stelzner Dep. at 85-86 ). Further, when asked whether he was assigned the duty of determining whether Loop or NOLA should be allowed to trade on margin, he testified "[a]bsolutely not." (Wachovia Ex. 7, Stelzner Dep. at 85). Neuhauser denies making the statements. (D. Ex. 1 at ¶¶ 4-6; 8-10, Neuhauser Affidavit).

35. This information was memorialized on Wachovia's new account intake form. (Ex., 9, Def.'s Dep. Ex. 12; Ex., 10, D. Damrow Dep. Tr., pp. 169-172; Ex. 11, E. Niemann Dep. Tr., pp. 140-141; Ex. 7, K. Stelzner Dep. Tr., pp. 170-174).

**ANSWER:** Disputed. The phrase "this information" is too vague and lacking in material specificity to respond to adequately. To the extent that Wachovia is relying on the testimony set forth in paragraphs 32-34 above, Neuhauser and Greenblatt adopt their responses thereto. Neuhauser disputes making these representations. (D. Ex. 1 at ¶¶ 4-6, Neuhauser Affidavit).

36. Neuhauser made the following representations:
- Loop Corp. had at least 10 years of investment experience in equities, bonds, options, futures, and mutual funds;
- Loop Corp. had net earnings of between $10,000,000 and $24,999,999;
- Loop Corp.'s net worth was between $10,000,000 and $24,999,999; and
- Loop Corp.'s liquid net worth was between $10,000,000 and $24,999,999. (Ex. 12, Def.'s Dep. Exs. 15, 50, 51; E. Niemann Dep. Tr. at pp. 140-141).

19

**ANSWER:**    Disputed.  Neuhauser denies making the representations.  (D. Ex. 1 at ¶¶ 4-6, Neuhauser Affidavit) (Wachovia Ex.8, Neuhauser Dep. at 130-132).  There is no foundation or factual basis for Niemann's testimony as she has no personal knowledge concerning the opening of the Loop or NOLA accounts. (Wachovia Ex. 11, Niemann Dep. at 15-17).  She also admits she did not personally have any role in the opening of the Loop or NOLA accounts.  (Wachovia Ex. 11, Niemann Dep. at 15.)   Niemann also testified that Wachovia had no written guidelines for the opening of a customer's account.  (Wachovia Ex. 11, Niemann Dep. at 46).

37.    In reality, Loop Corp. was not incorporated until September 12, 1997, approximately three years before Mr. Neuhauser opened the trading accounts at Wachovia. (Ex. 2, RS 2955-57).

**ANSWER:**    Admitted in part and disputed in part.  The statement is disputed to the extent that the phrase "in reality" indicates that Neuhauser supposedly represented that Loop had made the representation in the previous ¶ 36, which he denies.  (D. Ex. 1 at ¶ 6 Neuhauser Affidavit).

38.    Five months later, Mr. Neuhauser opened a margin account at Wachovia in the name of "NOLA, LLC," (Ex. 14, Pl.'s Dep. Ex. 10). Neuhauser executed a Security Agreement on behalf of Loop that allowed Loop to open a trading account at Wachovia. (Ex. 14, Pl.'s Dep. Ex. 7). Neuhauser signed as "agent for Loop" the Limited Power of Attorney document. (Ex. 14, Pl.'s Dep. Ex. 9). Neuhauser executed the "Partnership Account Agreement" on behalf of NOLA. (Ex. 14, Pl.'s Dep. Ex. 10). Neuhauser drafted letters to Wachovia [sic] requested it to "except checks from Loop Corp. account ... to be deposited into the Nola account ...."  (Ex. 14, Pl.'s Dep. Ex. 11).

**ANSWER:**    Admitted in part and disputed in part.  It is disputed that Plaintiff's Dep. Exs. 7 and 9 had anything to do with the opening of the NOLA account as they clearly relate to the Loop account.  (Wachovia Ex. 14, Plaintiff's Dep. Ex. 7 and 9).  It is also disputed that Neuhauser signed Plaintiff's Dep. Ex. 14 as it was signed by Andrew Jahelka.  (Wachovia Ex. 14, Plaintiff's Dep. Ex. 9).  It is also disputed that

Neuhauser drafted Plaintiff's Dep. Ex. 11. (Wachovia Ex. 8, Neuhauser Dep. at 144-146).

39.     Once again, this was at the direction of Mr. Greenblatt, in his capacity as the sole employee and officer of NOLA's manager. (Ex. 15, Individual Defendants' Supplemental Answers and Objections to Plaintiffs First Set of Interrogatories, p. 9; Ex. 8, D. Neuhauser Dep. Tr., pp. 155-156; Ex. 1, Greenblatt Dep. Tr., pp. 86-89).

**ANSWER:**     Admitted in part and disputed in part.  The statement is disputed in that the phrase

"this was at the direction of Mr. Greenblatt" is vague, ambiguous and lacking in

meaningful specificity.  To the extent that paragraph 39 is referring to the events

described in paragraph 38, Neuhauser and Greenblatt adopt their response thereto as

if fully set forth in response to this paragraph 39.

40.     As was the case with the Loop account, Mr. Neuhauser was required to provide certain information regarding the investment experience and financial status of NOLA, LLC. (Ex. 9, Def.'s Dep. Ex. 12; Ex. 10, D. Damrow Dep. Tr., pp. 169-172; Ex. 11, E. Niemann Dep. Tr., pp. 140-141; Ex. 7, K. Stelzner Dep. Tr., pp. 170-174).

**ANSWER:**     Disputed.  Damrow and Niemann have no personal knowledge concerning the

opening of the NOLA account, and thus have no knowledge as to what alleged

representations were made, who allegedly made them, or to whom they were

allegedly made, if anyone.  (Wachovia Ex. 10, Damrow Dep. at 35-36;  Wachovia

Ex. 11, Niemann Dep. at 15-17).  Damrow has never had a conversation with

Neuhauser.  (Wachovia 10, Damrow Dep. at 23 ).  Niemann's only conversations

with Neuhauser never addressed the opening of the Loop or NOLA accounts.

(Wachovia Ex. 11, Niemann Dep. at 16-19).  Except for his signature, Stelzner's

handwriting does not appear on the NOLA account intake form,  (Wachovia Ex. 7,

Stelzner Dep. at 105-06), and he does not recall completing the form.  (Wachovia Ex.

21

7, Stelzner Dep. at 107). At his deposition, Stelzner could not recall what the codes

on the form meant. (Wachovia Ex. 7, Stelzner Dep at 106-107).

41.     This information was memorialized on a new account intake form. (Ex. 9, Def.'s Dep. Ex. 12; Ex. 10, D. Damrow Dep. Tr., pp. 169-172; Ex. 11, E. Niemann Dep. Tr., pp. 140-141; Ex. 7, K. Stelzner Dep. Tr., pp. 170-174).

**ANSWER:**     Disputed. The phrase "this information" is too vague to respond to adequately. To

the extent that Wachovia is relying on the testimony set forth in paragraph 40 above

(or, in other unspecified paragraphs), Neuhauser and Greenblatt adopt their responses

thereto as if fully set forth in this paragraph 41. Neuhauser disputes making these

representations. (D. Ex. 1 at ¶¶ 8-10, Neuhauser Affidavit).

42.     Neuhauser made the following representations:

  •     NOLA, LLC. had at least 15 years of investment experience in equities, bonds, options, futures, and mutual funds;
  •     NOLA, LLC had net earnings of between $10,000,000 and $24,999,999;
  •     NOLA, LLC's net worth was in excess of $25,000,000; and
  •     NOLA, LLC's liquid net worth was in excess of $25,000,000. (Ex. 12, *Cf* Def.'s Dep. Exs. 15, 50, 51; Ex. 11, E. Niemann Dep. Tr. at pp. 140-141).

**ANSWER:**     Disputed. Neuhauser denies making the representations. (D. Ex. at ¶ 8-10,

Neuhauser Affidavit). There is no foundation or factual basis for Niemann's

testimony as she has no personal knowledge concerning the opening of the Loop or

NOLA accounts. (Wachovia Ex. 11, Niemann Dep. at 15-17). She also admits she

did not personally have any role in the opening of the Loop or NOLA accounts.

(Wachovia Ex. 11, Niemann Dep. at 15.) Niemann also testified that Wachovia had

no written guidelines for the opening of a customer's account. (Wachovia Ex. 11,

Niemann Dep. at 46).

43. Based upon the information that Mr. Neuhauser provided regarding the investment experience and financial status of Loop Corp. and NOLA, LLC, Wachovia allowed the accounts to be opened, and further allowed the accounts to trade on margin. (Exs. 9, 12 - Loop and NOLA's Intake Forms).

**ANSWER:** Disputed. Wachovia provides no record cite to respond to other than the account

intake forms, which on their face do not indicate whether or what Wachovia relied

on. To the extent that Wachovia is relying on the testimony set forth in paragraphs

32-36 and 40-42 above (or in other unspecified paragraphs), Neuhauser and

Greenblatt adopt their responses thereto as if fully set forth in this paragraph 43.

Neuhauser denies making the representations. (D. Ex. 1 at ¶¶ 4-6, 8-10, Neuhauser

affidavit.)

44. Moreover, NOLA, LLC had been administratively dissolved, and was a legal non-entity when Mr. Neuhauser opened the account in February 2001. (Ex. 4, Certificate of Dissolution).

**ANSWER:** Admitted in part and disputed in part. Neuhauser and Greenblatt dispute the legal

conclusion that the dissolution of NOLA, LLC meant that it was a "legal non-entity."

45. Once the Loop and NOLA accounts were opened, the Individual Defendants used them to acquire substantial numbers of shares of stock in Health Risk Management, Inc. ("HRMI") on margin. (Ex. 13, C000l-87; RS 947-949).[4]

**ANSWER:** Disputed. Wachovia's Ex. 13 reflects that Loop and NOLA acquired shares of

HRMI, and not any of the Individual Defendants. (Wachovia Ex. 13).

46. The Loop and NOLA accounts were used almost exclusively for that purpose. (*Id.*).

**ANSWER:** Admitted in part and disputed in part. It is disputed because the phrase "that

purpose" is too vague ambiguous and lacking in meaningful specificity to adequately

respond.

---

[4](Wachovia Footnote) Wachovia attached to its SSUF documents bates numbered C000l-C0002 as a representative sample of the documents bates numbered C0001-00087; RS 947-949.

47.     On May 22, 2001, the NASDAQ halted trading in HRMI, and the value of the Loop and NOLA accounts fell into debit balances. (*Id.*).

**ANSWER:**     Admitted.

48.     When Greenblatt spoke with Wachovia's representatives he treated the Loop and NOLA accounts as the information [sic] contained therein belong to him - not the entities. After the accounts had been opened, Greenblatt told Wachovia his net worth, not Loop or NOLA's, and when the NASDAQ halted trading of HRMI stock and the Loop and NOLA accounts fell into substantial debit position, Greenblatt told Wachovia that he would make good on Loop and NOLA's debt. (Ex. 7, K. Stelzner Dep. Tr., p. 51); (Ex. 10, D. Damrow Dep. Tr., P. 145-146).

**ANSWER:**     Disputed.  Greenblatt denies making the statements.   (D. Ex. 2 at ¶ 11 Greenblatt

Affidavit).  It is also disputed in that Stelzner testified that he specifically asked

Greenblatt about his "financials personally." (Wachovia Ex. 7, Stelzner Dep. at 51).

49.     Defendants incurred margin debt in the Loop account totaling $1,885,751.44. (Ex. 13, C000l-87; RS 947-949).

**ANSWER:**     Disputed.  Loop incurred margin debt and not Neuhauser and Greenblatt or either of

the two other Individual Defendants.  (Wachovia Ex. 13).

50.     Defendants incurred margin debt totaling $1,098,459.90 in the NOLA account. (Ex. 13, C000l-87; RS 947-949).

**ANSWER:**     Disputed. NOLA incurred margin debt and not Neuhauser and Greenblatt or either

of the other two Individual Defendants. (Wachovia Ex. 13).

51.     Defendants were unable to repay Wachovia out of "Loop" or "NOLA" funds. (Ex. 13 C000l-87; RS 947-949).

**ANSWER:**     Disputed.  Neuhauser and Greenblatt were not personally liable on the accounts and

neither were the other two individual defendants.  (Wachovia Ex. 13).

52.     Consequently, Wachovia obtained NYSE Arbitration Awards against Loop and NOLA which have been reduced to judgments in the amount of $2,478,418.80 and $1,358,847.73, respectively (Ex. 16, Sept. 22, 2005 Judgment Order; Ex. 17, Feb. 16, 2006 Judgment Order).

**ANSWER:**     Admitted in part and disputed in part. The statement is disputed to the extent that the use of the word "consequently" implies (i) either Neuhauser or Greenblatt are personally liable for the judgments against Loop and NOLA; or (ii) that any previous disputed fact enabled Wachovia to obtain any such arbitration awards. (Wachovia Ex. 16)

53.     Wachovia has suffered more than $3.8 million in damages as a result of the false representations provided by Neuhauser and Greenblatt. *Id.*

**ANSWER:**     Disputed. Neither Neuhauser or Greenblatt made any false representations to Wachovia (D. Ex. 1 ¶¶ 4-6, 8-10, Neuhauser Affidavit; D. Ex. 2, ¶¶ 4-5, 7-8, Greenblatt Affidavit) Further, even assuming, <u>arguendo,</u> that the misrepresentations occurred, any loss suffered by Wachovia was the result of the halt in trading of the HRMI stock and not as a result of any alleged misrepresentation. As Wachovia itself asserts: "On May 22, 2001, the NASDAQ halted trading in HRMI, and the value of the Loop and NOLA accounts fell into debit balances." (See Wachovia's Amended Statement of Uncontested Facts ¶ 47). There is no connection between any actions of the Defendants and the halt in trading in HRMI stock. In fact, in 2005, after this lawsuit was filed, a trial was held in the United States Bankruptcy Court, District Of Minnesota on a claim brought by Loop that it had been defrauded by the management of HRMI. Bankruptcy Judge Robert J. Kressel found that Loop was defrauded by HRMI and ruled that Loop was entitled to a claim of $3 million in the HRMI bankruptcy as a result. (D. Ex. 4, Judgment and Memorandum Opinion and Order, dated January 13, 2005.)

54.     Plaintiff Wachovia Securities, LLC ("Wachovia") is a Delaware limited liability

25

company with its principal place of business in Richmond, Virginia. Wachovia Securities, LLC is wholly owned by Wachovia Securities Financial Holdings, LLC, also a Delaware limited liability company with its principal place of business in Richmond, Virginia. In turn, Wachovia Securities Financial Holdings, LLC is 62% owned by Wachovia Securities Holdings, LLC (a Delaware limited liability company with its principal place of business in Richmond, Virginia) and 38% owned by Prudential Securities Group, Inc. (a Delaware corporation with its principal place of business in New York, New York). Finally, Wachovia Securities Holdings, LLC is wholly owned by Wachovia Corporation, a North Carolina Corporation with its principal place of business in Charlotte, North Carolina. (Pl.'s Revised Second Am. Compl. 8 - *DK 209*); (Defs.' Answer to Revised Second Am. Compl. at 8 - *DK 227*); (Corp. Defs." SSUF 1 - *DK 223*); (Individual Defs.' SSUF 1 - *DK 226*).[5]

**ANSWER:**     Admitted.


57.     Defendant David Neuhauser is an individual resident and citizen of Illinois. (Defs.' Answer to Revised Second Am. Compl. at 9 - *DK 227*).

**ANSWER:**     Admitted.


56.     Defendant Andrew A. Jahelka is an individual resident and citizen of Illinois. (Defs.' Answer to Revised Second Am. Compl. at 10 - *DK 227*).

**ANSWER:**     Admitted.


57.     Defendant Richard O. Nichols is an individual citizen of the United Kingdom and a permanent resident alien of the United States, who is domiciled in Illinois. (Defs.' Answer to Revised Second Am. Compl. at 11 - *DK 227*).

**ANSWER:**     Admitted.


58.     Defendant Leon A. Greenblatt III is an individual resident and citizen of Illinois, and resides at [redacted]. (Defs.' Answer to Revised Second Am. Compl. at 12 - *DK 227*).

**ANSWER:**     Admitted.  Defendant Greenblatt has raised confidentiality and privacy concerns

regarding his personal residence address.  Greenblatt's personal residence address

is not material or relevant and Wachovia includes it only for purposes of harassing

Greenblatt and his family.

---

[5](Defendants' footnote) "*DK*" is used by Wachovia and the Defendants to refer to the electronic docket that is kept as part of the Northern District's ECF system.

59.     Defendant Banco Panamericano, Inc. is a South Dakota corporation with its principal place of business at 330 South Wells Street in Chicago, Illinois. (Defs.' Answer to Revised Second Am. Compl. at 13 - *DK 227*).

**ANSWER:**     Admitted.

60.     Defendant Loop Corp. is a South Dakota corporation with its principal place of business at 330 South Wells Street in Chicago, Illinois. (Defs.' Answer to Revised Second Am. Compl. at 14 *DK 227*).

**ANSWER:**     Admitted.

61. Defendant Loop Properties, Inc. is a South Dakota corporation with its principal place of business at 330 South Wells Street in Chicago, Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 15 - *DK 227*).

**ANSWER:**     Admitted.

62.     Defendant Scattered Corp. is a South Dakota corporation with its principal place of business at 330 South Wells Street in Chicago, Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 16 - *DK 227*).

**ANSWER:**     Admitted.

63.     This court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1331. (Defs.' Answer to Revised Second Am. Compl. at 20, 21 - *DK 227*); (Corp. Defs.' SSUF 10 -*DK* 223); (Individual Defs.' SSUF 10 - *DK 226*).

**ANSWER:**     Admitted in part and disputed in part.  It is disputed that jurisdiction under 28 U.S.C.

§1331 still remains after the dismissal of Wachovia's federal securities law claim.

64.     Venue is proper in this District under 28 U.S.C. § 1391(a)(2) and under 735 ILCS 5/19-104 because a substantial part of the events or omissions giving rise to the claims asserted herein arose in the Northern District of Illinois. (Defs.' Answer to Revised Second Am. Compl. at ¶ 22 - *DK 227*).

**ANSWER:**     Admitted.

## STATEMENT OF ADDITIONAL FACTS THAT
## REQUIRE DENIAL OF SUMMARY JUDGMENT

65.     Prudential Securities, Inc. ("PSI") brought fraud claims in its arbitration proceedings against Loop and NOLA on May 8, 2003.  In PSI's Statement of Claim, filed in the arbitration, it never  alleged any supposed fraud in relation to the Loop and NOLA account intake forms.  (D. Ex. 5, Statement of Claim).  Additionally, the Loop and NOLA account intake forms were not attached to the Statement of Claim.  (D. Ex. 5, Statement of Claim)

66.     Wachovia dismissed its fraud claims against Loop and NOLA without prejudice in the arbitration proceeding, and its judgments against Loop and NOLA were based solely upon breach of contract.  (D. Ex. 6, Wachovia's Motion to Voluntarily Dismiss.)

67.     The Loop and NOLA account intake forms were never attached as exhibits to Wachovia's First Amended Complaint, which was the operative pleading during discovery. (First Amended Complaint, *DK* 52).

68.     The first time the Loop and NOLA account intake forms were attached to a complaint by Wachovia was when Wachovia filed its Second Amended Complaint on April 3, 2007.  (Second Amended Complaint, *DK* 192).

69.     On May 3, 2007, this Court struck the Second Amended Complaint stating, in part, "I am not permitting you to amend your fraud count."  (D. Ex. 7, Transcript of Hearing at 19.)

70.     Wachovia's Revised Second Amended Complaint is the operative pleading in this proceeding.  The Loop and NOLA account intake forms are not attached as exhibits thereto, nor are they referenced in the pleading.  (Revised Second Amended Complaint, *DK* 209).

71.     In its answers to interrogatories, Wachovia never referenced the

28

account intake forms or the misrepresentations supposedly made on the forms when it described the alleged fraud in this case. (D. Ex. 8, Wachovia Supplemental Interrogatory Answers at 9-19.)

72. Fact Discovery in this case was closed on February 28, 2007. (December 6, 2006 Minute Order, *DK* 181).

73. Pursuant to an agreement between the parties, the last fact deposition in the case was of Elisabeth Niemann, who was deposed March 14, 2007. At that deposition, a legible (but still incomplete) copy of the Loop account intake form was produced for the first time. (Wachovia Ex.11, Niemann Dep. at 31-33). Niemann was able to get a copy by making a phone call to the Wachovia microfiche department. (Wachovia Ex. 11., Niemann Dep. at 31-33).

74. Prior to that time, the bottom of the Loop account intake form obscured the name of the Wachovia employees who signed it. (Wachovia Ex. 9). The newly produced Loop account intake form revealed for the first time that it had been signed by both Kris Stelzner and a Peter Cory (or Corey), an assistant branch manager of the Deerfield branch office. (Wachovia Ex. 12; Wachovia Ex.13, Niemann Dep. at 32.)

75. Wachovia has never identified Peter Cory as a person who had knowledge in any answers to interrogatories or in its Rule 26.1 disclosures. (D. Ex. 8, Wachovia Supplemental Interrogatory Answers; D. Ex. 9, Wachovia's Final Rule 26.1 Disclosure.)

76. Cory's name first came up at the deposition of Kris Stelzner. (Wachovia Ex. 7., Stelzner Dep. at 21-25.) Cory had told Stelzner he had been fired relating to his conduct in opening the NOLA account. (Wachovia Ex. 7, Stelzner Dep. at 21-25.) He was also identified as the boyfriend of Amy "Gopher" (actually Goder (Wachovia Ex. 11, Niemann Dep. at 19), who was Stelzner's assistant. (Wachovia Ex. 7, Stelzner Dep. at 49-50). Cory's role in the

29

opening of the Loop account or in approving the Loop account intake form was not addressed at the Stelzner deposition. (Wachovia Ex. 7).

77.     Goder also was never identified by Wachovia as a person with knowledge in its interrogatory answers or in its Rule 26.1 disclosures. (D. Ex. 8, Wachovia Supplemental Interrogatory Answers; D. Ex. 9, Wachovia's Rule 26.1 Final Disclosure.)

78.     No employee of Wachovia has ever been able to definitively identify the handwriting that appears on the bodies of the Loop and NOLA account intake forms. (Wachova Exhibit 7, Stelzner Dep. at 48-49; Wachovia Ex. 11, Niemann Dep. at 33, 58-59).

79.     The revised copy of the NOLA account intake form was not produced until March 28, 2007, a month after discovery was closed, when Wachovia's counsel, Gary Blackman, mailed a copy of the form to the Defendant's Counsel. (D. Ex. 10, 3/28/2007 Blackman letter). It appears that the NOLA account intake form was signed by Stelzner and Cory, although Defendants, due to the close of discovery, have not been able to take a deposition to confirm that. (D. Ex. 10, 3/28/2007 Blackman letter).

80.     Like the Loop account intake form, the NOLA account intake form that Wachovia had produced earlier was illegible, and among the items that were obscured were the identity of the two persons who signed it. (D. Ex. 11, NOLA intake form used at depositions).

81.     In its answers to interrogatories, Wachovia stated that the two persons who had participated in the decision to extend credit to Loop and NOLA were Stelzner and Damrow. (D. Ex. 8, Wachovia's Supplemental Interrogatory Answers No. 17 at 65). Stelzner denies participating in the decision to extend credit to Loop or NOLA. (Wachovia Ex. 7, Stelzner Dep. at 85-86). Damrow has no personal knowledge concerning the opening of the Loop or NOLA accounts. (Wachovia Ex.10, Damrow Dep. at 35-37).

82.     Niemann testified that the only person besides Stelzner and/or Goder who would have had to have seen the Loop and NOLA account intake forms (aside from administrative employees who would have input the information into Wachovia's computer system) before Loop and NOLA would have been allowed to trade on margin was the person signing the forms, in this case, Peter Cory.  (Wachovia Ex. 11, Niemann Dep. at 43-49).

83.     It was not the practice of Wachovia to forward copies of the account intake form to the margin/credit department which is located in New York City.  (Wachovia Ex. 11, Niemann Dep. at 46-47).  Whether the securities were marginable was a decision made by the Credit Department in New York City who did not look at the new account forms.  (Wachovia Ex. 11, Niemann Dep. at 46-47).

84.      At the time Niemann produced the legible Loop account intake form at her deposition, she produced a copy of a code form. (Wachovia Ex. 11, Niemann Dep. at 35-39). Niemann pulled a copy of the code form out of the files at the Deerfield office, but it was a code form that was used for retail as opposed to institutional accounts, such as the Loop and NOLA accounts.  (Wachovia Ex. 11, Niemann Dep. at 35)  The code form she produced was not from the Loop or NOLA files.  (Wachovia Ex. 11, Niemann Dep. at 35).  Even using the more legible form, Neimann was not able to definitively state who filled out the Loop account form. (Wachovia Ex. 11, Neimann Dep. at 38).

85.     A copy of the code form for institutional clients was not produced until March 28, 2007, a month after the close of discovery. (D. Ex. 10, March 28, 2007 Blackman letter).  The code form produced was not the "actual back of the Loop and NOLA account intake forms." (*Id.*)

31

86.     Until the production of the code form, Wachovia's employees could not interpret the Loop and NOLA account intake forms.  For instance, Stelzner could not interpret the codes on the account intake form.  (Wachovia Ex. 7, Stelzner Dep. at 65-66).  Thus, for example, Stelzner could not tell what the alleged net earnings of Loop Corp. allegedly were by looking at the codes.  (Wachovia Ex. 7, Stelzner Dep. at 66).

87.     Neither Neuhauser (D. Ex. 1, at ¶ 11, Neuhauser Affidavit) or Greenblatt (D. Ex. 2 at ¶ 9, Greenblatt Affidavit)  was shown a copy of the account intake form when the accounts were opened.  It was not the practice of Wachovia to show account intake forms to clients. (Wachovia Ex. 11, Niemann Dep. at 39).

88.     Wachovia has no manuals or guidelines concerning the extension of margin credit to clients.  (D. Ex. 8, Wachovia Supplemental Answer to Interrogatories ¶17 at 65; Wachovia Ex. 11, Niemann Dep. at 14).  Wachovia did not have any official training for its financial advisors in filing out the account intake forms.  (Wachovia Ex. 11, Niemann Dep. at 14).

89.     In 2005, after this lawsuit was filed, a trial was held in the United States Bankruptcy Court, District Of Minnesota on a claim brought by Loop that it had been defrauded by the management of HRMI.  Bankruptcy Judge Robert J. Kressel found that Loop was defrauded by HRMI and ruled that Loop was entitled to a claim of $3 million in the HRMI bankruptcy as a result.  (D. Ex. 4, Judgment and Memorandum Opinion and Order, dated January 13, 2005.)

Respectfully submitted,

Individual Defendants,
David Neuhauser and Leon A. Greenblatt, III


By: /s/ James W. Naisbitt
        Their Attorney




James W. Naisbitt (ARDC No. 6183543)
James W. Naisbitt, Ltd.
205 West Wacker Drive, Suite 1600
Chicago, IL 60606-1441
(312) 345-1056
Fax: (312) 236-3820


Dated: June 21, 2007

## <u>CERTIFICATE OF SERVICE</u>

I, James W. Naisbitt, an attorney, certify that I caused a copy of the foregoing **DEFENDANTS NEUHAUSER AND GREENBLATT'S LOCAL RULE 56.1(B)(3) RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT DEFENDANTS** to be electronically filed and I caused copies to additionally be served upon the person listed below electronically, on June 21, 2007.

Gary I. Blackman
Christopher S. Greismeyer
Adam Rome
Levenfeld Pearlstein, LLC
2 North LaSalle Street
Suite 1300
Chicago, IL 60602

Gregory J. Jordan
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, IL 60606

C. Philip Curley
John H. Wickert
Robinson Curley & Clayton, P.C.
300 South Wacker Drive
Suite 1700
Chicago, IL 60606

Elizabeth D. Sharp
330 South Wells Street
Suite 706
Chicago, IL 60606

By:     /s/ James W. Naisbitt