IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WACHOVIA SECURITIES, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 3082 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| DAVID NEUHAUSER, ANDREW A. | ) | |
| JAHELKA, RICHARD O. NICHOLS, LEON | ) | |
| A. GREENBLATT IIII, BANCO | ) | |
| PANAMERICANO, INC., LOOP CORP., | ) | |
| LOOP PROPERTIES, INC., and SCATTERED | ) | |
| CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Wachovia Securities, LLC ("Wachovia") brings a ten-count Revised Second Amended Complaint against Defendants, David Neuhauser ("Neuhauser"), Andrew A. Jahelka ("Jahelka"), Richard O. Nichols ("Nichols"), Leon A Greenblatt, III ("Greenblatt") (collectively "the Individual Defendants"), Banco Panamericano ("Banco"), Loop Corp. ("Loop"), Loop Properties, Inc. ("Loop Properties"), and Scattered Corp. ("Scattered") (collectively "the Defendants") seeking damages for common law fraud, breach of contract and all remedies available under the Illinois Uniform Fraudulent Transfer Act ("UFTA"). Wachovia also seeks a declaratory judgment that Neuhauser, Jahelka, Nichols, and Greenblatt (the "Individual Defendants") are jointly and severally liable for the obligations of their alter egos, Loop and NOLA, LLC ("NOLA").

Wachovia moves for Partial Summary Judgment against Neuhauser and Greenblatt. Neuhauser and Greenblatt moves to strike several paragraphs and two exhibits associated with Wachovia's Motion for Partial Summary Judgment. Banco, Loop, Loop Properties, and Scattered

(the "Corporate Defendants") and the Individual Defendants move for summary judgment against Wachovia on all counts of the Revised Second Amended Complaint.

For the reasons stated herein, Defendants' Motion to Strike Paragraphs 31-36 and 39-43 and Exhibits 9 and 12 of Wachovia's Amended Statement of Material Facts is granted. Plaintiff's Motion for Partial Summary Judgment is denied. The Individual Defendants' Motion for Summary Judgment as to Counts I and VI is granted. The Individual Defendants' Motion for Summary Judgment as to Counts II through V is denied as to Loop, Greenblatt, Jahelka, and Nichols, granted as to Loop and Neuhauser, and granted as to NOLA and the Individual Defendants. The Corporate Defendants' Motion for Summary Judgment as to Counts VII through X brought under the Illinois Uniform Fraudulent Transfer Act is denied. Additionally, the Individual Defendants' Motion to Bar Wachovia's New Fraud Claim is granted and the Corporate Defendants' Motion to Bar Alleged Fraudulent Conveyances not in the Complaint is denied.

## I.     **Background**

Wachovia is a lending and banking institution and a successor to Prudential Securities Incorporated [1] ("Prudential"). Prudential's customer debits became Wachovia's assets after a July 2003 merger. Pl. 56.1 Resp. ¶ 1.[2] Wachovia is a limited liability company and a voluntary contract

---

[1] Because Wachovia is Prudential's successor in interest, Prudential will also be referred to as Wachovia.

[2] Citations to Plaintiff's Response to Individual Defendants' Rule 56.1 Statement of Undisputed Material Facts have been abbreviated to "Pl. Resp. Ind. 56.1," citations to Plaintiff's Response to Corporate Defendants' Rule 56.1 Statement of Undisputed Material Facts have been abbreviated to "Pl. Resp. Corp. 56.1," and citations to Plaintiff's Reply to Defendants' Local Rule 56.1(b)(3)(c) Statement of Additional Facts in Opposition to Wachovia's Motion for Partial Summary Judgment have been abbreviated to "Pl. Rep. Def. 56.1(b)." Citations to Defendants Neuhauser and Greenblatt's Local Rule 56.1(b)(3) Response in Opposition to Plaintiff's Motion for Partial Summary Judgment have been abbreviated to "Neuhauser Resp. 56.1(b)," The Individual and Corporate Defendants' Replies to Wachovia's Local Rule 56.1(b)(3)(c) Statements of Additional Undisputed Materia Facts have been

creditor. Pl. Resp. Ind. 56.1 ¶ 31, 41. Neuhauser, at Greenblatt's direction, opened two trading accounts at Wachovia using two entities, Loop and NOLA. The Individual Defendants began acquiring HRMI stock through the Loop and NOLA accounts on margin, and in doing so, incurred a substantial margin debt. Subsequently, the NASDAQ halted trading of HRMI stock, the stock plummeted, and the Loop and NOLA margin accounts became due. After the margin call, Wachovia contends that the Individual Defendants looted Loop by transferring its assets to the Individual Defendants, insiders, and related entities making it impossible for Wachovia to collect on its $2,900,000 margin call. Wachovia contends that Loop and NOLA were shell corporations and that the Individual Defendants are liable for the unpaid margins either directly or as alter egos of the two entities.

## II. <u>Statement of Facts</u>

<u>Relationships between the Individual and Corporate Defendants</u>

Greenblatt, Jahelka, and Nichols either own, operate, or have an interest in a web of corporate entities including Loop, Scattered, Banco, and Loop Properties. Loop is a small, closely-held company incorporated on September 12, 1997 and owned by Greenblatt, Jahelka, and Nichols. Neuhauser Resp. 56.1(b) ¶¶ 1, 6. Loop's shareholders are Greenblatt, Jahelka, and Nichols. Neuhauser Resp. 56.1(b) ¶¶ 1-2. Its officers are Greenblatt (Secretary), Jahelka (President), and Nichols (Treasurer). Neuhauser Resp. 56.1(b) ¶ 2; Pl. Resp. Ind. 56.1 ¶ 34. Loop is a "holding company" and until September 2002, it held ownership interests in limited partnerships which in turn, owned various parcels of commercial real estate in Chicago. Neuhauser Resp. 56.1(b) ¶ 8. Loop operates out of the 7th Floor of 330 South Wells, Chicago, Illinois (the "Wells building").

---

abbreviated to "Ind. Rep. 56.1" and "Corp. Rep. 56.1", respectively.

Neuhauser Resp. 56.1(b) ¶ 7.  Neuhauser is Loop's "agent."  Neuhauser Rep. 56.1(b) ¶ 28.

NOLA is a small, closely-held company that was organized on July 27, 1994.  Neuhauser Resp. 56.1(b) ¶ 14.  NOLA's "members" are Greenblatt's, Jahelka's, and Nichols's fathers.  Pl. Resp. Ind. 56.1 ¶ 27.  NOLA's manager is Teletech Systems, Inc. ("Teletech").  Pl. Resp. Ind. 56.1 ¶ 27; Neuhauser Resp. 56.1(b) ¶ 17.  Teletech operates out of the Wells building.  Neuhauser Resp. 56.1(b) ¶ 17.  Teletech had the authority to manage NOLA's assets limited only by the provisions of the Limited Liability Company Act.  Neuhauser Resp. 56.1(b) ¶ 16.  Greenblatt was Teletech's sole officer and employee, and therefore, made day-to-day decisions on NOLA's behalf including whether NOLA would enter into trades.  Neuhauser Resp. 56.1(b) ¶ 16, 18.  Greenblatt, though never a shareholder of Teletech, acted at times as its Secretary during the relevant time period. Greenblatt became NOLA's registered agent on June 6, 2001.  *Id.*

Scattered is owned by Greenblatt, Jahelka and Nichols and also operates out of the Wells building.  Corp. Rep. 56.1 ¶ 26; Ind. Rep. 56.1 ¶ 13.  Loop Properties is a wholly-owned subsidiary of Loop.  Pl. Resp. Corp. 56.1 ¶ 20.  Loop Properties' officers and directors are Greenblatt (Secretary), Jahelka (President), and Nichols (Treasurer).  Corp. Rep. 56.1 ¶ 29.  Banco is wholly owned by one of Greenblatt's family trusts.  Neuhauser Resp. 56.1(b) ¶ 12.  Greenblatt is solely responsible for running Banco's day-to-day operations.  Corp. Rep. 56.1 ¶ 28.  When Loop deals with Banco, it does so through Greenblatt.  *Id.*  Banco operates out of the Wells building and its only employee is Greenblatt.  Neuhauser Resp. 56.1(b) ¶ 13; Ind. Rep. 56.1 ¶ 23.

Loop held an ownership interest in EZ Links Golf, Inc. ("EZ Links") when EZ Links was established.  Corp. Rep. 56.1 ¶ 40.  Greenblatt and Jahelka have an interest in EZ Links via their ownership of Loop.  Ind. Rep. 56.1 ¶ 27.

<u>Shared Office Space</u>

Loop, Loop Properties, Banco, Scattered, Loop Telecom, Resource Technology Corporation ("RTC"), and EZ Links operate out of the Wells building. Ind. Rep. 56.1 ¶¶ 13, 18, 20. Greenblatt, Jahelka and Nichols worked out of the Wells building and each had only one phone number. *Id*. Neuhauser described the 7th Floor of the Wells building as "a little cluster of offices" that are all "basically connected." Ind. Rep. 56.1 ¶ 18. Scattered rented the 7th floor suites from 200 West Partners, LLP. The general partner of 200 West Partners is 200 West Properties, Inc. and the owner of 200 West Properties is Loop. *Id*. Jahelka signed Scattered's lease. *Id.* Scattered did not make rental payments from 1999 to 2003. *Id*. Loop may have also been on the 7th Floor lease, but assuming it was, Loop did not reimburse Scattered for using its space. *Id.*

<u>Shared Employees and Expenses</u>

Michael May ("May") was Loop's in-house accountant from 1999 through 2002. Corp. Rep. 56.1 ¶ 27. May's office was located in the Wells building. Ind. Rep. 56.1 ¶¶ 13, 18. May did not keep records of this time when he was employed by Loop. Ind. Rep. 56.1 ¶ 31. Although he was a Loop employee, May prepared Greenblatt's individual tax returns without receiving additional compensation. Ind. Rep. 56.1 ¶ 30**.** Additionally, May worked with other companies such as RTC, EZ Links, Loop Telecom, and Banco. Ind. Rep. 56.1 ¶ 31. While working for Loop, May received medical benefits from RTC and then through EZ Links. Ind. Rep. 56.1 ¶ 33. The parties dispute whether Greenblatt owned and controlled RTC. Corp. Rep. 56.1 ¶ 49. May did not know what benefits RTC received in exchange for providing employment benefits to Loop's employees. *Id*.

In 2002, Jahelka, Loop's President, advised May that his employment at Loop was terminated and that he would now be a Loop Properties employee. Ind. Rep. 56.1 ¶ 29. When May

changed positions from Loop to Loop Properties, his salary, day-to-day obligations, office, business cards, phone and fax numbers, and office equipment did not change. Ind. Rep. 56.1 ¶ 29. Subsequently, Jahelka told May that he was a Scattered employee. *Id.*

Elizabeth Sharp ("Sharp") initially served as Loop's in-house counsel. Ind. Rep. 56.1 ¶ 15. Sharp worked in the Wells building. While working for Loop, Sharp performed legal services for other limited partnerships such as 200 West Properties and RTC, and viewed those entities as "clients." Ind. Rep. 56.1 ¶ 15. Sharp does not know if other entities, such as 200 West Properties, reimbursed Loop for her time. *Id.* Sharp did not record her time while working for Loop and received healthcare benefits from RTC. *Id.*

In 2002, Sharp changed positions from Loop's in-house counsel to Loop Properties' in-house counsel at Jahelka's request. Ind. Rep. 56.1 ¶ 17. No one replaced Sharp as Loop's in-house counsel. *Id.* When Sharp moved to Loop Properties, she continued to represent the same clients that she represented while at Loop, did not move offices, did not change her phone number, and did not change her e-mail address. *Id.* In 2005, Sharp changed positions from Loop Properties' in-house counsel to Scattered's in-house counsel at Jahelka's request. *Id.* When Sharp moved to Scattered, she continued to represent the same clients that she represented while at Loop, did not move offices, did not change her phone number, and did not change her e-mail address. *Id.*

While Jahelka served as Loop's President, he worked for a number of different entities in which Loop's owners had an interest. Ind. Rep. 56.1 ¶ 10. Jahelka could not recall a situation where one of the entities under Loop reimbursed Loop for Jahelka's time. *Id.*

Although Defendants claim it exists, they have not produced an expense sharing agreement Loop had with several related entities. Sharp heard of the existence of an oral fee sharing agreement

between various Greenblatt controlled entities, but was unfamiliar with the specifics of the agreement. Ind. Rep. 56.1 ¶ 16. She did not know whether the agreement was followed. *Id*. There are no records reflecting payments from other related entities to Loop to reimburse Loop for its expenses. Pl. Resp. Ind. 56.1 ¶ 41.

Capitalization, payments, and shareholder's meetings

In 2000, Loop opened a line of credit with Banco which was secured by a blanket lien against all of Loop's assets. Neuhauser Resp. 56.1(b) ¶¶ 9, 11. Over the next several years, Banco loaned Loop $16-$17 million dollars despite the fact that Loop was in default on Banco's loan in 2001 or 2002. *Id*.; Greenblatt. Dep. Tr. pp. 61-62. Banco has not foreclosed on its loan to Loop even though Loop is in default. Corp. Rep. 56.1 ¶ 33. The parties dispute whether Loop had significant capitalization. Ind. Rep. 56.1 ¶ 34. May believes that as of December 31, 2000, Loop had additional paid-in capital of more than $9.8 million as reflected in Loop's 2000 and 2001 tax returns. *Id*. Jahelka does not know why Loop's annual reports showed $1,000 paid-in-capital despite Loop's claims that it was capitalized with a $10 million investment. Ind. Rep. 56.1 ¶ 11. The parties dispute whether paid-in-capital reflects the actual capitalization of a corporation. *Id*.

Jahelka was unable to explain why Loop's shareholders received payments in different amounts at different times. Ind. Rep. 56.1 ¶ 12. Nichols could not explain why the Individual Defendants were compensated for their work one year and not the next and why one shareholder would receive a payment on one day when another would not. For example, Greenblatt paid himself $175,000 in January 2001 and $100,000 in February 2001 but Jahelka received nothing in January and February 2001. *Id*. Jahelka could not say whether any payments made to the shareholders were based upon any pre-determined salaries. *Id*. Greenblatt could not recall why Loop paid him

7

$125,000 in April 2000.  Ind. Rep. 56.1 ¶ 25.

Jahelka could not recall any formal shareholders meetings for Loop, did not recall seeing meeting minutes, did not know if Loop kept a minute book, and testified that if Loop had corporate resolutions, they were not "in one place."  Ind. Rep. 56.1 ¶ 14.  Jahelka claims that Loop's officers met on a daily basis and believes that their meetings were memorialized "as necessary." *Id*.  Loop's resolutions, if they exist, were not a part of the record.  Greenblatt could not recall whether Loop had meetings of its board of directors nor could he recall whether Loop had directors at all.  Ind. Rep. 56.1 ¶ 24.  Greenblatt testified that minutes of annual shareholders' meetings were recorded and kept, but when Loop's officers met, minutes were not kept.  *Id.*

May did not know if Loop held annual shareholder meetings or if Loop held regular board of directors' meetings.  Ind. Rep. 56.1 ¶ 32.  May has never seen a minute book and did not know if Loop paid rent for its office space even though he was responsible for recording rental payments. *Id*.

<u>Neuhauser opens the Loop and NOLA accounts and Loop and NOLA acquire HRMI stock</u>

On May 19, 2000, Greenblatt, Banco, Chiplease, Inc. ("Chiplease"), and Leslie Jabine entered into a Standstill Agreement with HRMI wherein they represented they had no plans or intentions of acquiring additional HRMI shares in excess of 40% of the outstanding shares of the company.  Ind. Rep. 56.1 ¶ 7.  On August 8, 2000, Greenblatt filed a 13D publicly disclosing ownership of a sufficient percentage of HRMI to constitute a controlling interest.  Pl. Resp. Ind. 56.1 ¶ 23.

Two months later, on October 16, 2000, Neuhauser, Loop's agent, opened a securities account at Wachovia under the name of Loop Corp. at Greenblatt's direction.  Pl. 56.1 Resp. ¶ 13;

Neuhauser Resp. 56.1(b) ¶¶ 28-30. Neuhauser was a day trader and held an individual trading account at Wachovia as well as a business account in the name of his company, Loren Holdings, Inc. Neuhauser Resp. 56.1(b) ¶ 24. Neuhauser's broker at Wachovia, Kris Stelzner ("Stelzer"), described Neuhauser as "a very sophisticated trader' who was "knowledgeable about equities, bonds, [and] commodities." Neuhauser Resp. 56.1(b) ¶ 25. Neuhauser would never have opened the Loop account without authorization from Greenblatt. Ind. Rep. 56.1 ¶ 19. Wachovia knew that Loop was a corporation when it entered into a commercial relationship with Loop. Pl. Resp. Ind. 56.1 ¶ 40.

When Neuhauser opened the Loop account, Wachovia prepared a client intake form. The form has questions regarding a prospective client's investment experience and financial status. Neuhauser Resp. 56.1(b) ¶ 31. Loop's account intake form states that Loop has at least 10 years of investment experience in equities, bonds, options, futures, and mutual funds, net earnings of between $10,000,000 and $24,999,999, a net worth between $10,000,000 and $24,999,999, and a liquid net worth between $10,000,000 and $24,999,999. Neuhauser Resp. 56.1(b) ¶ 36. Although Wachovia claims that the information handwritten on the client intake forms is typically provided by the customer and recorded by a Wachovia representative, the parties dispute whether Neuhauser provided the information on the Loop intake form and dispute whether the information was accurate. Neuhauser Rep. 56.1(b) ¶ 24; Neuhauser Resp. 56.1(b) ¶ 34. The parties agree that Wachovia relies on the accuracy of information provided by customers when accounts are opened, but dispute whether Wachovia actually relied upon the information on the Loop intake form when it decided to open the account. Neuhauser Resp. 56.1(b) ¶ 32, 43.

When Neuhauser opened the Loop account, Neuhauser entered into margin agreement (the "Loop Margin Agreement") on Loop's behalf wherein Neuhauser expressly represented that he, as

well as Loop and its principals, would conduct trading in the account "in accordance with all applicable law or requirements as well as the rules and practices of any market or clearing house through which my trades may be executed or processed." Ind. Rep. 56.1 ¶ 5. On October 27, 2000, Greenblatt filed a 13D publicly disclosing a 21.09% ownership interest in HRMI. Pl. Resp. Ind. 56.1 ¶ 23.

On February 28, 2001, Neuhauser opened the NOLA, LLC account at Greenblatt's direction. Pl. Resp. Ind. 56.1 ¶ 13; Neuhauser 56.1(b) ¶ 29-30, 38, 39. NOLA is an Illinois Limited Liability Company. Pl. Resp. 56.1 ¶ 13. NOLA was dissolved when Neuhauser opened the account and was not reinstated until May 31, 2001. Pl. Resp. Ind. 56.1 ¶ 27. Although the account was opened under the name NOLA LLC, Neuhauser entered into a Partnership Account Agreement (the "PAA") that states:

> "We, the undersigned, request you to open a partnership account in the name of NOLA, LLC, a duly organized partnership, or which each of us is a general partner and of which the undersigned are the sole partners."

Pl. Resp. Ind. 56.1 ¶ 30; Ind. Rep. 56.1 ¶ 27, 38; Group Ex. 17. The parties dispute whether Neuhauser told Wachovia that NOLA was a partnership and that Neuhauser was its general and sole partner. The parties further dispute that by signing the PAA, Neuhauser represented that NOLA was a partnership as opposed to a limited liability company. Ind. Rep. 56.1 ¶ 38.

When Wachovia opened the NOLA account, Wachovia prepared a client intake form similar to Loop's. Neuhauser Rep. 56.1(b) ¶ 40. The form states that NOLA had at least 15 years of experience in equities, bonds, options, futures, and mutual funds, net earnings of between $10,000,000 and $24,999,999, a net worth in excess of $25,000,000, and a liquid net worth in excess of $25,000,000. Neuhauser Resp. 56.1(b) ¶ 42. The parties dispute whether Neuhauser supplied

the information on the NOLA client intake form and whether Wachovia relied upon the accuracy of the information in the NOLA intake form when it decided to open the account. Neuhauser 56.1(b) ¶ 29-30, 43.

The parties dispute whether Neuhauser represented to Stelzer that the Individual Defendants had a net worth of more than $50 million and would meet any margin calls which came due. Pl. Resp. Ind. 56.1 ¶ 21. Wachovia did not seek personal guarantees for the Loop or NOLA accounts from the Individual Defendants or anyone else at the time the accounts were opened, nor did it seek guarantees when the margin loans were extended. Pl. Resp. 56.1 ¶ 15.

On March 20, 2001, Greenblatt filed a 13D publicly disclosing a 24.58% ownership interest in HRMI. Pl. Resp. Ind. 56.1 ¶ 23. On April 3, 2001, HRMI publicized Greenblatt's holdings in a press release stating "Greenblatt and his affiliated companies own approximately 25% of HRMI's outstanding stock" and that HRMI also agreed at that time to an increase in the percentage to 39.9%. *Id*. On April 5 and April 12, 2001, Greenblatt filed 13D's publicly disclosing a 29.56% ownership interest and a 38.7% ownership interest, respectively. Pl. Resp. 56.1 ¶ 23. HRMI also disclosed the 38.7% ownership interest in its 2000 Form 10-k. *Id.*

The parties dispute whether Greenblatt's 13D disclosures accurately reflect his ownership interest in HRMI because they do not disclose NOLA's holdings. Pl. Resp. Ind. 56.1 ¶ 23. No one at Wachovia looked the 13D and 10k disclosures or any other filing with the SEC concerning HRMI even though such filings could have been easily obtained internally at Wachovia. Pl. Resp. Ind. 56.1 ¶ 24.

### The NASDAQ halts trading of HRMI

Once the Loop and NOLA accounts were opened, the accounts were used exclusively to

acquire a substantial number of shares of HRMI.  Neuhauser Rep. 56.1(b) ¶ 45, 46.  Wachovia

signed off on the trading in the Loop and NOLA accounts after the trade date but before the

settlement date.  Pl. Resp. Ind. 56.1 ¶ 20.  In 2001, Neuhauser wrote Wachovia (then Prudential)

asking it to accept checks from Loop's account to be deposited into the NOLA account.  Ind. Rep.

56.1 ¶ 9.

On May 22, 2001, the NASDAQ halted trading in HRMI, its stock plummeted, and the value

of the Loop and NOLA accounts fell into debit balances.  Neuhauser Resp. 56.1(b) ¶ 47.  The Loop

account incurred a margin debt of $1,895,751.44 and the NOLA account incurred a margin debt of

$1,098,459.90.  Neuhauser Resp. 56.1 ¶¶ 49-50.  All or most of the margin debt in the Loop and

NOLA accounts resulted from their holdings in HRMI.  Pl. Resp. 56.1 ¶ 16.  The parties dispute

whether Greenblatt told Wachovia that he would personally "make good' on Loops and NOLA's

debts after the NASDQ halted trading of HRMI stock and the Loop and NOLA accounts fell into

substantial debit positions.  Neuhauser Resp. 56.1(b) ¶ 48.  According to Nichols, Loop's Treasurer,

Loop did not pay its margin debt to Wachovia because Loop did not have sufficient funds, and

"didn't have availability on the line [of credit] from Banco to Loop to pay it."  Corp. Rep. 56.1 ¶ 32.

The parties dispute whether the Individual Defendants were personally liable for the account debits.

Neuhauser Resp. 56.1 ¶ 51.

<u>Loop payments to the Individual Defendants and other entities</u>

May produced a summary list of payments from Loop from 2000 to 2002 that were in excess

of $10,000.  Corp. Rep. 56.1 ¶ 42.  The summary reflects payments in 2000 to Greenblatt and Banco

in the amount of $741,900, Jahelka in the amount of $242,0000 and Nichols in the amount of

$168,000.  Corp. Rep. 56.1 ¶ 43.  The summary list also reflects a $823,000 payment from Loop to

RTC. Corp. Rep. 56.1 ¶ 49. Jahelka asserts that the payments to himself, Nichols, and Greenblatt in 2000 were treated as a return of capital, but was unable to determine how he arrived at the figures. Corp. Rep. 56.1 ¶ 44. Jahelka could not explain why the shareholders did not receive capital distributions at the same time and in proportion to their ownership interests.

In 2001, Loop made payments to Greenblatt and Banco in the amount of $472,5000, Jahelka in the amount of $67,500, and Nichols in the amount of $117,833.45. Corp. Rep. 56.1 ¶ 45. Jahelka explained that these payments were not capital distributions, but rather were "compensation." Corp. Rep. 56.1 ¶ 46. Jahelka could not explain why Loop's principals treated compensation in 2001 differently than in 2000 or why the amounts and frequency of compensation to Loop's directors varied. *Id*. For example, Jahelka could not explain why Greenblatt received $275,000 in compensation over a two-month period when Jahelka received nothing for the same two-month time period. *Id*.

May was unable to explain why Loop's owners were paid different "equity repayments" on the same day. Ind. Rep. 56.1 ¶ 35. He couldn't' recall why he classified payments to Jahelka in 2001 and 2002 as "fees and compensation". *Id*. May did not know why there was a note receivable from NOLA to Loop in the amount of $2 million. *Id*.

Nichols, Loop's Treasurer, could not explain why he received payments in January, March, and October nor could he explain why Greenblatt was not paid ay compensation in 2002. Ind. Rep. 56.1 ¶ 28. Nichols did not know why Jahelka was paid less than Nichols in 2002 considering Jahelka owned a greater percentage in the company nor could he recall why Loop's distributions to Nichols, Greenblatt, and Jahelka did not correlate with their percentage interest in the company. *Id*. In other words, Nichols could not explain the disparity in amounts and frequency of Loop's 2001

compensation payments.  Corp. Rep. 56.1 ¶ 47.

According to Jahelka, the accounting behind the 2001 compensation payments exists only in the minds of Loop's owners.  Corp. Rep. 56.1 ¶ 48.  They did not keep time records and they had no employment agreements with Loop.  *Id.*  Jahelka testified that these payments were credited towards Loop's outstanding debt under it line of credit with Banco.  Corp. Rep. 56.1 ¶ 50.

<u>Loop's Payments and Transfers after it incurred debit balances</u>

On May 22, 2001, the          NASDAQ halted trading of HRMI and the Loop and NOLA accounts fell into debit balances.  Neuhauser Resp. 56.1(b) ¶ 47.  Jahelka, Nichols, and Greenblatt were responsible for deciding that Loop wold make other investments, such as payments to EZ Links, instead of paying down Loop's margin debt to Wachovia.  Corp. Rep. 56.1 ¶ 35.  After the Loop/NOLA margin debts became due, Loop made nearly $1.5 million in payments to Nichols, Jahelka, EZ Links, and Banco.  Corp. Rep. 56.1 ¶ 43; Ex. 8.

| | |
|---|---|
| 6/11/01-11/15/01 | Loop pays Nichols $75,000 |
| 6/11/01-12/13/01 | Loop pays EZ Links $461,337 |
| 6/12/01-09/25/01 | Loop pays Jahelka $52,500 |
| 9/05/01-12/31/01 | Loop pays Banco $452,500 |
| 1/03/02-11/07/02 | Loop pays Banco $313,450 |
| 1/03/02-10/17/02 | Loops pays Nichols $48,000. |
| 1/18/02-10/17/02 | Loop pays Jahelka $30,000 |
| 2/15/02-10/15/02 | Loop pays EZ Links $57,000 |

Corp. Rep. 56.1 ¶ 43; Ex. 8.

In April 2002, Banco extended its existing line of credit established in January 2000 to Loop.  Corp. Rep. 56.1 ¶ 30.  Although in default, Banco had not foreclosed on Loop's January 2000 loan and agreed to extend credit to Loop.  Corp. Rep. 56.1 ¶ 33.  Banco allowed Loop to increase its line of credit under the Banco Loan to $16 to $17 million in April 2002.  Neuhauser Resp. 56.1(b) ¶ 11.  The original principal amount of the loan from January 2000 was $9.9 million.  Corp. Rep. 56.1 ¶

30; Ex. 1. Greenblatt's input weighed heavily as to which creditors Loop could (and could not) pay, by virtue of Banco's status as Loop's senior secured lender. Corp. Rep. 56.1 ¶ 35. Banco has no employees; never obtained a personal guaranty for any of its loans to Loop; and possessed no written appraisals on Loop's assets prior to making its loans to Loop. Ind. Rep. 56.1 ¶ 23.

In 2002, Loop transferred all of its ownership interests in real estate partnerships to Loop Properties, Loop's wholly-owned subsidiary. Corp. Rep. 56.1 ¶ 36; Pl. Resp. Corp. 56.1 ¶ 20. Loop made the transfer even though Loop owed Wachovia unpaid margin debt. Corp. Rep. 56.1 ¶ 38. According to the Corporate Defendants Answer to Interrogatories, the transfer occurred to parse out Loop's real estate and the consideration for the transfer was Loop Properties' agreement to become an additional borrower on the Banco to Loop loan. Pl. Resp. Corp. 56.1 ¶ 23. However, Jahelka, Loop's and Loop Properties' President, testified that Marine Bank, one of Loop's unaffiliated secured lenders, requested the transfer and that the transfer had been contemplated for a number of years. *Id.* Jahelka added that the transfer was "immaterial in the sense that we were transferring from Loop to a wholly owned subsidiary of Loop," and his only justification for the transfer was that it was an "easier way of looking at the universe." *Id.* Jahelka doesn't think there is 'any appreciable difference" between having the real estate interests under the umbrella of Loop verses Loop Properties. *Id.* In another matter, Jahelka testified that Loop was not required to provide any consideration to Loop Properties for the real estate ownership interest because Loop Properties was a subsidiary of Loop Corp. Corp. Rep. 56.1 ¶ 39. May, Loop's and Loop Properties' accountant, did not know what consideration, if any, was received from Loop Properties in exchange for the transfer of real estate interests. Corp. Rep. 56.1 ¶ 37.

The parties dispute whether Loop transferred its ownership interest in EZ Links to Scattered.

Nichols testified that the transfer occurred, but Defendants claim that he was mistaken. Corp. Rep. 56.1 ¶ 41.

Between January 1, 2001 and December 2001, Loop transferred $1,507,838.52 to EZ Links. Corp. Rep. 56.1 ¶ 51; Ind. Rep. 56.1 ¶ 27. The payments occurred after the margin debt to Wachovia became due. Ind. Rep. 56.1 ¶ 27. The parties dispute whether the transfer was a "payment" or an "investment." Ind. Rep. 56.1 ¶ 27. Greenblatt and Jahelka have an interest in EZ Links by virtue of their ownership of Loop. *Id.* Nichols believes that the "payments" were made pursuant to a "commitment to fund" from Loop to EZ Links. *Id.* However, Nichols has never seen such a commitment despite serving as Loop's treasurer. *Id.* The parties dispute whether Greenblatt was responsible for deciding that Loop would pay EZ Links in 2001 rather than pay down Loop's debt to Wachovia. Corp. Rep. 56.1 ¶ 51.

When asked to testify regarding Loop's assets, Jahelka stated that he did not know if Loop had sufficient assets to satisfy Wachovia's judgment and offered to have them appraised. Corp. Rep. 56.1 ¶ 53. Jahelka conceded that Loop's liabilities exceed its assets for purposes of a Chapter 7 liquidation in 2001-2002. Corp. Rep. 56.1 ¶ 54. Although Jahelka could not estimate the value of Loop's assets, he stated, "I don't think there is anybody else who has any more information than I have about what Loop's assets are but that is different from asking what your opinion of the value is." Corp. Rep. 56.1 ¶ 55.

Greenblatt testified that he is unable to calculate the value of Loop's assets, or even determine if the value of Loop's assets exceeded its liabilities. Corp. Rep. 56.1 ¶ 57. In order to make that determination, Greenblatt testified that he would need to appraise those assets. *Id.* His best estimate of the value of Loop's assets was "somewhere between zero and 20 million." *Id.*

<u>NYSE Arbitration and NOLA's Bankruptcy Proceedings</u>

Wachovia obtained an arbitration award against Loop in the amount of $2,439,000 and against NOLA in the amount of $1,387,355.39 in connection with the unpaid margin loan underlying this action.  Pl. Resp. 56.1 ¶¶ 7, 12.

On April 27, 2005, NOLA filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court of the Northen District of Illinois.  Neuhauser Rep. 56.1(b) ¶ 19.  According to NOLA's bankruptcy filings, its only asset was 100% of the stock in its wholly-owned subsidiary, South Beach Securities, Inc.  Neuhauser Resp. 56.1(b) ¶ 20.  On August 24, 2005, Judge Goldgar dismissed the NOLA bankruptcy proceedings under § 1112(b) of the Bankruptcy Code on the grounds that it was not a good-faith filing.  Neuhauser Resp. 56.1(b) ¶ 21.  South Beach Securities, in turn, filed for bankruptcy the same day, and identified its only asset as shares of HRMI, the same stock that Defendants acquired on margin through their Loop and NOLA accounts at Wachovia. Neuhauser Resp. 56.1(b) ¶ 22.

## **STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement."

*Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## DISCUSSION

### III. Wachovia's Motion for Partial Summary Judgement against Neuhauser and Greenblatt and the Individual Defendants' Motion to Strike

Defendants Neuhauser and Greenblatt move to strike Paragraphs 31-36 and 39-43 of Wachovia's Local Rule 56.1 Amended Statement of Undisputed Facts ("ASUF") and Exhibits 9 and 12 attached thereto. Wachovia offered Paragraphs 31-36 and 39-43 and Exhibits 9 and 12 in support of its Motion for Partial Summary Judgment and in opposition to the Individual Defendants' Motion for Summary Judgment (Count I). Neuhauser and Greenblatt argue that Wachovia is asserting new facts that are inconsistent with the fraud theories articulated in the RSAC and that the Defendants were deprived of their ability to conduct meaningful discovery associated with the forms. Neuhauser Mot. Strike, pp. 1-2.

On March 21, 2007, Wachovia filed a Motion to Voluntarily Dismiss Counts II and III of the First Amended Complaint alleging Federal Securities Fraud and Conspiracy to Commit Fraud. (Dk. #52). Wachovia also dismissed Greenblatt, Nichols, and Jahelka from Count VIII for Breach of Contract. *Id.* The Court granted Wachovia's motion and allowed it to file a Second Amended

Complaint. (Dk. # 191). On April 3, 2007, Wachovia filed a Second Amended Complaint but went beyond removing Counts II, III, and parts of Count VIII by adding new allegations to its fraud claim. Namely, Wachovia alleged, for the first time, that Neuhauser and Greenblatt made fraudulent misrepresentations to Wachovia when the Loop and NOLA accounts were opened concerning the financial expertise and investment experience of the entities and their officers (the "new misrepresentation allegations"). Wachovia recorded the alleged misrepresentations on Exhibits 9 and 12, the Loop and NOLA account intake forms.

On May 3, 2007, this Court struck Wachovia's Second Amended Complaint on the basis that Wachovia added new claims against Defendants more than one month after discovery closed and more than three years after the case was filed. Pl. Resp. Mot. Strike, Ex. D. Wachovia filed the RSAC removing the new allegations and striking Exhibits 9 and 12. Now, Wachovia attempts to use the same allegations and exhibits in support of its Motion for Partial Summary Judgment and in opposition to the Individual Defendants' Motion for Summary Judgment.

First, none of the new misrepresentation allegations found in Paragraphs 31-36 and 39-43 of the ASUF were pleaded in Wachovia's RSAC, the operative pleading in this case, and Exhibits 9 and 12 were not attached thereto or referenced therein. Pl. Rep. 56.1(b) ¶ 70. The new misrepresentation allegations and corresponding exhibits were not pleaded in Wachovia's previously filed pleadings. Pl. Rep. Def. 56.1(b) ¶ 67. It wasn't until after discovery closed and after Defendants filed dispositive motions that the new misrepresentation allegations were pleaded along with the corresponding exhibits. Pl. Rep. 56.1(b) ¶ 68. Accordingly, the new misrepresentation allegations are new facts not previously found in any operative pleading filed against the Defendants.

Wachovia argues that these allegations are not "new facts" because Wachovia has always pleaded a fraud claim, but Rule 9(b) requires that averments of fraud be stated with particularity. Fed. R. Civ. P. 9 (b). To satisfy this particularity requirement, Wachovia must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Howell v. Joffe*, 483 F. Supp. 2d 659, 670 (N.D. Ill. 2007); *citing UniQuality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (*quoting Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)). Wachovia has never pleaded allegations that comply with the specificity requirement of Rule 9 (b) with respect to the alleged misrepresentations recorded in Exhibits 9 and 12, and therefore, Defendants were not reasonably notified of the specifics of the alleged fraudulent activity. Wachovia cannot amend its pleadings through allegations made in response to a summary judgment motion. *See Lachmund v. ADM Investor Services, Inc.*, 191 F. 3d 777, 782 (7th Cir. 1999) (A complaint must outline the alleged misrepresentations and reasonably notify a defendant of the specifics of the alleged fraudulent activity, including the particular defendant's role); *see also Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).

Second, Wachovia claims that Exhibits 9 and 12 were produced in discovery and that Defendants had ample opportunity to cross-examine Wachovia's witnesses during the February 2007 depositions of Wachovia employees. Although Wachovia produced versions of the intake forms prior to the February depositions, these forms were illegible and obscured the very information that Wachovia now claims is false. *See* Ex. 1, 3 Def. Rep. Mot. Strike. Moreover, Loop's and NOLA's client profiles were recorded using codes. Without a code key the codes were meaningless as evidenced by the fact that none of Wachovia's witnesses produced for deposition in February were

able to testify about the forms' entries without the key. Pl. Rep. 56.1(b) ¶ 86; Roy Dep. Tr. pp. 18, 29; Damrow Dep. Tr. pp. 46-49, 75; Stelzner Dep. Tr., pp. 48, 50, 104, 106-7. The illegible forms also obscured the name of the Wachovia employees who signed them. Pl. Rep. 56.1(b) ¶ 74.

Wachovia provided a legible copy of Loop form and a code key prior to the deposition of Wachovia employee Elizabeth Niemann ("Niemann"). Pl. Rep. 56.1(b) ¶¶ 84- 85. Niemann was produced after discovery closed without the Court's permission. The legible Loop form revealed for the first time that Stelzner and Peter Cory signed the form. Pl. Rep. 56.1(b) ¶ 74. It wasn't until after discovery closed that Niemann was able to identify the handwriting on the form as belonging to Amy Goder, Stelzner's assistant. Pl. Rep. 56.1 (b) ¶ 78. Wachovia has never identified Peter Cory or Amy Goder as persons with knowledge in its answer its interrogatories or in its Rule 26.1 disclosures. Pl. Rep. 56.1(b) ¶ 75, 77.

Wachovia produced the legible NOLA form and the retail code key after discovery closed and after Niemann's deposition. Pl. Rep. 56.1(b) ¶ 79. It appears that the NOLA account intake form was signed by Stelzner and Cory although Defendants have been unable to confirm that fact due to the close of discovery. Pl. Rep. 56.1(b) ¶ 79.

Significantly, Niemann easily retrieved copies of the legible forms by making a phone call to Wachovia's microfiche department. Pl. Rep. 56.1(b) ¶ 73. Wachovia employees testified that the forms were for internal use only and not shown to the clients. Pl. Rep. 56.1(b) ¶ 87. In other words, the forms were always in Wachovia's possession—and never in the Defendants'. In essence, what Wachovia has done is asserted new facts and theories in its Motion for Partial Summary Judgment and in response to Defendants' Motion for Summary Judgment.

During the May 3, 2007 hearing, this Court stated:

"I am not permitting you to amend your fraud count. It is way too late in the game. It's an '04 case. *To the extent that there has been discovery done on this form*, it will come out at trial. It may be used in the summary judgments, but we're not going to open up discovery, and we're not amending the complaint further."

*Id.* (emphasis supplied by this Court). Discovery has not been done on these forms and Wachovia has only itself to blame since legible forms have been in its possession since their creation. This Court exercised its discretion when it denied Wachovia's attempt to add new facts and theories to a 2004 case, and will not entertain the same allegations set forth as part of Wachovia's dispositive motions especially when Defendants were deprived of an opportunity to develop evidence to rebut the allegations.

Therefore, Defendants' Motion to Strike Paragraphs 31-36 and 39-43 and Exhibits 9 and 12 of Wachovia's Amended Statement of Material Facts is granted. Because Plaintiff's Motion for Partial Summary Judgment is based solely upon allegations contained within Paragraphs 31-36 and 39-43 and Exhibits 9 and 12, Wachovia's Motion for Partial Summary Judgment is denied and Defendants' Motion for Summary Judgment as to those allegations is granted. [3] Additionally, Defendants' Motion in Limine to Bar the New Fraud Claim is granted for the reasons set forth above.

**IV.** **Wachovia's Remaining Promissory Fraud Allegations and the Individual Defendants' Motion for Summary Judgment (Count I)**

In light of the Court's grant of Defendants' Motion to Strike and its denial of Plaintiff's Motion for Partial Summary Judgment, this Court must decide what allegations, if any, remain in

---

[3] Additionally, Paragraphs 32-34 of the ASUF fail to comply L.R. 56.1(a) requiring that the statement of facts consist of "short numbered paragraphs." For example, the "statement" in paragraph 32 is nearly two pages long. Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, a district court has discretion to require strict compliance with those rules. *See Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Bordelon v. Chi. School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

Wachovia's common law fraud claim, and what evidence, if any, Wachovia proffered in support of those allegations.[4] To establish actionable fraud, Wachovia must prove that the Individual Defendants knowingly made a false statement of material fact with the intent to induce plaintiffs to act. *Ass'n Ben. Servs. v. Caremark Rx, Inc*., 493 F.3d 841, 853 (7th Cir. 2007). Plaintiffs must also show they justifiably relied on the statement and suffered damages resulting from their reliance. *Id.* Fraud must be proved by clear and convincing evidence. *Id.* Wachovia's remaining fraud allegations appear to center upon the Individual Defendants' representation that they would conduct trading in the Loop account "in accordance with all applicable laws or requirements" *See* Ind. Rep. 56.1 ¶ 5; *See* Loop Margin Agreement; Pl. Resp. Ind. 56.1, Ex. 10.

First, Wachovia claims that the Individual Defendants' agreement to trade the Loop account in accordance with federal securities law was an intentional misrepresentation because the Individual Defendants did not fully disclose their interest in HRMI to the U.S. Securities and Exchange Commission ("SEC"). Specifically, Wachovia alleges that Greenblatt's failure to disclose NOLA's interest in HRMI violated the SEC because NOLA was an alter ego of Greenblatt and the Individual Defendants and NOLA's interests weren't disclosed. Wachovia continues to advance this theory, albeit half-heartedly, despite its voluntary dismissal of its federal securities claims against the Individual Defendants.

On the outset, Wachovia's claims that Greenblatt's 13D filings violated federal securities law and that "Defendants utilized 19 different trading accounts for 11 different brokerage firms

---

[4] According to Wachovia, Paragraphs 1-9 of its ASUF and Paragraphs 23 and 24 of its Response to the Individual Defendants' Statement of Facts are supportive of its promissory fraud claim and are distinct from Wachovia's allegations associated with the account intake forms. Ind. Rep. 56.1 ¶ 5-8; Pl. Resp. Ind. 56.1 ¶¶ 23-24; Resp., p. 5. In reality, only paragraphs 5-9 and 23 and 24 appear to coincide with Wachovia's remaining fraud claims.

under the names of 8 different entities" to trade HRMI stock are wholly unsupported by citations to the record in its ASUF. Ind. Rep. 56.1 ¶¶ 7-8. Mere speculation or conjecture will not defeat a summary judgment motion and Wachovia's reply must state facts that require the denial of summary judgment supported by citations to the record. Fed. R. Civ. P. 56.1(b)(3); *see also Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 591 (7th Cir. 1997). Even if this Court were to assume that the Individual Defendants' failure to disclose NOLA's interest in HRMI to the SEC violated federal securities law, Wachovia proffered no evidence that it relied upon the 13D disclosures to its detriment. *See Ass'n Ben. Servs.*, 493 F.3d at 852-53; (Plaintiffs must show that they justifiably relied on the statements and suffered damages resulting from that reliance.) To the contrary, no one at Wachovia looked at any Schedule 13D filing or any other filing with the SEC concerning HRMI. Pl. Resp. Ind. 56.1 ¶ 24.

Second, Wachovia claims that the Individual Defendants purposefully concealed their intentions to use the Loop and NOLA accounts as a means to acquire a controlling interest in HRMI. Rev. 2d Am. Compl. ¶ 78; Ind. Rep. 56.1 ¶¶ 6-7. Foremost, this Court rejected Wachovia's contention that the Individual Defendants had a duty to disclose that they were attempting to gain control of HRMI reasoning that it is the broker (Wachovia) and not the client who is the fiduciary and therefore has the resulting duty to disclose. Judge Hart Op., pp. 22-23; (Dk. #52). Without such a duty, the Individual Defendants had no obligation to disclose their motivation for opening the accounts. Moreover, Wachovia failed to proffer sufficient evidence that its employees asked Neuhauser or any of the Individual Defendants why they wanted to open the Loop and NOLA accounts or if they intended to acquire a substantial percentage of ownership in HRMI or any other company. In other words, Wachovia failed to proffer evidence that the circumstances were such that

Wachovia's inquiry created the opportunity and duty to speak. *See Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc*., 794 N.E.2d 829, 835 (Ill. App. Ct. 2003) (Fraud may also be based on the omission or concealment of a material fact if accompanied by the intent to deceive under circumstances which create the opportunity and duty to speak.).

The absence of a duty to disclose justifies summary judgment. But, even if this Court were to assume that a duty existed, Wachovia failed to proffer clear and convincing evidence that the Individual Defendants had the "then-present intent" to violate securities laws and regulations. Meaning, Wachovia failed to reconcile how the Individual Defendants could have intended to conceal their desire to acquire a controlling interest in HRMI when Greenblatt publicly disclosed ownership of a significant percentage of HRMI in the Schedule 13D filings more than a month before the Loop account was opened. *See Ass'n Ben. Servs.*, 493 F.3d at 853; (A claim for fraud, promissory or otherwise, requires a showing that, at the time the allegedly fraudulent statement was made, it was an intentional misrepresentation). By the time Neuhauser opened the NOLA account, Greenblatt publicly disclosed a 21.09% interest in HRMI. Five days after Neuhauser opened the NOLA account, HRMI issued a press release announcing that "Greenblatt and his affiliated companies own approximately 25% of HRMI's outstanding stock" and that HRMI agreed to an increase in the percentage to 39.9%. In the next eight months, Greenblatt acquired and publicly disclosed a total of 38.7% ownership interest in HRMI and HRMI disclosed the 38.7% interest in its 2000 Form 10-k. Wachovia could have easily obtained publicly available information concerning HRMI, Loop, NOLA, or Greenblatt before and after it opened the Loop and NOLA accounts, but didn't. Moreover, Wachovia fully monitored the trading in the Loop and NOLA accounts and it was approved by Wachovia employees after the trade date but before the settlement date. For these

reasons, Wachovia's argument that the Individual Defendants purposefully concealed their interest in acquiring a controlling interest in HRMI fails as a matter of law.

Wachovia's game-time decision to focus its efforts on the misrepresentations on the intake forms[5] is reflected by the fact that its original fraud theories are nearly ignored in its ASUF. The majority of Wachovia's assertions in its ASUF are unsupported in the record, and therefore, the Individual Defendants' Motion for Summary Judgment as to Count I is granted and Count I is dismissed with prejudice in its entirety.

## V.    The Breach of Contract Claim against Neuhauser (Count VI)

Wachovia brings a breach of contract claim against Neuhauser seeking to hold him personally liable for the Loop and NOLA margin debts. Wachovia's claim is based upon the Loop Margin Agreement and the PAA and this Court will discuss each in turn.

### The Loop Margin Agreement

Wachovia alleges that Loop breached the Loop Margin Agreement by failing to meet margin calls and failing to conduct trading in the accounts in accordance with applicable securities law and regulations and that Neuhauser should be held personally liable for the breach. Rev. 2d. Am. Compl. ¶¶ 114-116.[6] Wachovia's breach of contract claim against Neuhauser fails as a matter of law because Neuhauser was not a party to the Loop Margin Agreement and Wachovia proffered no evidence that Neuhauser, as Loop's agent, intended to be bound by the terms of the contract. Rev.

---

[5] Wachovia voluntarily dismissed its securities fraud claim and sought to amend the common law fraud claim "so as to focus on misrepresentations made by Defendants when the Accounts were opened and not on the securities allegations." Resp., p. 4. It is precisely those "misrepresentations" that this Court struck on the basis that they are new facts pleaded for the first time during dispositive motions.

[6] The Loop Margin Agreement includes a choice of law provision whereby the agreement to be governed by New York law. Neither party disputes that New York law applies.

2d. Am. Compl., Ex. B; *See Blank v. Noumair*, 239 A.D.2d 534 (1997) (A plaintiff's breach of contract cause of action was properly dismissed inasmuch as the defendant was not a party to the agreements in question); *see also Walz v. Todd & Honeywell*, 195 A.D.2d 455 (1993) (A corporation's president could not be personally liable for a contract signed on behalf of a disclosed principal, absent explicit evidence that the agent intended to be bound). Additionally, Wachovia failed to put forth evidence supported in the record that it performed all of its obligations under the contract. Therefore, Wachovia failed to proffer evidence such that a reasonable jury could conclude that the Loop Margin Account was breached and Neuhauser was personally liable.

<u>The NOLA PAA</u>

Wachovia alleges that NOLA breached the PAA by failing to meet margin calls and failing to conduct trading in the accounts in accordance with applicable securities law and regulations and that Neuhauser should be held personally liable for the breach. Neuhauser opened the NOLA account after NOLA, LLC was involuntarily dissolved and before it was reinstated, and although NOLA is a Limited Liability Company, Neuhauser signed a Partnership Account Agreement. Wachovia argues that because NOLA was dissolved at the time Neuhauser opened the account, Neuhauser can be held personally liable for NOLA's breach of the PAA as a "member or manager" to same extent as a director or shareholder under Section 10-10 of the Illinois Limited Liability Act and Section 5/3.2 of the Illinois Business Corporation Act. Pl. Resp., p. 12-13.

Despite Wachovia's assertions, when Section 10-10 was amended in 1998, the legislature removed the provision that allowed a member or manager of an LLC to be held personally liable for his or her own actions or for the actions of the LLC to same extent as a director or shareholder of a corporation. *Puleo v. Topel*, 856 N.E.2d 1152, 1158 (Ill. App. Ct. 2006). The revised version also

held that the failure of an LLC to observe the usual corporate formalities is not a ground from imposing personal liability on its members or managers for the liabilities of the company. *Id.* Thus, the LLC Act did not provide for a member or manager's personal liability to a third party for an LLC's debts. *Id.* Accordingly, Neuhauser cannot be held liable for NOLA's debts even though NOLA was dissolved at the time Neuhauser opened the NOLA account. *See Puleo*, 856 N.E.2d at 1158 (A member was not personally liable for unpaid debts to contractors engaged after LLC was dissolved because the legislature removed the provision that allowed a member or manager of an LLC to be held personally liable in the same manner as provided in 805 ILCS 5/3.20. In other words, the LLC Act did not provide for a member or manager's personal liability to a third party for an LLC's debts.) Moreover, Neuhauser was not a "member or manager" of NOLA. NOLA's "members" are Greenblatt's, Nichols's, and Jahelka's fathers.

Section 35-10 of the LLC Act also precludes Wachovia's breach of contract claim against Neuhauser. It provides:

> (d) Upon the filing of the application for reinstatement, the limited liability company existence shall be deemed to have continued without interruption from the date of the issuance of the notice of dissolution, and the limited liability company shall stand revived with the powers, duties, and obligations as if it had not been dissolved; and all acts and proceedings of its members or managers, acting or purporting to act in that capacity, that would have been legal and valid but for the dissolution, shall stand ratified and confirmed.

805 ILCS 180/35-40. NOLA filed its application for reinstatement on May 31, 2001 and was subsequently reinstated on June 6, 2001. Additionally, Wachovia put forth no evidence that it performed its obligations under the PAA.

Accordingly, there is no statutory or other basis to hold Neuhauser personally liable for

breach of contract of the Loop Margin Agreement and the PAA.[7]  Therefore, the Individual

Defendants' Motion for Summary Judgment as to Count VI for breach of contract is granted and

Count VI is dismissed with prejudice in its entirety.

## VI.    The Alter Ego and Piercing Counts (Counts II through V)

Counts II and III allege that Loop and NOLA were the alter egos of the Individual

Defendants and Counts IV and V allege that Loop's and NOLA's corporate veils should be pierced

so that the Individual Defendants can be held personally liable for Loop's and NOLA's margin

debts.  In general, "[a] corporation is a legal entity that exists separately and distinctly from its

shareholders, officers, and directors," *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 775(Ill. App.

Ct. 2005), and parties related to a corporation are normally not subject to corporate liabilities.  *See*

*Dimmitt & Owens Fin., Inc. v. Superior Sports Prods., Inc.*, 196 F. Supp. 2d 731, 738 (N.D. Ill.

2002).  However, an exception to this rule exists when an "individual or entity uses a corporation

merely as an instrumentality to conduct that person's or entity's business."  *Fontana*, 840 N.E.2d

at 775-76.  In such situations, the corporate veil of limited liability may be "pierced" and the

individual held liable for the underlying cause of action.  *Sea-Land Servs., Inc. v. Pepper Source*,

941 F.2d 519, 520 (7th Cir. 1991) (*quoting Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d

565, 569-70 (7th Cir. 1985)).  "[P]iercing the corporate veil" is an equitable remedy designed to

prevent those who fail to respect a corporation's separate legal existence from hiding behind the

corporation to avoid liability for their wrongdoing.  *Fontana*, 840 N.E.2d at 776; *see also Dimmitt*,

---

[7]  Wachovia argues that because Neuhauser signed the NOLA account documents in his capacity as a "general partner" of NOLA, he is personally liable for breach of contract.  However, its is undisputed that NOLA is an LLC and Wachovia's misunderstanding of Neuhauser's role are not a basis for personal liability.  To this end, Wachovia's allegations against Neuhauser for fraud based upon his representation that he was NOLA's general partner were previously dismissed by Judge Hart.  Hart Op., p. 21.

196 F. Supp. 2d at 738. A party seeking to pierce the corporate veil must demonstrate that (1) there is "such unity of interest and ownership" between the individual and the corporation "that the separate personalities of the corporation and the individual . . . no longer exist;" and (2) the circumstances are "such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388-89 (7th Cir. 1994).

To determine whether the "unity of interest and ownership" between an individual and a corporation is such that the corporate fiction should be disregarded, courts consider the following factors: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) non-functioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a shareholder; (10) failure to maintain arm's length relationships among related entities; and (11) whether the corporation is a mere facade for the operation of the dominant shareholders." *Dimmitt*, 196 F. Supp. 2d at 738; *see also Fontana*, 840 N.E.2d at 778; *accord Hystro*, 18 F.3d at 1389). The court's task is to decide whether these factors, taken as a whole, demonstrate that the corporation is actually the alter ego of the individual--no one factor is determinative. *See Dimmitt*, 196 F. Supp. 2d at 738.

### Alter Ego and Piercing Corporate Veil (Loop)

Wachovia proffered sufficient evidence to demonstrate that Loop is actually the alter ego of Greenblatt, Jahelka, and Nichols. First, Wachovia proffered evidence that Loop was inadequately capitalized. "To determine whether a corporation is adequately capitalized, one must compare the amount of capital to the amount of business to be conducted and obligations to be fulfilled. . . .

Absent adequate capitalization, a corporation becomes a mere liability shield, rather than an independent entity capable of carrying on its own business." *Fiumetto v. Garret Enters., Inc.*, 321 Ill. App. 3d 946, 749 N.E.2d 992, 1005, 255 Ill. Dec. 510 (Ill. App. Ct. 2001). Loop's annual reports showed $1000 paid in capital despite Loop's claims that it was capitalized with a $10 million investment. Loop was also in default on a large loan from Banco and continued to seek credit from Banco despite its default status.

Second, Wachovia proffered evidence that Loop failed to observe corporate formalities and that Loop lacked corporate records. Loop's in-house accountant and counsel did not keep track of their time. Jahelka could not recall any of Loop's formal shareholders' meetings, Greenblatt could not recall whether Loop had board of directors' meetings nor could he recall whether Loop had directors at all. Jahelka did not recall seeing any minutes from any meetings, did not know whether a minute book excited for Loop, and testified that the corporate resolutions, to the extent that there were any, were not "in one place." May has never seen a minute book. Greenblatt testified that minute of annual shareholders meeting were recorded and kept, but when Loop's officers met, minutes were not kept.

Third, Defendants have not produced any records or other evidence regarding Loop's present financial status or its solvency. An unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under his control. *Berlinger's, Inc. v. Beef's Finest, Inc*., 372 N.E.2d 1043, 1048 (Ill. App. Ct. 1978); *see also McCracken v. Olson Cos., Inc*., 500 N.E.2d 487, 492 (Ill. App. Ct. 1986) (when there is a failure to produce a legitimate explanation as to the unavailability of business records, it can reasonably be inferred that those documents would have revealed the corporations' poor financial standing). Loop's owners, officers, and shareholders

could not attest to its financial status or solvency. For example, Jahelka stated that he did not know if Loop had sufficient assets to satisfy Wachovia's judgment and offered the Wachovia could have them appraised or determine their value by liquidating them. Greenblatt testified that he is unable to calculate the value of Loop's assets, or even determine if the value of Loop's assets exceeded its liabilities. Greenblatt's best estimate of the value of Loop's assets was "somewhere between zero and 20 million."

Fourth, Wachovia proffered evidence that Loop diverted assets from Loop to insiders. Wachovia produced evidence that Loop made unexplained sporadic payments to Greenblatt, Jahelka, Nichols and related entities both before and after the Loop/NOLA margin debts became due. According to Jahelka, the accounting behind the 2001 compensation payments exists only in the minds of Loop's owners. They did not keep time records, and they had no employment agreements with Loop. Loop also transferred assets, as discussed below, to Scattered, Banco, EZ Links, and Loop Properties– all of which were related entities.

Wachovia also proffered evidence of Loop's failure to maintain arm's length relationships among related entities. The record indicates that Greenblatt, Jahelka, Nichols are Loop's owners, officers, and shareholders and that they worked out of the Wells building. Loop, RTC, Loop Properties, Banco, Scattered, and EZ Links also operate out of the Wells building. The record is replete with evidence that Loop, Loop Properties, Banco, Scattered, EZ Links and RTC share owners, officers, directors, shareholders, employees, equipment, and office space without any proof of reimbursement for services or proof of a formal expense sharing agreement. *See Berlinger's*, 372 N.E.2d at 1048; *see also McCracken*, 500 N.E.2d at 492. The record is further replete with transactions between Loop, the Individual and Corporate Defendants, and other related entities with

little to no formality or explanation. Employees switch stop working for one entity and begin working for another with no rhyme or reason. Assets, investments, and payments are transferred among related entities without explanation. Finally, the related entities loan money to one other, but fail to collect when the loans are in default and the related entities rent office space without expecting to receive rental payments. Therefore, Wachovia has proffered sufficient evidence to demonstrate that there is "such unity of interest and ownership" between the Greenblatt, Jahelka, and Nichols and Loop "that the separate personalities of the corporation and the individual . . . no longer exist."

In addition to demonstrating that Greenblatt, Jahelka, and Nichols and Loop should be treated as a single entity, Wachovia must also show that fraud or injustice will result if the court fails to do so. *See Hystro*, 18 F.3d at 1390. To satisfy this portion of the inquiry, Wachovia must point to more than the mere prospect of an unsatisfied judgment. *See Sea-Land*, 941 F.2d at 522. Rather, Wachovia must show that "some 'wrong' beyond a creditor's inability to collect [will] result" if Loops's veil is not pierced, such as the individuals being unjustly enriched or unfairly avoiding liability after draining corporate assets. *Id*. at 524; *see also Hystro*, 18 F.3d at 1390. Importantly, the Seventh Circuit has given the following as an example of inequitable conduct that justifies veil piercing: "a corporate owner who used his several corporations to avoid responsibilities to creditors." *Hystro*, 18 F.3d at 1390 (*citing Sea-Land*, 993 F.2d at 1312.

There is no doubt that Wachovia has proffered evidence that it would inequitable to allow Greenblatt, Jahelka, and Nichols to escape responsibility for Loop's debts to Wachovia. Indeed, to merely say that Loop's remaining assets were pilfered following the date the margin debt became due is an understatement. After the Loop/NOLA margin debts became due, Loop made nearly $1.5

million in payments to Nichols, Jahelka, EZ Links, and Banco and Loop transferred assets to insider-entities such as Loop Properties, Scattered, Banco, and EZ Links.

If Loop's corporate veil is not pierced, Greenblatt, Jahelka, and Nichols will be unjustly enriched because they will be rewarded for using, transferring, and diverting money to which Wachovia was legally entitled. Such an inequitable result is exactly what the doctrine of piercing the corporate veil is designed to prevent. *See, e.g., Hystro*, 18 F.3d at 1391HN5 ("The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts.") Therefore, the court holds that Wachovia proffered sufficient evidence to create a genuine issue of material fact that Loop's corporate veil should be pierced and Greenblatt, Jahelka, and Nichols held liable for any judgment rendered against Loop in this case.

Conspicuously absent from Wachovia's ASUF is evidence that Loop was Neuhauser's alter ego. Neuhauser was Loop's agent and entered into agreements on Loop's behalf. However, Wachovia proffered no evidence that Neuhauser had any control or ownership interest in Loop nor did Wachovia proffer evidence that Loop's assets were commingled with Neuhauser's or transferred to Neuhauser. Similarly, Neuhauser was not an owner, shareholder, member, officer, or director of any of the related entities. Accordingly, the Individual Defendants' Motion for Summary Judgment as to Counts II-V as they pertain to Neuhauser is granted.

<u>Alter Ego and Piercing Corporate Veil (NOLA)</u>

Regarding NOLA, Wachovia proffered evidence that Greenblatt's, Jahelka's, and Nichols' fathers were NOLA's "members." Wachovia also proffered evidence that NOLA's articles were amended to reflect that Teletech managed NOLA and that Greenblatt was Teletech's sole officer and

employee. However, Wachovia produced little to no other evidence supportive of its assertion that there was a unity of interest and ownership between NOLA and the Individual Defendants to justify piercing NOLA's corporate veil. Wachovia failed to overcome the heavy burden of meeting the "stringent standards" applied to a voluntary contract creditor seeking to pierce the corporate veil under Illinois law. *See Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.,* 864 N.E. 2d 927, 2007 Ill.App. LEXIS 232 at * 30-31 (Ill. App. Ct. 2007) (Piercing the corporate veil is disfavored in a contract situation because the "party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of the limited liability associated with the corporate business form"). Accordingly, the Individual Defendants' Motion for Summary Judgment as to Counts II to V as those counts pertain to NOLA is granted and those allegations are dismissed with prejudice.

### VII.  **Wachovia's claims under the Illinois Uniform Fraudulent Transfer Act (Counts VII through X)**

The Corporate Defendants move for summary judgment on Counts VII through X of Wachovia's RSAC brought under the Illinois UFTA.[8] First, Wachovia brings Counts VIII through X under Sections 160/5(a)(1) and (2) and Section 160/6(a)(1) of the UFTA. The UFTA indicates two types of fraudulent transfers, actual fraud and constructive fraud. 740 ILCS § 160; *In re Martin*, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992). Actual fraud or "fraud-in-fact" results where the "debtor transfers property with the intent to hinder, delay, or defraud his creditors" while constructive fraud

---

[8] The Corporate Defendants' Motion in Limine to Bar Alleged Fraudulent Conveyances not in the Complaint is denied. This Court finds that the RSAC sufficiently pleads these claims in Paragraphs 55-69. Moreover, unlike the newly added fraud claim, Defendants had ample opportunity to conduct discovery on these matters as evidenced by May's production of Exhibit 8 and questions elicited during the Individual Defendants' depositions. Additionally, the RSAC pleaded several Loop and NOLA transfers with specificity in Paragraph 123.

or "fraud-in-law" "occurs when (1) a voluntary gift is made, (2) there is an existing or contemplated indebtedness against the debtor, and (3) the debtor has failed to retain sufficient property to pay the indebtedness." *Id.*

## Actual Fraud

Since actual fraud will not be presumed under Illinois law, Wachovia must prove all elements of actual fraud by clear and convincing evidence. *Hofmann v. Hofmann*, 94 Ill. 2d 205, 225, 446 N.E.2d 499 (1983). Therefore, Wachovia must show that it is highly probable that Loop transferred its assets in question to Scattered, Loop Properties, and Banco with an actual intent to hinder, delay or defraud its creditor, Wachovia. *In re Martin*, 145 B.R. at 946. Various factors are helpful considerations in determining actual intent to defraud. *Id.* at 168. Some of the "badges of fraud" enumerated in the UFTA are: the transfer or obligation was to an insider; the debtor retained possession or control of the property transferred after the transfer; before the transfer was made or obligation was incurred, the transfer was of substantially all the debtor's assets; the debtor removed or concealed assets; the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and the transfer occurred shortly before or shortly after a substantial debt was incurred. 740 ILCS 160/5(b)(1)-(11). "When the badges of fraud are present in sufficient number, it may give rise to an inference or presumption of fraud" and the creditor may prove actual intent. *Id*.

Regarding Loop's transfer of certain stock in EZ Links to Scattered, considering Greenblatt's relationship to Loop, Scattered, and EZ Links, his testimony, at a minimum, creates a genuine issue of disputed fact that the transfer of EZ Links stock to Scattered occurred. Wachovia also put forth

sufficient evidence that the transfer of the property was made to an insider.[9]  Loop and Scattered are owned by Greenblatt, Jahelka, and Nichols and both corporations operate out of the Wells building along with EZ Links.  Put another way, Greenblatt, Jahelka, and Nichols transferred stock in EZ Links from a company they owned to another company they owned.  In that regard, Loop, the debtor, may have retained possession or control of the property transferred after the transfer.  Wachovia also proffered evidence that the transfer occurred after Loop incurred a substantial margin debt.  Moreover, Loop made $1.5 million in payments or investments to EZ Links after the debt and prior to Loop's transfer to Scattered.  Now, Loop claims to be insolvent and unable to pay its creditor, Wachovia.  As such, Wachovia has proffered enough evidence to create a genuine issue of material fact that Loop transferred its assets in EZ Links to Scattered with an actual intent to hinder, delay or defraud its creditor.

Regarding Loop's transfer of Loop's ownership interest in a number of real estate partnerships to Loop Properties, Loop is owned by Greenblatt, Jahelka, and Nichols and Loop Properties is a wholly owned subsidiary of Loop.  Greenblatt, Jahelka and Nichols are officers of both Loop and Loop Properties.  Greenblatt, Jahelka, and Nichols effectively transferred assets from Loop, a company they owned, to Loop's wholly owned subsidiary where they served as officers.  In that regard, Loop, the debtor, may have retained possession or control of the property transferred after the transfer.  The transfer occurred after Loop incurred a substantial margin debt and Loop now claims that it is insolvent and unable to pay Wachovia.  Moreover, Jahelka, Loop and Loop

---

[9]  Under the UFTA, if the debtor (Loop) is a corporation, an insider includes a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is a general partner, a general partner in a partnership described in clause, or a relative of a general partner, director, officer, or person in control of the debtor.

Properties' President, offered conflicting reasons for the transfer.  As such, Wachovia has proffered sufficient evidence to create a genuine issue of material fact that Loop transferred its assets to Loop Properties with an actual intent to hinder, delay or defraud its creditor.

Regarding Loop's transfer of assets to Banco, after Loop incurred its margin debt, Loop received an extension of an existing line of credit from Banco in exchange for a security interest in all of Loop's assets.  Banco agreed to the extension of credit despite the fact that Loop was currently in default.  Banco is owned by Greenblatt's family trust and Greenblatt is its only employee. Greenblatt's input weighed heavily as to which creditors Loop could (and could not) pay, by virtue of Banco's status as Loop's senior secured lender.  In essence, Greenblatt as Banco's only employee and key decision maker decided to loan one of his company's additional money in exchange for a security interest in his own company.  This may explain why Banco never obtained a personal guaranty for any of its loans to Loop and possessed no written appraisals on Loop's assets prior to making its loans to Loop.  Because Greenblatt controlled Banco and Greenblatt owned and controlled Loop, Loop, the debtor, may have retained possession or control of its assets after the transfer to Banco.  As such, Wachovia has proffered enough evidence to create a genuine issue of material fact that Loop granted of a security interest in all of its assets to Banco with an actual intent to hinder, delay or defraud its creditor.

Constructive Fraud

Wachovia must also prove all of the elements of constructive fraud.  *In re Martin*, 145 B.R. at 946.  Constructive fraud or "fraud in law" is the cause of action set forth in § 5(a)(2) of the Act. Establishing fraud in law does not require proof of actual intent to defraud.  *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997); *Scholes v. Lehmann*, 56 F.3d

38

750, 757 (7th Cir. 1995). Rather, transfers made for less than reasonably equivalent value, leaving a debtor unable to meet its obligations, are deemed or presumed to be fraudulent. *In re Zeigler*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005). Whether "reasonably equivalent value" has been given is typically a question of fact. *Id.* Wachovia need only prove constructive fraud by a preponderance of the evidence. *See Bay State Milling Co. v. Martin*, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992). Here, Wachovia proffered sufficient evidence to create a genuine issue of disputed fact of constructive fraud on all three transfers. First, all three transfers occurred after Loop incurred a substantial margin debt and Loop failed to retain sufficient property to pay its indebtedness as evidenced by their claimed inability to pay the arbitration award and Loop's principals' testimony regarding Loop's insolvency.

In determining whether reasonably equivalent value was received under the UFTA, courts should consider how that phrase has been construed under the Bankruptcy Code. *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 374-75 (Bank. N.D. Ill. 2005); *In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998). The Seventh Circuit has recognized that there is no fixed formula for determining reasonable equivalence. *Id.*; *citing Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997). That determination will depend on all the facts of each case. *Id.* Several factors that have been utilized to determine reasonably equivalent value include: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee. *Id.*; *Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.)*, 238 B.R. 758, 773 (Bankr. N.D. Ill. 1999). "Reasonably equivalent value is measured at the time of the transfer." *Id.*; *citing Berland v. Mussa (In re Mussa)*, 215 B.R. 158, 172 (Bankr. N.D. Ill. 1997). Nominal

consideration is inadequate to satisfy the reasonably equivalent value standard. *Id*.; *citing Image Worldwide*, 139 F.3d at 580.

Regarding Loop's transfer to Scattered, Greenblatt, Jahelka, and Nichols transferred EZ Links stock to a company they owned, and therefore, was not at arm's length. Whether the transaction was made in good faith is disputed in light of Loop's debt to Wachovia and, Loop's transfer of $1.5 million to EZ Links prior to its transfer to Scattered. Greenblatt did not know why EZ Links was transferred to Scattered after the margin debt was due. The fact that Greenblatt is incapable of explaining why Loop transferred $1.5 million to EZ Links and then transferred Loop's holdings in EZ Links to Scattered or articulate what, if any, consideration was received, is sufficient to this Court to create a genuine issue of material fact for trial.

Regarding Loop's transfer to Loop Properties, Wachovia has proffered sufficient evidence to show constructive fraud. First, for the reasons previously stated, the transaction was not at arm's length. Second, the transaction was made for no or inadequate consideration. May, Loop and Loop Properties' accountant, did not know what consideration, if any, was received from Loop Properties in exchange for the transfer of real estate interests. Jahelka also testified that Loop was not required to provide any consideration to Loop Properties for the real estate ownership interest because Loop Properties was a subsidiary of Loop. Jahelka also testified that the transfer was "immaterial in the sense that we were transferring from Loop to a wholly owned subsidiary of Loop," and his only justification for the transfer was that it was an "easier way of looking at the universe." Jahelka doesn't think there is 'any appreciable difference" between having the real estate interests under the umbrella of Loop versus Loop Properties. This evidence creates a genuine issue of material fact for trial.

Regarding Loop's transfer to Banco, Wachovia has proffered sufficient evidence that the transaction was not at arm's length and was given without reasonably equivalent value. First, Greenblatt owned Loop and controlled Banco, and therefore, Wachovia proffered sufficient evidence that the transaction was not at arm's length. Second, Wachovia proffered sufficient evidence that the transaction was not made in good faith because Banco decided to loan more money to Loop even though Loop was currently in default and Loop pledged its assets to Banco after the margin debt became due. Banco obtained no written appraisals on Loop's assets prior to making its loans to Loop. Therefore, Wachovia proffered sufficient evidence to create a genuine issue of material fact that the Banco-Loop transfer was one without consideration.

Accordingly, the Corporate Defendants' Motion for Summary Judgment as to Counts VIII through X is denied. Because the Court denied Counts VIII through X against the transferees, the Corporate Defendants' Motion for Summary Judgment as to Count VII, against Loop, is also denied.[10]

## VIII. Conclusion

For the reasons stated herein, Defendants' Motion to Strike Paragraphs 31-36 and 39-43 and Exhibits 9 and 12 of Wachovia's Amended Statement of Material Facts is granted. Plaintiff's Motion for Partial Summary Judgment is denied. The Individual Defendants' Motion for Summary Judgment as to Counts I and VI is granted. The Individual Defendants' Motion for Summary Judgment as to Counts II through V is denied as to Loop, Greenblatt, Jahelka, and Nichols, granted as to Loop and Neuhauser, and granted as to NOLA and the Individual Defendants. The Corporate

---

[10] In addition to the reasons set forth above, Wachovia proffered evidence in support of Count VII that Loop made nearly $1.5 million in payments to insiders such as EZ Links, Jahelka, Banco, and Nichols after the margin debt became due as opposed to paying down its debt to Wachovia. *See* Corp. Rep. 56.1 ¶ 43; Ex.8.

Defendants' Motion for Summary Judgment as to Counts VII through X brought under the Illinois Uniform Fraudulent Transfer Act is denied. Additionally, the Individual Defendants' Motion to Bar Wachovia's New Fraud Claim is granted and the Corporate Defendants' Motion to Bar Alleged Fraudulent Conveyances not in the Complaint is denied.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: November 29, 2007