## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| WACHOVIA SECURITIES, LLC,    ) | |
|    ) | |
| Plaintiff,    ) | |
|    ) | |
| v.    ) | **Case No.  04  C  3082** |
|    ) | |
| DAVID NEUHAUSER;  ANDREW A.    ) | |
| JAHELKA;  RICHARD O. NICHOLS;    ) | |
| LEON A. GREENBLATT III;  BANCO    ) | Judge Virginia Kendall |
| PANAMERICANO, INC., a South Dakota    ) | |
| Corporation; LOOP CORP., a South    ) | |
| Dakota corporation; LOOP PROPERTIES,    ) | Magistrate Judge Maria Valdez |
| INC., an Illinois corporation; and    ) | |
| SCATTERED CORP., a South Dakota    ) | |
| corporation;    ) | |
|    ) | |
| Defendants.    ) | |

## PLAINTIFF'S POST-TRIAL PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Gary I. Blackman (# 6187914)
Christopher S. Griesmeyer (# 6269851)
Attorneys for Plaintiff
Levenfeld Pearlstein, LLC
2 North LaSalle, Suite 1300
Chicago, IL  60602
312-346-8380 (Phone)
312-346-8434 (Fax)

# TABLE OF CONTENTS

I. FINDINGS OF FACT ...................................................................................................... 1
   A.   BACKGROUND INFORMATION ..................................................................... 2
   B.   GREENBLATT'S COMPANIES ........................................................................ 3
   C.   ABOUT LOOP CORP. ..................................................................................... 5
      1.   Initial Capitalization ............................................................... 5
      2.   Loop's By-Laws ....................................................................... 8
      3.   Loop's Office Space ................................................................. 9
   D.   LOOP'S EMPLOYEES AND THEIR ACTIVITIES .............................................. 13
      1.   Accounting and Legal Services for Other Greenblatt Entities ............. 13
      2.   Change in Employers – in Name Only (No Change in Operations) .......... 17
      3.   Sharps Dual Representation of Loop and its "Lender" ......................... 20
      4.   Mr. May's Side-Duties for Greenblatt and his Companies .................... 20
      5.   David Neuhauser ..................................................................... 23
   E.   RECORD-KEEPING AT LOOP ........................................................................ 25
   F.   LOOP'S PAYMENTS TO GREENBLATT, NICHOLS AND JAHELKA ..................... 27
      1.   Loop's "Equity Repayments" to Shareholders ................................. 27
      2.   Loop Suddenly Switches to Paying "Compensation" to Shareholders ...... 31
      3.   Michael May Ignores Accountant's Duty to Verify ............................ 37
   G.   BANCO'S LOAN TO LOOP ............................................................................ 38
      1.   Banco-Loop Loan Terms ......................................................... 42
      2.   Banco's Control Over Loop ...................................................... 44
      3.   Participation of Banco Loan ...................................................... 46
      4.   Loop and Banco's Performance ................................................. 47
      5.   Loop Defaults (and Banco *Increases* Line) ................................. 49
   H.   LOOP'S TRANSFERS TO RELATED GREENBLATT COMPANIES ........................ 51
   I.   LOOP'S LOAN TO SOUTH BEACH ................................................................. 54
   J.   LOOP'S LEGAL REPRESENTATION ................................................................ 56
      1.   The "Hiring" of Ms. Sharp, Mr. Naisbitt and Mr. Willis ...................... 56
      2.   The Testimony of Greg Jordan .................................................. 61
   K.   LOOP'S CURRENT ASSETS .......................................................................... 69

II. CONCLUSIONS OF LAW .............................................................................................. 69
   A.   THE LAW ON VEIL PIERCING ..................................................................... 69
   B.   THE FIRST PRONG – UNITY OF INTEREST AND OWNERSHIP .......................... 73
      1.   Inadequate Capitalization ......................................................... 73
      2.   Failure to Issue Stock .............................................................. 75
      3.   Failure to Observe Corporate Formalities ..................................... 75
      4.   Nonpayment of Dividends ........................................................ 78

        5.     Insolvency of Debtor Corporation .................................................................. 78

        6.     Non-Functioning of Officers and Directors ......................................... 79

        7.     Absence of Corporate Records ........................................................ 80

        8.     Commingling of Assets..................................................................... 81

        9.     Diversion of Assets from the Corporation by or to a Shareholder...................... 82

        10.   Failure to Maintain Arm's Length Relationship Between Related Entities......... 82

        11.   Corporation is a Mere Façade for Operations of Dominant Shareholder ........... 85

    C.    THE SECOND PRONG – SANCTION A FRAUD OR PROMOTE INJUSTICE .............................. 85

    D.    WACHOVIA'S REQUEST FOR ATTORNEYS' FEES............................................................. 87

III. THE LAW ON FRAUDULENT TRANSFERS ........................................................................ 89

    A.    BANCO'S BLANKET LIEN OVER LOOP'S ASSETS ............................................................ 90

    B.    TRANSFER OF LOOP'S REAL ESTATE INTERESTS TO LOOP PROPERTIES........................... 91

    C.    TRANSFERS TO SCATTERED CORP........................................................................... 92

    D.    INVESTMENT IN EZ LINKS AND "COMPENSATION" TO SHAREHOLDERS ......................... 92

IV. PRAYER FOR RELIEF ........................................................................................................ 93

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| WACHOVIA SECURITIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.  04 C 3082** |
| | ) | |
| DAVID NEUHAUSER;  ANDREW A. | ) | |
| JAHELKA;  RICHARD O. NICHOLS; | ) | |
| LEON A. GREENBLATT III;  BANCO | ) | Judge Virginia Kendall |
| PANAMERICANO, INC., a South Dakota | ) | |
| Corporation; LOOP CORP., a South | ) | |
| Dakota corporation; LOOP PROPERTIES, | ) | Magistrate Judge Maria Valdez |
| INC., an Illinois corporation; and | ) | |
| SCATTERED CORP., a South Dakota | ) | |
| corporation; | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S POST-TRIAL PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plaintiff, Wachovia Securities, LLC ("Wachovia"), by and through its undersigned counsel respectfully submits these Post-Trial Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

Wachovia's proposed findings of fact are based upon: (a) the sworn testimony of the witnesses at trial (cited, for example, as "Tr. Vol. 2-A, Pg. __"); (b) the Plaintiff's and Defendants' trial exhibits that were admitted into evidence by: (i) the Parties' Final Pre-Trial Order (Dkt. 300, Ex. 2), and (ii) agreement of the parties at trial (Tr. Vol. 6-B, Pgs. 139-147), which are cited as "PTX" and "DTX," respectively; (c) the parties' pre-trial stipulations of fact (Dkt. 300, Ex. 1, hereafter, "Stip."); and (d) the documents produced in response to Wachovia's post-trial subpoenas to Gregory Jordan's current and former law firms, Polsinelli Shalton

Flanigan Suelthaus PC, and Dykema Gossett PLLC, respectively.[1]  All of the witnesses who testified at trial were either currently or formerly affiliated with or employed by one or more of the Corporate Defendants.

A.  **Background Information**

Plaintiff, Wachovia Securities, LLC ("Wachovia") is a banking and financial institution, and successor to Prudential Securities Incorporated ("Prudential").  (Stip. ¶ 2).[2]  Defendant Loop Corp. ("Loop") is a small, closely held company owned by Defendants Leon A. Greenblatt, III ("Greenblatt"), Andrew Jahelka ("Jahelka"), and Richard Nichols ("Nichols"), or their respective family trusts or estate planning entities.  (Stip. ¶ 19).[3]  The respective ownership interests in Loop are: Greenblatt – 50%, Jahelka – 30%, and Nichols – 20%.  (*Id.*)  Jahelka is Loop's President, Nichols is it's Treasurer, and Greenblatt was the company's Secretary.  (*Id.*, Tr. Vol. 4-B, Pg. 168).  Loop was incorporated in South Dakota on September 12, 1997, and maintains its registered office at 330 South Wells Street, Suite 711 in Chicago, Illinois.  (Stip. ¶ 20).

On or about September 28, 2000, David Neuhauser ("Neuhauser"), acting on behalf of Loop at the direction of Mr. Greenblatt, opened a margin account at Wachovia in the name of "Loop Corp."  (Stip. ¶ 13).  The Individual Defendants used their Loop account at Wachovia almost exclusively to acquire shares of stock in Health Risk Management, Inc. ("HRMI") on margin.  (Stip. ¶ 15; PTX 37).  On May 22, 2001, the NASDAQ halted trading in HRMI, and the value of the Loop account at Wachovia fell into a debit balance.  (Stip. ¶ 16).  Defendants' Loop account incurred a margin debt of $1,885,751.44, resulting almost entirely from holdings in

---

[1] Wachovia will submit the documents produced by the Dykema and Polsinelli firms in response to its post-trial subpoena in a separate Appendix.

[2] For purposes of these proposed Findings of Fact and Conclusions of Law, Plaintiff shall refer to Prudential as "Wachovia."

[3] Defendants Greenblatt, Jahelka and Nichols shall be collectively referred to as the "Individual Defendants," Defendants Loop, Loop Properties, Inc., Scattered Corp. and Banco Panamericano, Inc. shall be collectively referred to as the "Corporate Defendants."

HRMI; the Loop margin debt has never been repaid to Wachovia. (*Id.*; Stip. ¶ 17). Wachovia subsequently obtained an NYSE Arbitration Award, which has been reduced to a judgment against Loop in the amount of $2,478,418.80. (Stip. ¶ 18; PTX 38).

After the margin debt came due in the Wachovia account, Loop transferred assets and made a number of payments to its shareholders and a series of related companies that are owned or controlled by Mr. Greenblatt, including Banco Panamericano, Inc. ("Banco"), Resource Technology Corp., H&M Partners, EZ Links, Scattered Corp. ("Scattered"), 200 West Partners, Telegraph Properties, and Loop Telecom, LP. (PTX 26). Wachovia's judgment against Loop remains unsatisfied, and therefore Wachovia has asserted claims for piercing the corporate veil / alter ego liability to impose its judgment against Loop's shareholders – the Individual Defendants. Wachovia also seeks relief under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a)(1).

**B.     Greenblatt's Companies**

In addition to Loop Corp., Leon Greenblatt owns and controls a number of related companies, and operates them out of a suite of interconnected offices on the seventh floor of a building located at 330 South Wells in Chicago (the "Wells Building"):

- Defendant Banco Panamericano, Inc. ("Banco") is a South Dakota corporation with its principal place of business in Suite 718 of the Wells Building. (Stip. ¶ 32). Banco is wholly owned by one of Mr. Greenblatt's family trusts. (*Id.*; Tr. Vol. 4-B, Pg. 188). Greenblatt is the sole officer, director and employee of Banco. (*Id.*).

- Defendant Scattered Corporation ("Scattered" or "Scattered Corp.") was also incorporated under South Dakota law, and operates out of Suite 711 of the Wells Building. (Stip. ¶ 9). Like Loop, the three owners of Scattered are Greenblatt, who owns 50% of the shares of the company, Jahelka, who owns 30% of the shares of the company, and Nichols who owns the remaining 20% of the shares. (Stip. ¶ 54; Tr. Vol. 4-B, Pg. 186). More specifically, Greenblatt's 50% share of Scattered Corp. is held by the same family trust that owns Banco; the trustee of that trust is Defendant Nichols. (Tr. Vol. 4-B, Pg. 186).

- Defendant Loop Properties, Inc. ("Loop Properties") is an Illinois corporation operating out of Suite 711 of the Wells Building. (Stip. ¶ 8). Loop Properties is owned 90% by Scattered Corp., and 10% by Loop Corp. (Tr. Vol. 4-B, Pg. 185).

- Resource Technology Corporation ("Resource Technology" or "RTC") is owned 100% by Rumpelstiltskin USA, Corp. ("Rumpelstiltskin") (Tr. Vol. 4-B, Pg. 190). RTC's address is "c/o Scattered Corp." (*Id.*).

- Rumpelstiltskin, in turn, is owned 50% by Greenblatt, and Jahelka and Nichols own the other 50%. (Tr. Vol. 4-B, Pg. 191). The address of Rumpelstiltskin is "c/o Elizabeth Sharp," who was employed as the in-house counsel for Loop before she became the in-house counsel for Loop Properties and then finally (and currently) the in-house counsel of Scattered Corp. (*Id.*). According to Mr. Greenblatt, even though Elizabeth Sharp is currently employed as in-house counsel for Scattered Corp., she is also Rumpelstiltskin's attorney. (Tr. Vol. 4-B, Pg. 192).

- Chiplease, Inc. ("Chiplease") is 100% owned by one of Greenblatt's family trusts – the same one that owns Banco – and according to Mr. Greenblatt, the address of Chiplease is "wherever you [i.e., Greenblatt] happen to be." (Tr. Vol. 4-B, Pg. 192).

- Repurcahse Corp. ("Repurchase") is 100% owned by another one of Greenblatt's family trusts, and Greenblatt is solely responsible for the day-to-day operations of that company. (Tr. Vol. 4-B, Pg. 192).

- South Beach Securities, Inc. ("South Beach") operates out of Suite 718 of the Wells Building. (PTX 50). South Beach is wholly owned by NOLA, LLC ("NOLA"). (Tr. Vol. 5-A, Pg. 53). According to NOLA's bankruptcy filings, the address of South Beach is "300 South Wacker, Suite 1700," which happens to be the address of the Robinson, Curley & Clayton law firm, who is defense counsel for Banco and Scattered in this litigation. (PTX 48).

- NOLA operates out of Suite 711 of the Wells Building (PTX 44, 45, 46), as well as Suite 718 of the Wells Building (PTX 75, Pg. 2). The members of NOLA are the fathers of Defendants Greenblatt, Nichols and Jahelka. (Tr. Vol. 5-A, Pg. 53). The manager of NOLA – i.e., the entity in charge of running the day-to-day operations of NOLA – was Teletech Systems, Inc. ("Teletech") (*Id.*).

- Teletech operates out of Suite 711 of the Wells Building. (PTX 70). The lone officer and employee of Teletech is Greenblatt. (Tr. Vol. 5-A, Pg. 53).

- EZ Links is owed, at least partially, by Loop Corp. (PTX 26). According to Michael May – Loop's former in-house accountant, now currently employed through Scattered Corp. – EZ Links is providing the health care benefits for Scattered's employees. (Stip. ¶ 29).

4

## C.    About Loop Corp.

Loop Corp. was incorporated on September 12, 1997 as a wholly owned subsidiary of Rumpelstiltskin USA Corp. (Tr. Vol. 4-B, Pg. 170; PTX 1). That same day, Loop Corp. was "spun off" from Rumpelstiltskin to Messrs. Greenblatt, Nichols and Jahelka. (Tr. Vol. 4-B, Pg. 171). The "spin off" documents were part of Loop's corporate records, which Mr. Greenblatt was responsible for keeping in his capacity as Loop's Secretary. (Tr. Vol. 4-B, Pgs. 168, 171-173).

### 1.    Initial Capitalization

According to the annual reports that Loop filed with the Illinois Secretary of State from 1999 – 2004, Loop was capitalized with $1,000 of paid-in capital. (PTX 7-12). This is also confirmed on the Application for Authority to Transact Business that Loop filed with the State on June 15, 1998. (PTX 4, Pg. 4). Despite these representations to the Secretary of State – which were made by Greenblatt and Jahelka "under penalty of perjury" (*see, Id.*) – the Defendants contend that Loop was initially capitalized with more than $10 million worth of assets. Mr. Greenblatt contends that the documentary evidence to support this purported $10 million capitalization is contained in the Rumpelstiltskin-Loop "spin off" documents, which he was unable to locate – despite the fact that it was his duty as Loop's corporate secretary to keep and maintain them. (Tr. Vol. 4-B, Pgs. 172-173; *see also,* PTX 98, Pg. 6).[4]

Having been unable to locate the corporate records of Loop that would, in fact, establish that the company was initially capitalized with $10 million worth of assets, the Defendants rely

---

[4] At trial, Mr. Greenblatt initially disagreed that he did not know where the "spin-off" documents were kept, he subsequently admitted the following deposition testimony:

> Q:   And so you will agree with me then that during your deposition I asked
>      you the following: "Q: Where are the spin-off documents kept?"
>
> "A:  I don't know."
>
> A:  Yes. (Tr. Vol. 4-B, Pgs.. 173-175).

upon a summary document prepared by Loop's former accountant, Michael May (now employed at Scattered Corp.), after the close of discovery in order to prepare Loop's expert witness – Craig Greene, CPA – for deposition. (Tr. Vol. 1-A, Pg. 120; PTX 98, Pg. 6). That one-page document simply lists a number of real estate and stock investments that were purportedly transferred to Loop Corp. on September 12, 1997, and which total a little over $10 million. (PTX 98, Pg. 6). The document does not identify the basis for any valuations of those investments. (*Id.*). The document does not identify the source of those investments. (*Id.*). Nor does the document describe the method by which those assets were transferred into Loop. (*Id.*).

Mr. Jahelka did not know why this document was never produced prior to the deposition of Loop's expert, Mr. Green. (Tr. Vol. 3-A, Pg. 25); did not know who created the document (Tr. Vol. 3-A, Pg. 27); and though he had seen documents that reflect that the interests reflected on the document were actually transferred to Loop Corp., did not know why they hadn't been produced in this case. (Tr. Vol. 3-A, Pg. 27). When asked whether Loop had all the transfer certificates evidencing that these assets were actually transferred to Loop as part of its initial capitalization, he stated that he didn't know what Loop had. (Tr. Vol. 3-A, Pgs. 28-29).

For his part, Mr. May admitted that he prepared this document without ever seeing any source documents that would have verified that the investments were, in fact, transferred to Loop Corp. (Tr. Vol. 1-A Pg. 125, Vol. 1-B, Pg. 133). Mr. May admitted at trial that he had never even seen a corporate minute book of Loop's records. (*Id.*, Pg. 134). Instead, Mr. May's understanding that the transfer of those assets actually occurred is based entirely upon the word-of-mouth of Loop's shareholders, the Individual Defendants. Thus, Mr. May had no first-hand knowledge of this purported initial capitalization, and admitted that he was simply "instructed by the shareholders that the transfer did take place." (*Id.*). Mr. May further admitted that he had

testified during his deposition that he did not know whether Loop had, in fact, received $ 10 million of paid-in-capital at the time it was formed. (*Id.,* Pg. 123).

The Individual Defendants' representation that Loop was, in fact, initially capitalized with $10 million worth of assets is challenged by the Secretary of State filing that Mr. Greenblatt and Mr. Jahelka signed "under penalty of perjury." (PTX 4). According to Mr. Greenblatt, PTX 4 is certificate of authority to transact business that Loop Corp. filed with the Illinois Secretary of State. (Tr. Vol. 4-B, Pg. 175). Mr. Greenblatt signed this form on June 11, 1998, in his capacity as the Secretary of Loop Corp. (*Id.,* Pg. 176, PTX 4, Pg. 4). Section 10 of that form required Loop Corp. to provide an estimate as to the total value of all property of the company:

> 10(a)  Give an estimate of the total value of all property of the corporation for the following year:
>
> 10(b)  Give an estimate of the total value of all property of the corporation for the following year *that will be located in Illinois*:  (PTX 4, Pg. 4, emphasis added).

In response to both inquiries, Mr. Greenblatt recorded "$1,000" – *not* the $10 million worth of assets that were supposedly infused into Loop Corp. when it was incorporated on September 12, 1997, just nine months earlier. Mr. Greenblatt was unable to explain the discrepancy:

> Q:  Okay. And then you will see down in Section 10A and 10B it asks you to give an estimate of the total value of all the property of the corporation for the following year, and it lists, $1,000. Do you see that?
>
> A:  Yes.
>
> Q:  Why doesn't it list $10 million worth of value of property held by Loop Corp.?
>
> A:  Because I believe that includes the definition of property in Illinois, and that was all that there was.
>
> Q:  Okay. Well, I will agree with you that that is what section B says, "Give an estimate of the total value of all the property of the corporation for the

following year that will be located in Illinois," but section A isn't so limited. ***So, I guess I am wondering why it is that $10 million isn't listed there?***

    **A:**    ***I have no idea.*** (Tr. Vol. 4-B, Pg. 179, emphasis added).

Assuming for the sake of argument that the assets identified on Mr. May's list were, in fact, transferred to Loop Corp. at its inception, the document does not disclose the extent to which the real estate assets were encumbered by mortgages, or whether the other investments were pledged as security for another obligation. (PTX 98, Pg. 6). "The consideration of whether a corporation is adequately capitalized is based on the policy that shareholders should in good faith put at the risk of the business ***unencumbered*** capital reasonably adequate for the corporation's prospective liabilities." *Fontana v. TLD Builders, Inc.,* 362 Ill.App.3d 491, 298 Ill.Dec. 654, 840 N.E.2d 767, 779 (2005), *citing Fiumetto v. Garrett Enterprises, Inc.,* 321 Ill.App.3d 946, 255 Ill.Dec. 510, 749 N.E.2d 992 (2001) (emphasis added). Moreover, Mr. Greenblatt admitted at trial that he did not know if the real estate assets that were purportedly transferred into Loop Corp. on the date of its incorporation – which comprises the bulk of the $10 million worth of the initial capital contribution identified in PTX 98 – were encumbered by mortgages. (Tr. Vol. 4-B, Pg. 181).

    With respect to the assets and securities that were allegedly transferred into Loop Corp. in order to initially capitalize it, Mr. Jahelka testified that the securities and assets that were transferred into Loop are no longer owned by Loop; that he did not recall when they were liquidated; and does not know why Loop didn't produce any corporate records that reflect the sale of those securities. (Tr. Vol. 4-B, Pg. 113).

### 2.    Loop's By-Laws

    The By-Laws of Loop Corp. were marked as a trial exhibit and admitted into evidence. (*See,* PTX. 2). Article III of Loop's By-Laws established the corporate governance standards for directors. (*Id.*, Pg. 5). According to Section 2 of Article III, Loop was required to have at least one (1) director, but not allowed to have any more than two (2) directors:

> SECTION 2. NUMBER, TENURE AND QUALIFICATIONS.
> **The number of directors of the corporation shall be <u>not less</u>**
> **<u>than one (1)</u> and <u>not greater than two (2)</u>.** Each director shall
> hold office until the next annual meeting of shareholders or until
> his/her successor shall have been elected and qualified. Directors
> need not be residents of Illinois or shareholders of the corporation.
> (*Id.*, emphasis added)

Despite this mandate in the company's By-Laws, the Individual Defendants maintain that

Loop has always had three (3) directors – specifically, Greenblatt, Nichols and Jahelka. (Stip. ¶

19. Though the Bylaws required no more than two directors, Loop had three directors. Tr. Vol.

2-B, Pg. 208. Mr. Jahelka did not recall whether the officers or directors of Loop ever amended

that provision. (*Id.*) Though the Bylaws required that an annual meeting of the shareholders

shall be held on the second Wednesday in March of each year at 10:00 a.m., Mr. Jahelka did not

believe there was any meeting that was specifically determined to be the annual meeting held

every year. Tr. Vol. 2-B, Pg. 207. While Mr. Jahelka testified that he did believe that

shareholder or director meetings were held, he agreed that there were no notes or meeting

minutes for any of the shareholder or director meetings. Tr. Vol. 3-A, Pg. 76.

Curiously, the application that Loop filed with the Illinois Secretary of State identifies the

Individual Defendants as the three directors, but also has an attachment identifying two

additional directors – Kevin Werner and Leigh Rabman. (PTX 4, Pgs. 3, 5). Mr. Jahelka never

saw any resignations by any of the directors and if such resignations did exist, Mr. Jahelka would

have expect them to be in Loop's "corporate minute book". Tr. Vol. 2-B, Pg. 210. Thus,

whether Loop had three directors or five, it is clear that the Individual Defendants were operating

Loop in contravention of the company's own By-Laws.

### 3. Loop's Office Space

According to Mr. May, Greenblatt operates his various companies out of a suite of

interconnected offices located on the seventh floor of the Wells Building. While suite numbers

706, 710, 711 and 718 may each have a distinct external door – in fact, suite 710 and 711 share a double door – inside the offices are all interconnected with internal doors that allow the occupants to freely move within the common space. (Tr. Vol. 1-A, Pgs. 75; 103-104).

Because the various companies that comprised their enterprise all operated out of the same common space, the Individual Defendants were often inconsistent when they referred to the suit number of Loop Corp. For example, Greenblatt signed a series of letters on May 10, 2001 on behalf of South Beach, Repurchase, Loop, and Chiplease. (PTX 62-65). The letterhead for each of those letters is identical:

330 South Wells
Suite 711
Chicago, Illinois, USA 60606
Tel: (312) 341-4042
Fax: (312) 341-9596

On May 10, 2001, Greenblatt also signed an identical letter for Banco; while the suite number was different (Suite 718), the telephone and fax numbers were nonetheless identical. (PTX 66).

Three years earlier, on March 25, 1998, Mr. Greenblatt signed an IRS Form 2553 on behalf of Loop Corp. (PTX 5; Tr. Vol. 4-B, Pgs. 181-182). While the Illinois Secretary of State form that Mr. Greenblatt signed on June 11, 1998 identified the address of Loop Corp. as Suite 711, and its date of incorporation as September 12, 1997, the IRS form that Mr. Greenblatt signed just seven months later identified the address of Loop Corp. as "Suite 718," and its date of incorporation as "October 1, 1997." (*Cf.*, PTX 4, Pg. 3, PTX 5, Pg. 1). Mr. Greenblatt could not explain that discrepancy, and instead offered the following glib response at trial:

> Q: Following up on that I take it then you don't know why this IRS form identifies Loop's address as Suit 718 and its date of incorporation as October 1st 1997, when it has been stipulated that the address of Loop Corp. is Suite 711, and it was incorporated on September 12, 1997?

> **A:** **I have no idea. I don't think the IRS cares.** (Tr. Vol. 4-B, Pg. 184, emphasis added).

Similarly, on January 12, 1998, Mr. May signed an IRS Form SS-4, falsely representing himself to be the "VP" or "Vice President" of Loop Corp., even though the only officers of Loop were Greenblatt, Nichols and Jahelka. (PTX 6; Stip. ¶ 19). On that application, Mr. May identified the address of Loop Corp. as "Suite 718." (PTX 6). At trial, Mr. May admitted that he had no idea if that was Loop's correct address when he submitted the form to the IRS. (Tr. Vol. 1-A, Pgs. 80-81). Mr. May did not consider suite numbers to be very important, because the numerous offices on the seventh floor of the Wells Building were really just shared office space. (*Id.*). Mr. May suggested that the fact that Loop, Loop Properties, Scattered, Banco and other entities shared the same office space, furniture, telephone number, and fax number was not relevant because Loop was "just a holding company":

> **Q:** Are you saying it doesn't matter because, from your perspective, all these entities are essentially one big corporate enterprise?
>
> **A:** No. It doesn't matter because of the holding companies – I'm not going out into the general public representing that, you know, I'm Loop Corp. or Scattered. It's just not the nature of that corporation just holding investments.
>
> **Q:** Okay. So when Loop Corp. goes and opens a margin account at Wachovia, Loop Corp. isn't holding itself out to the general public; is that it?
>
> **A:** That's holding it out to Wachovia.
>
> **Q:** Okay. And Wachovia's not part of the general public though; is that it?
>
> MR. DOLINKO: Objection, argumentative.
>
> THE COURT: Overruled. Was there an answer? I don't think there's an answer, and the question is pending.

THE WITNESS: I guess Wachovia would be part of the general public. (Tr. Vol. 1-B, Pgs. 235-236).

Finally, it is worth noting that Loop *never* paid any rent for its office space, and was *never* a party to any lease. (Stip. ¶ 21). Mr. May admitted at trial that Loop never paid any rent for its office space, and the payment of rent was something that, as Loop's accountant, Mr. May confirmed he would monitor. (Tr. Vol. 1-A, Pg. 104). Mr. Jahelka also testified that Loop never paid any rent; did not recall Scattered Corp. ever requesting that Loop pay any portion of the rent and did not know why. Tr. Vol. 2-B, Pg. 201. Mr. Jahelka also could not recall Loop ever paying any utility bills. Tr. Vol. 2-B, Pg. 200.

Loop also operated out of Suite 710 of the Wells Building, along with Loop Properties, Scattered Corporation, and Rumpelstiltskin. (Stip. ¶ 23). After 2003, the rent for Suite 710 was paid by Scattered Corp., under a lease signed by Defendant Jahelka. (Stip. ¶ 24). Scattered's lease was with 200 West Partners, LLP, which was a real estate partnership in which Loop held an ownership interest. (Stip. ¶ 24; PTX 19, Pg. 6). The general partner of 200 West Partners, LLP is 200 West Properties, Inc. (Stip. ¶ 24). The current owner of 200 West Properties, Inc. is Loop Properties, Inc. (*Id.*). Although Scattered was party to lease, Scattered paid no rent for Suite 710 from 1999 through 2003; thereafter, Scattered has paid rent for Suite 710. (Stip. ¶ 25). Importantly, Loop *never* paid rent for Suite 710, has never been on a lease, and did not reimburse Scattered Corporation for its use of any office space. (Stip. ¶ 26).

Like Mr. Greenblatt and Mr. Nichols, Mr. Jahelka's only office is on the 7th floor of 330 S. Wells. (Tr. Vol. 2-B, Pgs. 195-97); the entities that he worked for do not each have their own phone number or fax number and do not separately pay utility bills. Tr. Vol. 2-B, Pg. 198. Jahelka did not know whether Loop, at any point in time, has had its own phone number. Tr. Vol. 2-B, Pg. 201. If someone wanted to call Loop, they would have to call Mr. Nichols or Mr. Greenblatt or Mr. Jahelka directly. Depending on who the caller was would determine whether

Mr. Jahelka was speaking to that person as President of Loop or Loop Properties or one of the other entities he referenced. (Tr. Vol. 2-B, Pg. 202).

Likewise, there was little distinction between the records related to the various entities using the office – all of which were kept by Loop's accountant and lawyer – regardless of the entity. Mr. Jahelka testified, for example, that the financial records with respect to the various for whom he did work were maintained by Loop's accountant, Mr. May and Loop's in house counsel, Ms. Sharp. (Tr. Vol. 2-B, Pg. 204). As an individual involved in each of the various businesses (either a President or officer or director or investor) he would have access to the financial information to all of them. (Tr. Vol. 3-A, Pg. 75).

### D.    Loop's Employees and their Activities

Michael May was employed as Loop's in-house accountant from 1999 through 2002. (Tr. Vol. 1-A, Pgs. 74-75). From 2003 until 2005, Mr. May was employed as the in-house accountant for Loop Properties, and since 2005, has been employed as the in-house accountant for Scattered Corp. (*Id.*). During those same time periods, Elizabeth Sharp was employed as the in-house counsel for Loop, then Loop Properties and now Scattered Corp. (Stip. ¶ 27).

When Mr. May was employed at Loop, his e-mail address was mmay@scattered.com. (Tr. Vol. 1-A, Pgs. 104-105). He could not explain why his domain name was "scattered" at a time when he was employed by Loop. (*Id.,* Pg. 105). When Mr. May was employed by Loop, received health care benefits from RTC. (*Id.,* Pg. 106; Stip. ¶ 29). Now that he is employed by Scattered, he receives his health care benefits from EZ Links. (*Id.,* Pg. 107; Stip. ¶ 29).

### 1.    Accounting and Legal Services for Other Greenblatt Entities

According to Mr. May, Loop had an "accounting and legal team" that would provide accounting and legal services to other entities that were owned, directly or indirectly, by Leon Greenblatt. (Tr. Vol. 1-A, Pgs. 82-84). He was the accountant, and Elizabeth Sharp was the

lawyer on that team. (*Id.*). The entities, which received legal and accounting services from Loop's accountant and lawyer, included Resource Technology Corp ("RTC"), EZ Links, Loop Telecom, Green Gas Delaware Business Trust, Rumpelstiltskin, Chicago Videopath (collectively, the "Greenblatt Entities"). (*Id.*; Stip. ¶ 29).

Mr. May testified that Loop used a rate of $150 per hour to calculate how much to charge the Greenblatt Entities for his accounting services, but Mr. May also admitted that he never kept track of his time. (Tr. Vol. 1-A, Pgs. 86-87). Mr. May did not prepare any bills or invoices to the Greenblatt Entities for Loop's legal and accounting services other than invoices for RTC (which was in bankruptcy had had a trustee appointed). (*Id.*, Pgs. 90-91). According to Mr. May, Loop *never* sent any invoices for legal and accounting services provided to any of the other Greenblatt Entities. (*Id.*).

Mr. May further testified that the few bills that Loop did send to RTC were based upon the number of hours that he and Ms. Sharp spent providing accounting and legal services; but he again admitted that Loop didn't keep records of the time that its employees spent working on various matters. (*Id.*, Pg. 91). Mr. May also admitted that RTC never kept track of the time that he and Ms. Sharp spent working for RTC. (*Id.*, Pg. 93). And neither RTC nor Loop ever did an audit to determine if the amount of the bills accurately reflected the actual amount of time that Ms. Sharp and Mr. May spent providing legal and accounting services to RTC. (*Id.,* Pgs. 93-94). For this reason, the bills that Mr. May prepared for Loop and sent to RTC would simply contain a single line-item for "legal and accounting services." (*Id.*, Pg. 91). Even though Loop billed Mr. May and Ms. Sharp at a rate of $150 per hour, Loop's bills to RTC contained no itemization of the time spent by Mr. May or Ms. Sharp; in fact, the bills didn't even distinguish which portion of the amount due was for "legal" services, and which was for "accounting" services. Essentially, Loop's bills to RTC were pure fabrications, entirely devoid of any objectively

14

verifiable metrics. Ultimately, RTC paid more than $1,635,000 for the "legal and accounting services" provided by Mr. May and Ms. Sharp. (PTX 31, Pgs. 69-70).[5] Because Loop's bills contained no breakdown of time, and because neither Loop nor RTC ever kept track of anyone's time, it would have been impossible for the creditors of RTC to verify that Mr. May and Ms. Sharp, in fact, spent more than 10,900 hours providing legal and accounting services to RTC.[6]

Although Mr. May was aware that Loop had an unpaid margin debt to Wachovia as of May of 2001, he did not know why Loop never used any of the $1.635 million it received from RTC to pay down its debt to Wachovia. (Tr. Vol. 1-A, Pg. 96). Even though he was Loop's accountant, Mr. May testified that he was not responsible for determining how Loop utilized the funds it received from RTC. (*Id.*, Pgs. 96-97). According to Mr. May, "cash management was generally controlled by the owner / shareholders." (*Id.*).

Mr. May's testimony was confirmed by Mr. Jahelka who testified that after Mr. May moved from Loop Corp. to Loop Properties in 2003 and then to Scattered Corporation in 2005, he continued to do work for Loop Corp. even though he was not an employee of Loop Corp. Tr. Vol. 2-B, Pg. 175. When Mr. May was doing work for Loop Corp. after he left Loop Corp., he was being paid by Loop Properties in 2003 and 2004 and by Scattered in 2005. Tr. Vol. 2-B, Pg. 175. Loop never reimbursed Scattered or Loop Properties for the time spent with Mr. May when he was doing work for Loop. Tr. Vol. 2-B, Pg. 176.

Mr. Jahelka testified that to the best of his knowledge no records were kept that would reflect the amount of time Mr. May spent doing work for Loop Corp. and, therefore, the amount

---

[5] Mr. May prepared the document attached as "Exhibit E" to PTX 31 (which is found at Pgs. 69-70 of PTX 31. (Tr. Vol. 1-A, pp. 94-95). The document contains a list of all payments made by RTC to Loop and Loop Properties for the legal and accounting services provided by Mr. May and Ms. Sharp from February 29, 2000 through May 23, 2003.

[6] According to the chart that Mr. May prepared, the total amount paid by RTC for legal and accounting services was $1,635,250. (PTX 31, p. 70). That amount, divided by Loop's hourly rate of $150 per hour, yields 10,901.66 hours.

of money that Loop Corp. should have reimbursed Loop Properties for Scattered for the work done by Mr. May. Tr. Vol. 2-B, Pg. 176.

Likewise, and while employed by Loop, Sharp performed legal services for other entities that were not her employer. (Tr. Vol. 1B, Page 80). Those entities include: Old Colony Properties, LP, 200 West Partners, LP, 401 Partners, LP, South Loop Properties, Telegraph Properties, Randolph Properties, LP, Resource Technology, Easy Links Golf, LLC, and Chicago VideoPath. (Tr. Vol. 1B, Page 81) Sharp did not have any engagement letters with the entities for whom she did work for and was never paid directly by any of them. (Tr. Vol. 1B, Page 80) Sharp testified that in March of 2001, her representation of Telegraph (in a lawsuit brought by the City of Chicago) was a full-time job. (Tr. Vol. 1B, Page 83)

Although she thought that there existed an oral fee sharing agreement between the various entities she did work for, she could not say whether one actually existed. She did not recall ever asking anyone whether a fee sharing agreement existed. (Tr. Vol. 1B, Page 85); did not recall anyone ever telling her that there existed an oral fee sharing agreement to which the entities she did work for were a party. (Tr. Vol. 1B, Page 86); did not know whether all the entities she did work for reimbursed Loop; never saw any bills that were issued to the entities, and did not keep track of her time, other than on forcible entry and detainer cases. (Tr. Vol. 1B, Page 86) No one ever came to her and asked her how much time she had spent doing work for the various entities. (Tr. Vol. 1B, Page 87)

With respect to Ms. Sharp's work for Telegraph Properties while employed by Loop (which she had described at times as a "full time job") Mr. Jahelka could not recall the existence of an oral fee sharing agreement with Telegraph (Tr. Vol. 3-A, Pg. 12); and did not recall whether Telegraph was part of an oral fee sharing agreement when he also was working for Telegraph and could not recall whether Telegraph ever reimbursed Loop for Ms. Sharp's time.

Tr. Vol. 3-A, Pg. 13. With respect to Randolph Properties, another entity Ms. Sharp testified she did work for, Mr. Jahelka was not aware of any oral fee sharing agreement or reimbursement. (Tr. Vol. 3-A, Pg. 13); and did not believe such an agreement existed between Loop and 200 W. Partners nor could he recall whether reimbursements were made. Tr. Vol. 3-A, Pgs. 14-15. Regardless, Mr. Jahelka testified that Ms. Sharp and Mr. May would not keep track of their time. There was no written report that summarized the amount of time they spent on individual projects. Tr. Vol. 3-A, Pgs. 15-16.

Mr. Nichols, on this point, could not shed any light, testifying that while he believed there existed an oral fee sharing agreement between Loop and various entities, he had delegated the billing and collection responsibilities to Mr. May and did not recall actually seeing any bills sent to the other entities for reimbursement. Mr. May, as noted above, testified that he was unaware of any such fee-sharing agreement and confirmed that he never saw any written document regarding fee-sharing between the Greenblatt Entities. (Tr. Vol. 1-A, Pg. 89).

### 2. Change in Employers – in Name Only (No Change in Operations)

Starting in 2003, Mr. May and Ms. Sharp's employer changed from Loop to Loop Properties. (Tr. Vol. 1-A, Pgs. 95-97; Stip. ¶¶ 27-28). At that time, all of the employees of Loop Corp. – i.e., Mr. May, Ms. Sharp, and their assistants – became employees of Loop Properties. (*Id.*). In 2005, their employer changed from Loop Properties to Scattered Corp. (*Id.*). Again, all of the employees of Loop Properties became employees of Scattered Corp. (*Id.*). Mr. May and Ms. Sharp were informed of these employment changed by Loop's President, Andrew Jahelka. (*Id.*).

At trial, Mr. May testified that he did not find the sudden change in employer strange, and he never asked Mr. Jahelka about the reason for the move. (*Id.*). Instead, Mr. May was

simply interested in receiving his paycheck – he did not care where the money came from, even though he was employed as the in-house accountant for each of these entities:

> Q: And you never spoke with or discussed the change in employer from Loop to Loop Properties and Loop Properties to Scattered, you never discussed that with any of the owners at Loop Corp.?
>
> A: Correct. That's a business decision. As an employee, I'm looking for my paycheck.
>
> Q: I understand. And as Loop's accountant that wasn't important to you, the reasons for that change?
>
> A: No. (Tr. Vol. 1-A, Pg. 99)

Mr. May's laissez-faire attitude about his change in employers is perhaps understandable, when one considers that precisely nothing changed in the day-to-day duties of operations of Loop's employees as they moved from Loop to Loop Properties and from Loop Properties to Scattered. Mr. May testified that, following each move, nothing changed regarding his salary. (Tr. Vol. 1-A, Pg. 100). His office didn't move. (*Id.*). None of his office equipment moved. (*Id.*). He did not receive a new telephone, telephone number, fax machine, fax number, or e-mail address. (*Id.*). According to Mr. May, his day-to-day work life didn't change one bit when his employer switched from Loop to Loop Properties, and Loop Properties to Scattered. (*Id.*). Most importantly, Mr. May and Ms. Sharp continued to perform the exact same accounting and legal services for the exact same Greenblatt Entities for which they were working when they were employed at Loop. (*Id.*, Pg. 101; Stip. ¶¶ 27-28).

Likewise, at the end of 2002, Jahelka, President of Loop Corp., told Sharp her new employer would be Loop Properties. (Tr. Vol. 1B, Page 88). He did not tell her why her employer was changing. (Tr. Vol. 1B, Page 88). When her employer changed to Loop Properties, Sharp's office telephone number and e-mail address remained the same. (Tr. Vol. 1B, Page 88-89); with the exception of the work she was doing for RTC (terminated at the

direction of a bankruptcy trustee), the work she had been doing on a day-to-day basis for the (non-Loop) entities continued even after her employment changed. (Tr. Vol. 1B, Page 90)

When Jahelka told Sharp in 2005 that her new employer would now be Scattered Corporation, again, she did not move offices and her telephone number did not change. (Tr. Vol. 1B, Page 91) Tellingly, Sharp left Loop and later Loop Properties, no one took her place at either company and she continued to work on whatever Loop or Loop Properties matters needed to be worked even after her employment at those companies had been terminated. (Tr. Vol. 1B, Page 93).

Jahelka did not recall ever seeing any written resolutions, notes or minutes with respect to the decision made to transfer Mr. May and Ms. Sharp's employment from Loop Corp. to Loop Properties or from Loop Properties to Scattered. Tr. Vol. 3-A, Pg. 17.

The "employees" of Loop Corp., Loop Properties or Scattered did not even attempt to hold themselves out as an employee of a distinct corporate entity. Sharp did not list the name of her employer on either her business cards or her stationery. (Tr. Vol. 1B, Pg. 96). When she would file appearances on litigation matters, she would file them as "Elizabeth D. Sharp" and would listing whatever her suite number was at the time and her personal phone number. (Tr. Vol. 1B, Page 96) Sharp admitted that there would be no way for anyone to know what company she was working for when she appeared on various litigation matters and that she considered each of the entities she did work for as her "clients." (Tr. Vol. 1B, Pg. 97).

After they changed employers, Ms. Sharp and Mr. May continued to work for Loop Corp. Loop Properties and Scattered never reimbursed Loop Corp. for the time spent by Ms. Sharp and Mr. May in the work they did for Loop Corp. and there were no accounting records to keep track of or reflect the time they spent. The day-to-day responsibilities and obligations of Ms. Sharp and Mr. May stayed the same after terminating their employment with Loop Corp. and becoming

employed by Loop Properties as did their business cards, office equipment and phone and fax numbers. (Tr. Vol. 3-A, Pgs. 18-19).

### 3.    Sharps Dual Representation of Loop and its "Lender"

In addition to being in-house counsel for Loop Corp., Sharp was asked by Mr. Greenblatt to be the Registered Agent for Banco Panamericano, Loop's lender. (Tr. Vol. 1B, Page 99). In the Guaranty and Security Agreement, dated January 3, 2000, entered into between Loop Corp. and BancoAmericano (it's lender), Sharp was listed as the person to whom any notices under that Agreement should go if directed to Banco, the lender. (Tr. Vol. 1B, Page 102). (PTX 19, Sec. 10.6, Pg.29). Ms. Sharp admitted that the person listed in a loan document to whom notices should be given is typically "... *the person who is the legal representative, the lawyer for one of the contracting parties as opposed to which registered agent.*" (Tr. Vol. 1B, Pgs. 103-104). (PTX 19 Pg. RS3476).

Although she was Loop's in-house counsel when the initial loan was entered into, Sharp did not know why she was not listed in the Guaranty and Security Agreement as the legal representative to whom notices should go if made to Loop Corp. (Tr. Vol. 1B, Page 104). Notwithstanding this clear conflict, Sharp never obtained or requested conflict waivers from Loop Corp. when she was acting as both Loop Corp.'s in-house counsel and Banco's Registered Agent. (Tr. Vol. 1B, Page 99).[7]

### 4.    Mr. May's Side-Duties for Greenblatt and his Companies

In addition to the accounting services he was providing the various Greenblatt Entities during the course of his employment at Loop (and Loop Properties and Scattered), Mr. May also had a number of uncompensated side-duties that he performed for Mr. Greenblatt personally.

---

[7] As this Court is aware, Ms. Sharp had to be removed from this case (on the Court's own motion) as counsel for Loop when she failed to recognize or appreciate that she could not be both the lawyer for Loop and a critical witness against it.

Mr. May testified that he prepared Mr. Greenblatt's personal tax returns, for which he was not paid – although both Mr. May later testified that he had received White Sox World Series tickets and a pool table from Mr. Greenblatt over the years. (Tr. Vol. 1-A, Pg. 107).

Mr. May also held himself out as an officer and director of Greenblatt's various companies – always at the request and direction of Mr. Greenblatt. For example, Mr. May admitted that he was never an owner, director or shareholder of Loop Corp. (Tr. Vol. 1-A, Pg. 77). Yet, on January 12, 1998 he held himself out as the "Vice President" of Loop Corp. in a tax filing that he submitted to the IRS. (PTX 6). At trial, anticipating questioning on this topic, Mr. May volunteered that "Once, I think, I was a VP in filling out a form for them to get an identification number." (Tr. Vol. 1-A, Pg. 77). Even so, Mr. May described it as "just a title position" for the purpose of obtaining an identification number for the company. Mr. May admitted that he was never compensated for his duties as a "Vice President" of Loop, and the position lasted "just a few days," until the IRS issued the FEIN number. (Tr. Vol. 1-A, Pgs. 79-80).

In addition to holding himself out as the Vice President of Loop, Mr. May also held himself out to Loop's creditors as the "Assistant Vice President" of Banco. (*See*, PTX 107).[8] At trial, Mr. May confirmed that he was *never* an officer, director or shareholder of Banco. (Tr. Vol. 1-A, Pg. 108). Yet, on September 27, 2002, Mr. May wrote a letter – on behalf of Banco, Loop's lender – to Golf Venture, LLC (one of Loop's creditors), identifying himself as the "Assistant Vice President" of Banco. (PTX 107). According to Mr. May, it was Greenblatt who asked him to write this letter and identify himself as an officer of Banco at a time when he was

---

[8] PTX 107 was a complaint filed against Greenblatt, Nichols and Jahelka by Golf Venture, LLC. "Exhibit F" to that complaint was a September 27, 2002 letter from Mr. May to Golf Venture, written on behalf of Banco. At trial, by agreement of the parties, Wachovia redacted PTX 107 to include only "Exhibit F." Hence, PTX 107 now simply refers to Mr. May's September 27, 2002 letter.

employed as the accountant for Loop. (Tr. Vol. 1-A, Pg. 112). Moreover, in that letter Mr. May

invites Golf Venture to enter into an agreement with Banco, and to contact Elizabeth Sharp –

Loop's in-house lawyer – to document the deal on behalf of Banco:

> In order to avoid an unnecessary and detrimental series of events
> we [i.e., Banco] have suggested that a compromise inter-creditor
> agreement be reached wherein Banco would allow GV to be repaid
> on its $1,000,000 unsecured note coincident and pari-parsu with
> repayment to Banco of its $9,900,000 secured note rather than
> subsequent and subordinate to Banco…
>
> **If you determine that this approach is acceptable, please have
> the appropriate person contact Elizabeth Sharp who will co-
> ordinate documentation of the agreement.** (PTX 107).[9]

Even though he wrote the letter, Mr. May could not explain the logistics of that proposed

transaction:

> Q: Okay. But why would they – if they [Golf Venture] want to enter into an
> agreement with Banco, why would they contact Ms. Sharp to document the
> agreement when Liz Sharp is the in-house counsel for Loop?
>
> A: I don't know.
>
> Q: Okay. And you weren't concerned at all that you were holding yourself out
> as the assistant vice president of Banco at a time when you were Loop's
> accountant; is that right?
>
> A: Correct.
>
> Q: And that's because Mr. Greenblatt asked you to write this letter; is that
> right?
>
> A: Yes. (Tr. Vol. 1-A, Pgs. 114-115)

Given the various side-jobs that Greenblatt assigned to Mr. May – e.g., representing

himself as the Vice President of Loop and the Assistant Vice President of Banco – coupled with

---

[9] As noted above, this was not the first time that Ms. Sharp has been identified as a representative of Banco (Loop's
lender) when she was employed as Loop's in-house counsel.

the fact that the name on his paycheck continuously changed, it is little wonder that Mr. May effectively viewed his real employers to be Greenblatt, Nichols and Jahelka.[10]

### 5.    David Neuhauser

David Neuhauser ("Neuhauser") worked for Mr. Greenblatt as a personal clerk, and also worked for South Beach, which shared the same office as Loop: 330 South Wells, Suite 711. (Tr. Vol. 2-A, Pgs. 114-115) During that time period, Mr. Neuhauser also did work for RTC out of the same office. (*Id.*, Pg. 119) One of Mr. Neuhauser's jobs was to assist Mr. Greenblatt with an investment strategy involving HRMI. (*Id.*, Pg. 120) Neuhauser would purchase HRMI stock on the open market for Mr. Greenblatt through a number of brokerage accounts; at trial, Neuhauser confirmed that he would personally call in trades for HRMI stock, and would do so at the direction and request of Greenblatt. (*Id.* Pg. 121). In fact, Neuhauser was the one who opened up the Loop margin account at Wachovia, again at the direction and request of Greenblatt. (*Id.,* Pgs. 122-123, 129) Neuhauser called in trades for HRMI stock via the Loop account at Wachovia, always at Greenblatt's direction:

> Q:    Okay. And the trades that you called in for HRMI stock on behalf of Loop Corp., those trades were always done at the direction of Mr. Greenblatt; is that correct?
>
> A:    Yes. I wouldn't – yes.
>
> Q:    Okay. Nobody else would direct you to make trades in HRMI stock on behalf of Loop Corp.?
>
> A:    No. (*Id.*, Pg. 122)

---

[10] At trial, Mr. May testified as follows:

> Q:    You're familiar with Mr. Greenblatt, Mr. Jahelka, and Mr. Nichols, I take it, correct?
>
> A:    Correct.
>
> Q:    Okay. And how are you familiar with them?
>
> A:    They're my employers. (Tr. Vol. 1-A, p. 76).

Neuhauser also opened up a margin account at Wachovia in the name of NOLA, LLC. (PTX 43). As with the Loop account, Neuhauser called in trades for HRMI stock at the direction of Mr. Greenblatt. (Tr. Vol. 2-A, Pg. 132). Greenblatt also asked Neuhauser to open an account on behalf of NOLA at RJ Steichen & Co., and in doing so Neuhauser held himself out as the "Secretary" of NOLA (much like Mr. May held himself out as the vice president of Loop and assistant vice president of Banco) even though Neuhauser admitted that he did not hold that position. (*Id.*, Pg. 133; PTX 75).

Neuhauser also opened accounts at First Union Securities on behalf of Chiplease, and at Northern Trust Securities on behalf of Teletech. (*Id.*, Pgs. 137, 139-140; PTX 58; PTX 70). In each of those accounts, Neuhauser called in trades for HRMI stock at the request and direction of Greenblatt. (*Id.*).

On May 14, 2001, Neuhauser and Greenblatt jointly signed a letter on behalf of Loop Corp., directing First Union Securities to wire cash and accrued interest from "our accounts" – i.e., Neuhauser and Greenblatt's accounts – held in the name of Banco, Chiplease, Loop, South Beach and Repurchase. (PTX 61). At trial, Neuhauser admitted signing this letter, and testified that he had no idea of the address and contact information of Loop Corp. set forth on that letterhead – i.e., Suite 711 of the Wells Building – was correct. (Tr. Vol. 2-A, Pgs. 140-141). Four days earlier, on May 10, 2001, Neuhauser signed a series of individual letters on behalf of South Beach, Repurchase Corp., Loop, Chiplease and Banco. (*Id.*, Pgs. 149-155; PTX 62-66). Neuhauser did not recall writing any of those letters, did not know why he would have signed them, and did not know if the address and telephone numbers for the various entities was correct. (*Id.*). But, he did confirm that he had opened each of those accounts at the direction and request of Greenblatt:

Q: The accounts we are talking about here that are identified on these letters that you signed on or about May 10th, 2001, the Loop account, the South Beach account, the Repurchase Corp. account, the Chiplease account, the Banco Panamericano account, it is your understanding that you were involved in opening up those accounts, right?

A: Yes.

Q: And you would have opened those accounts at the direction and at the request of Leon Greenblatt, correct?

A: Yes. (Tr. Vol. 2-B, Pg. 165).

## E. Record-Keeping at Loop

Mr. May, as Loop's accountant, was responsible for preparing the company's accounting records. (Tr. Vol. 1-A, Pg. 116). But Mr. May never prepared or maintained monthly accounting records for Loop, such as profit-and-loss statements, account payable records, account receivable records, or operating budgets. (*Id.*). Nor did Mr. May ever prepare or maintain any sort of capital account reconciliation reports, or any other records concerning the capital accounts of its owners. (*Id.*). Thus, whenever a shareholder sought to take a distribution from Loop, there was no way for Mr. May to know whether that shareholder had, in fact, contributed sufficient capital into the company to fund the distribution.

Although Mr. May testified that he provided accounting services for other Greenblatt Entities during the course of his employment at Loop, it appears that his accounting services for Loop itself simply involved preparing and filing tax returns. Mr. May testified that he prepared tax returns for Loop for the years 2000, 2001 and 2002. (*Id.*, Pg. 140). He never prepared tax returns for Loop for the years 2003, 2004, 2005 or 2006, however. (*Id.*).

In order to prepare the tax returns for 2000 - 2002, Mr. May prepared year-end trial balances, which, in turn, were prepared based upon Loop Corp.'s bank records. (*Id.*, Pg. 142). Mr. May admitted that the bank records only gave him an idea of how much money was going into and out of the company – the records did not tell him what a given payments was for. (*Id.*,

Pg. 145). In order to find out to what a given payment related, Mr. May simply asked Jahelka and relied on whatever characterization he (Jahelka) provided for the payment – Mr. May did nothing to independently verify or confirm Jahelka's characterization of Loop's transactions. (*Id.*).

Even though he did prepare tax returns for 2000 – 2002, Mr. May prepared them years after the filing deadline had passed. For example, Mr. May prepared Loop's 2000 return on April 4, 2003. (*Id.,* Pg. 146; PTX 13). Mr. May could not explain why he was preparing Loop's year 2000 tax return in 2003, at a time when he was employed as the in-house counsel for Loop Properties. (*Id.,* Pgs. 149-150). He further admitted that Loop Properties never received any compensation from Loop Corp. in exchange for the services he rendered in preparing Loop's tax returns. (*Id.*). Mr. May waited until April 28, 2003 to prepare Loop's 2001 return. (*Id.,* Pg. 152; PTX 14). And although Loop's 2002 tax return is not dated, Mr. May testified that he prepared that return shortly after April of 2003. (*Id.*, Pg. 156; PTX 15). On some of Loop's tax returns, he used his home address; on other returns, he used the address of Loop Properties. According to Mr. May, there was "no rhyme or reason" as to what address he used as Loop's tax preparer. (*Id.*, Pg. 150). Loop Corp. did not have what would typically be referred to as a "corporate minute book" that contained, for example, corporate resolutions, stock certificates, or certificates of incorporation. (Tr. Vol. 1B, Page 49)

Ms. Sharp, the in-house counsel, confirmed the lack of thoughtful recordkeeping at Loop. Sharp testified that the annual reports were kept in a separate manila file and that the corporate resolutions related to different financing transactions were in the "closing binders" [documents outside of Loop's records] related to those transactions. (Tr. Vol. 1B, Page 51-52). With respect to the documents that might be in some of the files for individual financing transactions, Ms.

Sharp did not know whether copies of all those documents made it into the corporate document file she was maintaining. (Tr. Vol. 1B, Page 53).

Sharp testified that when she was initially hired to work for Loop Corp., she was not hired to do corporate governance work, but that that was something she assumed the responsibility for in late 1999 or 2000. (Tr. Vol. 1B, Page 60). Ms. Sharp testified that until she took over the responsibility of maintaining corporate records in late 1999 or 2000, she did not know who at Loop was charged with the responsibility of maintaining the records while she was there. (Tr. Vol. 1B, Pgs. 61-62). When she did undertake the responsibility of maintaining the corporate records, she did not, at the time, do a uniform search for the company's corporate records. (Tr. Vol. 1B, Page 63).

**F.      Loop's Payments to Greenblatt, Nichols and Jahelka**

During the pre-trial discovery process, Michael May prepared a list of payments in excess of $10,000 that Loop Corp. had made in 2000, 2001 and 2002. (Tr. Vol. 1-B, Pg. 163; PTX 26). This document was the focus of much trial testimony and, according to the Individual Defendants, the payments identified on PTX 26 were either: (a) equity repayments / distributions to Loop's shareholders, (b) compensation to Loop's directors, (c) investments in related Greenblatt Entities, or (d) payments made to other, related Greenblatt Entities for which Loop received a credit on its line of credit with Banco. The first two categories of payments are discussed directly below, and the latter two categories will be analyzed after a discussion about the Banco loan.

**1.      Loop's "Equity Repayments" to Shareholders**

According to Mr. May, the first three categories of payments – identified in Sections A, B and C to PTX 26 – represent Loop's equity repayments to Greenblatt, Jahelka and Nichols,

respectively. (*Id.*, Pgs. 164-165). Mr. May was quite clear that these payments were most definitely a return of "equity," and not "compensation" to Loop's shareholders. *Id.*

Mr. May was unable to explain why he characterized a $10,000 payment to "Bob Jahelka" on July 27, 2000 as an "equity repayment," since he knows that Bob Jahelka – Mr. Jahelka's father – was not a shareholder of Loop. (*Id.*, Pgs. 164-165). Nor could Mr. May explain the inconsistent distribution of equity – specifically, why the shareholders of Loop received equity repayments in differing amounts on different days (e.g., why Jahelka and Nichols each received equity repayments on April 10, 2000, but Greenblatt did not). (*Id.*). Mr. May also acknowledged that he did not maintain capital account records for the shareholders; therefore, even though he was Loop's accountant, he simply relied upon Greenblatt, Jahelka and Nichols to tell him whether there was sufficient equity in the company to merit a distribution;

> Q: Okay. Now, you testified earlier that you never prepared any sort of capital account reconciliation and reports. **And, so, I guess I'm wondering how it is that Loop Corp. know that, for example, Andrew Jahelka had at least $242,000 in his capital account as of 2000, so he could get paid that amount from Loop Corp.?**
>
> A: **It's generally up to the shareholders to keep track of their own basis.**
>
> Q: Okay. So that's not something you would do as the company's accountant?
>
> A: No.
>
> Q: Okay. So when Andrew Jahelka says, you know, I want to pay myself $242,000 and take a distribution from Loop Corp. in 2000 in this amount, it's not up to you as Loop Corp.'s accountant to say, "Well wait a minute. Let's take a look here to figure out how much money Mr. Jahelka has paid into the company to figure out if there's enough to pay that $242,000 to Mr. Jahelka," is that right?
>
> A: **The basis is, you know, kept and calculated by the shareholders.**
>
> Q: Not by you, the accountant?
>
> A: No.

Q:    Okay. And the same would hold true obviously for the [equity] payments to Mr. Nichols and Mr. Greenblatt, right?

A:    Correct. (*Id.*, Pgs. 166- 167, emphasis added).

According to Mr. May, the payments to Greenblatt, Nichols and Jahelka in 2001 (reflected in Sections G, H and I of PTX 26) were repayment of equity for the first half of the year – at least, until May of 2001, when Loop's margin debt came due. (*Id.*, Pgs. 168-172). Mr. May also confirmed, however, than when he was preparing the list of transactions, he did absolutely nothing to independently verify the characterization of those payments. Instead, he just had "conversations with the shareholder / owners on what these payments represented," and accepted the representations of Greenblatt, Nichols and Jahelka about how those payments should be characterized. (*Id.,* Pgs. 171-172).

The testimony of the shareholders themselves did not clarify matters. Mr. Nichols believed that the payments made to him and the other shareholders prior to May of 2001 were capital distributions, however, he was not aware of any document that reflected or confirmed that. (Tr. Vol. 4-B, Pg. 137). Mr. Jahelka, for his part, was not sure how it was that his capital accounts were maintained and while he testified that he recalled seeing a capital account reconciliation, he did not know why -- if one existed -  it would not have been produced in this case. (Tr. Vol. 2-B, Pgs. 249-250); could not recall the last time he saw a capital account reconciliation; (Tr. Vol. 2-B, Pg. 250); and when asked whether he would disagree with Mr. May's statement that May had never prepared a capital account reconciliation, stated only that he would disagree to the extent that he has a "vague recollection of seeing one". (Tr. Vol. 2-B, Pg. 251).

As for exactly how the distributions would be obtained, Nichols confirmed that the process of obtaining capital distributions consisted merely of him or Mr. Jahelka or Mr.

Greenblatt going to Mr. May and advising him to write a check to them for a certain amount.
(Tr. Vol. 4-B, Pg. 137). The amount of the distribution would be decided by the person
requesting it. In this regard, Mr. Nichols testified as follows:

> Q: You are not understanding my question. How did you come up with the
> amount? I am understanding that if you tell Mr. May to put in $1,000 he
> will write down $1,000, but how did you come up with the amount that
> you choose to pay yourselves [as distributions] on a particular day. I am
> talking about the number itself. Is this difficult?

> A: Obviously, more difficult than I am making it. If I needed cash for
> something personally, for example, $20,000, I would ask the other two,
> Mr. Greenblatt and Mr. Jahelka, for a distribution and they would either
> approve it or disapprove it, and depending upon availability of resources,
> it was either available or it wasn't. (Tr. Vol. 4-B, Pgs. 139-140).

Mr. Nichols further testified that after deciding how much monies he or one of the other
shareholders would want to distribute to themselves, he would "talk to Mr. Greenblatt, and that
was one of the functions that Mr. Greenblatt would have, is confirm that a distribution could be
taken". (Tr. Vol. 4-B, Pg. 140). Nichols admitted that when Loop would make a distribution to
one person, it would not necessarily make a proportionate distribution to the other two on the
same day. Instead, the way the three shareholders handled the distribution process was each
would informally request a distribution on any given day and if there was money available, it
could be taken, but there was no requirement that the other two shareholders get distributions
equally as well. (Tr. Vol. 4-B, Pgs. 145-146).

Finally on this point, Nichols testified that there are no records reflecting any discussions
amongst the shareholders regarding the distribution process; no agreements that were entered
into amongst the shareholders that provide for one person getting a distribution and not the other
two and no discussions with Loop's general counsel, Ms. Sharp, as to whether that process was
proper. (Tr. Vol. 4-A, Pg. 146). Mr. Jahelka confirmed all of this when he testified that because

Loop kept no capital account reconciliations - or any documents with respect to return of capital - there is no document that anyone can look at that shows that a payment made was reflected in Mr. Jahelka's capital account or that the shareholders even had a capital account balance on any given date. (Tr. Vol. 3-A, Pg. 79).

### 2. Loop Suddenly Switches to Paying "Compensation" to Shareholders

After Loop's margin debt came due, the Individual Defendants decided to call their equity repayments "compensation." According to Mr. May, in May of 2001, *"all of a sudden there was a magical switch and they [the shareholders of Loop] said that after HRMI, we're going to characterize these payments as compensation."* (*Id.*, Pg. 173). The only reason Mr. May knew to refer to those post-May-2001 payments as "compensation" was because that is how Jahelka and Nichols told him to classify the payments:

> Q: And the only way you know that those are compensation and not repayment of equity is because you're relying upon information that in this case that Mr. Nichols told you, right?
>
> A: Correct.
>
> Q: And the same thing with Mr. Jahelka, section I of the form [PTX 26] references $67,000 of payments to Mr. Jahelka. Were those compensation or were they equity repayments?
>
> A: I believe, up until May of '01, they would be equity repayments. After that would be considered compensation.
>
> Q: Okay. And, again, the only way you know that is because that's what Mr. Jahelka told you, and that's how he told you to classify those payments, correct?
>
> A: Correct. (*Id.,* Pgs. 173-174).

But when the Individual Defendants decided to start calling their distributions "compensation," they did not treat those payments as compensation for tax purposes. According to Mr. May, Loop ***never*** issued W-2 Forms for the compensation paid to Jahelka and Nichols, and ***never*** withheld taxes from that compensation. (*Id.*, Pgs. 174-175). This differs starkly from

the compensation that Loop paid to Mr. May, Ms. Sharp, and all of its other employees in 2000, 2001 and 2002, which were reported on W-2 Forms issued by Loop. (*Id.*, Pgs. 151, 153). Moreover, the compensation that Loop paid to its employees was reported on Loop's tax returns, whereas the "compensation payments" to Mr. Nichols and Mr. Jahelka were not.

Mr. May testified that the salaries of Mr. May and Ms. Sharp were reported on Line 2 (as "cost of goods sold") for 2000 and 2001, and the salaries of their assistants were reported on Line 8 (as "salaries and wages") for those years. (*Cf.*, PTX 13, PTX 14; Tr. Vol. 1-B, Pgs. 150-151). For 2002, the salaries of Mr. May and Ms. Sharp were lumped together with their assistants' salaries and reported on Line 2 of Loop's return. (*Id.*; PTX 15).

Loop's tax returns provided a line item for "compensation of officers" at Line 7, and for 2000, 2001 and 2002, that line item is blank. (*Cf.*, PTX 13, PTX 14, PTX 15). Mr. May explained that he never reported the compensation to Nichols and Jahelka on Loop's 2001 tax returns because those compensation payments were made off-the-books – although he could not explain why those payments were made outside of Loop's normal payroll process:

> Q: Why is it that the compensation that Loop Corp. supposedly paid to Mr. Jahelka and Mr. Nichols in 2001, which Is reflected in sections H and I on Plaintiff's Exhibit – Trial Exhibit 26, how come those aren't reflected on the tax returns?
>
> A: I consider the 7, 8 and the line 2 of page 2 to be salaries that we ran through the payroll service where we had taxes taken out. **Since we didn't run them through the payroll service as salary, I did not put them on that line.**
>
> Q: **So the compensation that Mr. Jahelka and Mr. Nichols received, that was outside of Loop Corp.'s normal payroll process; is that right?**
>
> A: **Correct.**
>
> Q: Okay. And is there any reason that the compensation they received wasn't through the normal payroll process?
>
> A: Sorry. What was the question again?

> Q:  **Why – why?  Why was the compensation that Mr. Nichols and Mr. Jahelka received, why wasn't that run through the normal payroll process of Loop?**
>
> A:  **Just didn't run it through the payroll.**
>
> Q:  Whose decision was it not to run it through the payroll?
>
> A:  It would be the three shareholder / owners.
>
> Q:  Okay.  You didn't have anything to do with that decision?
>
> A:  No.  (*Id.,* Pgs. 175-176, emphasis added).

Similarly, Loop never issued W-2 Forms or withheld taxes from the compensation payments that were paid to Nichols and Jahelka in 2002. (*Id.,* Pgs. 177-178; *cf.,* PTX 26, §§ P, Q; PTX 15, line 7).  The compensation once again fell outside of Loop's normal payroll process, and was never accounted for on Loop's tax returns. (*Id.*).  Starting in 2003, Nichols and Jahelka started taking compensation from Loop Properties. (*Id.,* Pgs. 185-187; PTX 27, Pgs. 2-3).  As was the case with Loop Corp., Loop Properties never filed tax returns or issued W-2 statements for the compensation that they took. (*Id.*).  Mr. May also confirmed that Loop Properties never prepared or filed tax returns for 2003 or 2004. (*Id.*).

On this point, Mr. Jahelka could not state why Loop did not issue 1099s reflecting compensation paid to him and did not recall how it was he listed that income on his tax returns. (Tr. Vol. 2-B, Pgs. 229-230).  In answer to a question by the Court, Mr. Jahelka could not recall at all how he treated payments after May, 2001 on his personal tax returns and had no recollection as to whether he treated any payments as a partnership distribution or as other income. (Tr. Vol. 4-A, Pgs. 82-83). [11]

Mr. Jahelka admitted that after the "collapse" of HRMI" [in May, 2001, Loop was unable to pay its debts as they came due. (Tr. Vol. 2-B, Pg. 193).  Nonetheless, the

shareholders chose to pay themselves "compensation" – payments that before May of 2001, they called "distributions."

Section 7.13 of the Loop Bylaws required Loop to obtain in writing permission from its Lender to pay its officers and directors compensation after the occurrence and during the continuation on an event of default, however, Mr. Jahelka testified that he knew of no such writing. (Tr. Vol. 4-B, Pgs. 115-116). Mr. Jahelka also acknowledged that the Bylaws state that the Board of Directors can establish a "reasonable compensation system" for its directors for their services (Tr. Vol. 2-B, Pg. 211), there was never a compensation plan *per se* and no formula as to how each would be paid. (Tr. Vol. 2-B, Pgs. 212-213).

In order to determine how much to pay themselves as compensation, Mr. Jahelka initially testified that one of the factors was the time they spent on various projects, however, they did not keep track of the time spent on any projects. (Tr. Vol. 2-B, Pg. 214). When asked whether he could be more specific in terms of how the tasks involved translated into a specific compensation amount and whether he could give any examples, he said he could not. (Tr. Vol. 2-B, Pg. 220).

At another point, however, Jahelka testified that the compensation was "*generally tied to what the corporation had available to pay.*" If there was little money to be paid, the compensation would go down and if there was more money to be paid, the compensation would go up. How much to pay themselves was determined by the bank balance. (Tr. Vol. 2-B, Pgs. 215-216). The amount of compensation was determined by looking at whatever cash was in the checking account, which he would review on a regular basis. Jahelka testified that compensation would be paid "*whenever one of the three of us brought it up for a discussion*". (Tr. Vol. 2-B, Pgs. 227-228).

---

[11] Given the importance of these issues, one would think that the shareholders – all three intelligent people - would have looked at their tax returns at some point since this action was commenced filed in 2004.

*Mr. Jahelka admitted that in 2001 when the "compensation plan began" he made the decision that it would be more important to pay themselves than certain creditors.* (Tr. Vol. 2-B, Pgs. 217-218). When asked to explain why it was he and other directors began to pay themselves compensation after May 2001, for doing the same services they had done before May of 2001 (for which there was no compensation) Mr. Jahelka testified as follows:

> Q: Why did you, as the directors, decide in May of 2001 that you would begin compensating yourself at that time?
>
> A: Because I was performing services for the corporation.
>
> Q: But you were performing services for the corporation before May of 2001, were you not?
>
> A: Yes.
>
> Q: Ok, so why not compensation yourself then?
>
> A: I could have.
>
> Q: Why didn't you?
>
> A: I don't know? (Tr. Vol. 2-B, Pg. 223).

Mr. Jahelka then admitted to giving the following answer to the following questions in his deposition:

> Q: Why is it that you would not be compensated for the same time in 2000?
>
> A: We created it differently.
>
> Q: Why?
>
> A: I don't recall.
>
> Q: Who would know?
>
> A: I don't know. (Tr. Vol. 2-B, Pg. 225).

Mr. Jahelka also admitted that in May of 2001, when the Board had supposedly made the decision that he and Mr. Nichols would be compensated, that there were creditors of Loop Corp. that were going unpaid. (Tr. Vol. 2-B, Pg. 226). One creditor that was being paid at that time was Banco PanAmericano. (Tr. Vol. 2-B, Pg. 226). After May of 2001, Mr. Jahelka, Mr. Greenblatt and Mr. Nichols would make the decision as to which creditor would be paid. The decision was made that paying Mr. Nichols and Mr. Jahelka justified (or rationalized) - despite the fact that there was margin debt due and owing to Prudential at the time. (Tr. Vol. 2-B, Pg. 227). According to Mr. Jahelka, after May 2001, being a 30% shareholder wasn't enough of an incentive to work for Loop without being paid. (Tr. Vol. 2-B, Pg. 222). Mr. Jahelka elaborated that he made the personal decision to compensate him, instead of making a payment to Wachovia because he made the decision that he would not work for free. (Tr. Vol. 3-A, Pg. 85). Mr. Jahelka believed that the obligation of Loop to pay its creditors was unrelated to his person issues as to whether or not he would work for free. (Tr. Vol. 3-A, Pg. 86).

Mr. Jahelka testified that there was no way from looking at PTX 26 (the payments by Loop over $10,000) whether a payment is a return of equity vs. compensation; that there are no other documents that reflect the decision by the Board of Directors to begin compensating themselves; and that he is not aware of any resolution or any minutes, or any notes or anything that reflect the decision to change equity payments to compensation payments after May of 2001. (Tr. Vol. 2-B, Pg. 23). He went on to state that it was his right as an officer and director in Loop to make the decision to not pay a debt that was due and pay himself compensation instead and further that he had right to not pay a debt that was due and make an investment in a third party. When asked on what he based this position, Jahelka stated that it was on his "experience" and the "*collective wisdom of me, Mr. Greenblatt and Mr. Nichols*". (Tr. Vol. 2-B, Pg. 246). When asked whether, when making these decisions based on the "collective wisdom" of the

shareholders how he knew that Mr. Greenblatt wasn't participating in his capacity as the lender, as opposed to the 50% shareholder, he glibly testified: *"I can't control what is going on in his [Greenblatt's] brain."* (Tr. Vol. 2-B, Pg. 247).

Mr. Nichols, the only treasurer Loop Corp. has ever had, stated that his duties included monitoring the case and assuring that Loop had the resources necessary to pay its obligations and the responsibility of tracking what amounts were owed other creditors and monetary accounts receivable and accounts payable. (Tr. Vol. 4-B, Pg. 129). Despite knowing (as did Mr. Jahelka) that there were debts owed to Wachovia that could not be paid, Nichols did not recall ever having a conversation with Mr. Greenblatt and Mr. Jahelka to the effect that they should not pay any of them compensation and start paying available funds to Wachovia to help pay down Loop's debt. (Tr. Vol. 4-B, Pg. 132). Nichols, like Mr. May, also could not state why in any given month he would be paid any more or less compensation to Mr. Jahelka other than that was the shareholders had agreed to.

Regardless of the shareholder's inability to articulate what they did and why, there is no dispute that the payments made after May of 2001 were at a point in time when there were debts owed a creditor (Wachovia) that could not be paid in the ordinary - personal decisions made not in the best interest of the Loop but made by the shareholder in the best interest. (Tr. Vol. 3-A, Pg. 83).

### 3. Michael May Ignores Accountant's Duty to Verify

Mr. May conceded that part of his job as Loop's accountant was to verify the accuracy of the financial information that was provided to him. (*Id.,* Pg. 188). However, when preparing PTX 26 and PTX 27 (the listing of payments) he never took any steps to independently verify the accuracy of the information that Greenblatt, Nichols and Jahelka provided to him regarding the purpose of the payments identified on those lists. (*Id.*). Instead, he simply relied upon their

characterizations. (*Id.*). Moreover, when Loop made payments from its checking accounts, Mr. May did not have signing authority, even though he was the company's accountant. Instead, he simply did what he was told to do by Greenblatt, Nichols and Jahelka; he never questioned any of their transactions, and he never took any steps to independently verify the accuracy of their characterizations – even though that was his job:

> Q: Okay. And if Mr. Greenblatt told you to write a check and he told you that this is for compensation, you just took his word for it, right?
>
> A: Yes.
>
> Q: And if he told you, "Here's a check and this is for an equity repayment," you just took his word for it, right?
>
> A: Yes.
>
> Q: And Mr. Jahelka, if he wrote a check and he said, "Hey, Mr. May, I want you to write a check and this check is for a loan repayment," you just took his word for it, right?
>
> A: Yes.
>
> Q: And if Mr. Nichols wrote a check on – or told you to write a check and said, 'This is for compensation," again, you just took his word for it?
>
> A: Yes.
>
> Q: You did nothing to independently verify the accuracy of that financial information or that information that Mr. Greenblatt, Mr. Jahelka, or Mr. Nichols were providing to you, correct?
>
> A: I believe checking with the owners is verification of what the checks are for. (*Id.*).

Mr. May was not so much an account for Loop Corp., as he was a scrivener of whatever Greenblatt, Nichols or Jahelka represented to him.

## G.    Banco's Loan to Loop

On January 3, 2000, Loop obtained a $9.9 million loan – specifically, a line of credit – from Banco. (Stip. ¶ 33; PTX 19-20). Loop also executed a promissory note payable to Banco, and entered into a security agreement with Banco as part of the Banco loan. (*Id.*). The Banco

loan was secured by a lien against all of Loop's assets. (*Id.*). Though the bylaws of Loop state that no loan should be contracted on behalf of the corporation and no evidence of indebtedness shall be issued unless authorized by a resolution of the Board of Directors, Mr. Jahelka did not recall ever seeing a written resolution. (Tr. Vol. 3-A, Pg. 5).

When negotiating its loans with the Banco, Loop was represented by Mr. Jahelka and Mr. Nichols on the one hand, and Mr. Greenblatt on behalf of Banco on the other. (Tr. Vol. 3-A, Pg. 32). When the loans with Banco were "negotiated", Mr. Greenblatt was also a 50% shareholder of Loop Corp. (Tr. Vol. 3-A, Pg. 32). When the loans with Banco were negotiated, neither side was represented by counsel. (Tr. Vol. 3-A, Pgs. 34-35). In negotiating the loans with Banco, Mr. Jahelka could not recall ever advising Banco that it wanted to pay a lower interest rate. (Tr. Vol. 3-A, Pgs. 37-38). He also could not recall what discussions he and Mr. Nichols had on behalf of Loop with Banco (represented by Mr. Greenblatt) with respect to the pledging of collateral. (Tr. Vol. 3-A, Pg. 38). Though he stated that the reason Loop agreed to give Banco collateral worth $32 million to secure $9.9 million line of credit was because those were the best terms available to it at the time, Loop does not possess any documentation to reflect any applications put in at any other banks or other lenders other than Banco. (Tr. Vol. 3-A, Pgs. 39-40). Mr. Jahelka did not recall having to provide Banco with any documentation prior to Banco agreeing to make the loan; did not believe an application was filled out; and agreed that, as a 50% owner of Loop Corp., Greenblatt would have already been familiar with the financial condition of Loop. (Tr. Vol. 3-A, Pg. 40). Although the loan and security agreement referenced a number of schedules that were to be attached as exhibits to the loan, there were no schedules attached to any of the loan documents produced as exhibits in this case and Mr. Jahelka did not know whether any such schedules were prepared. (Tr. Vol. 3-A, Pg. 59).

At trial, Greenblatt testified that he negotiated the loan on behalf of Banco. (Tr. Vol. 4-B, Pg. 216). The loan documents reflect that Greenblatt signed on behalf of the lender (Banco), and Jahelka signed on behalf of the borrower (Loop). Greenblatt's due diligence was minimal. Banco never received a loan application from Loop, and never obtained a title commitment. (Tr. Vol. 4-B, Pgs. 217-218). Greenblatt never performed a formal appraisal of Loop's assets, but rather performed an off-the-cuff valuation. (Tr. Vol. 4-B, Pg. 216). According to Greenblatt, he was qualified to appraise Loop's assets prior to entering into the loan because he believes himself to be an expert in the commercial real estate industry: "The reasons I am able to do that is because I believe I am expert at valuing Class B and Class C office buildings, and that I was fairly good at valuing the start up." (Tr. Vol. 4-B, Pg. 217).

While Banco obtained a blanket security interest over all of Loop's assets, Banco did not obtain a personal guarantee from Loop's shareholders when it made the loan. According to Greenblatt, "Banco considers personal guarantees essentially worthless." (Tr. Vol. 5-A, Pg. 19). Mr. Jahelka did not know why Mr. Greenblatt, on behalf of Banco, never asked for the personal guarantees of himself (in his capacity as a shareholder of Loop Corp), Mr. Jahelka or Mr. Nichols to guarantee the Banco loan. (Tr. Vol. 3-A, Pg. 55).

At trial, Mr. Greenblatt conceded that his status as the 100% owner of Banco (the lender) and 50% owner of Loop Corp. (the borrower) allowed him to streamline the due diligence process, granting funds to Loop Corp. far quicker than they would have received from an arms-length lender. (Tr. Vol. 4-B, Pg. 219) ("It is absolutely true that the knowledge that I had enabled Loop to skip a large portion of the process that it would have had to have gone through at a regular commercial bank or savings and loan or other insurance company or similar type lender."). Greenblatt's dual status as lender (i.e., 100% owner of Banco), and borrower (i.e., 50% owner of Loop), clearly created a conflict of interest. Greenblatt admitted that his dual

status affected his decision-making as lender, although he claimed that it somehow did not affect

his decision-making as borrower:

> Q:  Did you find that your dual status as 50 percent owner of Loop Corp. and as
> the lender ever influenced your decisions as a lender?
>
> A:  Yes.
>
> Q:  And did you ever find that your status – your status as a 50 percent owner of
> Loop Corp. and the lender ever influenced your decisions as the 50 percent
> owner of Loop?
>
> A:  No.  (Tr. Vol. 5-A, Pg. 65).

Greenblatt's dual status as lender and borrower did have an effect on Loop's due

diligence, however.  According to Article V of Loop's By-Laws, any loan transaction involving

Loop needed to be authorized by a formal board resolution:

> SECTION 2.  LOANS.  No loans shall be contracted on behalf of
> the corporation and no evidences of indebtedness shall be issued in
> its name unless authorized by a resolution of the board of directors.
> Such authority may be general or confined to specific instances.
> (PTX 2, Pg. 9)

At trial, Greenblatt admitted that the decision by Loop's directors to borrow $9.9 million

from Banco was _**not**_ documented in any formal board resolution – or, at least, no such resolution

has ever been produced by Loop:

> Q:  Okay.  Now, the decision by Loop to take a 9.9 million dollar loan from
> Banco, that was not documented in any sort of formal board resolution by
> the directors of Loop Corp., was it?
>
> A:  I don't know that to be the case.
>
> Q:  Okay.  Well, you were the corporate secretary of Loop Corp., right?
>
> A:  Yes.
>
> Q:  And it was your job to keep and maintain Loop's corporate records?
>
> A:  Yes.

Q: And if I represent to you that the corporate records that were produced in this case did not contain any formal board resolution of the directors authorizing Loop Corp. to enter into that loan transaction, would you have any reason to disagree with me?

A: That it wasn't produced in this case?

Q: Correct.

A: No, I have no reason to disagree with you. (Tr. Vol. 5-A, Pgs. 18-19).

Greenblatt's admission that the Defendants never produced any board resolution regarding the Banco loan is important, because an unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence, which is under his control. *See, e.g., Berlinger's, Inc. v. Beef's Finest, Inc.,* 57 Ill.App.3d 319, 14 Ill.Dec. 764, 372 N.E.2d 1043, 1048 (1978); *see also, McCracken v. Olson Cos., Inc.,* 149 Ill.App.3d 104, 102 Ill.Dec. 594, 500 N.E.2d 487, 492 (1986) (when there is a failure to produce a legitimate explanation as to the unavailability of business records, it can reasonably be inferred that those documents would have revealed the corporation's poor financial standing).

### 1. **Banco-Loop Loan Terms**

Under the loan documents, Loop granted Banco a first-position security interest over all of Loop's assets, including its operating subsidiaries, partnership interests, inventory, accounts, general intangibles, as well as all proceeds and products of any of those interests. (PTX 19, Pg. 13, § 4.1). Pursuant to Loop's note, interest would accrue at the rate of 12% per year, and the maturity date of the note was December 31, 2001. (PTX 20). Section 5.3 of the Banco loan further provided that Loop was required to provide Banco on a regular or quarterly basis with financial information pertaining to Loop, however this was not done. (Tr. Vol. 3-A, Pg. 58).

Section 7.6 of the loan agreement (Pg. RS 3467), prohibited Loop Corp from making distributions to its shareholders without the approval of Banco, its lender. Although Mr. Jahelka testified that when the distributions were made after the loan came into effect in the year 2000

that he did obtain approval from Mr. Greenblatt to make distributions to themselves, there is nothing in writing. (Tr. Vol. 3-A, Pg. 60). The true process for obtaining the approval consisted of a meeting amongst the three shareholders to discuss making a distribution and Mr. Greenblatt, on behalf of Banco, would consent to that distribution. Mr. Jahelka did not know how Mr. Greenblatt, as a 50% shareholder would ask Mr. Greenblatt as the lender's representative, for approval to make a distribution to himself. (Tr. Vol. 3-A, Pgs. 60-61).

Mr. Jahelka admitted that Loop's pledge of $32 million in collateral to Banco, was regardless of whether Loop owed Banco a $1 or $10 million. (Tr. Vol. 3-A, Pg. 43). Despite having pledged $32 million worth of real estate to collateralize the line of credit, Loop did not have complete access to the funds to do with them as Loop pleased. (Tr. Vol. 3-A, Pg. 44).

The parties' guaranty and security agreement states that the relationship between Loop and Banco is "solely that of borrower or guarantor and lender," and disclaims any fiduciary responsibilities by Banco. (PTX 19, Pg. 28, § 10.4). Nevertheless, Greenblatt admitted at trial that, at the time he signed the Banco loan documents, he did owe fiduciary duties to Loop Corp. and Loop's shareholders, which created a conflict of interest for him. (Tr. Vol. 5-A, Pg. 25).

This conflict of interest occasionally worked in Loop's favor (although, not in favor of Loop's creditors). Under Sections 6.1 and 6.2 of the guaranty and security agreement, Loop was required to provide Banco with unqualified audited consolidated financial statements prepared in accordance with GAAP (generally accepted accounting principles) by an independent Certified Public Accountant. (PTX 19, Pgs. 16-17). Greenblatt admitted that Banco never received audited financials from Loop. (Tr. Vol. 5-A, Pg. 22). He further explained that Banco did not require audited financial information because he was already aware of Loop's financial condition by virtue of his status as a 50% owner:

> Q: And Banco really wouldn't need to obtain this information, because, you know, you're the owner of Banco and you're also a 50 percent owner of Loop Corp. and you'd already know this information, correct?
>
> A: Banco wouldn't require an audit, because Banco is aware that the – the manner in which the financial statements were constructed and is aware that it was constructed properly.
>
> Q: And Banco's aware of that fact because you happen to be the 50 percent owner of Loop Corp., right?
>
> A: Yes.  (Tr. Vol. 5-A, Pg. 24).

The Banco loan documents provided very little restriction on the use of proceeds.  Loop was permitted to use the proceeds from the Banco loan for, *inter alia*, start-up costs and related costs for "Projects" (defined as "the projects operated by LOOP and its Subsidiaries"), as well as costs "already incurred."  (PTX 19, Pg. 21, § 7,.15; Pg. 7, §1.1; Tr. Vol. 5-A, Pg. 75).  According to Mr. Greenblatt, Loop's investment in HRMI – including via the margin account at Wachovia – constituted just such a "project."  (Tr. Vol. 5-A, Pg. 76).  But when a margin debt came due on the Wachovia account, Mr. Greenblatt refused to allow the Banco funds to be utilized to pay that debt.  He rationalized that decision by claiming the initial purchase of the HRMI stock was a "cost," and the margin debt incurred in the account was "financing."  (Tr. Vol. 5-A, Pg. 95).

## 2.    Banco's Control Over Loop

Mr. Nichols testified to the degree of control that Banco possessed over Loop (even prior to when Loop became in default to Banco in May of 2001) in the following exchange:

> Q:    Why would you need to get your lender's approval to make a distribution to yourself **before May of 2001**?
>
> A:    It is just something that I just did.
>
> Q:    Well didn't you have control over your own company at that time?  Weren't you allowed as shareholders and officers and directors to pay yourselves what you wanted to?
>
> A:    Well, to the extent that there was a draw down from Banco's line, I would always go to Mr. Greenblatt for just – if nothing