IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WACHOVIA SECURITIES, LLC, | ) | |
| | ) | Case No. 04 C 3082 |
| Plaintiff, | ) | |
| vs. | ) | Judge Virginia M. Kendall |
| | ) | |
| DAVID NEUHAUSER, ET AL., | ) | Magistrate Judge Maria G. Valdez |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' POST-TRIAL POSITION PAPER
ON FRAUDULENT TRANSFER COUNTS**

Defendants Scattered Corp. ("Scattered"), Banco Panamericano, Inc. ("Banco"), Loop Corp ("Loop"), and Loop Properties, Inc. ("Loop Properties"), by their respective counsel, and for themselves and any other Defendant in this case affected by Plaintiff Wachovia Securities, LLC's ("Wachovia") fraudulent transfer claims, submit this position paper in support of their request for a verdict in their favor.

**I.  THE COURT'S PRIOR RULINGS**

During trial, this Court marked the bounds of Wachovia's fraudulent transfer claims with two bright lines. First, no transfer occurring before May 22, 2001, the date of the collapse of HRMI and also the date on or about which the Wachovia debit balance arose, will be unwound as fraudulent. (Tr. Vol. 6A at 26, 29 ("[w]hat I am allowing you [Wachovia] to bring in ... are post-debt incurrence [HRMI collapse] transfers"); 30-31.) [1]  Second, only those transfers that are the subject of the fraudulent transfer Counts pleaded in the Revised Second Amended Complaint

---

[1] Citations to Trial Exhibits will be made as "PTX" for Plaintiff's Trial Exhibits and "DTX" for Defendants' Trial Exhibits. Citations to the trial transcripts will be made as: "(Tr. Vol. [number of volume], [name of witness] at [page number of transcript].)" Citations to "DKT" refer to docket. Citations to SUF" refer to the Stipulated Uncontested Facts. Citaitions to "FPTO" refer to the Final Pre-Trial Order.

("RSAC"), Counts VII through X, will be considered for judicial relief. (Tr. Vol. 6A at 30.)

The only transfers within these parameters are: (1) the alleged transfer by Loop to Scattered of Loop's stock in EZ Links Golf, Inc. ("EZ Links") (RSAC, ¶63 and Counts VII and VIII; Tr. Vol. 6A at 18-19); (2) the reaffirmation by Loop of a security interest in favor of Banco on **April 1, 2002** (RSAC, ¶64 and Counts VII and IX ; Tr. Vol. 6A at 18-19); and (3) the transfer of Loop's limited partnership interests in Old Colony Partners, LP ("Old Colony") and 200 West Partners, LP ("200 West") to Loop Properties on September 24, 2002 (RSAC, ¶65 and Counts VII and X.) [2]

## II. THE APPLICABLE LEGAL STANDARD

During trial, Wachovia abandoned fraudulent transfer claims based upon either Section 5(a)(2) or Section 6 of the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS 160/5(a)(2) and 160/6. (Tr. Vol. 5B at 133,138.) As a result, the only remaining IUFTA section upon which Wachovia is pursuing its three fraudulent transfer claims is Section 5(a)(1), 740 ILCS 160/5(a)(1). (*Id.*) Claims pursuant to Section 5(a)(1) are known as actual fraud or "fraud-in-fact" claims.

To prove actual fraud, or "fraud-in-fact," a plaintiff must prove a transfer of assets with the specific intent to hinder, delay, or defraud creditors. *Wachovia Sec., LLC v. Neuhauser*, 2007 528 F. Supp. 2d 834, 858 (N.D. Ill. Nov. 29, 2007); *In re Knippen*, 355 B.R. 710, 732 (Bankr. N.D. Ill. 2006); *In re Zeigler*, 320 B.R. 362, 372 (Bankr. N.D. Ill. 2005); *Lindholm v. Holtz*, 221

---

[2] Wachovia is precluded based on the Court's rulings on the parameters of permissible claims, from questioning or asserting as fraudulent transfers: (1) the original Consolidated Loan, Guaranty and Security Agreement entered between Loop and Banco on January 3, 2000; (2) Loop's repayments on the Banco Line of Credit, including payments made to third parties at the direction of Banco; and (3) Loop's investments in EZ Links, Inc. and the real estate limited partnerships.

Ill. App. 3d 330, 334, 581 N.E.2d 860, 863 (2d Dist. 1991), *citing Gendron v. Chi. & N.W. Transp. Co.*, 139 Ill. 2d 422, 437, 564 N.E.2d 1207, 1214-15 (1990). Actual fraud is never presumed under Illinois law and Wachovia must prove all elements of its "fraud-in-fact" fraudulent transfer claims, including specific intent, by clear and convincing evidence. *Wachovia,* 528 F. Supp. 2d at 858. *Hofmann v. Hofmann*, 94 Ill. 2d 205, 225, 446 N.E.2d 499 (1983).

As a threshold matter, however, with respect to the EZ Links stock and Scattered, there was not even a "transfer" of the stock by Loop to Scattered (RSAC, Counts VII and VIII). Similarly, with regard to the two transactions that did take place, the reaffirmation of the Banco lien on April 1, 2002 (RSAC, Counts VII and IX) and the transfer of the interests in Old Colony and 200 West to Loop Properties (RSAC, Counts VII and X), there was, as discussed below, no transfer of "assets." Thus, the Court need not reach the issue whether Defendants acted as to these two transactions with the specific intent to hinder, delay, or defraud creditors. If the Court were to get to the issue, though, the direct evidence is that there was a valid business reason for each of these two transactions challenged by Wachovia.

To show specific intent, and in light of the absence of any direct evidence of an intent to hinder, delay or defraud creditors, Wachovia relies on Section 5(b) of the IUFTA which sets forth several indicia of fraudulent intent, also known as "badges of fraud":

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

3

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 ILCS 160/5(b).

When these "badges of fraud" are proven in sufficient number, they *may* give rise to a presumption or indication of the required intent. *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 373 (Bankr. N.D. Ill. 2005); *Matthews v. Serafin*, 319 Ill. App. 3d 72, 76-77, 744 N.E. 2d 934, 937 (3rd Dist. 2001) (badges do not create a presumption but may indicate fraudulent intent.) That a presumption or indication may arise under the appropriate circumstances, however, does not shift the burden of proof from Wachovia:

> "[A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

Fed. R. Evid. 301.

While proof of seven badges has been held sufficient to raise a presumption of fraudulent intent, *Berland v. Mussa (In re Mussa)*, 215 B.R. 158, 170 (Bankr. N.D. Ill. 1997), six badges

4

and four badges have been deemed insufficient. *In re Zeigler*, 320 B.R. at 378 (six badges); *In re Knippen*, 355 B.R. 710, 735 (Bankr. N.D. Ill. 2006) (four badges); *Firstar Bank, N.A. v. Fault Chevrolet*, 249 F. Supp. 2d 1029, 1048 (N.D. Ill. 2003) (four badges). After the close of the evidence, Wachovia abandoned all pretense of even attempting to prove five of the badges, numbers (3), (4), (6), (7), and (8); and is now asserting *only* six badges, numbers (1), (2), (5), (9), (10) and (11), to raise the presumption of specific fraudulent intent. (Tr. Vol. 6B at 198-199 and handout referred to therein.) As discussed below, however, four of those badges, numbers (2), (5), (10), and (11), on their face do not apply. Wachovia, thus, is left with at best just two badges, and consequently has not raised even an inference of the necessary specific intent to defraud.

### III. THE THREE ALLEGED FRAUDULENT TRANSFERS

**A. Loop's EZ Links Stock Was Not Transferred to Scattered.**

A *sine qua non* of a fraudulent transfer is that there be a transfer. 740 ILCS 160/5(a)(1); *see generally In re Wey*, 854 F.2d 196, 198 (7th Cir. 1988) (Bankruptcy Code). Here, Wachovia presented no evidence, much less clear and convincing evidence, that Loop ever transferred any stock in EZ Links to Scattered. In fact, after strenuously resisting both Scattered's requests for summary judgment and directed finding at the close of Wachovia's case, Wachovia in light of its total failure of proof all but abandoned this claim in its Closing Argument.

The uncontradicted trial testimony is that Loop still owns all of the EZ Links stock it acquired over the years, and that Banco, as Loop's senior secured creditor, has taken physical possession of the EZ Links stock certificates, and still holds them as collateral for the Banco Line of Credit. (Tr. Vol. 6A, Greenblatt at 75-76.) The remedy, if there had been a fraudulent transfer of EZ Links stock to Scattered, or any for other fraudulent transfer, would be for this Court to order its return from Scattered. *MacDonald v. Estate of Gayton*, 469 F.3d 1079, 1081 (7th Cir.

2006) (under IUFTA a fraudulent transfer is nullified and property treated "as though the fraudulent transfer had not occurred"). Indeed, that is exactly the relief Wachovia seeks. (RSAC, Count VIII.) Since all of Loop's EZ Links stock is still owned by Loop (subject to Banco's lien as senior secured creditor), judgment should be entered in favor of Loop and Scattered on Counts VII and VIII, respectively.

**B. The Reaffirmation of Banco's Security Interest**

On April 1, 2002, Loop signed a Promissory Note extending the maturity date of the Banco Line of Credit. (PTX 24.) Loop and Wachovia at the same time also entered a Consolidated, Amended and Restated Guaranty and Security Agreement ("Restated Security Agreement") reaffirming Banco's status as Loop's senior secured creditor. (PTX 23.) Wachovia did not establish by clear and convincing evidence that the reaffirmation by Loop of Banco's status as senior secured creditor and lien holder constituted a fraudulent transfer.

First, there was no transfer of an "asset," which is defined under the IUFTA as: "property of a debtor, but the term does *not* include: (1) property to the extent it is encumbered by a valid lien." 740 ILCS 160/2(b) (emphasis added). Loop's property was already fully encumbered by a valid lien in favor of Banco pursuant to the future advances clause of the *original* Consolidated Loan, Guaranty and Security Agreement entered January 3, 2000 ("Security Agreement"), up to the full extent of Banco's advances plus interest and other charges, *including* those incurred on and after April 1, 2002. (PTX 19 at Section 4.1 and Section 1.1 (definition of "obligations").) Thus, no "asset" was transferred under the Restated Security Agreement.[3]

---

[3] The principal difference between the original Security Agreement and the Restated Security Agreement is that EZ Links Golf, LLC and EZ Links Golf, Inc. became parties to (and therefore guarantors of) the Banco Line of Credit when they signed the latter agreement on April 1, 2002. (PTX 23; Tr. Vol. 4A, Jahelka at 59-61.)

Second, even assuming an "asset" was transferred, the uncontroverted direct testimony as to the actual intent behind the Restated Security Agreement is that it was entered to induce Banco to renew the Line of Credit and forebear from foreclosing. The original Promissory Note documenting the Line of Credit had matured on December 31, 2001. (PTX 20.) By then, Loop owed Banco $8,839,759, (DTX 61; PTX 15), and Banco was entitled to foreclose upon and be paid $8,839,759 out of Loop's assets. Instead, Banco gave Loop breathing room and a chance to work out its financial difficulties. With the benefit of hindsight, Wachovia has criticized this course of action, but it is hard to conceive how Wachovia would be any better off now if Banco had foreclosed in 2002 and put Loop out of business.

In the face of the uncontradicted testimony that the Restated Security Agreement was entered for a valid business purpose and not to hinder, delay or defraud, Wachovia relies on just six badges of fraud in an effort to establish a presumption of fraudulent intent. They are:

> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (5) the transfer was of substantially all the debtor's assets;
>
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Four of these badges, however, do not apply on their face.

With respect to badge (2), Loop did not retain possession or control "of the property transferred" after the reaffirmation or, for that matter, the original granting of the lien. The

7

transfer here was of the lien rights, not the underlying property itself. The granting of lien rights merely gives the lien holder the inchoate right to liquidate and be paid out of the debtor's property upon default. Indeed, the IUFTA defines a "lien" as "a charge against or an interest in property *to secure payment of a debt* or performance of an obligation." 740 ILCS 160/2(h) (emphasis added). Put another way, there is no evidence that Loop as the debtor under the IUFTA ever possessed or controlled the lien rights after they were transferred to Banco. In fact, the exact opposite is true. Wachovia went out of its way at trial to demonstrate that Banco monitored and controlled the manner in which Loop used its assets pursuant to the lien rights granted Banco. (Tr. Vol. 4B, Nichols at 159-162; Tr. Vol. 6B at 197.) Therefore, the only evidence is that Banco, *not Loop*, controlled and exercised its lien rights. Therefore, "the debtor" Loop did not "retain[] possession or control" of the lien rights, which was the only property "transferred."

Similarly, badge (5) is also wholly inapplicable. While the Restated Security Agreement gave Banco *a lien against* substantially all of Loop's assets to the extent of Banco's advances plus interest and other charges, there was not a transfer to Banco of substantially all of Loop's underlying assets themselves. Loop remained the title owner of all of its assets before and after the granting of the lien, which as defined by the IUFTA above was simply a charge against Loop's property to secure payment to Banco of the amounts owed to it under the Line of Credit.

Wachovia fares no better with regard to badge (10), which requires that the challenged transfer occur "shortly before or shortly after a substantial debt was incurred." While it need not be the debt to Wachovia itself, for badge (10) to apply, Wachovia nonetheless had the burden of showing that a "substantial debt was incurred" by Loop shortly before or shortly after the

8

Restated Security Agreement was entered on April 1, 2002.[4] Wachovia did not even attempt to adduce evidence of or argue that any such substantial debt had been incurred "shortly before or shortly after" April 1, 2002. This badge is intended to protect against a debtor who takes quick action to transfer assets before a creditor can take action to protect its position. Here, Wachovia had *eleven months* between the time the debit balance arose and the Restated Security Agreement was entered to take action against Loop; it did nothing, however, for almost two years, until 2003, when it initiated the NYSE arbitration. Wachovia cannot now rely on badge (10) after having slept on its rights.

Finally, Badge (11) is also inapplicable on its face. It contemplates a collusive sequence of transfers in which a debtor's assets are transferred to a lienholder, such as in a friendly foreclosure, who then transfers them in a second transaction back to an insider of the debtor. Thus, badge (11) requires two transfers: one to a lienor, and then a second to an insider. Here, of course, there have not been two transactions; a single "transfer," is not a multi-step "transfer of the essential assets of the business to a lienor who transfer[s] the assets to an insider of the debtor." In addition, Wachovia has complained that Banco has not taken sufficient steps as the lienholder to foreclose on and take possession and control of Loop's assets.[5] The single act of

---

[4] While the Wachovia debt balance is admittedly "substantial" Banco has not conceded that badge (10) applies. (Tr. Vol. 5B at 123-24.)

[5] Wachovia's complaint in this regard is not entirely accurate. While Banco refrained from foreclosing on the EZ Links stock before 2007 in order to give Loop 'breathing room' and an opportunity to work through its financial difficulties, and so as not to trigger an adverse tax consequence for EZ Links (Tr. Vol.5A, Greenblatt at 41-43, 98-101), Banco in 2007 was preparing for a UCC Article 9 sale of the EZ Links stock. An Illinois state court, however, has temporarily held up the sale. *See* Order of Court of April 24, 2007, in Case No. 02 L 003667, Circuit Court of Cook County, Illinois (Exhibit A hereto), of which this Court may take judicial notice. *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (court may take judicial notice of matters of public record).

9

the granting of a lien simply does fall within badge (11).

While it is not contested that Banco is an "insider" under the IUFTA as to badge (1), and that Loop was unable to meet its obligations as they became due for purposes of badge (9), proof of just two badges cannot give rise to a presumption of specific intent to hinder, delay, or defraud creditors. [6]

Wachovia has failed to prove by clear and convincing evidence that the Restated Security Agreement was entered on April 1, 2002, in order to hinder, delay or defraud creditors. This is particularly true given that it only reaffirmed Banco's existing status as senior secured creditor and the lien Loop had granted Banco on January 3, 2000, sixteen months before the Wachovia debit balance even arose, when it is undisputed that Loop was solvent. For the foregoing reasons, judgment should be entered in favor of Loop and Banco on Counts VII and IX, respectively.

## C. The Transfers of the Real Estate Limited Partnership Interests to Loop Properties

On September 24, 2002, Loop transferred its limited partnership interests in Old Colony and 200 West to Loop Properties. (SUF ¶53; PTX 30.) Wachovia did not establish by clear and convincing evidence that these transfers from Loop to its own wholly owned subsidiary Loop Properties constituted a fraudulent transfer.

First, and once again, there was no transfer of an "asset" because as the uncontroverted trial testimony proved, the first mortgages against the two buildings owned by the limited partnerships and the additional liens of Marine Bank and then Banco exceeded the market value of the properties. (Tr. Vol. 6A, Greenblatt at 81- 82.) Under the IUFTA, as discussed above with regard to the Restated Security Agreement, because there was no equity in the limited

---

[6] Defendants have found no case decided under the IUFTA where a presumption was successfully raised based on only two badges.

partnership interests, there was no "asset" transferred. Courts in other states interpreting parallel provisions in their Uniform Fraudulent Transfer Acts defining "asset," have held that if valid liens exceed the value of the property, the property cannot be considered an "asset" and there can be no fraudulent transfer. *Epperson v. Entertainment Express, Inc.*, 338 F. Supp. 2d 328, 342 (D. Conn. 2004); *Webster Indus., Inc. v. Northwood Doors, Inc.,* 320 F. Supp. 2d 821, 836 (N.D. Iowa 2004); *Clark v. Brooks Woolen, Inc.,* 2000 Me. Super. LEXIS 242, *11 (Me. Sup. Ct. Oct. 30, 2000). In other words, when a plaintiff fails to establish there was equity in property subject to a valid lien or liens, as Wachovia failed to do here, it fails to prove a fraudulent transfer.

Similarly, whatever their value, there was no transfer of an "asset" because the limited partnership interests were transferred to Loop Properties, a wholly-owned subsidiary of Loop. *See, e.g., In re Royal Crown Bottlers , Inc.,* 23 B.R.28, 30 (Bankr. D.Ala. 1982) ("because the subsidiary corporation is an asset of the parent corporation, and what benefits the asset will ordinarily accrue to the benefit of its owner"). While the limited partnership interests might have appeared elsewhere on Loop's balance sheet after the transfer, on a net basis, Loop's assets were not depleted and Loop, as the 100% owner of Loop Properties, continued to realize their full value. (Tr. Vol. 3A, Jahelka at 22-24.) *See In re Jeffrey Bigelow Design Group, Inc.,* 956 F.2d 479, 485 (4th Cir. 1992) (the focus in a fraudulent transfer case is whether the net effect of the transfer has depleted the debtor's assets).

Second, Wachovia has failed to show by clear and convincing evidence a specific intent to hinder, delay or defraud creditors. Instead, the uncontradicted trial testimony is that transfers of the limited partnership interests were done at the specific request Marine Bank, which loaned Loop $3.25 million in January 2001. As one of the loan requirements, Marine Bank insisted that the Old Colony and 200 West limited partnership interests, against which it was taking security

interests as collateral, (DTX 89), be placed into a single-purpose entity. (Tr. Vol. 3A, Jahelka at 19-21; Tr. Vol. 4A, Jahelka at 45-46.) Thus, this transfer occurred *at the insistence of a creditor*, not to defraud one.

Nonetheless, seeking to show specific fraudulent intent despite this valid business purpose, Wachovia turns to the same six badges of fraud as before; but as before, four are simply inapplicable on their face. With regard to badge (2), the evidence is that Loop Properties and not Loop owned, and therefore possessed, the interests in Old Colony and 200 West after the transfers. In addition, Marine Bank took possession of all of the shares of Old Colony Partners, Inc. and 200 West Properties, Inc., the corporate general partners of the partnerships, giving Marine Bank control of the limited partnerships.(DTX 119.) Wachovia adduced no contrary evidence about the possession and control of the limited partnership interests after the transfers to Loop Properties.

Also, as before, badge (5) is not satisfied. The limited partnership interests were only a small part of Loop's assets when they were transferred. Loop held and continued to hold significant interests in other real estate limited partnerships that owned downtown Chicago office buildings, including 180 West Randolph and 327 South Plymouth, as well 100% of the stock of the corporate general partners of those partnerships. Loop also continued to hold its investment in EZ Links. Nor did the transfers occur "shortly before or shortly after a substantial debt occurred" for purposes of badge (10). Again, Wachovia adduced no evidence of any debt incurred on or about the time of the transfers; and the Wachovia debit balance itself had arisen *sixteen months* before the transfers to Loop Properties on September 24, 2002. Finally, badge (11) does not apply because there was not a collusive sequence of transfers.

Wachovia, then, at best, presented evidence to satisfy only two badges of fraud, numbers

(1) and (9), not enough to give rise to a presumption or indication of specific intent to hinder, delay, or defraud creditors. For the foregoing reasons, judgment should be entered in favor of Loop and Loop Properties on Counts VII and X, respectively.

### D. Other Transfers Wachovia May Seek to Challenge

Both of the Court's stated limitations on alleged fraudulent transfers as to which Wachovia may seek relief, place the original Security Agreement dated January 3, 2000, off limits. Indeed, the original Security Agreement and the lien granted Banco therein is not even *mentioned,* much less pleaded as a fraudulent transfer, in the RSAC. It was not until trial that Wachovia questioned the original Banco Line of Credit transaction entered on January 3, 2000. Thus, Wachovia should not be allowed to question the transaction at the last minute on previously undisclosed grounds or legal theories, including by challenging the fairness of the Line of Credit through little more than innuendo. [7]

Wachovia is also estopped from challenging Banco's status as Loop's senior secured lender dating to January 3, 2000, because it made binding stipulations and admissions confirming Banco's status as such in the Final Pretrial Order filed October 9, 2007. (DKT 300.) *Pure Imagination, Inc. v. Pure Imagination Studios, Inc.,* 2004 U.S. Dist LEXIS 23064 *15 at fn. 2 (N.D. Ill. Nov. 12, 2004) (admissions contained in a final pretrial order are binding). In paragraph 33 of the Stipulation of Uncontested Facts submitted as part of the FPTO, Wachovia

---

[7] At trial, Wachovia tried to paint the original Line of Credit transaction as a sham because of Greenblatt's involvement as both "lender" and "borrower." Jahelka and Nichols testified, however, that as two-thirds of Loop's Board of Directors, they protected Loop's interests in the transaction, and ensured that the terms, including the interest rate, were fair and consistent with the lending market. (Tr. Vol. 6B, Nichols at 112-115.) Wachovia also insinuated that the Participation Agreements were suspect. But as Jahelka explained, they were a recognized and safe way to allow the real estate limited partnerships to realize a return on funds that otherwise would have remained in the partnership earning no return at all. (Tr. Vol. 6A, Jahelka at 51-54.) It is undisputed that the partnerships were repaid their participation amounts in full, including all interest. *See generally Natwest USA Credit Corp. v. Alco Std. Corp.*, 858 F.Supp. 401, 407-08 (S.D.N.Y. 1994) (explaining participation agreements).

stipulated that:

> "On or about January 3, 2000, Loop obtained a loan from Banco. Loop also issued a promissory note payable to Banco on January 3, 2000. On January 3, 2000, Loop also entered into a security agreement with Banco as part of the Banco loan. The Banco loan was secured by a lien against all of Loop's assets."

In another part of the FPTO, Wachovia proposed the following finding of fact: "On or about January 3, 2000, Loop obtained a loan of approximately $9.9 million from Banco Panamericano, Inc. ("Banco"), which was secured by a blanket lien against all of Loop's assets." (FPTO Exhibit 7: Wachovia's Proposed Findings of Fact and Conclusions of Law, ¶3). Wachovia also proposed a second finding of fact that acknowledged Banco's status as Loop's "senior secured lender." (*Id.,* ¶43). Defendants admitted both these proposed findings of fact. (DKT 307, Exhibit 7 at 81.) In light of the pleadings and pre-trial filings, Defendants did not and could not have expected that Banco's status as Loop's senior secured creditor, the original Banco Line of Credit transaction, or the advances under the Line of Credit would be at issue.

Likewise, Loop's repayments on the Banco Line of Credit, including payments made to third parties such as Chiplease, Inc., Resource Technology Corporation, and Scattered Corporation at the direction of Banco; and Loop's investments in EZ Links, Inc. and the real estate limited partnerships were not put at issue in the RSAC and cannot be the subject of fraudulent transfer claims. In addition, many of the Line of Credit repayments occurred before May 22, 2001, and for this further reason cannot be the subject of fraudulent transfer claims. (PTX 26-27.) After that date, the total of payments in excess of $10,000 out of Loop and Loop Properties to related companies and persons was $1,738,297. (PTX 26-27.) During the same

14

time period, Banco advanced to Loop a total of $3,097,450 under the Banco Line of Credit. (DTX 61.) Thus, since the Wachovia debit balance arose, $1,359,153 *more* was paid into Loop and Loop Properties than was paid out. And in any event, all of the Line of Credit repayments, including those directed by Banco third parties, regardless of when they were made, *reduced* the amount Loop owed to Banco. [8]

Finally, Wachovia cannot pursue fraudulent transfer claims with respect to payments by Loop to RTC, Chiplease, EZ Links, Repurchase Corp., the real estate limited partnerships, or any other non-party, because Wachovia failed to join them as defendants. *See Nastro v. D'Onofrio*, 263 F. Supp. 2d 446, 450 (D. Conn. 2003)(Conn. law); 37 Am. Jur. 2d, *Fraudulent Conveyances and Transfers* §188 ("The fraudulent grantee is a necessary party defendant in an action to set aside a conveyance as fraudulent, since he has an interest in the subject matter of the suit which should not be affected by a decree unless he has been given a right to be heard.").

## CONCLUSION

Defendants request that judgment be entered in their favor and against Wachovia on Counts VII through X of the Revised Second Amended Complaint. [9]

---

[8] The testimony of May was uncontroverted that the Banco-directed repayments reduced the amount Loop owed to Banco dollar for dollar. (Tr. Vol. 1B, May at 213, 221, 223-30.) Wachovia's suggestion that these payments were highly irregular is unfounded. In fact, they are entirely proper, and Banco had the absolute right to determine how it should be repaid the amounts owed by Loop. The directed repayments are in the nature of three-party transactions involving bills of exchange that have long been accepted between commercial entities. *See generally* 815 ILCS 105/7 (2008).

[9] Defendants reserve their right to contest any attorney's fee petition that Wachovia may file, and note that counsel for Wachovia was incorrect when he told the Court that the IUFTA provides for fees. (Tr. Vol. 6B at 204). No provision of the IUFTA provides for attorney's fees. *See* 740 ILCS 160/8; *Kardynalski v. Fisher*, 135 Ill. App. 3d 643, 482 N.E. 2d 117 (2nd Dist. 1985).

        Respectfully submitted,

        SCATTERED CORP. and
        BANCO PANAMERICANO, INC.


        By:    /s/ Alan R. Dolinko
                One of Their Attorneys


C. Philip Curley (ARDC No. 3124181)
Alan R. Dolinko (ARDC No. 6193228)
John H. Wickert (ARDC No. 6188313)
Robinson Curley & Clayton, P.C.
300 S. Wacker Drive, Suite 1700
Chicago, IL 60606
312-663-3100 – Telephone
312-663-0303 – Facsimile

        The following Counsel has consented to
        the filing of this Position Paper:


        LOOP CORP and
        LOOP PROPERTIES, INC.


        By:    /s/ Gerald C. Willis
                One of Their Attorneys


Gerald C. Willis (ARDC No.6238372)
McAndrews, Held & Malloy
500 West Madison Street, 34th Floor
Chicago, IL 60661
312-775.8000 – Telephone
312-775.8100 – Facsimile

## **CERTIFICATE OF SERVICE**

      I hereby certify that on March 24, 2008, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system which sent notification of such filing to the following:

**Gary Irwin Blackman**
gblackman@lplegal.com

**Beau T. Greiman**
bgreiman@lplegal.com

**Christopher Scott Griesmeyer**
cgriesmeyer@lplegal.com

**Gregory J Jordan**
gjordan@polsinelli.com

**Paul W. McAndrews**
pwmcandrews@mhmlaw.com

**James Worlton Naisbitt**
jnaisbitt@aol.com

**Adam Brent Rome**
arome@lplegal.com

**Peter James Schmidt**
pschmidt@polsinelli.com

**Gerald C. Willis , Jr**
jwillis@mhmlaw.com

      /s/ Alan R. Dolinko
      Alan R. Dolinko