IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WACHOVIA SECURITIES, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 3082 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| ANDREW A. JAHELKA, RICHARD O. | ) | |
| NICHOLS, LEON A. GREENBLATT IIII, | ) | |
| BANCO PANAMERICANO, INC., LOOP | ) | |
| CORP., LOOP PROPERTIES, INC., and | ) | |
| SCATTERED CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Loop Corp. ("Loop") traded stock on margin using an account at Prudential

Securities Incorporated ("Prudential"). Stip. ¶ 2. Plaintiff, Wachovia Securities, LLC ("Wachovia")

is Prudential's successor in interest.[1] *Id.* On May 22, 2001, the stock collapsed resulting in a $1.9

million debt. Wachovia subsequently obtained an NYSE Arbitration Award, which was reduced to

judgment against Loop in the amount of $2,478,418.80. Stip. ¶ 17, 18; PTX 38. Seven years later,

the debt remains unpaid and Wachovia contends that Defendants Andrew A. Jahelka ("Jahelka"),

Richard O. Nichols ("Nichols"), and Leon A Greenblatt, III ("Greenblatt") looted Loop by

transferring its assets to themselves, insiders, and related entities, which made it impossible for

Wachovia to collect. Dk. 319 at 3. Wachovia now seeks to hold Jahelka, Nichols, and Greenblatt[2]

jointly and severally liable for the obligations of Loop, as the alter ego of Loop, under the doctrine

---

[1] For purposes of these proposed Findings of Fact and Conclusions of Law, the Court shall refer to
Prudential as "Wachovia."

[2] Pursuant to the Court's Memorandum and Opinion Order of November 20, 2007, David Neuhauser
("Neuhauser") was dismissed as a defendant and Counts I, V and VI were dismissed in their entirety.

of piercing the corporate veil (Counts II and IV) and seeks all remedies available under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a)(1) ("UFTA") against Loop, Banco Panamericano ("Banco"), Loop Properties, Inc. ("Loop Properties"), and Scattered Corp. ("Scattered")(Counts VII through X).[3] Wachovia also seeks actual costs and attorneys fees incurred since September 22, 2005 through the date of judgment.[4]

## PROCEDURAL HISTORY

On November 29, 2007, this Court denied Wachovia's Motion for Summary Judgement as to Neuhauser and Greenblatt with respect to Count I and granted summary judgment in favor of Neuhauser, Jahelka, Nichols, and Greenblatt with respect to Counts I and VI. Additionally, the Court granted in part and denied in part Neuhauser, Jahelka, Nichols, and Greenblatt's Motion for Summary Judgment as to Counts II through V. Specifically, the motion was denied as to Loop, Greenblatt, Jahelka, and Nichols; granted as to Loop and Neuhauser; and granted as to NOLA, LLC and Neuhauser, Jahelka, Nichols, and Greenblatt. Finally, the Court denied Banco, Loop Properties, and Scattered's Motion for Summary Judgment as to Counts VII through X brought under the Illinois Uniform Fraudulent Transfer Act.

From January 7, 2008 to January 16, 2008, the court conducted a bench trial to resolve the remaining claims. After listening to the testimony presented by both parties and reviewing the documents entered into evidence at trial, the following constitutes the Court's findings of fact and

---

[3] Citations to the sworn testimony of the witnesses at trial have been abbreviated to "Tr. Vol. 2A, Pg. __"; citations to the Plaintiff's and Defendants' trial exhibits that were admitted into evidence by the Parties' Final Pre-Trial Order have been abbreviated to "Dkt. 300, Ex __"; citations to Plaintiff's and Defendants' trial exhibits will be abbreviated to "PTX" and "DTX," respectively; and citations to the parties' pre-trial stipulations of fact have been abbreviated to "Stip."

[4] Wachovia's Motion to Strike Defendants' Post Trial Position Paper is denied as the court finds that Dependants complied with the Court's order at the close of trial.

conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I. **Background**

    A.    The Parties

Wachovia is a banking and financial lending institution. Stip. ¶ 2. Defendant Loop is a small, closely-held company owned by Defendants Greenblatt, Jahelka, and Nichols, or their respective family trusts or estate planning entities.[5] (Stip. ¶ 19). Loop's respective ownership interests are: Greenblatt (50%), Jahelka (30%), and Nichols (20%). *Id.* Jahelka is Loop's President, Nichols is it's Treasurer, and Greenblatt was the company's Secretary. *Id.;* Tr. Vol. 4-B, Pg. 168.

On September 28, 2000, Neuhauser, acting on behalf of Loop and at Greenblatt's direction, opened a margin account at Wachovia in the name of "Loop Corp." Stip. ¶ 13. Loop's account was used exclusively to acquire shares of stock in Health Risk Management, Inc. ("HRMI") on margin. Stip. ¶ 15; PTX 37. On May 22, 2001, the NASDAQ halted trading in HRMI and the value of the Loop account at Wachovia fell into a debit balance. Stip. ¶ 16. As a result, Defendants' Loop account incurred a margin debt of $1,885,751.44 resulting almost entirely from holdings in HRMI. *Id.*; Stip ¶ 17. Although Wachovia subsequently obtained an NYSE Arbitration Award which was reduced to a judgment against Loop in the amount of $2,478,418.80, Loop has not paid the judgment. Stip. ¶ 17, 18; PTX 38.

After the margin debt came due, Loop transferred over a million dollars in assets and made a number of payments to its shareholders and companies such as Banco, Resource Technology

---

[5] Defendants Greenblatt, Jahelka and Nichols shall be collectively referred to as the "Individual Defendants," Defendants Loop, Loop Properties, Inc., Scattered Corp. and Banco Panamericano, Inc. shall be collectively referred to as the "Corporate Defendants." Greenblatt, Jahelka, Nichols, Loop, Banco, Loop Properties, and Scattered will collectively be referred to as the "Defendants."

Corporation ("RTC"), H&M Partners, EZ Links, Scattered, 200 West Partners, Telegraph Properties, and Loop Telecom, LP. PTX 26.

B.    The Companies

Greenblatt, Jahelka, and Nichols either own, operate, or have an interest in a web of corporate entities including Loop, Scattered, Banco, and Loop Properties and operate them out of a suite of interconnected offices on the seventh floor of a building located at 330 South Wells in Chicago (the "Wells Building").

Loop was incorporated in South Dakota on September 12, 1997 as a wholly-owned subsidiary of Rumpelstiltskin USA, Corp. ("Rumpelstiltskin"). Tr. Vol. 4-B, Pg. 170; PTX 1. Loop maintains its registered office in Suite 711 of the Wells Building. Stip. ¶ 20. Loop was "spun off" from Rumpelstiltskin to Greenblatt, Nichols and Jahelka with the same 50%, 30%, and 20% ownership structure. Tr. Vol. 4-B, Pg. 171; Tr. Vol. 5B, Pg. 147-149. The "spin off" documents were purportedly a part of Loop's corporate records—records that Greenblatt was responsible for maintaining as Loop's Secretary. Tr. Vol. 4-B, Pgs. 168, 171-173.

Defendant Banco  is a South Dakota corporation with its principal place of business in adjoining Suite 718 of the Wells Building. Stip. ¶ 32. Banco is wholly-owned by one of Mr. Greenblatt's family trusts. *Id.*; Tr. Vol. 4-B, Pg. 188. Greenblatt is the sole officer, director and employee of Banco. *Id.* Defendant Scattered was also incorporated under South Dakota law and operates out of Suite 711 (the same Suite as Loop) of the Wells Building. Stip. ¶ 9. Like Loop, Scattered's owners are Greenblatt (50%), Jahelka (30%), and Nichols (20%). Stip. ¶ 54; Tr. Vol. 4-B, Pg. 186. Greenblatt's 50% share of Scattered is held by the same family trust that owns Banco and the trustee of that trust is Defendant Nichols. Tr. Vol. 4-B, Pg. 186. Defendant Loop Properties

is an Illinois corporation operating out of Suite 711 of the Wells Building. Stip. ¶ 8. Loop Properties is owned 90% by Scattered and 10% by Loop. Tr. Vol. 4-B, pg. 185.

In addition to Loop, Greenblatt owns and controls a number of related companies, and operates them out of the seventh floor of the Wells Building. RTC is owned 100% by Rumpelstiltskin. Tr. Vol. 4B, pg. 190. RTC's address is "c/o Scattered Corp." *Id.* Rumpelstiltskin, in turn, is owned by Greenblatt (50%), Jahelka and Nichols (collectively 50%). Tr. Vol. 4-B, Pg. 191. Rumpelstiltskin's address is "c/o Elizabeth Sharp," who was employed as the in-house counsel for Loop before she became the in-house counsel for Loop Properties and then finally (and currently) the in-house counsel of Scattered. *Id.* Even though Elizabeth Sharp ("Sharp") is currently employed as in-house counsel for Scattered, she is also Rumpelstiltskin's attorney. Tr. Vol. 4B, pg. 192. Chiplease, Inc. ("Chiplease") is 100% owned by one of Greenblatt's family trusts—the same trust that owns Banco—and according to Greenblatt, the address of Chiplease is "wherever you [i.e., Greenblatt] happen to be." Tr. Vol. 4B, pg. 192. Repurchase Corp. ("Repurchase") is 100% owned by another one of Greenblatt's family trusts, and Greenblatt is solely responsible for the day-to-day operations of that company. Tr. Vol. 4B, pg. 192.

South Beach Securities, Inc. ("South Beach") operates out of Suite 718 of the Wells Building. (PTX 50). South Beach is wholly owned by NOLA, LLC ("NOLA"). Tr. Vol. 5-A, Pg. 53. According to NOLA's bankruptcy filings, the address of South Beach is "300 South Wacker, Suite 1700," which is the address of the Robinson, Curley & Clayton law firm, defense counsel for Banco and Scattered in this litigation. PTX 48.

NOLA operates out of Suites 711 and 718 of the Wells Building. PTX 44, 45, 46; PTX 75, pg. 2. NOLA's members are the Individual Defendants' fathers. Tr. Vol. 5-A, Pg. 53. NOLA's

manager was Teletech Systems. *Id.* Teletech operates out of Suite 711 of the Wells Building and its lone officer and employee is Greenblatt. Tr. Vol. 5-A, Pg. 53; PTX 70.

EZ Links is owned, at least partially, by Loop. PTX 26. According to Michael May ("May"), Loop's former in-house accountant who is now employed by Scattered, EZ Links is providing the health care benefits for Scattered's employees. Stip. ¶ 29.

Because many of the Court's findings of fact and conclusions of law pertaining to the piercing issues concern Greenblatt's credibility and Banco's loans to Loop, the Court will address these matters prior to discussing the factors under the piercing claims.

## II. The Court's Findings Regarding Defendant Leon Greenblatt and the Banco-Loop Loans

### A. Banco's Loan to Loop

On January 3, 2000, Loop obtained a $9.9 million line of credit from Banco. Stip. 33; PTX 19-20. Loop executed a promissory note payable to Banco and entered into a security agreement with Banco as part of the loan. *Id.* Greenblatt signed the agreement on behalf of the lender (Banco) and Jahelka signed on behalf of the borrower (Loop). *Id.* The Banco loan was secured by a lien against all of Loop's assets. *Id.* Although Loop's by-laws state that the Board of Directors must authorize such a loan by a written resolution, Jahelka did not recall ever seeing a written resolution and no such resolution was produced in this case . PTX 2, Art. V, § 2; Tr. Vol. 3A, pg. 5; Tr. Vol. 5A, pgs. 18-19.

### 1. The terms of the Banco-Loop loan were designed to shield Loop from its creditors.

#### i. *Greenblatt's dual status as lender and borrower*

Greenblatt's dual status as lender (i.e., 100% owner of Banco), and borrower (i.e., 50%

owner of Loop), created a conflict of interest.  Greenblatt admitted that his dual status affected his decision-making as lender, although he claimed that it somehow did not affect his decision-making as borrower:

> Q:    Did you find that your dual status as 50 percent owner of Loop Corp. and as the lender ever influenced your decisions as a lender?
>
> A:    Yes.
>
> Q:    And did you ever find that your status - your status as a 50 percent owner of Loop Corp. and the lender ever influenced your decisions as the 50 percent owner of Loop?
>
> A:    No.

Tr. Vol. 5A, pg. 65.  Accordingly, Greenblatt's dual status as a lender and borrower created a clear conflict of interest that was conveniently ignored by the Individual Defendants and had a significant negative impact on the negotiation of the loan, its terms, its enforcement, and Loop's third-party creditors.

   *ii.*   *The non-existent Banco-Loop "negotiation"*

Despite having a clear conflict of interest, Greenblatt "negotiated" the terms of the loan. Banco is owned by Greenblatt's family trust and Greenblatt is its only employee.  During the negotiation process between Loop and Banco, Jahelka and Nichols represented Loop and Greenblatt represented Banco.  Tr. Vol. 3A, p. 32-33; Tr. Vol. 4B, pg. 216.  Greenblatt was also a 50% shareholder of Loop.  Tr. Vol. 3A, pg. 32.  Neither side was represented by counsel.  Tr. Vol. 3A, p. 34-35.

As Banco's only employee, Greenblatt did little if any due diligence before deciding to loan

Loop $9.9 million. "Banco"—a.k.a. Greenblatt[6]—did not receive a loan application from Loop nor did it obtain a title commitment; Greenblatt did not perform a formal appraisal of Loop's assets, but instead performed an "off-the-cuff" valuation . Tr. Vol. 4B, pgs. 218-218. According to Greenblatt, he was qualified to appraise Loop's assets prior to entering into the loan because he believes himself to be an expert in the commercial real estate industry. *Id.*

Jahelka confirmed that Banco did not require Loop to provide Banco with any documentation prior to Banco agreeing to make the loan because Greenblatt, as a 50% owner of Loop, would have already been familiar with its financial condition. Tr. Vol. 3A, pg. 40. Although Banco obtained a blanket security interest over all of Loop's assets, Greenblatt did not obtain a personal guarantee from Loop's shareholders when it made the loan. According to Greenblatt, "Banco considers personal guarantees essentially worthless." Tr. Vol. 5A, pg. 19. Jahelka did not know why Greenblatt, on behalf of Banco, didn't asked for the personal guarantees of the shareholders. Tr. Vol. 3A, pg. 55. Although the loan and security agreement referenced a number of schedules that were to be attached as exhibits to the loan, there were no schedules attached to any of the loan documents produced as exhibits in this case and Jahelka did not know whether any such schedules were prepared. Tr. Vol. 3A, pg. 59.

Jahelka and Nichols' due diligence was non-existent. Jahelka could not recall asking Banco

---

[6] Throughout the trial, Greenblatt continually referred to himself in the third person as "Banco." Jahelka and Nichols followed suit and referred to Greenblatt's decisions as "Banco's decisions." Banco is 100% owned by Greenblatt and Greenblatt hired himself as its only employee. Thus "Banco" is Greenblatt and Greenblatt is Banco. Yet, Greenblatt insisted on testifying that "*Banco* considers personal guarantees essentially worthless." The Court finds that Banco was nothing more than Greenblatt's one-man enterprise and the Individual Defendants' attempts to paint Banco as anything else simply detracted from their credibility. For simplicity's sake and not because the Court is persuaded by the Individual Defendants' efforts to frame Banco as separate and apart from Greenblatt, the Court will refer to "Banco" as Banco and Greenblatt as Greenblatt.

for a lower interest rate nor did he recall any discussions between himself, Nichols, and Greenblatt regarding pledging collateral. Tr. Vol. 3A, pgs. 37-38. When asked why Loop agreed to give Banco $32 million in collateral to secure a $9.9 million line of credit, Jahelka testified that Banco gave Loop the best terms available to it at the time. Loop, however, does not possess any documentation reflecting applications to any other banks or lenders other than Banco. Tr. Vol. 3A, pgs. 39-40.

Greenblatt conceded that his status as the 100% owner of Banco (the lender) and 50% owner of Loop Corp. (the borrower) allowed him to streamline the due diligence process, granting funds to Loop far quicker than they would have received from an arm's length lender. Tr. Vol. 4B, pg. 219-220. ("It is absolutely true that the knowledge that I had enabled Loop to skip a large portion of the process that it would have had to have gone through at a regular commercial bank or savings and loan or other insurance company or similar type lender.") With Greenblatt negotiating the terms of the loan agreement as the sole owner of the lender and as a 50% shareholder of the borrower, the terms of the loan agreement enabled Greenblatt, Nichols, and Jahelka to remain liquid while blocking Loop's third-party creditors from collecting their judgment.

Banco's loan agreement effectively shielded Loop from its creditors and was drafted carefully to ensure that Greenblatt controlled Loop from the date of the loan forward.[7] The Banco-Loop loan granted Banco a first-position security interest over all of Loop's assets, including its operating subsidiaries, partnership interests, inventory, accounts, general intangibles, as well as all proceeds and products of any of those interests. PTX 19, pg. 13, § 4.1. Pursuant to Loop's note, interest would accrue at the rate of 12% per year, and the maturity date of the note was December

---

[7] Although Greenblatt controlled Loop's decisions as its senior secured lender and pursuant to section 7.6, Jahelka and Nichols were complicit in the scheme. They agreed to the terms of the loan which shielded Loop, of which they owned 50%, from its creditors.

31, 2001. PTX 20.

The terms also placed Banco, and thus Greenblatt, in a position of power over Loop's assets. Jahelka admitted that Loop's pledge of $32 million in collateral to Banco, was regardless of whether Loop owed Banco a $1 or $10 million. Tr. Vol. 3A, pg. 43. Despite having pledged $32 million worth of real estate to collateralize the line of credit, Loop did not have complete access to the funds to do with them as Loop pleased. Tr. Vol. 3A, pg. 44.

Conveniently, the parties' guaranty and security agreement states that the relationship between Loop and Banco is "solely that of borrower or guarantor and lender," and disclaims any fiduciary responsibilities by Banco. PTX 19, pg. 28, § 10.4. Nevertheless, Greenblatt conceded at trial that he owed fiduciary duties to Loop Corp. and Loop's shareholders, which created a conflict of interest for him, when he testified as follows:

> Q: And didn't you owe fiduciary duties to Loop Corp. and to Loop Corp.'s shareholders at the time that this loan document was entered into?
>
> A: Yes. There's no question of that.
>
> Q: Okay. And then you didn't think it was a conflict of interest for you to be the 50 percent owner of Loop Corp. owing fiduciary duties to Loop and its shareholders while at the same time representing Banco, the lender in this transaction?
>
> A: That's not the case. There definitely was some conflict in interest.
>
> Q: Okay. Yet you went through with the loan anyways?
>
> A: Mr. Jahelka and Mr. Nichols approved the loan on behalf of Loop without my determination as part of the judgment.

Tr. Vol. 5A, pg. 25.

Nichols admitted that he had to get Greenblatt's approval to make distributions even prior to the time that Loop defaulted on Banco's loan:

> Q:  Why would you need to get your lender's approval to make a distribution to yourself before May of 2001?
>
> A:  It is just something that I just did.
>
> Q:  Well didn't you have control over your own company at that time?  Weren't you allowed as shareholders and officers and directors to pay yourselves what you wanted to?
>
> A:  Well, to the extent that there was a draw down from Banco's line, I would always go to Mr. Greenblatt for just - if nothing else, to let him know that we are drawing down on that line.

Tr. Vol. 4B, pgs. 140-141.  Perhaps recognizing the impact of his testimony, Nichols subsequently changed his answer.[8] Tr. Vol. 4B, pgs. 141-145.  When asked whether after May of 2001 Banco had to approve all of Loop's payments to third-parties, Nichols responded "not all payments, no."  Tr. Vol. 4B, pg. 159.

> Q:  When you say you viewed it that way, were you ever a party to a conversation with anybody representing Banco, where Banco said to you or Mr. Jahelka that every payment, whether it is compensation or to a third party creditor, must be approved by Banco?
>
> A:  I do recall conversations with Banco which provided Banco with that level of oversight.
>
> Q:  So Mr. Greenblatt would tell you who you could and could not pay?
>
> A:  He definitely had oversight.

---

[8]  *See United States v. Woods*, 233 F.3d 482, 484 (7th Cir. 2000) (at a bench trial the "trial judge is in the best position to judge the credibility of witnesses who offer conflicting testimony….").

> Q:    Well, did he have the final say as to who could and could not be paid?
>
> A:    Given his status as the senior secured lender, yeah.

Tr. Vol. 4B, pg. 160.

The fact that the Individual Defendants enforced and ignored the terms of the Banco-Loop loan agreement at Greenblatt's behest is proof that the loan was a sham transaction designed to put Greenblatt in control of Loop's assets. The evidence showed that the terms favoring Banco's priority lien over Loop's assets were enforced but other terms, such as terms favorable to third-party creditors, were ignored. For example, Loop did not provide Banco with financial information pertaining to it on a regular or quarterly basis even though Section 5.3 of the Banco loan required it to do so. Tr. Vol. 3A, pg. 58. Similarly, Banco did not require Loop to provide it with unqualified audited consolidated financial statements prepared by an independent Certified Public Accountant even though it was required by Sections 6.1 and 6.2 of the guaranty and security agreement. PTX 19, Pgs. 16-17. Tr. Vol. 5-A, pg. 22. At trial, Greenblatt explained that Banco did not require audited financial information because he was already aware of Loop's financial condition by virtue of his status as a 50% owner:

> Q:    And Banco really wouldn't need to obtain this information, because, you know, you're the owner of Banco and you're also a 50 percent owner of Loop Corp. and you'd already know this information, correct?
>
> A:    Banco wouldn't require an audit, because Banco is aware that the - the manner in which the financial statements were constructed and is aware that it was constructed properly.
>
> Q:    And Banco's aware of that fact because you happen to be the 50 percent owner of Loop Corp., right?
>
> A:    Yes.

Tr. Vol. 5A, pg. 24.

On the other hand, Banco enforced Section 7.6 of the loan agreement which prohibited Loop from making distributions to its shareholders without Banco's approval. Jahelka explained that the process for obtaining Banco's approval consisted of Jahelka, Nichols and Greenblatt meeting to discuss making a distribution and Greenblatt consenting to that distribution on Banco's behalf. Jahelka testified that when Greenblatt wanted a distribution, he, as Loop's 50% shareholder, would ask himself, as Loop's lender if it was okay and he would tell himself yes. Even Jahelka was at a loss to explain the logistics of how Greenblatt, as a 50% shareholder, was able to ask Greenblatt, as Banco's only employee, for approval to make a distribution to himself. Tr. Vol. 3A, pgs. 60-61. Of course, there is nothing documenting Greenblatt's decision to permit Jahelka and Nichols to distribute money to themselves from Loop's coffers. Tr. Vol. 3A, pg. 60.

2.      The Banco Loan shielded Loop from creditors such as Wachovia

The Banco loan documents provided very little restriction on the use of proceeds. Loop was permitted to use the proceeds from the Banco loan for start-up costs, "projects"— which were defined as "the projects operated by Loop and its Subsidiaries"— and costs "already incurred." PTX 19, Pg. 21, § 7,.15; Pg. 7, §1.1; Tr. Vol. 5A, pg. 75. According to Greenblatt, Loop's investment in HRMI via its margin account at Wachovia constituted such a "project." Tr. Vol. 5A, pg. 76. But when a margin debt came due on the Wachovia account, Greenblatt refused to allow the Banco funds to be utilized to pay the debt. Greenblatt rationalized his decision by claiming the initial purchase of the HRMI stock was a "cost" and the margin debt incurred in the account was "financing." Tr. Vol. 5-A, Pg. 95. Greenblatt's refusal to allow Loop to repay the debt and Loop's assent to Banco's refusal occurred in spite of the clear language of the loan documents which

permitted the proceeds of the loan to be used for repayment of prior indebtedness. When asked about this particular loan term, Jahelka acknowledged: "As I read this term, it would appear that is does not require Banco's approval for payment of prior indebtedness." Tr. Vol. 3A, pg. 51.

While Banco refused to allow Loop to use the proceeds of the loan to pay down its margin debt, it was quite comfortable with Loop "investing" in related companies such as EZ Links:

> Q:      And in that transaction Banco allowed Loop to use the proceeds of that sale as opposed to funneling those proceeds up to Banco and paying off the loan, right?
>
> A:      Yes. That was - to the extent there were proceeds, Banco made its decision to allow Loop to keep the proceeds and fund probably EZ Links at the same time. I don't really recall, but, yes, if we allowed them to keep the proceeds, Banco would not have to make any further advances.

Tr. Vol. 5A, pg. 47. Moreover, Banco was quite comfortable allowing Loop to divest collateral on its loan with Banco's approval so long as it involved other Greenblatt-related entities. For example, Loop transferred its ownership interests in the real estate partnerships to Loop Properties with Banco's knowledge and consent. Tr. Vol. 5A, pg. 44.

In 2001, Loop defaulted on Banco's loan. Stip. ¶¶ 35-37. When Loop defaulted, Banco didn't enforce the loan agreement by sending a written notice of default demanding payment or filing suit against Loop or seeking foreclosure. In fact, Jahelka did not know of any actions taken by Banco since May 2001 to enforce its rights under any loan agreement with Loop. Tr. Vol. 3A, pg. 70-74. Instead, Banco decided to lend Loop an additional $17 million and add 12% interest onto the loan amounting to $1 million year. Stip. 35-37; Tr. Vol. 5A, pg. 96-98; Tr. Vol. 3A, pg. 70-74. Greenblatt elected to extend an additional $17 million to Loop in lieu of foreclosing on the $9.9 million because he felt it would "maximize the value of Loop's assets." Tr. Vol. 5B, pgs. 106-109.

Consequently, the current balance on Loop's loan to Banco is approximately $16 to $17 million, with perhaps an additional $1 million in interest. Tr. Vol. 4B, p. 191. May testified that Loop did not pay off the Banco line in full at the end of 2003 and that Banco made additional advances to Loop as late as 2004. Tr. Vol. 1-B, Pg. 220.

In summary, Banco chose to loan additional money to a company in default rather than use the proceeds from the sale of Loop's assets to pay Loop's debts to creditors like Wachovia. On this issue, Greenblatt flippantly testified that he would never advance funds to Loop in order to pay off Loop's margin debt with Wachovia because "[i]t's not Banco's general practice to make advances on troubled debt to pay under—to pay lower classes of creditors." Tr. Vol. 5A, pgs. 128. Based on the foregoing, the Court finds that the Loop-Banco Loan Agreement was devised to keep Greenblatt in control of Loop's assets and to avoid paying Loop's creditors.

3.      Loop's failure to maintain arm's length relationships among related entities

Banco's participation in the Loop loan is evidence of Loop's failure to maintain arm's length relationships among related entities.[9]  First, Banco and Loop are related entities in that they share a common owner—Greenblatt.  Additionally, the evidence at trial showed that Banco sold a $3 million participation interest in the Loop loan to a number of "participating entities," including Old Colony Properties, Telegraph Properties, 200 West Properties and H&M Partners. PTX 21, Tr. Vol. 5A, pgs. 93-95.   Greenblatt signed the participation agreement on behalf of Banco and the participants.  *Id.*, Tr. Vol. 5A, pg. 92.  Old Colony Properties, Telegraph Properties, 200 West

---

[9]  As discussed in § III, failing to maintain arm's length relationships with related entities is one of the factors the courts use to decide whether to pierce the corporate veil.  The Court finds that the Banco-Loop loan evidence is also proof that Loop failed to adhere to corporate formalities and failed to maintain corporate records.

Properties and H&M Partners are Loop's subsidiaries. *Id.* In other words, Loop's subsidiaries contributed $3 million to assist Banco in funding the $9.9 million to Loop and Loop subsequently pledged its interest in the participating entities to Banco as collateral to secure the loan. *Id.*; PTX 21, PTX 19. According to Greenblatt:

> Q: So the participants here, the participating entities, they're not only participants in the loan, but they are themselves the collateral securing the loan, right?
>
> A: It's true that they're participants, and it's true that they've pledged collateral for the loan.
>
> Q: Well, they themselves are the collateral, right?
>
> A: Yes.

Tr. Vol. 5A, pg. 94-95.

By entering into participation agreements with subsidiaries of the borrower, which also happened to be pledged as collateral, Greenblatt effectively created a complex lending structure that ultimately resulted in Loop contributing the funds (via its subsidiaries) that Banco would then turn around and lend back to Loop. As a result, control over the funds and use of the pledged assets remained effectively unchanged. Accordingly, this Court finds that the Banco loan was nothing more than a vehicle to avoid Loop's creditors by ensuring that all of Loop's assets were fully encumbered by a blanket lien in favor of Greenblatt, the dominant shareholder of both Banco and Loop.

4.     Greenblatt's Testimony Regarding Banco-Loop Loan Documents

Review of Banco's loan statements to Loop was critical to the Court's analysis of piercing the corporate veil. Wachovia claimed that after Loop's margin debt became due, Loop, at Banco's

direction, diverted its assets to other related entities such as Scattered, EZ Links, Telegraph, and Loop Telecom rather than pay its creditors. Defendants argued Loop's post-debt transfer of assets was an attempt to avoid its creditors because Banco gave Loop "dollar-for-dollar" credit on the Banco line in exchange for the transfers. Wachovia, not surprisingly, requested documentation that would reflect Banco's purported "dollar-for-dollar" credit since no such documentation had been produced in discovery.

During Wachovia's case in chief, Greenblatt testified that Banco sent either monthly or quarterly loan statements to Loop but that he didn't have them because he didn't know their whereabouts. Tr. Vol. 5A, pp. 30-31. Apparently, "Loop" searched for the loan statements but couldn't find them. Tr. Vol. 5A, p. 71. When questioned by defense counsel, Greenblatt was more cooperative and testified that the loan statements were also a part of Banco's books and records and that it would have maintained those records for three years or as long as the IRS required it keep them. Tr. Vol. 6A, pp. 85-88. When asked whether he destroyed the records as opposed to not being able to find them, Greenblatt stated, "It was my testimony that I couldn't find them, but also that I testified that I wasn't required to keep them that long." *Id.* When asked, "Well, regardless of whether you're required to keep them, you did not destroy them, did you?" Greenblatt replied, "I have no recollection.*" Id.* Regarding Banco's potential destruction of key evidence Greenblatt stated:

> Q:    Okay. So it is possible that you would have destroyed the
>         Banco Panamericano loan statements to Loop Corp. in 2000,
>         2001, 2002?
>         [objections omitted]
>
> A:    There's no way that I would have destroyed them in 2000,
>         2001, or 2002. If they were destroyed, which could have
>         been the case because we don't keep records longer than the

IRS requires to keep them, they would have been done in 2004.
***

Q:    Okay.  And were you aware in 2004 that a lawsuit had been filed against Loop and Banco Panamericano?

A:    Yes.

Q:    Okay. So you wouldn't have destroyed them after the lawsuit was filed, would you?

A:    You know, I have no idea what I would have done then.  But the– if I knew they were to be kept for a lawsuit, I certainly wouldn't have been destroying them.  But you didn't even subpoena– you didn't even ask for them.

A:    Well, sir, I'm not sure I understand your testimony.  Is it your testimony that you may have thrown out documents after 2004 under the assumption that they weren't asked for?

A:    No.
      [portion omitted]

Q:    Now, do you recall whether or not those documents related to the loan statements that would have gone to Loop on a monthly or quarterly basis or a yearly basis, whether those were destroyed?

A:    It's our general operating procedure not to keep records longer than the IRS requires us to keep them.  I don't particularly recall whether they were destroyed or not.

Q:    Okay.  Is it possible they were [destroyed]?

A:    Yes.

Tr. Vol. 6A, pp. 86-88.

The next day, Greenblatt insisted that counsel had not previously asked about Banco's loan "statements," but had in fact asked him about Banco's loan "invoices."

Q:    Okay.  So is it your testimony today that when you said last

18

week that you couldn't find the loan statements that reflected those credits, is it your testimony that those loan statements do exist?

A:     I think you're asking me about something different than you asked me last week.

Q:     No -

A:     You asked me last week about whether I sent invoices reflecting the loans, and this [morning] you're asking me about the loan statement.

Q:     No, sir. I will tell you that you were specifically asked last week: Was there a loan statement that was sent to Loop that reflected the credits given to it by Banco on a dollar-by-dollar basis? You stated that there was, and then you stated that you couldn't find them. So that's the question that I'm following up on this morning.

A:     That's not what I'm talking about.

Q:     Okay.

A:     You asked me about invoices that I sent to Loop versus statements of Loop's balance on the loan.

Q:     Okay. Well, the record will reflect what it reflects.

Tr. Vol. 6A, pp. 90-91. Then, Greenblatt testified that the "loan statements"—which he referred to as the loan balance—were in fact in Banco's possession but hadn't been produced because Wachovia didn't ask for them. Tr. Vol. 6A, p. 92.

After the bench trial, documents supporting Defendants' dollar-for-dollar defense magically appeared. Greenblatt produced the documents—this time calling them Banco's "ledger" along with an affidavit in support of their admission. Dk. 362, Ex. A. Banco's "ledger" was located four years after the lawsuit was filed and after the conclusion of the trial. Greenblatt's affidavit and Banco's

"ledger" are stricken pursuant to Federal Rule of Evidence 37 (b)(2)(A)(ii) and 37(c)(1)(C).[10]

Greenblatt's counsel was forced to concede—despite his client's testimony to the contrary—that

Wachovia asked for the entirety of Banco's financial records via requests for production 92 through

102. And despite counsel's arguments in their post-trial submission briefs, the propriety of the

Banco-Loop loan has been at issue since Wachovia filed its First Amended Complaint. Dk. 362, p.

3; Dk. 52. In short, Banco's loan statements fall within the purview of Wachovia's discovery

requests and should have been produced. Banco's failure to do so until after trial merits striking the

"exhibits." Greenblatt's affidavit is also stricken on the basis that it was filed post-trial and without

leave of court giving no opportunity to Wachovia for cross-examination.

Nevertheless, even if this Court agreed to consider Banco's never-before-seen miracle

documents, this Court deems them unreliable. First, the exhibit consists of a self-described

electronic and computerized ledger maintained by "Banco." The entries on the document were made

by Greenblatt personally or under his "direct supervision" and are based on unspecified "Banco

---

[10] Federal Rule of Civil Procedure 37
(b) Failure to Comply with a Court Order.
(2)       Sanctions in the District Where the Action Is Pending.
       (A) For Not Obeying a Discovery Order. If a party or a party's officer, director, or managing agent--or
a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit discovery,
including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just
orders. They may include the following:
       (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or
       from introducing designated matters in evidence;
***
(c)       Failure to Disclose, to Supplement an Earlier Response, or to Admit.
(1) Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required
by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a
motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to
or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
       (C) may impose other appropriate sanctions, including any of the orders listed in Rule
37(b)(2)(A)(i)-(vi). Fed.R.Civ.P. 37 (2008).

records," "Greenblatt's own notes," and "other financial documents." Banco Memo. Ex. A, p. 3. Greenblatt's self-serving, eleventh-hour fabrication cannot fix his inconsistent testimony at trial. Moreover, Greenblatt only made the entries "periodically" or "usually quarterly" though "sometimes there may have been a longer time between the transactions and the entries." Greenblatt only attests that the ledger is "a printout of the computerized, electronic ledger as it existed at the time of trial" and not that it accurately reflects the payments and credits on the loan. *Id*. Moreover, Greenblatt admits that the ledger has not been audited. *Id*. The document lacks foundation, is hearsay, is unauthenticated, and is highly questionable based on Greenblatt's incentive to create a document to support his trial testimony after that testimony was effectively attacked at trial. Greenblatt's credibility is not rehabilitated by his admission that the 2000 and 2001 "loan statements" that "formed the basis for his deposition and trial testimony have been discarded." Dk. 362, Ex. A. It is important to note that Greenblatt's demeanor on the stand supports this Court's decision to strike his post-trial exhibit. His flippant, condescending air in response to legitimate fact-finding questions further convinces the Court that he was intentionally evading the truth.

It comes to no surprise to the Court that Michael May's ("May") testimony contradict's Greenblatt's. May is Loop's former in-house accountant who is currently employed by Scattered and has done work for several Greenblatt entities. He testified that he was responsible for keeping track of the amount owed on the Banco line of credit and that Loop did not receive loan statements from Banco. Tr. Vol. 1B, p. 236.

In summary, the Court finds that the Banco-Loop loans were designed to fraudulently shield Loop from its creditors by placing Greenblatt in control of Loop's fully encumbered assets. The Court also finds Leon Greenblatt to be an inherently incredible witness. Based on the foregoing, the

Court finds that Banco failed to produce admissible evidence that Banco gave Loop "dollar-for-dollar" credit for Loop's transfers of assets made after its debt to Wachovia was incurred and that the Banco-Loop loans are proof that Loop's corporate veil should be pierced.

**III.  Piercing the Corporate Veil to reach Greenblatt, Nichols and Jahelka**

   A.  Choice of Law

After four years of litigating, extensive briefing, including nine months of briefing on the Defendants' Motions for Summary Judgment, Defendants appeared for the bench trial and, for the first time, argued in their opening statements for the application of South Dakota law to the piercing the corporate veil claims. Wachovia opposed Defendants' sudden reliance on South Dakota law to the Court's conclusions of law, but doesn't deny that South Dakota law is applicable.  Instead both parties agreed to compromise by applying the facts of the case to both Illinois and South Dakota law at trial and in their submission papers to the Court and the parties agreed that Illinois and South Dakota law are substantially similar.  *Id*; *see also* (Tr. Vol. 7 A at 10:14-16).

Remarkably, Defendants have argued that Illinois law applies to the piercing claims since they filed their motions for summary judgment in October 2006.  Over the next nine months, the parties flooded the docket with motions and briefs and continued to assert that Illinois law applied to Wachovia's piercing claims.  On November 29, 2007, the Court ruled on the Defendants' Motions for Summary Judgment granting them in part and denying them in part.  Dk. 319.  In the Court's Memorandum and Opinion Order, the Court applied Illinois law on the issue of piercing the corporate veil because both parties cited Illinois law in their briefs.  *Id*.  In October 2007, Defendants submitted their answer to Wachovia's proposed findings of fact and conclusions of law and, once again, cited Illinois law as being applicable to the piercing claims.  Dk. 307.  Then, on January 4,

2008 the parties appeared for a pre-trial conference. The Court's Memorandum and Opinion Order was discussed at length and neither party raised the choice of law issue. A mere three days later, Defendants appeared for the bench trial and disclosed, for the first time, that South Dakota law applies to the piercing claims. Defendants provided no explanation for their failure to address the choice-of-law issue earlier in the proceedings. Rather, when the Court inquired as to the parties' sudden shift in applicable law, Loop's counsel stated:

> Q:     And did you present that in your motion for summary
>        judgment? I don't recall you arguing any South Dakota law
>        in your motion for summary judgment.
>
> A:     I was not involved in that.

Tr. Vol. 7A, pg. 14-16. In Defendants' post-trial position papers, they devote one paragraph to the matter of South Dakota law as being appropriate for the piercing claims without providing further explanation as to why the parties failed to address the matter prior to trial. Def. Pos. Paper Corp. Veil, p. 2.

Defendants have waived any objection to the application of Illinois law to the piercing claims by failing to address the choice-of-law issue earlier in the proceedings. *See Muslin v. Frelinghuysen Livestock Managers, Inc.*, 777 F.2d 1230, 1231 n.1 (7th Cir. 1985) (noting that acquiescence to court's choice of law amounts to waiver...objection to such choice). Despite the fact that both parties, citing *Stromberg Metal Works versus Press Mechanics*, 77 F.3d 928 (7th Cir. 1996), appear to agree that South Dakota law governs the piercing claims, the same parties acquiesced in the application of Illinois law for four years. *See Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 530-31 (7th Cir. 1985) ("parties can within broad limits stipulate the substantive law to be applied to their dispute, and that is what we deem them to have done here by not objecting to the district judge's

application of the substantive law of Illinois to their dispute."); *accord International Adm'rs v. Life Ins. Co.*, 753 F.2d 1373, 1376 (7th Cir. 1985). Thus, Defendants are deemed to have waived any objection to application of Illinois law which may have been available.

Nevertheless, the Seventh Circuit has held that efforts to "pierce the corporate veil" are governed by the law of the state of incorporation, *see Kern v. Chicago & Eastern Illinois R.R.*, 6 Ill. App. 3d 247, 250-51, 285 N.E.2d 501, 503-04 (1st Dist. 1972), and Loop was incorporated in South Dakota. *See Stromberg*, 77 F.3d at 933. Accordingly, the Court will apply Illinois law on the basis of the parties' waiver consistent with its November 20, 2007 Memorandum and Opinion Order, but will also briefly address South Dakota law since it is substantially the same.

B.    Piercing the Corporate Veil under Illinois Law

In general, "[a] corporation is a legal entity that exists separately and distinctly from its shareholders, officers, and directors," *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 775 (Ill. App. Ct. 2005), and parties related to a corporation are normally not subject to corporate liabilities. *See Dimmitt & Owens Fin., Inc. v. Superior Sports Prods., Inc.*, 196 F. Supp. 2d 731, 738 (N.D. Ill. 2002). However, an exception to this rule exists when an "individual or entity uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Fontana*, 840 N.E.2d at 775-76. In such situations, the corporate veil of limited liability may be "pierced" and the individual held liable for the underlying cause of action. *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 520 (7th Cir. 1991) (*quoting Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985)). "[P]iercing the corporate veil" is an equitable remedy designed to prevent those who fail to respect a corporation's separate legal existence from hiding behind the corporation to avoid liability for their wrongdoing. *Fontana*, 840 N.E.2d at 776; *see also Dimmitt*,

196 F. Supp. 2d at 738. A party seeking to pierce the corporate veil must demonstrate that: (1) there is "such unity of interest and ownership" between the individual and the corporation "that the separate personalities of the corporation and the individual . . . no longer exist;" and (2) the circumstances are "such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388-89 (7th Cir. 1994).

To determine whether the "unity of interest and ownership" between an individual and a corporation is such that the corporate fiction should be disregarded, courts consider the following factors: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) non-functioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a shareholder; (10) failure to maintain arm's length relationships among related entities; and (11) whether the corporation is a mere facade for the operation of the dominant shareholders." *Dimmitt*, 196 F. Supp. 2d at 738; *see also Fontana*, 840 N.E.2d at 778; *accord Hystro*, 18 F.3d at 1389). The court's task is to decide whether these factors, taken as a whole, demonstrate that the corporation is actually the alter ego of the individual, no one factor is determinative. *See Dimmitt*, 196 F. Supp. 2d at 738.

### 1. Inadequate Capitalization

Wachovia proved that Loop was inadequately capitalized at its formation. A court will find a corporation to be undercapitalized only when it "has 'so little money that it could not and did not actually operate its nominal business as its own.'" *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008); *citing Firstar Bank, N.A. v. Faul*

*Chevrolet, Inc*., 249 F. Supp. 2d 1029, 1041 (N.D. Ill. 2003) (*quoting Browning-Ferris Indus. of Ill.,*

*Inc. v. Ter Maat*, 195 F.3d 953, 961 (7th Cir. 1999)).[11]

According to Loop's Annual Reports filed with the Illinois Secretary of State and prepared

under penalty of perjury by Greenblatt and Jahelka, Loop was capitalized with $1,000 of paid-in

capital.  PTX 7-12.  This is also confirmed on the Application for Authority to Transact Business

that Loop filed with the State on June 15, 1998.  PTX 4, pg. 4.  Loop's share certificates also

confirm that 25,000 shares of the company were issued with a par value of $0.04 per share (i.e.,

$1,000).

Defendants contend that Loop was actually infused with more than $10 million worth of

investments in stock and real estate at the time it was incorporated.  The only support the Defendants

have for this contention is Greenblatt's testimony and the missing documents allegedly prepared

during the Rumpelstiltskin to Loop "spin off" (the "spin-off documents").  Greenblatt[12] was

responsible as Loop's corporate secretary to keep and maintain the purported "spin-off" documents;

yet, now he is unable to locate them.  Tr. Vol. 4B, pgs. 172-173;  *see also,* PTX 98, Pg. 6.[13]

---

[11] South Dakota law determines undercapitalization at the point of formation of the corporation. *Kansas Gas & Electric v. Ross*, 521 N.W.2d 107, 117 (S.D. 1994).  A corporation which is adequately capitalized at formation but later suffers losses is not undercapitalized, and "simply identifying evidence of financial problems is insufficient."  *Id*.  The South Dakota Supreme Court also made it clear that the burden is on the plaintiff to prove undercapitalization. *Id*. at 115.

[12] As discussed herein, documents under Greenblatt's care that would allegedly support Loop's adherence to the corporate form are suspiciously missing.

[13] At trial, Mr. Greenblatt initially disagreed that he did not know where the "spin-off" documents were kept, he subsequently admitted the following deposition testimony:

Q:      And so you will agree with me then that during your deposition I asked
        you the following:  "Q:  Where are the spin-off documents kept?" "A: I don't know."

A:      Yes.

(Tr. Vol. 4-B, Pgs.. 173-175).

Because these documents were undoubtedly in Loop's, and specifically Greenblatt's, control and neither party produced them, an unfavorable evidentiary presumption arises and the Court may infer that the documents either never existed, or if they did, would have shown negative financial standing. *See, e.g., Dimmitt*, 196 F. Supp. 2d at 738; ("An unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under his control."); *see also McCracken v. Olson Cos., Inc*., 500 N.E.2d 487, 492 (Ill. App. Ct. 1986) (when there is a failure to produce a legitimate explanation as to the unavailability of business records, it can reasonably be inferred that those documents would have revealed the corporations' poor financial standing).

Having been "unable" to locate the purported documents supporting the Individual Defendants' assertion that Loop was adequately capitalized, Defendants introduced a one-page summary document prepared by May, Loop's accountant, as evidence that Loop was infused with $10 million of assets at its formation. PTX 98.

May created Exhibit 98 after discovery closed for the purpose of preparing Loop's expert witness, Craig Green, CPA. Tr. Vol. 1A, pg. 120; PTX 98, Pg. 6. The document lists a number of real estate and stock investments that were purportedly transferred to Loop on September 12, 1997 which total in excess of $10 million. PTX 98, pg. 6. The document does not identify the basis for the valuations of the investments, identify the source of the investments, or describe the method by which the assets were transferred into Loop. *Id*. No back-up documentation used to create PTX 98 was ever introduced.

May admitted that he prepared PTX 98 without ever seeing any source documents that would have verified that the investments were in fact transferred to Loop. Tr. Vol. 1A pg. 125, Vol. 1B,

pg. 133.  Instead, May's belief that the assets were transferred into Loop is based entirely upon the word-of-mouth of Loop's shareholders: Jahelka, Nichols and Greenblatt.  Thus, May had no first-hand knowledge of this purported initial capitalization and admitted that he was simply "instructed by the shareholders that the transfer did take place."[14]  *Id*.  May testified during his deposition that he did not know whether Loop had, in fact, received $10 million of paid-in-capital at the time it was formed.  *Id*., pg. 123.  Accordingly, the Court finds that PTX 98, May's "list" is unreliable and lacks foundation.  It is another example of the Defendants' manipulation of records to support their trial position.

Defendants' contention that Loop was infused with $10 million in capital is controverted by documents introduced in evidence at trial; namely, Loop's filings with the Secretary of State.  PTX 4.  According to Greenblatt, PTX 4 is a certificate of authority to transact business that Loop filed with the Illinois Secretary of State.  Tr. Vol. 4B, pg. 175.  Greenblatt signed this form on June 11, 1998 in his capacity as Loop's Secretary.  *Id.*, pg. 176, PTX 4, pg. 4.  Section 10 of PTX 4 required Loop to provide an estimate as to the total value of all property of the company:

10(a)   Give an estimate of the total value of all property of the corporation for the following year:

10(b)   Give an estimate of the total value of all property of the corporation for the following year *that will be located in Illinois*:  PTX 4, Pg. 4, (emphasis added).

In response to both inquiries, Mr. Greenblatt recorded "$1,000"—*not* the $10 million worth

---

[14] Mr. Jahelka did not know why this document was never produced prior to the deposition of Loop's expert, Mr. Green (Tr. Vol. 3-A, Pg. 25); did not know who created the document (Tr. Vol. 3-A, Pg. 27); and though he had seen documents that reflect that the interests reflected on the document were actually transferred to Loop, did not know why they had not been produced in this case.  Tr. Vol. 3-A, Pg. 27.  When asked whether Loop had all the transfer certificates evidencing that these assets were actually transferred to Loop as part of its initial capitalization, he stated that he didn't know what Loop had.  Tr. Vol. 3A, pgs. 28-29.

of assets that were supposedly infused into Loop when it was incorporated on September 12, 1997,

just nine months earlier. Greenblatt was unable to explain the discrepancy:

> Q: Okay. And then you will see down in Section 10A and 10B it asks you to give an estimate of the total value of all the property of the corporation for the following year, and it lists, $1,000. Do you see that?
>
> A: Yes.
>
> Q: Why doesn't it list $10 million worth of value of property held by Loop Corp.?
>
> A: Because I believe that includes the definition of property in Illinois, and that was all that there was.
>
> Q: Okay. Well, I will agree with you that that is what section B says, "Give an estimate of the total value of all the property of the corporation for the following year that will be located in Illinois," but section A isn't so limited. So, I guess I am wondering why it is that $10 million isn't listed there?
>
> A: I have no idea.

Tr. Vol. 4B, pg. 179.

Even if Exhibit 98 had a modicum of evidentiary value as to Loop's actual initial

capitalization, it fails to disclose the extent to which the real estate assets were encumbered by

mortgages, or whether the other investments were pledged as security for another obligation. PTX

98, pg. 6. "The consideration of whether a corporation is adequately capitalized is based on the

policy that shareholders should in good faith put at the risk of the business unencumbered capital

reasonably adequate for the corporation's prospective liabilities." *Fontana*, 840 N.E.2d at 779;

*citing Fiumetto v. Garrett Enterprises, Inc.*, 749 N.E.2d 992 (2001). In fact, Greenblatt admitted

that he did not know if the real estate assets that were purportedly transferred into Loop on the date

of its incorporation— which comprises the bulk of the $10 million worth of the initial capital

29

contribution identified in PTX 98—were encumbered by mortgages. Tr. Vol. 4B, pg. 181. With respect to the assets and securities that were allegedly transferred into Loop in order to initially capitalize it, Jahelka testified that those are no longer owned by Loop; that he did not recall when they were liquidated; and does not know why Loop didn't produce any corporate records that reflect the sale of those securities. Tr. Vol. 4B, pg. 113.

The only credible evidence of Loop's actual capitalization at the time of its inception are the filings that show capitalization of $1000 of paid-in-capital. In fact, the only source of Loop's funds seems to be the fully encumbered "loans" from Banco. There was no evidence at trial that Loop was capable of operating its nominal business without help from Banco, and therefore, it was inadequately capitalized. *See Judson,* 529 F.3d at 379. In fact, May testified that Loop depended upon Banco for financing and to continue its operations and investments:

> Q: Okay. And is it your understanding that Loop Corp. was dependent upon financing from Banco in order to operate?
>
> A: They relied on Banco to increase their investments.
>
> Q: Okay. And without that funding from Banco, Loop Corp. couldn't operate and it couldn't increase those investments; is that right?
>
> A: Yes.

In other words, the evidence at trial showed that Loop was operating on $1000 paid-in-capital even though it was engaging in acquiring millions of dollars of HRMI stock on margin with third-party institutions such as Wachovia.

### 2. Failure to Issue Stock

Wachovia also proved that Loop failed to issue stock for valuable consideration. Loop issued stock to its shareholders at the time of its inception and its share certificates confirm that

25,000 shares of the company were issued, with a par value of $0.04 per share (i.e., $1,000). PTX 1. However, Wachovia argued at trial that Loop's shares were not given to the Individual Defendants in exchange for proper consideration. Once again, the Individual Defendants pointed to the alleged Rumpelstiltskin "spin off" records as proof that consideration was given to Loop in exchange for the Individual Defendants' shares. As previously discussed, Loop was responsible for maintaining those records and the Defendants failed to produce them. Thus, Wachovia is entitled to an adverse inference in its favor on this issue. *See, Berlinger's,* 372 N.E.2d at 1048; *see also, McCracken,* 500 N.E.2d at 492. On this basis, the Court infers that Loop's share certificates were worth nothing more than the value of the paper on which they were printed.

3. <u>Failure to Observe Corporate Formalities</u>

The evidence overwhelmingly established that Loop failed to observe corporate formalities. In fact, formality was the exception and not the rule for the Individual Defendants in Greenblatt's web of companies. Loop's directors, officers, and shareholders (Greenblatt, Jahelka, and Nichols) failed to adhere to Loop's By-Laws, failed to prepare and maintain corporate records, failed to file income taxes, and failed to observe formalities when they distributed money to the directors, officers, and shareholders and in their dealings with other Greenblatt-controlled entities.

i. *Failure to adhere to Loop's By-Laws*

The Court finds that the Individual Defendants failed to adhere to Loop's By-laws. Article III of Loop's By-Laws established the corporate governance standards for directors. PTX. 2, pg. 5. According to Section 2 of Article III, Loop was required to have at least one director, but not allowed to have any more than two directors:

Section 2. Number, Tenure and Qualifications. The number of directors of the corporation shall be not less than one (1) and not greater than two (2). Each director

31

shall hold office until the next annual meeting of shareholders or until his/her successor shall have been elected and qualified. Directors need not be residents of Illinois or shareholders of the corporation.

*Id.*

Loop had three directors—Greenblatt, Nichols and Jahelka. Stip. ¶ 19; Tr. Vol. 2B, pg. 208. When confronted by Wachovia's counsel on the issue, Jahelka, Loop's President, testified that he could not recall whether the officers or directors of Loop ever amended that provision. *Id.* Secretary of State filings contradict the Individual Defendants' testimony at trial and at their depositions on this issue because Loop's application filed with the Illinois Secretary of State identifies Kevin Werner and Leigh Rabman as directors in addition to the Individual Defendants. PTX 4, Pgs. 3, 5; Neuhauser Resp. 56.1(b) ¶ 2. Thus, according to Loop's Illinois application, Loop had five directors—three more than the By-Laws allowed. Jahelka never saw any resignations by any of the directors and testified that if such resignations did exist he would have expected them to be in Loop's "corporate minute book."[15] Tr. Vol. 2-B, Pg. 206-210. Accordingly, Wachovia proved that the Individual Defendants were operating Loop in contravention of the company's own By-Laws regardless of whether they had three or five directors.

Additionally, Loop's By-Laws established that the directors "shall hold office until the next annual meeting of shareholders" (PTX 2, Art. III, § 2, Pg. 5) and that an annual meeting of the shareholders shall be held on the second Wednesday in March of each year at 10:00 a.m. PTX 2, Art. II, § 1. However, Jahelka testified that no meeting between the shareholders was ever determined to be the "annual meeting." Tr. Vol. 2B, pg. 206- 210; Tr. Vol. 3A, pg. 76.

---

[15] The Court's discussion regarding Loop's failed to produce a "corporate minute book" is discussed below.

Accordingly, Wachovia proved that the Individual Defendants were operating Loop in contravention of the company's own By-Laws by failing to hold an annual meeting of the shareholders.

Loop's By-Laws also state that no loan should be contracted on behalf of the corporation and that no evidence of indebtedness shall be issued unless authorized by a resolution of the Board of Directors. Jahelka did not recall ever seeing a written resolution and Greenblatt admitted he had no reason to dispute that Loop's directors decision to borrow the $9.9 million was not documented in any formal board resolution. PTX 2, Art. V, § 2; Tr. Vol. 3A, pg. 5; Tr. Vol. 5A, pgs. 18-19. Defendants' failure to produce a formal resolution documenting the Banco loan allows this Court to infer an unfavorable evidentiary presumption. *See, e.g., Berlinger's*, 372 N.E.2d at 1038; *see also McCracken*, 500 N.E.2d at 492; (when there is a failure to produce a legitimate explanation as to the unavailability of business records, it can reasonably be inferred that those documents would have revealed the corporation's poor financial standing). It seems that the only time a formal resolution occurred was when Loop entered into transactions with entities that were not controlled, owned, or managed by Greenblatt, Jahelka, or Nichols. *See* DTX 11, 100 (the only resolutions produced at trial).

Though Defendants argue that Loop's By-Laws did not require that *informal* actions taken by agreement of the shareholders be documented in minutes, Loop's By-Laws required consent in writing should the shareholders wish to undertake informal action without a meeting and there was no evidence that Loop's shareholders obtained such consent in writing. PTX 2, Art. II, § 14, pg. 4. When formal meetings were required by the By-Laws, such as the annual meeting, Wachovia introduced evidence that no such meetings ever took place. Moreover, the Court finds that the transactions at issue, such as Loop's loan from Banco, Loop's payments to the Individual

Defendants, and Loop's post-debt transactions were not "informal" actions that would not require records of votes, minutes, or resolutions. Therefore, the Court finds that Loop failed to observe corporate formalities by adhering to its own By-Laws.

Finally, Loop failed to prepare and maintain corporate records documenting compensation and/or distributions to shareholders. Tr. Vol. 3A, pg. 62.

*ii.*     *Failure to Prepare and Maintain Corporate Records*

Loop's Corporate Minute Book and Loop's Meeting Minutes

Loop's By-Laws specifically reference keeping minutes of the shareholders' and Board of Directors' meetings "in one or more books provided for that purpose." PTX 2, Art. IV, § 9, pg. 8. At trial, testimony regarding the existence or whereabouts of Loop's corporate "minute book" was a game of implausible deniability and finger-pointing. In short, though it was undisputed that Greenblatt was responsible for maintaining Loop's corporate records as its Secretary, no corporate minute book or notes of meetings were produced at trial and the Individual Defendants' testimony was either that key documents were lost, were given to corporate counsel, or were never prepared in the first instance.

Nichols' testimony regarding the existence of notes from Loop's shareholders' meetings was impeached. When asked at trial whether it was "fair to state that you don't recall any notes taken in any officer or director meetings..." Nichols said, "No." Yet, at Nichols' deposition, he testified that he didn't recall notes being taken at the officer's and director's meetings. Tr. Vol. 4B, pg. 134. Subsequently, Nichols testified that a corporate red book, a red binder that purportedly contained Loop's corporate records and "some meeting minutes," existed at one time. Tr Vol. 4B, pg. 137. Nichols hasn't seen the red book since 1998 or 1999 and believes that it was lost when the law firm

that incorporated Loop, Gulcher & Gulcher, shipped boxes of documents from its offices to a location that Nichols did not identify during testimony. *Id.* According to Nichols, any subsequent corporate records would have been kept by in-house counsel, Elizabeth Sharp ("Sharp"). *Id.* Of course, that testimony was also impeached by Nichol's deposition testimony at which time he stated, that he did not know where minutes of Loop's meetings where kept if they existed. Tr. Vol. 4B, pg. 136-137.

Jahelka also pointed the finger at Sharp[16] stating that she maintained Loop's minute book, which incidentally, he "hope[s]" contains the resignations of Loop's mystery directors, Werner and Rabman and the resolutions of the Board of Directors for the Banco loans. Tr. Vol. 2B, pg. 208-10, Tr. Vol. 3A, p. 6. As for Greenblatt, he testified that Freeborn & Peters kept the Rumpelstiltskin "spin off" documents but his testimony was impeached by his deposition testimony; namely, that he did not know where Loop's records were kept. Tr. Vol. 4B, pgs. 172-76. May testified that he never saw Loop's corporate "minute book" which purportedly contained Loop's corporate records, corporate records that purportedly included vital documents regarding Loop's initial capitalization, formation, distributions, and resolutions involving millions of dollar of loans and property transfers. Tr. Vol.1B, p. 142. At the end of the day, it was undisputed that Greenblatt, as Loop's Secretary, was responsible for maintaining Loop's corporate records—not his lawyers. *Id.*

Since two out of the three Individual Defendants attest that Loop's in-house counsel, Sharp, maintained Loop's corporate records, it is appropriate to address her testimony on the matter. Unfortunately, however, Sharp was less than helpful. Sharp's testimony regarding the existence and

---

[16] The Individual Defendants have blamed Loop's counsel for Loop's failure to prepare or maintain corporate records. However, Greenblatt was forced to concede that as Loop's Secretary it was his responsibility—and not his lawyers'—to maintain Loop's corporate records. *Id.*

whereabouts of Loop's minute book is condensed below and is contained in trial transcript volume 2A, pages 100 through 140. During her trial testimony, Sharp testified that a certain Loop resolution was contained within Loop's "minute book." Much to her observable annoyance, Wachovia's counsel's next question was "where is that minute book?" Sharp initially testified that the minute book, along with Loop's annual reports, was in a filing cabinet in her office. Wachovia's counsel expressed surprise at Sharp's answer considering Wachovia had been "asking for the minute book for the last two or three or four years and there's been testimony in depositions that nobody knows where it is and that they're still looking for it." Defendants' counsel objected stating, "I believe that mischaracterizes the evidence. I think she said the annual reports are what she is referring to and those have all been produced, as I understand."[17] Then, Sharp testified, defensively, that Loop and Loop Properties assembled "all the corporate records that were available" and produced them in this case. Contradicting her own testimony from just a few minutes earlier, Sharp testified that a corporate "minute book" or "red binder" was not produced, but a "series of papers that were loose in a file" were produced which comprised "everything that there is for corporate records for Loop."

A few minutes later, Sharp revealed that when she was first hired by Loop, she was not responsible for maintaining Loop's records, but rather, performed litigation services only. During that time period, Sharp believes that Loop's records were not kept on site. Sometime after she was hired, a law firm, most likely Freeborn & Peters or Chuhak and Tecson, sent Loop's corporate records to *Loop's offices*— but not to her directly. Sharp surmised that Loop's officers would have been charged at that point in time with maintaining Loop's records created prior to 1999 which

---

[17] Incidentally, the record belies counsel's speaking objection. Apparently, Sharp was paying attention because she quickly and defensively included that Loop had produced all of its corporate documents in discovery. Sharp's testimony conflicts with that of her clients who previously testified that they didn't know why certain Loop documents to which they were referring weren't produced.

contradicts Nichol's testimony that Loop's prior counsel lost its records during shipping. Sharp stated that she didn't begin doing Loop's corporate governance work until 1999, 2000, or 2001. When Sharp assumed the task, however, she did not assemble Loop's pre-1999/2000 corporate records that may or may not have existed prior to the time that she began doing Loop's transactional work. Though Sharp ceased working for Loop in 2003 and began working for Loop Properties, she oversaw Loop's production of documents in this case.

To say that the Individual Defendants and Sharp were evasive when questioned about Loop's corporate minute book and Loop's record keeping is an understatement. As a result, questioning on the matter was a fruitless exercise and tested the Court's patience. In summary, May has never seen a corporate minute book; Nichols and Jahelka testified that Sharp has it; Sharp first testified that one existed but later testified that it was really a series of documents-all of which were produced; Sharp's testimony conflicted with Nichol's, and Greenblatt—who by all accounts was in charge of Loop's records—pleaded ignorance and referred the matter to Freeborn & Peters. In the end, no meeting minutes documenting vital events in Loop's corporate history were ever produced and the evidence showed that it is more likely than not that minutes were never kept in the first place. Accordingly, this Court finds Loop's failure to maintain records of meeting minutes is proof that it failed to adhere to the corporate form. Many of these "missing" documents concerned transfers of property in and out of Loop during critical times, and thus, this Court further finds that Loop's failure to document important events in its corporate history was part of its scheme to defraud creditors, such as Wachovia.

<u>Loop's Accounting Records</u>

May, as Loop's accountant, was responsible for preparing Loop's accounting records, but

did not prepare or maintain profit-and-loss statements, account payable records, account receivable records, or operating budgets on Loop's behalf. Tr. Vol. 1A, pg. 116. May did not prepare or maintain any sort of capital account reconciliation reports or any other records concerning the capital accounts of its owners. Tr. Vol. 1A, pg. 116. As a result, whenever a shareholder sought to take a distribution from Loop, there was no way for May to know whether that shareholder had, in fact, contributed sufficient capital into the company to fund the distribution.

<u>Loop failed to maintain records of fee sharing agreements and bills and invoices reflecting Sharp's and May's legal and accounting services</u>

Loop also failed to maintain corporate records documenting its employees' legal and accounting services provided to other Greenblatt entities. May and Sharp served as Loop's "accounting and legal team" that would provide accounting and legal services to other entities that were owned, directly or indirectly, by Greenblatt such as RTC, EZ Links, Loop Telecom, Green Gas Delaware Business Trust, Rumpelstiltskin, Chicago Videopath. Tr. Vol. 1-A, Pgs. 247-302; Stip. 29. May testified that Loop used a rate of $150 per hour to calculate how much to charge the Greenblatt-related entities for his accounting services, but May also admitted that he never kept track of his time. *Id*. May did not prepare bills or invoices to account for Loop's legal and accounting services nor did he send invoices to the other Greenblatt Entities for reimbursement purposes. *Id*. May prepared invoices to account for his work for RTC which was in bankruptcy and had a trustee appointed. *Id*. However, RTC did not record May and Sharp's time. *Id*. Neither RTC nor Loop performed an audit to determine if the amount of the bills accurately reflected the actual amount of time that Sharp and May spent providing legal and accounting services to RTC while they were working for Loop. *Id*. May and Sharp's bills prepared for Loop and sent to RTC comprised a single line-item for "legal and accounting services." *Id*. Accordingly, there was no way to break

down the 10,900 hours[18] that May and Sharp allegedly spent working for RTC while they were employed by Loop because the bills did not itemize their efforts. Ultimately, RTC was paid an astonishing amount of more than $1,635,000 for May and Sharp's "legal and accounting services." *Id.*; PTX 31.[19]

Similarly, Jahelka testified that no records were kept to reflect May's time spent doing Loop's work while May was employed by Loop Properties and Scattered. Tr. Vol. 2-B, Pg. 176. Likewise, while Loop employed Sharp, Sharp performed legal services for other Greenblatt entities such as Old Colony Properties, LP, 200 West Partners, LP, 401 Partners, LP, South Loop Properties, Telegraph Properties, Randolph Properties, LP, RTC, EZ Links Golf, LLC, and Chicago VideoPath. Tr. Vol. 2A, pg. 180-81. There were no engagement letters between Sharp's current employee and the other Greenblatt entities for whom she did work and Sharp was never paid directly by those entities. *Id.* Although Sharp thought that there existed an oral fee sharing agreement between the various entities for whom she did work, like most business records in this case, none was presented at trial, and she could not say whether one actually existed, nor could she recall asking the Individual Defendants whether a fee-sharing agreement existed. *Id.* at 185-86. Sharp did not know whether all the entities for whom she did work reimbursed Loop; nor did she see bills that were issued to the entities. *Id.* Nevertheless, Sharp failed to keep track of her time other than when she worked on

---

[18] The exhorbitant number of billable hours is highly questionalbe considering that a 40-hour work week yields about 2000 work hours in a year. Most impressive is the fact that their 10,900 of work occurred over only a three-year period while they say they were also busy helping Greenblatt with other related entities. PTX 31; Exhibit E, pgs. 69-70; to PTX 31; Tr. Vol. 1A, pp. 94-95. But like most individuals involved in Greenblatt's entities, they were paid in spite of lack of documentation.

[19] Incidentally, although May, acting as an accountant with a fiduciary duty, was aware that Loop had an unpaid margin debt to Wachovia as of May 2001, he did not know why Loop did not use the $1.6 million that it received from RTC to pay down its debt to Wachovia. Tr. Vol. 1A, pg. 277.

forcible entry and detainer cases. Tr. Vol. 2A, pg. 186. Thus, it seems that the only time Loop felt the need to keep track of its employee's hours was when it was required to do so by law.

Sharp testified that in March 2001, her representation of Telegraph (in a lawsuit brought by the City of Chicago) was a full-time job. *Id*. at 183-85. However, Jahelka could not recall the existence of an oral fee-sharing agreement with Telegraph in relation to Sharp's work nor could he recall whether Telegraph ever reimbursed Loop for Sharp's time. Tr. Vol. 3A, pgs. 11-13. With respect to Randolph Properties and 200 West Partners, Jahelka was not aware of any oral fee sharing agreement or reimbursement in relation to Sharp's work nor could he recall whether Loop sought reimbursement. Tr. Vol. 3A, pgs. 13-15. Jahelka testified that neither Sharp nor May kept track of their time. On this point, Nichols testified that although he believed an oral fee agreement existed between Loop and various entities, he had delegated the billing and collection responsibilities to May and did not recall actually seeing any bills sent to the other entities for reimbursement. May, as noted above, testified that he was unaware of any such fee-sharing agreement and confirmed that he never saw any written document regarding fee-sharing between the Greenblatt-related entities.

Based on the above evidence, this Court finds that Loop failed to maintain any documentation of its employees' time, bills, invoices, or fee-sharing agreements for the purpose of seeking reimbursement for its employees' work for other Greenblatt entities. Further, this Court finds that a corporation that observed corporate formalities would have required its employees to keep track of their time and would have sought reimbursement for its employees' work performed for the benefit of entities other than Loop. This evidence supports Wachovia's claim that Loop did not have a separate existence from other entities controlled by the Individual Defendants and that Loop's employees failed to observe corporate formalities.

<u>Other missing records</u>

Additionally, the Court finds that Loop failed to maintain records concerning the following transactions and that, as a result, Loop failed to adhere to the corporate form. First, Loop failed to produce reliable documentary evidence associated with the Banco-Loop loan as previously discussed. See Tr. Vo. 5A, pg. 18-19.

Second, Jahelka testified that after Loop incurred its debt to Wachovia, it was "obligated" to invest $3 million in EZ Links, a related company, pursuant to a "commitment to fund." Tr. Vol. 2B, pg. 240. Yet, Jahelka was not aware of any document that required Loop to make an investment in EZ Links at that time. Jahelka did not recall ever seeing a written commitment and stated that he didn't believe that one existed in Loop's records. Tr. Vol. 2B, pg. 241. Similarly, Nichols testified that Loop does not have in its records a written commitment to fund that required it to invest in EZ Links after May of 2001. Tr. Vol. 4B, pg. 156.

Third, as previously discussed, Loop failed to maintain records that, presumably, would have established Loop's initial capitalization. Loop also failed to maintain employment agreements with its employees and failed to issue W-2 or 1099 forms documenting Nichol's and Jahelka's compensation in 2001 and 2002 (as discussed later on in this Opinion) regarding Loop's taxes and payments to insiders. On both issues, the Court finds that Loop's failure to maintain vital records such as those documenting its formation and employee compensation is evidence of its failure to adhere to corporate formalities.

Fourth, Loop did not maintain capital accounts records for the shareholders. Tr. Vol. 4A, p. 79. Rather, May relied on Greenblatt, Jahelka and Nichols' assertions that there was sufficient

equity in the company to merit distributions.[20] And, May testified that there are no records reflecting discussions among the shareholders regarding the distribution process, agreements that were entered into among the shareholders that provide for one shareholder receiving a distribution over the others, and discussions with Loop's general counsel, Sharp, as to whether that process was proper. Tr. Vol. 4A, pg. 146.

Finally, Jahelka testified that there are no other documents that reflect the Board of Director's decision to begin compensating themselves after Wachovia's debt became due, nor are there documents that reflect the sudden change in payments from "return of equity" to compensation after May 2001. Tr. Vol. 2B, pg. 23. Moreover, when Loop defaulted on its $9.9 million loan, Banco did not send it a written notice of default because Greenblatt, as Greenblatt explained, owned 100% of Banco and 50% of Loop. Tr. Vol. 5A, p. 96-97.

In summary, the evidence showed that Loop failed to observe corporate formalities because

---

[20]    Q:    Okay. Now, you testified earlier that you never prepared any sort of capital account reconciliation and reports. And, so, I guess I'm wondering how it is that Loop Corp. know that, for example, Andrew Jahelka had at least $242,000 in his capital account as of 2000, so he could get paid that amount from Loop Corp.?
         A:    It's generally up to the shareholders to keep track of their own basis.
         Q:    Okay. So that's not something you would do as the company's accountant?
         A:    No.
         Q:    Okay. So when Andrew Jahelka says, you know, I want to pay myself $242,000 and take a distribution from Loop Corp. in 2000 in this amount, it's not up to you as Loop Corp.'s accountant to say, "Well wait a minute. Let's take a look here to figure out how much money Mr. Jahelka has paid into the company to figure out if there's enough to pay that $242,000 to Mr. Jahelka," is that right?
         A:    The basis is, you know, kept and calculated by the shareholders.
         Q:    Not by you, the accountant?
         A:    No.
         Q:    Okay. And the same would hold true obviously for the [equity] payments to Mr. Nichols and Mr. Greenblatt, right?
         A:    Correct.

Tr. Vol 1B, p. 166- 167.

it failed to prepare and maintain vital corporate records. Had Loop adhered to the corporate form, its officers would have kept meeting minutes documenting important corporate decisions, and at minimum, of the annual meeting (that never occurred according to Jahelka). Had Loop been more than a shell company, it would have kept a corporate minute book and would have followed its own By-Laws. Had Loop maintained separate identities between itself, its shareholders, and other related entities, it would have maintained vital corporate records that would document the important events in its corporate history such as Loop's initial capitalization, formation, distributions, employee transfers, resignations, and votes, notes, or resolutions documenting important decisions involving millions of dollar of loans and property transfers. PTX 2, Art. IV, § 9, pg. 8. In other words, Loop failed to adhere to the corporate form, was nothing more than a shell company, and failed to maintain a corporate identify separate and apart from its shareholders and related entities.

Additionally, the Court finds that the Individual Defendants' testimony on Loop's record-keeping was not credible and that Loop's corporate records were within its control but not produced. The Court finds that Wachovia proved that meeting minutes were not maintained and likely never existed, that Loop failed to maintain crucial corporate records; and that Greenblatt, Loop's secretary, failed to adhere to Loop's By-Laws to maintain corporate records; and ultimately, that Loop failed to adhere to the corporate formalities as a result.

### iii. Loop's Taxes

May testified that he prepared tax returns for Loop for the years 2000, 2001, and 2002 but filed the returns on April 2003—long after the deadlines had passed. Tr. Vol. 1A, pgs. 140, 146, 152, 156; PTX 13-15. May could not explain why he prepared Loop's tax returns one to three years after they were due nor could he explain why he prepared Loop's returns when he was employed

by Loop Properties or why Loop did not compensate Loop Properties' for his services. *Id*., pgs. 149-150. According to May, there was "no rhyme or reason" as to what address he used as Loop's tax preparer. *Id.*, pg. 150. On some of Loop's tax returns, May used his home address; on other returns, he used Loop Properties' address.

In order to prepare Loop's tax returns for 2000 - 2002, May prepared year-end trial balances, which in turn, were prepared based upon Loop's bank records. *Id*., pg. 142. May admitted that the bank records only gave him an idea of how much money was going into and out of the company and not the purpose behind the payments. *Id*., pg. 145. If May wanted to learn why a given payment was made, he asked Jahelka and relied on whatever characterization he provided for the payment. *Id*. In other words, May did nothing to independently verify or confirm Jahelka's characterization of Loop's transactions. *Id*.

This Court finds that Loop's failure to timely file taxes from 2000 to 2002 is evidence of its failure to adhere to the corporate form. This Court recognizes that—standing along— Loop's failure to timely file taxes or its failure to file them does not justify piercing the corporate veil. However, this evidence, coupled with all of the other evidence discussed herein, is one more reason why Loop's veil should be pierced.

#### iv. Conclusion regarding Loop's failure to observe corporate formalities

In summary, the Court recognizes that "merely missing one annual meeting is not a sufficient showing of failure to observe corporate formalities"; but such is not the case here. *See People v. V & M Indus., Inc*., 700 N.E.2d 746, 751-52 (Ill. App. Ct. 1998). Loop failed to adhere to its By-Laws, failed to hold annual meetings, failed to maintain vital corporate records, failed to take meeting minutes, failed to pay its taxes in a timely fashion or failed to pay them at all. Loop's

employees worked for other entities without reimbursement and payments between related entities

and from Loop to its shareholders were neither documented nor adequately calculated. Accordingly,

Loop failed to observe corporate formalities. *See id;* (failure to hold regular meetings, take minutes,

maintain corporate records showed failure to observe corporate formalities); *see also Ted Harrison*

*Oil Co., Inc. v. Dokka*, 617 N.E.2d 898, 902 (Ill. App. Ct. 1993) (finding a "complete lack of

corporate formalities" where "[n]o records were kept and the company did not hold formal

shareholder or director meetings.")[21]

### 4. Insolvency of the Debtor Corporation

On the issue of Loop's insolvency, Defendants, on the one hand, claim that Loop is a "dead

company" and thus, unable to pay Wachovia's judgment; and on the other, Greenblatt, Jahelka and

Nichols can't quite bring themselves to admit that Loop is insolvent because it shows that Loop's

assets were looted after it incurred its margin debt.[22] Loop's owners, officers, and shareholders

claimed to be unable to attest to its financial status or solvency. For example, Jahelka stated that he

did not know if Loop had sufficient assets to satisfy Wachovia's judgment and offered that

---

[21] The Court is not suggesting that informal/day to day decisions had to be formally documented under Loop's By-Laws or according to South Dakota law. However, the Court finds that Loop failed to document significant corporate decisions regarding loans and transfers of property and that Loop's By-Laws contemplated documenting corporate resolutions and at least some of the directors' and shareholders' meetings. The Court further holds that the Individual Defendants' lack of corporate formality is distinguishable from that of the directors in *Kansas City & Electric v. Ross* because the evidence showed that this was not a "mere failure upon occasion to follow all the forms prescribed by law for the conduct of corporate activities." 521 N.W.2d 107, 115 (S.D. 1994); *quoting Larson v. Western Underwriters, Inc.*, 87 N.W. 2d 883, 887 (S.D. 1958). The Court finds that the degree to which Loop failed to keep corporate records justifies veil piercing. *See Kansas City*, 521 N.W. 2d at 113 (court must look at the degree to which each factor is established.)

[22] For example, Loop argued that it is a dead company, but also argued that it was adequately capitalized by Loop's limited partnership assets. In the same breath, Loop argues that its transfer of the limited partnerships post-HRMI collapse was not a "transfer" under the UFTA because the limited partnerships were fully encumbered-- and thus-- not "assets."

Wachovia could have them appraised or could determine their value by liquidating them. Greenblatt testified that he is unable to calculate the value of Loop's assets or even determine if the value of Loop's assets exceeded its liabilities. Greenblatt's best estimate of the value of Loop's assets was "somewhere between zero and 20 million." Tr. Vol. 5A, p. 107. Yet, Defendants were also adamant that Loop is unable to pay Wachovia's $2.4 million judgment. The evidence at trial supports a finding that Loop is insolvent.[23] For example, (a) Sharp defended Loop and Loop Properties when she was employed by (and receiving her salary from) Scattered; (b) Loop has relied on other Greenblatt entities to contribute to its legal fees in this matter; (c) and Chiplease is currently or has previously paid for Loop's legal fees. Most significantly, Loop's accountant testified that Loop depended upon Banco for financing and to continue its operations and investments and couldn't operate without those investments.

As noted above, there was no reliable evidence that Loop was adequately capitalized at is inception. In fact, the evidence showed that one of Loop's first orders of business was to borrow nearly $10 million from Greenblatt/Banco. Even after Loop went into default on its $9.9 million loan, Banco continued to lend more money to Loop because Loop had no other means for obtaining the funds necessary to run its business. After incurring the debt, the Individual Defendants chose to pay down the loan on the Banco line, in essence, to pay back Greenblatt instead of paying off Loop's third-party creditors.

Certainly, Defendants were well aware that Loop's solvency would be at issue at trial considering the Court's ruling on the Motions for Summary Judgment. Yet, Defendants produced

---

[23] As discussed below, Loop was insolvent as a result of the Individual Defendants' fraudulent transfers of assets, decisions to pay themselves before creditors, and carefully crafted web of companies designed to shield them from creditors.

no records or other evidence regarding Loop's present financial status or its solvency. That fact, coupled with Wachovia's proffered evidence of insolvency at trial, leads the Court to conclude that Loop is an insolvent corporation. *See Berlinger's*, 372 N.E.2d at 1048; *see also McCracken*, 500 N.E.2d at 492 (when there is a failure to produce a legitimate explanation as to the unavailability of business records, it can reasonably be inferred that those documents would have revealed the corporations' poor financial standing).

### 5.     Absence of Corporate Records

Based on the Court's findings, as set forth above, associated with Loop's failure to observe corporate formalities with regard to record keeping, the Court finds that there is a conspicuous absence of vital corporate records that justifies piercing Loop's corporate veil.

### 6.     Jahelka and Nichols were non-functioning officers

Greenblatt's control over Loop's other officers and employees rendered them non-functioning and Loop was a mere facade for the operation of the Individual Defendants, especially Greenblatt. First, Wachovia proved that Loop's other directors and officers, Jahelka and Nichols, were non-functioning as a result of Banco, a.k.a Greenblatt's, control over Loop's decisions after the Banco-Loop loan. In addition to Greenblatt's control over Loop's payments to its shareholders, Banco, and third-party creditors, much of the day-to-day investment decisions and financial activities of Loop— including opening brokerage accounts and calling in trades for HRMI stock—were effectively controlled by Greenblatt.

Additionally, other employees, such as May and Neuhauser, worked directly for Greenblatt or at his behest and performed tasks unrelated to their employment at Loop. May, for example, performed accounting services for several Greenblatt-related entities during the course of his

employment at Loop, Loop Properties, and Scattered, but May also performed uncompensated side-duties for Greenblatt personally. For example, May prepared Greenblatt's personal tax returns in exchange for White Sox World Series tickets and a pool table. Tr. Vol. 1A, pg. 107.[24] As set forth in more detail below, Greenblatt directed May to hold himself out as Loop and Banco's Vice President to entities such as the IRS when it suited his purposes even though May never held those positions. Moreover, as discussed throughout this Opinion, May and Sharp changed employers and prepared filings at Greenblatt's direction without independently verifying their accuracy.

Neuhauser worked as Greenblatt's personal clerk and for Greenblatt-related entities such as South Beach and RTC. Tr. Vol. 2A, pgs. 114-115, 119. One of Neuhauser's jobs was to assist Greenblatt with an investment strategy involving HRMI. *Id*., pg. 120. To that tend, Neuhauser would purchase HRMI stock on the open market at Greenblatt's direction through a number of brokerage accounts. *Id*., pg. 121. Two such brokerage accounts were opened at Wachovia—the Loop and NOLA accounts. *Id*., pgs. 122-123, 129; PTX 43; Tr. Vol. 2A, pg. 132.

Greenblatt also asked Neuhauser to open an account on behalf of NOLA at RJ Steichen & Co., and in doing so Neuhauser held himself out as NOLA's "Secretary" (much like May held himself out as Loop's Vice President and Banco's Assistant Vice President) even though Neuhauser admitted that he did not hold that position. *Id*., pg. 133; PTX 75. Neuhauser also opened accounts at First Union Securities and Northern Trust Securities on behalf of other Greenblatt-related entities such as Chiplease and Teletech at Greenblatt's direction. *Id.*, pgs. 137, 139-140; PTX 58; PTX 70. On May 14, 2001, Neuhauser and Greenblatt jointly signed a letter on behalf of Loop directing First

---

[24] The Courts finds that this evidence also supports a finding the Loop failed to observe corporate formalities and failed to maintain arm's length relationships among related entities.

Union Securities to wire cash and accrued interest from Neuhauser and Greenblatt's accounts— held in the name of Banco, Chiplease, Loop, South Beach and Repurchase.  PTX 61.  At trial, Neuhauser admitted signing this letter and testified that did not know whether Loop's address and contact information as set forth on that letterhead—i.e., Suite 711 of the Wells Building—was correct.  Tr. Vol. 2-A, Pgs. 140-141.

Four days earlier, again at Greenblatt's direction, Neuhauser signed a series of individual letters on behalf of South Beach, Repurchase Corp., Loop, Chiplease and Banco.  *Id.*, Pgs. 149-155, 165; PTX 62-66.  Neuhauser did not recall writing any of those letters, did not know why he would have signed them, and did not know if the addresses and telephone numbers for the various entities were correct.  *Id*.  Based on the aforementioned evidence and in part on Neuhauser's demeanor at trial,[25] the Court finds that Neuhauser was nothing other than Greenblatt's pawn in a larger scheme to shield Loop from its creditors in the event that its investments went sour.

Based on the foregoing, the Court concludes that Loop was, in reality, little more than a façade for the operations of Greenblatt, its dominant shareholder.  Defendants argue that Greenblatt should not be considered to be a "dominant" shareholder because he owned only 50% of Loop and his ownership interests were numerically counterbalanced by Jahelka's 30% and Nichols' 20% interests.  But the percentage of ownership interest is just one factor in determining whether a shareholder is "dominant."  In this case, Greenblatt's unique position as the 100% owner of Banco —Loop's lender and its sole source of financing—gave him sufficient power and influence over Loop's operations to render him the "dominant shareholder."  The Defendants even admitted that,

---

[25]  Neuhauser presented as a young, naive, frightened, and impressionable witness.  Oftentimes, Neuhauser looked in Greenblatt's direction for guidance before answering counsel's questions at trial.  Claims against Neuhauser were dismissed during the summary judgment phase of this litigation.

after Loop defaulted on its loan, Banco (i.e., Greenblatt) had "substantial oversight" over Loop's operations and activities. Even Greenblatt was forced to concede that his position as an owner of Loop effected the decisions he made in his capacity as Loop's lender, but he was loathe to admit that the converse was true—i.e., that his position as Loop's lender effected the decisions he made as an owner of Loop. Moreover, both Nichols (Loop's Treasurer), and May (Loop's accountant) testified that after HRMI imploded and Loop went into default under its loan, Banco (i.e., Greenblatt) effectively ran the financial decisions of Loop.

Moreover, the fact that Greenblatt forced May to falsely hold himself out to the public as Loop's "Vice President" and Banco's "Assistant Vice President" demonstrates the extent of Greenblatt's influence over Loop's employees. Similarly, David Neuhauser testified at length about how he opened and managed brokerage accounts for Loop, South Beach, RTC, Chiplease, Banco, Teletech, and NOLA, all at the direction and request of Greenblatt—not Jahelka, and not Nichols.

Also noteworthy is Jahelka's inability to answer 216 questions posed by Wachovia's counsel. Despite serving as Loop's President and Loop's 30(b)(6) representative, Jahelka testified: (a) that he "did not know" 100 times, (b) that he could not recall or remember 102 times, and (c) answered "not to my knowledge" 14 times. The person most knowledgeable about Loop's financial affairs is also the person who offered the most evasive and least helpful answers: Greenblatt. Greenblatt served as puppet master while the other officers and directors sat blithely by and followed his orders to Loop's creditor's detriment.[26] Accordingly, the evidence showed that Jahelka and Nichols were non-functioning officers and directors and that Loop was a mere facade for Greenblatt's operations.

---

[26] To be clear, the Court finds that Greenblatt controlled Loop's financial decisions to the detriment of its creditors and to the benefit of Greenblatt's pocket. That said, Jahelka and Nichols were not naive to Greenblatt's scheme and knowingly assisted him in his efforts to improperly shield Loop from its creditors.

All of the players in Greenblatt's scheme comfortably allowed him to control his web of entities, took directions from him, and fllowed his will because they financially benefitted from their acquiescence, including Tahelka, Nichols, May, Jordan and Sharp.

7.    Evidence regarding the diversion of Loop's assets to shareholders or entities to the detriment of creditors

After the Loop margin debt became due,[27] Loop made nearly $1.2 million in payments to insiders or related entities; namely, Banco, Nichols, Jahelka, RTC, Scattered, EZ Links, Telegraph, and Loop Telecom.[28] PTX 26. Defendants argue that Loop's payments to Banco were repayments of the Banco line of credit as evidenced by Banco's "ledger" and PTX 26. PTX 26; PTX 27; Tr. Vol 1B, pgs. 223-28. The Court has already concluded that evidence that Banco gave Loop "dollar-for-dollar" credit was unreliable and inadmissable. Even if this Court were to ignore the lack of evidence supporting Banco's "dollar-for-dollar" credit theory, the evidence is undisputed that Loop chose to pay down $386,550 in debt to Banco rather than pay third-party creditors like Wachovia.

Although presented to the Court to demonstrate the normalcy of business operations at Loop, the payment of compensation was anything but normal at Loop. In 2001 and 2002, Loop failed to

---

[27] Consistent with its Memorandum and Opinion Order of November 20, 2007 and its rulings during the bench trial, the Court will only consider transfers out of Loop's coffers after its margin debt became due.

[28]
| 7/5/01 to 1/2/02 | Loop pays Banco $93,500 |
| 6/11/01 to 11/15/01 | Loop pays Nichols $65,000 |
| 6/12/01 to 9/25/01 | Loop pays Jahelka $67,500 |
| 7/23/01 | Loop pays RTC $20,000 |
| 6/21/01 | Loop pays Scattered $2,000 |
| 6/11/01 to 12/13/01 | Loop pays EZ Links $461,338.52 |
| 5/25/01 | Loop pays Telegraph $20,000 |
| 1/8/02 to 11/7/02 | Loop pays Banco 293,450 |
| 1/03/02 to 10/17/02 | Loop pays Nichols $48,000 |
| 1/18/02 to 10/17/02 | Loop pays Jahelka $30,000 |
| 2/15/02 to 10/15/02 | Loop pays EZ Links $57,000 |
| 5/16/02 to 11/09/02 | Loop pays Loop Telecom $15,775. PTX 26. |

issue W-2 forms for Jahelka and Nichols even though it did so for May and Sharp during the same time period. *Id.*, pgs. 151, 153; 177-178; PTX 26, §§ P, Q; PTX 15, line 7. Similarly, Loop reported its compensation to May and Sharp on Loop's tax returns but failed to do so with respect to Nichols' and Jahelka's "compensation payments." *Id.*; PTX 13, PTX 14; Tr. Vol. 1B, pgs. 150-151. May explained that he did not report Nichols' and Jahelka's compensation on Loop's 2001 tax returns because the payments were made off-the-books. May could not explain why the payments were made outside of Loop's normal payroll process because it was a decision made by the shareholders (Jahelka, Nichols, and Greenblatt). *Id.*, pgs. 175-176. Like Loop, Loop Properties did not file tax returns or issue W-2 forms when Nichols and Jahelka began taking compensation from it. *Id.* In fact, Loop Properties didn't even file tax returns for 2003 or 2004. *Id.*, pgs. 185-187; PTX 27, Pgs. 2-3. As for the $210,500 in payments to Jahelka and Nichols, Defendants argue that the payments were made to compensate them "modest[ly]" for their work and that they were "underpaid." PTX 26-27; Tr. Vol. 2B, pgs. 213-15. These "modest" payments are proof yet again that Loop, i.e. Jahelka, Nichols, and Greenblatt, chose to pay themselves rather than Loop's creditors.

Loop also diverted its assets to other related entities such as Scattered ($2,000), EZ Links ($518,338.52), Telegraph ($20,000), and Loop Telecom ($15,775) rather than pay its creditors. Unbelievably, Greenblatt testified that Loop made these payments directly to these entities in order to avoid the one-week hold banks place on deposited funds. Tr. Vol. 5A, pgs. 49-50. As these payments make clear, Banco was perfectly content to pay Jahelka, Nichols and Greenblatt-related entities but morally opposed to paying Loop's third-party creditors. Defendants' failed to produce reliable and admissible evidence that Loop's assets were transferred to the above entities in exchange for "dollar-for- dollar" credit on the Banco line. There is no evidence to show that Banco

would ever foreclose on Loop's loan nor did Greenblatt allow Loop to use Banco's loan to do anything other than pay Greenblatt-related entities even though the Agreement allowed Loop to do so. In other words, Banco never behaved like a typical lender. Based on the foregoing, the Court finds that Loop diverted its assets to its shareholders and related entities after it incurred its debt to Wachovia.

8. <u>Loop's failure to maintain arm's length relationships among related entities</u>

i. *Shared office space, phantom suite numbers, and lack of leases*

Greenblatt operates his various companies out of a suite of interconnected offices located on the seventh floor of the Wells Building. Loop operates out of Suite 710 of the Wells Building, along with Loop Properties, Scattered, and Rumpelstiltskin. Stip. ¶ 23. The Individual Defendants' offices are located on the 7th floor of the Wells Building. Tr. Vol. 2B, pgs. 195-97. The entities for whom he worked do not have their own phone or fax numbers and do not separately pay utility bills. Tr. Vol. 2B, pg. 198. If an individual wanted to call Loop, he would need to call Nichols, Greenblatt, or Jahelka directly.

After 2003, Scattered paid the rent for Suite 710 under a lease signed by Jahelka. Stip. ¶ 24. Scattered's lease was with 200 West Partners, LLP which was a real estate partnership in which Loop held an ownership interest. Stip. ¶ 24; PTX 19, Pg. 6. The general partner of 200 West Partners, LLP is 200 West Properties, Inc. Stip. ¶ 24. The current owner of 200 West Properties, Inc. is Loop Properties. *Id.* Although Scattered was a party to the lease, Scattered paid no rent for Suite 710 from 1999 through 2003. Stip. ¶ 25. Loop never paid rent for its office space and was never a party to a lease. Stip. ¶ 21; Tr. Vol. 1A, pg. 104. Jahelka couldn't explain why Loop didn't pay a portion of the rent nor could he recall Scattered asking Loop for rental payments. Tr. Vol. 2B,

pg. 200-201.

Because the various companies comprising the enterprise all operated out of the same common space, the Individual Defendants were often inconsistent when they referred to Loop's suite number. For example, Greenblatt signed a series of letters on May 10, 2001 on behalf of South Beach, Repurchase, Loop, and Chiplease. PTX 62-65. The letterhead for each of those letters is identical: 330 South Wells, Suite 711, Chicago, Illinois, USA 60606, Tel: (312) 341-4042, Fax: (312) 341-9596. On May 10, 2001, Greenblatt signed an identical letter for Banco and although the suite number was different (Suite 718) the telephone and fax numbers were identical. PTX 66. The Illinois Secretary of State form that Greenblatt signed on June 11, 1998 identified Loop's address as Suite 711 and its date of incorporation as September 12, 1997, but the IRS form that Greenblatt signed seven months later identified Loop's address as Suite 718 and its date of incorporation as October 1, 1997. PTX 4, Pg. 3, PTX 5, Pg. 1. Greenblatt could not explain that discrepancy and offered the following glib response at trial:

> Q: Following up on that I take it then you don't know why this IRS form identifies Loop's address as Suite 718 and its date of incorporation as October 1st 1997, when it has been stipulated that the address of Loop Corp. is Suite 711, and it was incorporated on September 12, 1997?
>
> A: I have no idea. I don't think the IRS cares.

Tr. Vol. 4B, pg. 184. Similarly, on January 12, 1998, May identified Loop's address as "Suite 718" on an IRS Form but admitted at trial that he had no idea if Suite 718 was Loop's correct address at the time that he submitted it. PTX 6; Tr. Vol. 1A, pgs. 80-81. May did not consider suite numbers to be very important because the numerous offices on the seventh floor of the Wells Building were really just shared office space. *Id*. May suggested that the fact that Loop, Loop Properties,

Scattered, Banco and other entities shared the same office space, furniture, telephone number, and fax number was not relevant because Loop was "just a holding company." May testified:

> Q: Are you saying it doesn't matter because, from your perspective, all these entities are essentially one big corporate enterprise?
>
> A: No. It doesn't matter because of the holding companies – I'm not going out into the general public representing that, you know, I'm Loop Corp. or Scattered. It's just not the nature of that corporation just holding investments.
>
> Q: Okay. So when Loop Corp. goes and opens a margin account at Wachovia, Loop Corp. isn't holding itself out to the general public; is that it?
>
> A: That's holding it out to Wachovia.
>
> Q: Okay. And Wachovia's not part of the general public though; is that it?
> [Objection omitted]
>
> A: I guess Wachovia would be part of the general public.

Tr. Vol. 1B, pgs. 235-236.

Evidence that Loop shared office space, phone, and fax numbers with related entities is not persuasive standing alone due to the fact that it is logical for closely held corporations to share expenses. The fact that its directors and officers played fast and loose with the entities' employees' titles and when company forms were submitted to government agencies coupled with the lack of lease agreements and rental payments is more persuasive. Considering that evidence with the evidence of shared employees and related transactions, the Court concludes that the Defendants failed to observe corporate formalities and failed to maintain arm's length relationships among entities.

> ii. *Changing employers, titles, and health benefits*

May was employed as Loop's in-house accountant from 1999 through 2002.  Tr. Vol. 1A, pgs. 74-75.  In 2002, May and Sharp were employed by Loop and then Loop Properties,  Tr. Vol. 1A, pgs. 95-97; Stip. ¶¶ 27-28.  From 2003 until 2005, May and Sharp were employed as Loop Properties' in-house accountant and in-house counsel, respectively.  In 2005, May and Sharp began working for Scattered.  *Id*.; Stip. ¶ 27.  When Jahelka advised May and Sharp about their change in employment, Sharp did not find it strange because it was a "business decision' and that "[a]s an employee," she was simply "looking for [her] paycheck."  Tr. Vol. 1A, pg. 99.

May's and Sharp's unexplainable changes in employers were changes in name only.  For example, May and Sharp's offices, salaries, telephones, telephone numbers, fax machines, fax numbers, and e-mail addresses remained the same even though their employers switched from Loop to Loop Properties to Scattered.  Tr. Vol. 1A, pg. 100; Tr. Vol. 1B, Page 88-93.  In fact, May and Sharp continued to perform the same accounting and legal services for the exact same Greenblatt-related entities for which they were working when they were employed at Loop.  *Id.*, pg. 101; Stip. ¶¶ 27-28.  Sharp's legal work for the non-Loop Greenblatt entities continued even after her employment changed.  Tr. Vol. 1B, Page 90.  While May was employed by Loop, his e-mail address was mmay@scattered.com.  Tr. Vol. 1A, pgs. 104-105.  When May was employed by Loop, he received health care benefits from RTC.  *Id.*, pg. 106; Stip. ¶ 29.  Now that he is employed by Scattered, he receives his health care benefits from EZ Links.  *Id.*, pg. 107; Stip. ¶ 29.  As previously discussed, neither May nor Sharp kept track of their time unless it was mandated by law.  When May and Sharp worked for other Greenblatt entities while they were working for Loop, Loop was not reimbursed.

Jahelka did not recall seeing written resolutions, notes or minutes with respect to the decision

to transfer May and Sharp's employment from Loop to Loop Properties or from Loop Properties to Scattered. Tr. Vol. 3A, pg. 17. The Corporate Defendants' "employees" did not attempt to hold themselves out as employees of a distinct corporate entity. For example, Sharp did not identify the name of her employer on either her business cards or her stationery. Tr. Vol. 1B, pg. 96. When Sharp filed her appearance in court, she filed it as "Elizabeth D. Sharp" including whatever her current suite and phone number was at the time. Tr. Vol. 1B, pg. 96.

Sharp also represented different entities with competing interests at the same time. For example, at Greenblatt's request, Sharp served as Loop's in-house counsel and Banco's Registered Agent simultaneously. Tr. Vol. 1B, pg. 99. The January 3, 2000 Guaranty and Security Agreement between Loop and Banco (Loop's lender) identified Sharp as Banco's contact person to whom notices under that Agreement should be directed even though Sharp was Loop's in-house counsel at the time. Tr. Vol. 1B, pg, 102-104; PTX 19, Sec. 10.6, pg. 29. Notwithstanding this clear conflict, Sharp never obtained or requested conflict waivers from Loop even though she was acting as both Loop's in-house counsel and Banco's Registered Agent. Tr. Vol. 1B, pg. 99.

Further evidence of Loop's lack of corporate formality and failure to maintain arm's length between related entities is Loop's employees propensity to play fast and loose with it employee's titles. May, at Greenblatt's direction, held himself out as an officer and director of Greenblatt's various companies. For example, although May admitted was never an owner, director or shareholder of Loop, he held himself out as Loop's Vice President on January 12, 1998 in a tax filing that he submitted to the IRS. Tr. Vol. 1-A, Pg. 77; PTX 6. May volunteered that "Once, I think, I was a VP in filling out a form for them to get an identification number." Tr. Vol. 1A, pg. 77. May conceded that he was never compensated for his duties as Loop's "V.P." and that it was

"just a title position." The position lasted "just a few days" until the IRS issued the FEIN number. Tr. Vol. 1A, pgs. 79-80.

In addition to holding himself out as the Loop's Vice President, May falsely held himself out to Loop's creditors as Banco's "Assistant Vice President" at Greenblatt's direction. PTX 107; Tr. Vol. 1A, pg. 112. May did so in a letter from Banco (Loop's lender) to Golf Venture, LLC (one of Loop's creditors. PTX 107. In May's letter, May invites Golf Venture to enter into an agreement with Banco and to contact Elizabeth Sharp—Loop's in-house lawyer—to document the deal on behalf of Banco. PTX 107. May testified:

> Q:    Okay.  But why would they – if they [Golf Venture] want to enter into an agreement with Banco, why would they contact Ms. Sharp to document the agreement when Liz Sharp is the in-house counsel for Loop?
>
> A:    I don't know.
>
> Q:    Okay. And you weren't concerned at all that you were holding yourself out as the assistant vice president of Banco at a time when you were Loop's accountant; is that right?
>
> A:    Correct.
>
> Q:    And that's because Mr. Greenblatt asked you to write this letter; is that right?
>
> A:    Yes.

Tr. Vol. 1A, pgs. 114-115.

May's constantly changing titles, duties, and positions between the related companies is evidence that the Defendants had little respect for the corporate form and failed to maintain arm's length relationships between the related companies.  As Wachovia argued in its post-trial brief, given May's ever-changing titles, employers, and hats, it is no wonder why May effectively viewed

his real employers to be Greenblatt, Nichols and Jahelka.

iii.    *The Banco Loan and other transactions between*
*The related companies*

Though not a part of Loop's UFTA claims, Wachovia submitted evidence that on January 26, 2001, Loop loaned approximately $2.2 million to South Beach—an entity wholly owned by a related Greenblatt company, NOLA, LLC. PTX 49, Tr. Vol. 5A, pg. 53. NOLA's members are the fathers of Greenblatt, Nichols and Jahelka, and NOLA's manager in charge of running its day-to-day operations was Teletech Systems, Inc. *Id.* Greenblatt is Teletech's sole officer. Greenblatt signed the loan on behalf of South Beach. *Id.*, pg. 54. Nevertheless, Greenblatt did not perceive any conflict of interest in representing South Beach as the borrower. PTX 49, Tr. Vol. 5A, pgs. 55-56.

South Beach subsequently used the $2.2 million loan from Loop to purchase HRMI stock (the same stock that Loop was rapidly acquiring in its margin account with Loop). South Beach's investment in HRMI stock did not pan out and Loop sold the $2.2 million note to Scattered for $100,000, or 4.5 cents-on-the-dollar. Tr. Vol. 5A, pg. 61. Greenblatt testified that Scattered never collected anything on the note because South Beach has no assets. Tr. Vol. 5B, pg. 106. The disposition of Loop's loan to South Beach is more fully set forth in a recent opinion by Judge Goldgar in *In re South Beach Securities, Inc.* which Wachovia submitted to the Court during trial. Judge Goldgar held:

> The evidence presented at the plan confirmation hearing was sparse-partly because South Beach saw fit to offer very little evidence to support confirmation, but also because Greenblatt, the sole witness, was taciturn and uncooperative, purporting not to remember even basic information about himself and his affairs….Debtor South Beach Securities is a Mississippi corporation incorporated in 1984, but Greenblatt was unable to say who had formed South Beach. Its mailing address is 330 South Wells Street, Chicago, Illinois. It has a single officer and director, one William Johnson. Johnson receives no

59

compensation and has never received any. According to Greenblatt, Johnson's only duty as an officer and director of South Beach is to occupy those positions. His qualification to act as an officer and director, Greenblatt said, is simply that "[h]is heart is beating."
***
The sole shareholder of South Beach is NOLA, LLC, and a limited liability company with a mailing address of 330 South Wells Street, Chicago, Illinois. The members of NOLA include Greenblatt's father, Leon Greenblatt, II, James Nichols, and possibly Robert Jahelka. NOLA has no current business operation and has never had one. NOLA has no assets and owns no property other than the stock of South Beach. Greenblatt described NOLA as "hopelessly insolvent," though how NOLA could have generated debts when it never had a business operation is unclear.

NOLA is managed (for want of a better term) by Teletech Systems, Inc., a non-member of which Greenblatt is president. Managing NOLA is Teletech's only function, but NOLA does not pay Teletech for its services. Greenblatt is Teletech's only employee, and he, too, is unpaid. Although he is Teletech's president and sole employee, Greenblatt claimed not to know who owns Teletech's stock, where its books and records are, whether it has a checking account, or where it banks. Like South Beach and NOLA – and Greenblatt, Teletech's address is 330 South Wells Street, Chicago, Illinois.

On January 26, 2001, South Beach entered into an agreement with another entity, Loop Corp., entitled "Subordinated Loan Agreement for Equity Capital." Under the agreement, Loop lent South Beach $2,198,326. The loan was to be repaid five years later and during the interim would accrue 12% interest annually. According to the agreement, the loan was to be used as part of South Beach's "capital." Asked how South Beach found Loop as a lender, Greenblatt testified that he "arranged" it. Asked what that meant, he said only that he "participated in the funding of the loan" and did not elaborate further. Greenblatt executed the agreement on behalf of South Beach as an "authorized person." Andrew A. Jahelka executed the agreement on Loop's behalf.

The same year that Loop lent South Beach $2,198,326, South Beach lent NOLA a "significant" amount of money, probably $3.2 million. The purpose of the loan was to enable NOLA to buy the stock of a company called Health Risk Management ("HRM").

On December 31, 2002, Loop and another entity, Scattered

> Corporation, executed an "Assignment and Sale of Loan." Under the
> document, Loop assigned to Scattered its interest in the January 2001
> loan agreement with South Beach in return for $100,000. Greenblatt
> is an officer and director of Scattered. The other officers and
> directors are Andrew Jahelka and Richard Nichols…Andrew Jahelka
> executed the assignment as president of Loop, and Greenblatt did so
> as secretary of Scattered.

*In re South Beach Securities, Inc.*, 376 B.R. 881, 883-85 (N.D. Ill. 2007) (internal citations and footnotes omitted). The Court finds that Loop's loan to South Beach is evidence that it failed to maintain arm's length relationships between related entities.

Though no one factor was determinative, taken as a whole, the evidence overwhelmingly demonstrated that Loop is actually the alter ego of the Individual Defendants. *See Dimmitt*, 196 F. Supp. 2d at 738. The Court finds that Loop was inadequately capitalized, failed to observe corporate formalities, is insolvent, employs non-functioning officers or directors, is missing vital corporate records, and diverted assets to its shareholders and related entities, failed to maintain arm's length relationships among related entities, and that Loop was a mere facade for the operation of the dominant shareholders. *See Dimmitt*, 196 F. Supp. 2d at 738; *see also Fontana*, 840 N.E.2d at 778; *accord Hystro*, 18 F.3d at 1389. Accordingly, Wachovia proved its case as to the first prong under the doctrine of piercing the corporate veil.

D.    Adherence to the fiction of separate corporate existence would
       sanction a fraud or promote injustice

Now that the Court has found there is "such unity of interest and ownership" between the Individual Defendants and Loop "that the separate personalities of the corporation and the individual[s] . . . no longer exist," Wachovia must prove that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Hystro,* 18 F.3d at 1388-89. In order to satisfy the second prong, Wachovia must point to more than the mere prospect of an

unsatisfied judgment and must show that "some 'wrong' beyond a creditor's inability to collect [will] result" if the veil is not pierced, such as the individuals being unjustly enriched or unfairly avoiding liability after draining corporate assets. *See Sea-Land*, 941 F.2d at 522-24; *see also Hystro*, 18 F.3d at 1390. Actual fraud is not a necessary predicate to piercing the corporate veil; limited liability may be discarded to prevent injustice or inequitable consequences. *Fontana*, 840 N.E.2d at 782, *citing Central States, Southeast & Southwest Areas Pension Fund v. Gaylur Products, Inc*., 384 N.E.2d 123 (1978). One example of inequitable conduct that justifies veil piercing: "a corporate owner who used his several corporations to avoid responsibilities to creditors." *Hystro*, 18 F.3d at 1390; (*citing Sea-Land*, 993 F.2d at 1312).

Based on the evidence presented at trial, Greenblatt, Nichols and Jahelka will be unjustly enriched if this Court does not pierce Loop's corporate veil. While certainly the dominant shareholder, Greenblatt didn't act alone. Jahelka and Nichols are educated businessmen who either drafted or knowingly assented to the terms of the Banco-Loop loan agreements. Thus, Greenblatt may have been the puppet master—but Jahelka and Nichols happily tied themselves to his strings.

Allowing the Defendants to hide behind Loop's veil would sanction a fraud and promote injustice because Loop's shell status, the Banco-Loop loan, and its shareholders' representations on the margin accounts falsely created the appearance of a vital company capable of covering its losses when all the while Loop's assets were fully encumbered by a company insider. Wachovia was powerless to negotiate with Loop because the Individual Defendants would simply use Banco's status as a "senior secured lender" as an excuse for its "inability" to pay its margin debt.

Wachovia's inability to collect on its judgment resulted from the Individual Defendants' scheme to fully encumber Loop's assets and then turn control over to Greenblatt to decide who

would get paid. With only minor exceptions, the only time that the Individual Defendants agreed to use Banco's loan was when they paid themselves, paid Banco, or paid related entities. Their claim that their diversion of assets following HRMI's collapse was innocent because Loop received "dollar- for-dollar" credit on the Banco line was not credible. Even if it were true that such a credit was given to Loop, the credit was worthless because it paid down a loan that a company insider had no intention of collecting.

Additionally, the Court finds that Loop's misuse of the corporate form harmed Wachovia. The Individual Defendants knew that Loop was using its account at Wachovia to acquire HRMI stock on margin; that Loop was inadequately capitalized and that it couldn't function without Banco's loan; that Loop's assets were fully encumbered by Banco, its sole source of financing; and that if Loop defaulted on its margin debt, its creditors would be at Greenblatt's mercy. Since it wasn't Greenblatt's "general practice to make advances on troubled debt to pay under – to pay lower classes of creditors," (Tr. Vol. 5A, pg. 48), the Individual Defendants shielded themselves from their debts. Making matters worse for Wachovia, the Individual Defendants diverted assets, paid themselves and paid related entities rather than enforce the term of the Banco loan that expressly permitted Loop to use Banco funds to pay for costs incurred in connection with Loop's investments and then embarked on this years-long litigation forcing Wachovia to fight for its judgment. PTX 19, § 7.15, pg. 21). Accordingly, Wachovia proved that there is a nexus between Loop's misuse of the corporate form and Wachovia's harm. *See Kansas City*, 521 N.W.2d at 113. If Loop's corporate veil is not pierced, Greenblatt, Jahelka, and Nichols will be unjustly enriched because they will be rewarded for using, transferring, and diverting money to which Wachovia was legally entitled. Such an inequitable result is exactly what the doctrine of piercing the corporate veil is

designed to prevent.  *See, e.g., Hystro*, 18 F.3d at 1391  ("The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts.")  Therefore, the Court finds in favor of Wachovia and against Jahelka, Nichols, Greenblatt, and Loop on Counts II (declaratory judgment) and IV (piercing the corporate veil).[29]

### 1.   Attorney's Fees

In connection with this finding, the Court awards attorneys' fees and costs to Wachovia incurred from September 22, 2005 through the date of judgment.  Under Illinois law, a party who prevails on a veil-piercing claim can recover attorneys' fees if the underlying statute or contract provides for an award of fees.  *See Fontana*, 840 N.E.2d at 785.  Wachovia's $2.4 million judgment is based upon Loop's failure to pay its margin debt in breach of its securities agreement.  PTX 33. Under Paragraph 6 of that agreement, Loop agreed to pay for Wachovia's reasonable attorneys' fees in the event Wachovia took any legal action to collect any amount due:

> I agree to pay commissions, charges, interest and fees at [Wachovia's] prevailing rates, which may change without notice to me except as otherwise provided by law.  I also agree to pay [Wachovia's] reasonable attorneys' fees and interest at the highest

---

[29] The Court will briefly address South Dakota law due to the Defendants' eleventh hour revelation that it applies.  South Dakota law was also addressed when applicable in the body of the Court's Opinion. South Dakota law, however, requires brief mention because it is substantially the same as Illinois law.  Like Illinois, South Dakota applies essentially the same two-prong test: (a) the "separate corporate identity" prong, and (b) the "fraud **or** inequitable consequences" prong.  *Id.*  Unlike Illinois, South Dakota enumerates six factors relevant to the "separate corporate identity" and "fraud or inequitable consequences" prongs.  *Brevet*, 604 N.W.2d at 274, *citing Kansas Gas & Electric*, 521 N.W.2d at 113.  "Those factors include: (1) undercapitalization; (2) failure to observe corporate formalities; (3) absence of corporate records; (4) payment by the corporation of individual obligations; (5) fraudulent misrepresentation by corporate directors; and (6) use of the corporation to promote fraud, injustice of illegality."  *Id.*  South Dakota's factors are subsumed within the eleven factors used by Illinois courts, and thus, the Court does not need to readdress them here. South Dakota's requirement that there must exist some "nexus" between the shareholders' disregard of the corporate fiction and the resulting injustice or inequity to the plaintiff has also been addressed and needs no repeating.  *See, e.g., Sea-Land* , 993 F.2d at 1313; *Kansas Gas & Electric*, 521 N.W.2d at 113.

lawful rate in the event [Wachovia] takes legal action to collect any
amount due from me to [Wachovia].  PTX 33, Pg. 1, ¶ 6.

Wachovia obtained a NYSE arbitration award against Loop and the panel of arbitrators awarded Wachovia attorneys fees pursuant to the above provision in the securities agreement.  PTX 38.  The NYSE arbitration award was confirmed and reduced to judgment by Judge Hart on September 22, 2005 when he entered judgment "in favor of Petitioner, Wachovia Securities, LLC and against Respondent, Loop Corp., in the amount of $2,478,418.80 (consisting of compensatory damages in the amount of $2,349,000.00, attorneys' fees in the amount of $90,000 and interest in the amount of $39,411.87)." *Id*.  When Judge Hart ruled that "[p]etitioner's right to additional attorneys' fees for post-judgment proceedings shall not be construed to have merged into this judgment," he specifically left open the possibility of Wachovia recovering additional attorneys' fees in any post-judgment proceedings.  *Id*. ¶ 2.

With Loop's veil pierced, the Individual Defendants are liable for the underlying judgment as well as Loop's obligation under the Agreement to pay attorneys' fees.  Wachovia's recovery of attorneys' fees is not "double-dipping" because the $90,000 in attorneys' fees awarded by the NYSE was incurred in connection with Wachovia's efforts to obtain a judgment against Loop.  Since then, Greenblatt, Nichols and Jahelka have not only refused to pay that judgment, but they have forced Wachovia to incur additional fees and costs to collect that judgment.  Thus, like Loop, Greenblatt, Nichols and Jahelka are jointly and severally liable for Wachovia's attorneys' fees incurred in this post-judgment proceeding to pierce Loop's corporate veil.

## IV.  **Wachovia's claims under the Illinois Uniform Fraudulent Transfer Act (Counts VII through X)**

Wachovia also seeks remedies available to it under Sections 160/5(a)(1) and (2) and Section

160/6(a)(1) of the UFTA. The UFTA indicates two types of fraudulent transfers, actual fraud and constructive fraud. 740 ILCS § 160; *In re Martin*, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992). Actual fraud or "fraud-in-fact" results where the "debtor transfers property with the intent to hinder, delay, or defraud his creditors" while constructive fraud or "fraud-in-law" "occurs when (1) a voluntary gift is made, (2) there is an existing or contemplated indebtedness against the debtor, and (3) the debtor has failed to retain sufficient property to pay the indebtedness." *Id.*

Since actual fraud will not be presumed under Illinois law, Wachovia must prove all elements of actual fraud by clear and convincing evidence. *Hofmann v. Hofmann*, 446 N.E.2d 499 (1983). Therefore, Wachovia must show that it is highly probable that Loop transferred its assets in question to Scattered, Loop Properties, and Banco with an actual intent to hinder, delay or defraud its creditor, Wachovia. *In re Martin*, 145 B.R. at 946. Various factors are helpful in determining actual intent to defraud. *Id.* at 168. Some of the "badges of fraud" enumerated in the UFTA include whether: 1) the transfer or obligation was to an insider; 2) the debtor retained possession or control of the property transferred after the transfer; 3) before the transfer was made or obligation was incurred, the transfer was of substantially all the debtor's assets; 4) the debtor removed or concealed assets; 5) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; 6) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and 7) the transfer occurred shortly before or shortly after a substantial debt was incurred. 740 ILCS 160/5(b)(1)-(11). "When the badges of fraud are present in sufficient number, it may give rise to an inference or presumption of fraud" and the creditor may prove actual intent. *Id*.

With respect to the claim of constructive fraud or "fraud in law," the Court looks to § 5(a)(2)

66

of the Act.  Establishing fraud in law does not require proof of actual intent to defraud.  *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995).  Rather, transfers made for less than reasonably equivalent value, leaving a debtor unable to meet its obligations, are deemed or presumed to be fraudulent.  *In re Zeigler*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005).  Whether "reasonably equivalent value" has been given is typically a question of fact.  *Id*.  Wachovia need only prove constructive fraud by a preponderance of the evidence.  *See Bay State Milling Co. v. Martin*, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992).

In determining whether reasonably equivalent value was received under the UFTA, courts should consider how that phrase has been construed under the Bankruptcy Code.  *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 374-75 (Bank. N.D. Ill. 2005);  *In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998).  The Seventh Circuit has recognized that there is no fixed formula for determining reasonable equivalence.  *Id*.; *citing Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997).  That determination will depend on all the facts of each case.  *Id*.  Several factors that have been utilized to determine reasonably equivalent value include: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee.  *Id*.; *Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.)*, 238 B.R. 758, 773 (Bankr. N.D. Ill. 1999).  "Reasonably equivalent value is measured at the time of the transfer." *Id*.; *citing Berland v. Mussa (In re Mussa)*, 215 B.R. 158, 172 (Bankr. N.D. Ill. 1997).  Nominal consideration is inadequate to satisfy the reasonably equivalent value standard.  *Id*.; *citing Image Worldwide*, 139 F.3d at 580.

Wachovia seeks to void the following transfers: 1) Banco's lien or security interests over Loop's assets; 2) Loop's transfer of its ownership interests in real estate to Loop Properties; 3) Loop's transfer of assets to Scattered; 4) Loop's investment in EZ Links; and 5) Loop's post-HRMI collapse payments to Jahelka and Nichols. Wachovia relied on factors 1, 2, 5, 9, and 10[30] to prove its case under 740 ILCS 160/5(b). The Court has already ruled that each of the aforementioned transfers was made to insiders and has further ruled that transfers made prior to the date Loop's debt to Wachovia became due will not be considered. *See Wachovia Sec., LLC v. Neuhauser*, 528 F. Supp. 2d 834, 2007 U.S. Dist. LEXIS 88041 (N.D. Ill. 2007).

A.     Banco's April 1, 2002 security interest over Loop's Assets

Banco's loan to Loop has been addressed by the Court at length. In addition to the reasons previously articulated, the Court finds that the April 1, 2002 Banco/Loop loan, the loan made after Loop incurred its debt to Wachovia, was made for one purpose, to prevent Loop's creditors from reaching its assets.[31] The loan was made between insiders, while Loop was insolvent and dependant upon Banco to operate, and after it incurred its debt to Wachovia. The loan further encumbered Loop's assets and was made after Loop was already in default on Banco's line. The evidence showed that the purpose behind the loan was to further encumber Loop's assets thereby giving Greenblatt even more control over its decision to pay creditors. Because Greenblatt, as a 50% shareholder, effectively retained control of Loop's assets before and after the transfer, Loop retained

---

[30] (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property after the transfer; (5) the transfer was of substantially all of the debtor's assets; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; and (10) the transfer occurred shortly before or shortly after a debt was incurred;740 ILCS 160/5(b).

[31] The Court also finds, as it has previously set forth, that the first loan was also made with the intent to hinder, delay, and defraud creditors.

possession or control over all of its assets indicative of a sham transaction. Accordingly, Wachovia proved by clear and convincing evidence that Banco's blanket lien was made with the actual intent to hinder and delay Wachovia's efforts to collect Loop's judgment under 740 ILCS 160/5(b)(1), (2), (5), and (9) and Banco's security interest in Loop's assets constitutes a "fraudulent transfer" under the UFTA.[32]

Additionally, Wachovia proved constructive fraud by a preponderance of the evidence that the April 1, 2002 Banco loan was not at arm's length and was given in bad faith. First, Greenblatt owned Loop and controlled Banco, and therefore, Wachovia proffered sufficient evidence that the transaction was not at arm's length. Second, Wachovia proffered sufficient evidence that the transaction was not made in good faith because Banco decided to loan more money to Loop even though Loop was currently in default and Loop pledged its assets to Banco after the margin debt became due. Therefore, Wachovia proved that the Banco-Loop transfer was one without consideration. Accordingly, the Court finds in favor of Wachovia and against Defendant Banco on Count IX.

B.      Transfer of Loop's Real Estate Interests to Loop Properties

Loop held ownership interests in limited partnerships which, in turn, owned various parcels of commercial real estate in Chicago. Stip. ¶ 22. In September 2002, after Loop incurred its debt to Wachovia, Loop transferred all of its ownership interests in real estate partnerships 200 West Partners, LP, and Old Colony Partners, LP to Loop Properties. Stip. ¶ 53. Loop Properties is a wholly-owned subsidiary of Loop (100% of its stock), and thus, when Loop transferred the

---

[32]    Defendants argue that a transfer of property under the UFTA does not include property to the extent that it is encumbered by a valid lien. 710 ILCS 160/2(b). As this Court concluded, however, there was nothing "valid" about Banco's loans to Loop.

properties to Loop Properties for no consideration (Tr. Vol. 3A, pgs. 22-23) it retained possession or control of the transferred properties while shielding them from Loop's creditors. Tr. Vol. 3A, pgs. 22-23. Loop was in default under its $9.9 million loan to Banco, insolvent, and sought an extension on its line of credit at the time the transfer was made.

Defendants claim that Loop's transfer of real estate to Loop Properties was not made to hinder, delay, or defraud Loop's creditors, but rather, was done at third-party lender Marine Bank's request. Tr. Vol. 3A, p. 12-21; 45-46. Defendants introduced evidence that in January 2001, Loop entered a loan agreement with Marine Bank for $3.25 million at a 10% interest rate. DTX 89. Marine Bank required Loop to provide security for its loan and Banco agreed to subordinate its position as Loop's senior secured creditor on Old Colony Partners, LP and 200 West Partners, LP, to Marine Bank. Greenblatt testified that Marine Bank then took physical possession of the stock certificates reflecting Loop's 100% ownership of Old Colony Partners, Inc. and 200 West Properties, Inc., the corporate general partners of the limited partnerships. Tr. Vol. 6A, Greenblatt at 74-75; DTX 119.

The Court finds that although Wachovia introduced evidence of three factors of fraud, it failed to prove by clear and convincing evidence that Loop's transfer to Loop Properties violated the UFTA. Wachovia's evidence was rebutted by Defendants' documentary evidence of third-party Marine Bank's interest in the properties and Wachovia failed to show that there was an actual transfer of an "asset" as defined under the UFTA. *See In re Royal Crown Bottlers, Inc*. 23 B.R. 28, 30 (Bankr. D. Ala. 1982 (because the subsidiary corporation is an asset of the parent corporation, the benefits the asset will ordinarily accrue to the benefit of its owner); *see also In Re Jeffrey Bigelow Design Group, Inc*., 956 F.2d 479, 485 (4th Cir. 1992) (the focus in a fraudulent transfer

case is whether the net effect of the transfer has depleted the debtor's assets). Under constructive fraud, Wachovia proved by a preponderance of the evidence that the value of what was transferred was equal to the value of what was received via Jahelka's testimony. However, based on Marine Bank's involvement, Wachovia failed to prove that the transaction took place at arm's length and was made in bad faith. *See Grigsby*, 238 B.R. at 773. Accordingly, the Court finds in favor of Loop Properties and against Wachovia on Count X.

C.     Transfers to Scattered Corp.

Wachovia also seeks to void Loop's March 19, 2001 to June 21, 2001 transfer of $242,000 to Scattered. Consistent with its Memorandum and Opinion Order of November 20, 2007 as well as its rulings during the bench trial, this Court will not consider Loop's transfers of assets made prior to the date that its margin debt to Wachovia became due. Of the $242,000 transfers from Loop to Scattered only $2,000 was transferred after May 22, 2001. Accordingly, this Court finds in favor of Scattered and against Wachovia on Count VIII[33] under the UFTA.

D.     Investment in EZ Links and "Compensation" to Shareholders

Wachovia seeks to void Loop's "investment" in EZ Links as well as its "compensation" payments to Nichols and Jahelka.[34] As stated above, after May 22, 2001, Loop "invested" $518,338.52 in EZ Links—a related entity—rather than pay down its debt to Wachovia. EZ links was an insider, and hence, when the Individual Defendants, especially Greenblatt, "invested" in EZ

---

[33] Wachovia appears to have abandoned its quest to void Loop's purported transfer of EZ Links stock to Scattered as it was alleged in the RSAC. RSAC, p. 36.

[34] Though Wachovia seeks to void Loop's investments in EZ Links and payments to Nichols and Jahelka from the beginning of 2001, this Court—in keeping with its Memorandum and Opinion Order of November 20, 2007 as well as its rulings during trial—will only consider payments made after Loop incurred its debt to Wachovia.

Links, they were essentially investing in themselves. In dong so, they retained possession and control of the transferred assets but shielded themselves from Loop's creditors. Furthermore, the transfer occurred shortly after a substantial debt was incurred.

There was no credible explanation as to why Loop chose to "invest" in EZ Links when it purportedly could not pay its third-party creditors. The Individual Defendants' story that Loop was obligated to invest in EZ Links pursuant to a $3,000,000 commitment to fund was unsupported at trial and not credible especially in light of Jahelka's and Nichols' uncertainty as to its existence and the Defendants' failure to produce a record of the "commitment." An agreement to "invest" $3 million in a company is the kind of record that a corporation would maintain and the Court finds that Loop's failure to produce it justifies an adverse inference that one never existed. The Court further finds Jahelka and Nichols' testimony to be not credible on this issue and that the purpose of the transfer was not to invest in a related entity but to further divest Loop of assets that could be given to its third-party creditors. Accordingly, because Loop's $518,338.52 "investment" in EZ Links was made to hinder, delay, or defraud Loop's creditors, the Court finds in favor of Wachovia and against Defendants on Count VII.

Additionally, the Court finds that Wachovia proved by clear and convincing evidence that Loop's "modest compensation" to Nichols and Jahelka in the amount of $210,500 were made to hinder, delay, or defraud Loop's creditors. The payments were suspiciously absent from Loop's tax returns and those of its shareholders. Moreover, the asset transfers were made to insiders shortly before and after Loop was rendered insolvent and incurred its multi-million dollar margin debt to Wachovia. Accordingly, these payments satisfy a number of the factors of fraud and violated the UFTA. The Court finds in favor of Wachovia and against the Defendants on Count VII.

## V.    Loop's Legal Fees and Gregory's Jordan's Testimony

### A.    Loop's Legal Fees

It has been the Defendants' position for a number of years in this litigation that Loop has been unable to pay Wachovia's judgment because it does not have the funds to do so. Because attorneys were so vigorously defending the suit, this Court questioned how Loop has been able to pay for its attorneys for the last four years. The Court ruled before and during trial that Loop's inability to pay its legal fees is relevant to the case. Whether other insider entities are paying Loop's legal fees is relevant to whether Loop commingled funds or whether it failed to maintain arm's length relationships with other related entities. As such, evidence regarding Loop's legal fees was relevant to the Court's decision regarding whether Loop's corporate veil should be pierced.

Loop's attorneys, Sharp and Jordan, testified regarding Loop's legal fees but only after strenuously opposing Wachovia's subpoenas. Sharp eventually testified but only after the Court ordered her to withdraw from representing Loop (over her strenuous objection) in light of the fact that her deposition testimony created a clear conflict of interest and instructing her that the Rules of Professional Conduct do not permit her to serve as an advocate when she will be testifying as a material witness in the dispute. Dk. 296. According to Sharp, while she was employed by Scattered in July 2005, Jahelka asked her to represent Scattered and Loop Properties in this matter.[35] Sharp doesn't know whether Jahelka asked her to represent the companies in his capacity as Loop's President or as an officer of Scattered. Tr. Vol. 1B, pg. 22. Sharp also did not know whether

---

[35] At some point in time, Sharp met with Jahelka, Greenblatt, Nichols and Banco's attorney, C. Philip Curley, to discuss who would represent the various defendants. Of course, Sharp did not know in what capacity Jahelka was attending (as President of Loop, Loop Properties, or Scattered) and did not know whether Greenblatt was attending in his capacity as an officer/shareholder of Loop or in his capacity as the sole employee of Loop's lender, Banco. Tr. Vol. 1B, pg. 30-31.

Jahelka made arrangements for Loop or Loop Properties to reimburse Scattered for her time. Tr.

Vol. 1B, pg 22. Claiming attorney-client privilege, Sharp refused to testify as to why she was not

asked to represent Scattered considering she was employed by Scattered and not Loop or Loop

Properties at that time. Tr. Vol. 1B, pg. 27-28. When asked why Scattered allowed Sharp to

represent Loop, Jahelka testified:

> A: It is an arrangement. Because of the common ownership, because the shareholders of Scattered are common to the shareholders of Loop Corp., and Loop Corp. is effectively contributing to Loop Corp. by providing Ms. Sharp's services to defend Loop Corp. in that matter. (Tr. Vol. 2-B, Pg. 184).
>
> * * *
>
> Q: What is the benefit to Scattered, the corporation, of having its lawyer spend the time that she [did] representing Loop Corp.?
>
> A: I understand and I think I answered that by saying she is providing a benefit to Scattered's shareholders by doing so. Does that make sense to Your Honor? It would be - - it is no different than if she were to provide legal services to me as an individual while she is being paid by Scattered. I am effectively - - it is a form of distribution. It is non-cash. I would be - - you know, I would be taking the benefit. In this case, it is all proportional to the same shareholders of Scattered. When she provides those services they come out to us individually, and they are effectively contributed to Loop so that Loop can defend itself in this matter.
>
> Court: There is your answer.

Tr. Vol. 2B, pgs. 185-186. On this issue, Greenblatt initially testified that Scattered received no

benefit from this arrangement:

> Q: When Ms. Sharp was representing Loop and Loop Properties in this case she was in-house counsel for and employed by Scattered Corp., correct?
>
> A: Yes.

> Q:    And what benefit did Scattered Corp. get out of Ms. Sharp
>       providing legal services to Loop Properties and Loop Corp.
>       in this case?
>
> A:    None.

Tr. Vol. 4B, pgs. 2,0-211.  Later on, however, Greenblatt changed his mind and testified that

Scattered received a tangible benefit from Sharp's representation; namely, that Scattered "had happy

shareholders."  Tr. Vol. 4B, pgs. 212-213.  Scattered's shareholders were undoubtedly happy

because they are also Loop's shareholders.  Tr. Vol. 4B, pgs. 214-215.

At one point, Greenblatt testified that Loop's shareholders were paying for its legal fees in

this litigation.  Tr. Vol. 4B, pg. 203.  Once again, this testimony is inconsistent with Greenblatt's

later testimony, Dykema Gosset's records (discussed herein), and Mr. Willis's representations that

Chiplease—another Greenblatt-related entity[36]—paid for Loop's legal fees arising from this lawsuit.

Tr. Vol. 5A, pgs. 91-92.  Then, Greenblatt changed his testimony on the matter not once, but twice.

First, Greenblatt claimed that Loop's shareholders intend to reimburse Chiplease for Loop's legal

fees, and then he said that Chiplease was paying for Loop and Loop Properties' defense because he

had an indirect ownership interest in Chiplease, and therefore, felt Chiplease should pay for his

expenses:

> Q:    Okay. Well, why is Chiplease paying for Loop and Loop
>       Properties' representation in this case?
>
> A:    Chiplease paid for Loop and Loop Properties' representation
>       because Chiplease paid for my expenses.
>
> Q:    And why is Chiplease paying for your expenses?

---

[36]  Chiplease is 100% owned by one of Greenblatt's family trusts—the same one that owns Banco
—and according to Greenblatt, the address of Chiplease is "wherever [Greenblatt] happen[s] to be." Tr. Vol.
4B, pg. 192.

A:     Because I own it indirectly.

Q:     Okay.  What benefit does Chiplease, the entity, get out of
       defending Loop and Loop Properties in this case?

A:     None.

Tr. Vol. 5-B, pg. 108.  After that, Greenblatt flip-flopped between saying that Loop's shareholders

paid Loop's fees—to Loop paying its own legal fees—to denying that Loop ever paid for its defense.

Tr. Vol. 4-B, Pg. 206-208.  Thus, the only thing consistent about Greenblatt's testimony on this issue

is that it changes.

No one, however, was less credible than Gregory Jordan, Loop and Greenblatt's outside

counsel, as discussed below.  Nevertheless, the Court finds that related entities paid for Loop's

defense yet never sought reimbursement.  The evidence supports Loop's failure to observe corporate

formalities and its failure to maintain arm's length relationships among related entities.

B.     Wachovia's subpoenas and Jordan's attempts to avoid testifying

Jordan is Loop's counsel in a post-judgment citation presently before the Honorable Maria

Valdez.  Tr. Vol. 1B, pg 239.  Jordan also represented May and Sharp during their depositions

associated with this case and has represented other entities in which either Loop or its shareholders

have a financial interest including:  Banco Panamericano, Chiplease, 200 West Partners, EZ-Links

Golf, Repurchase Corporation, South Beach Securities and Teletech Systems.    Tr. Vol. 1B, pg.

245-47.    Jordan is currently a partner with the law firm of Polsinelli, Shalton, Flanigan and

Suelthaus, P.C.   ("Polsinelli") and, prior to July 1, 2007, was a partner at Dykema Gossett

("Dykema").  Tr. Vol. 1B, pg. 239.

Wachovia issued a trial subpoena to compel Jordan to testify in this case.  The purpose of

the Subpoena was to inquire of Jordan at trial whether Loop was, in fact, a "dead company" as he had previously represented and whether Loop received payments from Greenblatt-related entities for its legal bills. Dk. 282-2; 288-290. On September 27, 2007, Jordan moved to quash Wachovia's subpoena on the on the grounds that "Wachovia cannot compel Mr. Jordan to disclose confidential information" and that "…this information is privileged because in the event the information had any relevance to the alter ego claims at issue in this case, it would necessarily, in effect, reveal confidential communications by that person or entity to Mr. Jordan." Dk. 284. This Court denied Jordan's motion. Dk. 296. In the same order, the Court ordered the parties to brief the privilege issue that Jordan raised in his brief. *Id*. In his brief, Jordan argued that the areas of inquiry were too broad and that "…disclosing the name of the payor would reveal that payor's motivation for paying the fees, …"; that Jordan's testimony "has no possible relevance to this litigation"; and that "revealing the identity of the individual or entity, if any, who paid the fees would reveal information conveyed in confidence to Mr. Jordan." Dk. 298. Finally, Defendants' moved *in limine* to bar Jordan from testifying on the basis of Federal Rule of Civil Procedure 26(a)(1). On January 3, 2008, this Court ruled that the information requested did not invoke the attorney/client privilege and ordered Jordan to testify at trial. Dk. 335.

C.     Jordan's testimony

Gregory Jordan lied under oath when he testified on January 7, 2008. From the beginning, Jordan displayed behavior indicative of his disrespect for the proceedings. Jordan was recalcitrant, arrogant, and irritated that the Court would dare compel him to testify. When asked reasonable questions, Jordan responded in a condescending and evasive manner. Jordan testified under oath that he had been representing Loop without compensation on three occasions:

| Q: | Is it your testimony then that you have not been paid by any third-party? |
|---|---|
| A: | That is my testimony. |
| Q: | And you have been working then for free since Spring of 2006? |
| A: | Yes. |

Tr. Vol. 1B, pg. 241.

At a later point in his testimony, Jordan again testified that he was working for free while employed by Dykema and Polsinelli. Notably, Jordan said that he actually checked to see whether Dykema had not received payment on Loop's bills and he confirmed this was the case *prior* to taking the witness stand because he "didn't want to be wrong."

| The Court: | Have you received payment for any of those [Loop's] bills? |
|---|---|
| Jordan: | No. Dykema hasn't received payment and Polsinelli hasn't received payment. |
| The Court: | Based - |
| Jordan: | And I confirmed that before I came up, because I didn't want to be wrong. |

Tr. Vol. 1B, pg. 252.

Finally, Jordan stated that he did not intend to bill Loop for his trial testimony because the bill "wouldn't get paid."

| Q: | Are you being compensated for being here today? |
|---|---|
| A: | No |
| Q: | You don't intend to send anybody a bill? |
| A: | Even if I did, it wouldn't get paid. |
| Q: | Okay. Why is that? |

| A: | Well because I have two clients potentially I could bill for this. NOLA, LLC and Loop Corp, neither of which I have ever received any compensation. |
| --- | --- |
| Q: | Was it your testimony that you've received no compensation for doing any work for Loop or Nola from any other party? |
| A: | Yes, that's correct. |
| Q: | That's your testimony? |
| A: | That's correct; that's my testimony. |

Tr. Vol. 1B, pg. 238. The Court found Jordan's testimony incredulous and allowed Wachovia to subpoena his law firms' records on the matter.

Records from Jordan's law firm prove that Jordan was lying when he testified that he had confirmed the accuracy of his testimony before taking the witness stand and that he was working for free. After his testimony, the Court granted Wachovia's request to issue a trial subpoena for any billing records related to Jordan's work. Dykema produced records showing that on Tuesday, January 8, 2008, the day *after* Jordan's trial testimony, Jordan emailed another attorney at Dykema asking "Can you confirm that Dykema has never received any monies from Loop Corp."[37] Dk. 364. The next day, Jordan received a response to his inquiry stating, in part:

> On 4/18/07 we received two checks from Chiplease totaling $100,000. Greg, you sent an email to Kirsten directing her to tell Arin Martinez to apply them against certain invoices, including Loop Corp's then outstanding invoices. A PDF of the checks and your email is attached. The amount that you directed be applied against Loop Corp's invoices was sufficient to pay all then outstanding invoices. *See* Dykema E-mail dated January 9, 2008 with attached Gregory Jordan email dated April 18, 2007 and Chiplease checks number 1222 and 1223, Plaintiff Appendix Group Exhibit 5.

---

[37] Of course, Jordan turned to the Court during the trial and asserted that he had already checked this prior to his testimony.

Attached to Dykema's response email were two checks dated April 17, 2007 made payable to Dykema and drawn on an account at Chiplease, Inc. (330 South Wells, Suite 718) in the amounts of $29,184.59 and $70,815.41 along with a copy of an email, dated April 18, 2007, from Jordan describing in detail how the checks should be applied. *Id.* Jordan himself directed Dykema to use Chiplease's $100,000 check to pay legal fees incurred by Greenblatt personally, Scattered, Chiplease, and Loop. *Id.*

The Dykema email proves that Jordan lied when he testified that he confirmed the accuracy of his testimony prior to taking the stand and that he lied when he testified that Loop was working for free and that its bills were not paid by third-parties. His bills, in truth, had been paid by Chiplease (one of Greenblatt's many entities) and he had directed his firm's accounting office to apply those funds to his outstanding bills. Even if this Court were to give Jordan the benefit of the doubt, Jordan—at best—was aware that his testimony was inaccurate as of 8:30 a.m. the following morning and, despite being an officer of the court, and despite knowing that the proceedings were ongoing, Jordan failed to disclose this information to the Court. The only way the Court became aware of the supporting information was when the Court permitted Wachovia to subpoena the billing records, which were received after the trial ended.

Dykema's email as well as Jordan's testimony before Magistrate Judges in this District also prove that Jordan falsely testified that despite receiving no compensation, he continued to work for Loop out of principal. During this trial, Jordan testified:

> Q:   Well, if they are a dead company and if they both [Loop and NOLA] have no assets and you are referring to the NOLA judgment as well, which is currently pending before Judge Filip, then why defend them?
>
> A:   Because I thought it was one of those things where this big

> bank, Wachovia, was going and trying to punish and get
> behind a situation of Loop and NOLA…and maybe I am
> wrong and maybe I picked the wrong case to make a stand in,
> but I made a stand in saying, this is ridiculous…

> Q: So it's your testimony that over the last two years in these
> battles that have been brought before Judge Filip and Judge
> Valdez and the representation of Loop and Loop Properties,
> that this is pro bono being done by you to make a statement
> that Wachovia should not be pursuing a dead company with
> no assets; that something you chose to embrace and take a
> stand on?

> A: I swore under oath today, to be clear, and, yes, that is exactly
> correct, and I have told you on a number of occasions…

Tr. Vol. 1-B, pg. 243, 244. Dykema's email confirms that Jordan's work was not being done on a "pro bono basis." Moreover, Jordan's martyr-like statement that he would continue to work for free is also untrue in light of Jordan's post-trial statements to Judges Valdez and Keys when he sought to withdraw from representing Loop and NOLA on the basis that he does not "want to work for free."[38] His altruistic proclamation that he wanted to take a stand is also false since he had directed his firm to apply payment for his services to another account, thus perpetrating the fraud of his clients and concealing the truth of the attorney fee payments.

Jordan's contumacious conduct has infected at least three courtrooms in the Northern District of Illinois. On February 14, 2008, while Jordan was representing NOLA, Judge Keys granted Wachovia's Motion for Sanctions as a result of NOLA's failure to designate a 30(b)(6) representative and awarded Wachovia attorneys' fees and costs incurred as a result of having to brief

---

[38] Judge Keys refused to grant Jordan's motion to withdraw and ordered Jordan to produce Greenblatt for deposition—something for which NOLA—represented by Jordan—was previously ordered but failed to comply. During this proceeding, Judge Keys stated when referring to Greenblatt: "Well, I can tell you that if he doesn't come, the marshals are going to come out and put him in handcuffs and bring him here. We'll bring him in, and he'll take his deposition down here, if necessary." Magistrate Keys Sanctions Order, Jordan Motions to Withdraw and Transcript dated 3/21/08. Appendix Exhibits 10-12.

the matter. *Wachovia Securities v. NOLA, LLC,* 05 C 7213, Dk. 70. On March 21, 2008, Judge

Keys found NOLA to be in contempt of court—a decision upheld by the Honorable Robert W.

Gettleman. *Wachovia Securities v. NOLA, LLC,* 05 C 7213, Dk. 95. Judge Gettleman held:

> If this isn't "stringing along" the court and the plaintiff, nothing is. It
> has been 27 months since judgment was entered, 26 months since the
> citation was issued, two years since Judge Filip initially entered a
> rule to show cause on the citation, 15 months since Magistrate Judge
> Keys ordered defendant to produce a Rule 30(b)(6) designee for
> deposition in Chicago, one year since Judge Filip ordered Mr.
> Nichols to travel to Chicago for a deposition, 11 months since
> Magistrate Judge Keys issued a similar order and threatened to hold
> Nichols in contempt of court, and three months since Magistrate
> Judge Keys ordered defendant to produce Greenblatt for a deposition
> (none of which orders were appealed). Enough is enough.

*Id*. Then, on July 9, 2008, Judge Key's reported and recommended that Wachovia's Motion for

Sanctions against Jordan be granted and that Jordan's Motion for leave to withdraw as counsel for

NOLA be denied. *Id*.; Dk. 97. Judge Keys' held Jordan personally liable for Wachovia's fees in

costs because Jordan "....stood before this Court and gave assurances that he was attempting to

locate Mrs. Nichols, while subsequent events reveal that neither he nor NOLA, ever received

consent from Mr. Nichols to serve as NOLA's 30(b)(6) representative." *Id*. Judge Keys held:

> After careful review of the events that have transpired thus far, it
> appears that Mr. Jordan has allowed himself to fall into the
> unfortunate position of attempting to serve two masters– NOLA, a
> now defunct limited liability company, who has no assets and has
> never had a business operation, and Leon Greenblatt III, the past
> president and sole employee of Teletech Systems, Inc, which Mr.
> Greenblatt set up for the sole purpose of "managing" NOLA. As
> Judge Goldgar found, both of these entities were created for the soul
> purpose of avoiding taxes. In his representation of NOLA, for which
> he claims to have not been paid for more than a year and a half, and
> which he claims to have undertaken out of principle rather than from
> any expectation that he will be paid...., Mr. Jordan's interests here
> would not appear to be the same as those of Mr. Leon Greenblatt, III,
> his other client in several other related and unrelated matters.

Because of this connection with Mr. Greenblatt, Mr. Jordan's strategy has left his client in this case, NOLA, vulnerable sanctions, in an attempt to avoid having Mr. Greenblatt testify at Wachovia's 30(b)(6) examination and to protect Mr. Greenblatt from other potential legal problems.

*Id.* Judge Keys concluded that Jordan's representation "crossed the line between zealous advocacy and willful obstruction and bad faith." *Id.* Clearly, Jordan has shown no respect for his duties as an officer of the court in this case and others.

Turning back to Jordan's testimony before this Court, Jordan testified that at some point he learned that Loop had no money:

| Court: | At what point did you make this determination that Loop was a dead company and had no assets? |
|---|---|
| Jordan: | I couldn't tell you…it was probably, like, I don't know, late fall '06. If it [in the Loop Citation Proceedings] started in the Spring of '06, probably late Fall of '06, early '07, and I think that's when I went in front of Judge Valdez and said, this is ridiculous. This is a dead company…(Tr. Vol. 1-B, page 250, 251). |

\*\*\*

| Court: | And how many hours have you billed since you believed that it was a dead company? |
|---|---|
| Jordan: | Truthfully, not many. |
| Court: | What does that mean? |
| Jordan: | I couldn't tell you exactly… |
| Court: | More than 50, 100? How many? |
| Jordan: | Some 25, 30, 35 maybe, tops. |

Tr. Vol. 1B, pg. 252. However, Jordan's law firm's records reveal that Jordan and his colleagues generated bills in the amount of $20,569.64 representing approximately 75 hours of time between

83

September 11, 2007 and January 16, 2008.  Wachovia Appendix Exhibit 6.  Contrary to Jordan's testimony that the Loop's bills were sent to Jahelka (Tr. Vol. 1B, pgs. 244-245), they were sent to Greenblatt.  *Id*.

Despite testifying that Jordan's firm had never been paid for work done on behalf of NOLA, the records reveal that Chiplease paid Dykema on NOLA's behalf in April of 2007.  Wachovia Appendix Exhibit 7.  Additionally, and despite testifying that NOLA has no assets and has never paid for its representation (Tr. Vol. 1B, pg. 238) Jordan and his colleagues billed for work for NOLA through December, 2007 and sent the bills to Greenblatt to be paid by Chiplease.  Wachovia Appendix Group Exhibit 7.

This Court finds that Jordan's testified falsely as detailed above.  Even if this Court were to assume that Jordan was somehow mistaken regarding payments by third-parties on Loop's behalf (something that the Court does not believe), Jordan was still obliged to correct his inaccurate testimony as an officer of the court—and did not.  As the Court concludes below, it is unable to hold Jordan in contempt under the law.  However, the Court sanctions Jordan under §1927 because his unreasonable refusal to testify and false testimony compelled Wachovia to expend monies to brief matters and issue subpoenas. It also wasted the Court's time and resources. Reviewing Jordan's testimony before this Court, before Judge Valdez, and his sanctionable behavior before Judge Keys, it is apparent that Jordan has no respect for his oath of office or the judiciary.

D.    Sanctions

Wachovia petitions to sanction Jordan in his individual capacity and ask for the Court to order that: "1) Mr. Jordan be ordered to reimburse Plaintiff for all attorney's fees incurred by it since September 2007 and related to Jordan and his testimony; 2) reimburse Plaintiff for fees incurred by

Wachovia in the post judgment proceedings before Magistrates Keys and Valdez; 3) for other relief this Court deems just." Dk. 364. Wachovia does not cite to a specific rule or statute in support of its motion to sanction Jordan until its Reply when it clarified that it seeks to petition Jordan pursuant to 28 U.S.C. § 1927. Dk. 376.

Although the Court finds that Jordan committed perjury on January 7, 2008, it is unable to hold Jordan in civil contempt. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 738-39 (7th Cir. 1999) ("[O]ur review of relevant authority makes clear . . . that civil contempt is an improper method by which to punish perjurious or false testimony absent some element of obstruction of justice."). The Court can, however, grant Wachovia's Petitions for Sanctions and order Jordan to reimburse Wachovia for all attorney's fees incurred by it since September 2007 that are related to Jordan and his testimony pursuant to Section 1927[39] on the basis of Jordan's unreasonable and vexatious conduct associated with Wachovia's trial subpoenas, Jordan's Motion to Quash, and post-trial submissions on the matter.[40] A District Court has discretion to impose § 1927 sanctions when an attorney has acted in an "objectively unreasonable manner" by engaging in "serious and studied disregard for the orderly process of justice," *Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 119 (7th Cir. 1994); pursued a claim that is "without a plausible legal or factual basis and lacking in justification," *id.*; or "pursued a path that a reasonably careful attorney would have known, after

---

[39] § 1927. Counsel's liability for excessive costs

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

[40] This Court will not impose sanctions based on Jordan's appearances before other Judges.

appropriate inquiry, to be unsound," *Kapco Mfg. Co. v. C & O Enters., Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989). Based on the foregoing, Jordan has displayed a complete disregard for the orderly process of justice, has committed perjury, and has failed to uphold his duties as an officer of the Court and should be sanctioned. Wachovia is ordered to submit its fee petition to the Court within 21 days of this Order. Additionally, a copy of this opinion will be forwarded to the Illinois Attorney Registration & Disciplinary Commission.

## VI.  Conclusion and Order

For the foregoing reasons, the Court finds in favor of Wachovia and against Defendants Loop, Jahelka, Nichols, and Greenblatt as to Counts II and IV and awards judgment against Defendants Greenblatt, Nichols, and Jahelka, jointly and severally, in the amount of $2,478,418.80 with interest from September 22, 2005 through the date of judgment. The Court also awards Wachovia its actual costs and attorneys fees incurred since September 22, 2005 through the date of judgment.

The Court finds in favor of Wachovia and against Loop and Banco on Counts VII and IX. The Court finds in favor of Scattered and Loop Properties and against Wachovia on Counts VIII and X. In accordance with 740 ILCS 160/8,[41] Banco's lien or security interest over Loop's assets,

---

[41]§ 740 ILCS 160/8.  [Creditor; action for relief]

  Sec. 8. (a) In an action for relief against a transfer or obligation under this Act, a creditor, subject to the limitations in Section 9 [740 ILCS 160/9], may obtain:

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Code of Civil Procedure [735 ILCS 5/1-100 et seq.];

(3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

Loop's post-May 22, 2001 "compensation payments" to Jahelka and Nichols, and Loop's post-May

22, 2001 "investments" in EZ Links are hereby voided to satisfy Wachovia's claim.[42] Having twice

obtained a judgment against Defendants, Wachovia may levy execution on the transferred assets or

its proceeds in accordance with 740 ILCS 160/8.

In accordance with the Court's order granting Wachovia its attorneys' fees and costs under

Counts II and IV and its order granting Wachovia's Petitions for Sanctions against Jordan, Wachovia

shall submit a fee petition to the Court within 21 days of this Order. Wachovia's Motion to Strike

Defendants' Post Trial Position Paper is denied as the Court finds that Dependants complied with

the Court's order at the close of trial and Wachovia's Motion to Strike Gregory Jordan's affidavit

is denied.

So ordered.

_____
Virginia M. Kendall
United States District Judge
Date: October 22, 2008          Northern District of Illinois

---

(A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) any other relief the circumstances may require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

[42] By its terms, the UFTA allows only equitable remedies such as avoidance, attachment, an injunction, or appointment of a receiver. *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 353-55 (7th Cir. 2004).